1  **LITTLE REID & KARZAI LLP**
   Eric R. Little, Bar No. 169021,
2  Najwa Tarzi Karzai, Bar No. 210415
   3333 Michelson Dr., Suite 310
3  Irvine, California 92612
   Telephone: (949) 333-1699
4  Facsimile:  (949)333-1697
   erl@lrkllp.com
5  ntk@lrkllp.com

6  **Attorneys for:** Plaintiffs
   Angles Beauty Care Group, Inc. and
7  Richard Ouellette

8

**FILED**

**2008 AUG 20 PM 4: 05**

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

9              UNITED STATES DISTRICT COURT

10           SOUTHERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12  ANGLES BEAUTY CARE GROUP, INC., a California Corporation; RICHARD OUELLETTE, an Individual,  <br>14      Plaintiffs,  <br>15      vs.  <br>16  FIDELITY & GUARANTY INSURANCE COMPANY, an Iowa Corporation; HARTFORD CASUALTY INSURANCE COMPANY, a Connecticut Corporation,  <br>19      Defendants. | Case No.: **'08 CV 1 5 4 1 ᴶSAJB**  <br><br>**COMPLAINT FOR:**  <br><br>1. **BREACH OF CONTRACT: DUTY TO DEFEND**  <br><br>2. **BREACH OF CONTRACT: DUTY TO SETTLE**  <br><br>**VIA FAX** |

20

21

22

23

24

25

26

27

28

Plaintiffs Angles Beauty Care Group, Inc., a California Corporation and Richard Ouellette, an individual (collectively "Angles"), file this Complaint seeking court-ordered relief on the grounds that Defendants Fidelity & Guaranty Insurance Company, a subsidiary of St. Paul Travelers Casualty Company of America ("FGIC") and Hartford Casualty Insurance Company ("Hartford") breached their contractual obligations to provide their insured, Angles, a prompt and complete defense in an action styled as *Angles Beauty Care Group, Inc. v. Hair Art International, Inc.*, U.S.D.C., S.D. of Calif., Case No. 05-CV 0166 JAH (RBB) (the "*Hair Art* Action"), and also breached their duty to settle.

## THE PARTIES

1.      Angles is a corporation organized under the laws of the State of California with its principal place of business in San Diego, California.

2.      Richard Ouellette is an individual residing in San Diego.

3.      Angles is informed and believes and thereon alleges that FGIC is an Iowa corporation with its principal place of business in St. Paul, Minnesota.

4.      Angles is informed and believes and thereon alleges that Hartford is a Connecticut corporation with its principal place of business in Hartford, Connecticut.

## JURISDICTION

5.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. Complete diversity of citizenship exists between the parties. Plaintiff Angels is a California corporation with a California principal place of business in San Diego and Richard Ouellette is an individual residing in San Diego, Defendant FGIC is an Iowa corporation with its principal place of business in St. Paul, Minnesota, and Hartford is a Connecticut corporation with its principal place of business in Hartford, Connecticut.

6.      The amount in controversy is in excess of $75,000, exclusive of interest and costs. The amount in controversy includes unpaid defense costs in excess of $230,000.00, and settlement costs.

**VENUE**

7.      Venue is proper in the Southern District of California, pursuant to 28 U.S.C. § 1391(a) as a substantial portion of the events and/or omissions giving rise to the claims occurred in this judicial district.  Angles is a California corporation with its principal place of business in San Diego, California and Richard Ouellette is an individual residing in San Diego.  The policies of insurance at issue in this Action were issued to Angles at its San Diego location.  Venue is also proper in this District, pursuant to 28 U.S.C. §1391(c) in that FGIC and Hartford are corporations that transact business in this district and are thus subject to personal jurisdiction here.

**CHOICE OF LAW**

8.      California law applies under California choice of law principles.  The insurance policies at issue do not include a choice of law provision.  The contracts were entered, performed, and breached in California.

**THE INSURANCE POLICIES**

9.      FGIC issued to Angles commercial general liability policies for the period including October 31, 2002 and renewed through October 31, 2008.  The policies have limits of $1 million for "personal and advertising injury" and a $2 million "General Aggregate Limit." A true and correct copy of the FGIC Policy effective October 31, 2004 to October 31, 2005 is attached hereto as **Exhibit "1."**

10.      The FGIC policy provides in pertinent part:

**SECTION I. COVERAGE**

**Insuring Agreement**

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "personal injury" to which this insurance applies.  We will have the right and duty to defend the Insured against any "suit" seeking those damages.  We may, at our discretion, investigate any "occurrence" or "personal injury" or "advertising injury" offense and settle any claim or "suit" that may result.

b.  This insurance applies to:

- 3 -

**COMPLAINT FOR BREACH OF CONTRACT**

(2) "personal injury":

    (a)  Arising out of your businsess; and

    (b)  Caused by an offense committed in the "coverage territory" and during the period that this "personal injury" liability coverage is in effect; . . .

The Policy defines "personal injury" as follows:

**SECTION V – DEFINITIONS**

. . .

24.    "Personal injury" means injury, other than "bodily injury" or "advertising injury," caused by one or more of the following offenses:

. . .

    d)  Publication of "insured material" that slanders or libels a person or organization or disparages a person's or organization's goods, products or services[.]

11.    Hartford issued to Angles a commercial general liability insurance policy for the period including October 31, 2000 to October 31, 2001 and October 31, 2001 to October 31, 2002, Policy No. 72 SBALH0763. The policy has limits of $1 million for "personal and advertising injury" and a $2 million "General Aggregate Limit." On information and belief, pertinent excerpts of the Hartford Policy effective October 31, 2000 to October 31, 2001 are attached hereto as **Exhibit "2."**

12.    Plaintiff is informed and believes, and on the basis of that information and belief alleges that the Hartford policy provides in pertinent part:

**A. COVERAGES**

**Insuring Agreement**

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages.

We may, at our discretion, investigate any "occurrence" or "personal injury" or "advertising injury" offense and settle any claim or "suit" that may result.

- 4 -

**COMPLAINT FOR BREACH OF CONTRACT**

b. This insurance applies to:

(2) "personal injury" caused by an offense arising out of your business.

But only if the offense causing the "personal injury" . . . was committed in the "coverage territory" and during the period that.

The Policy defines "personal injury" as follows:

**G. LIABILITY AND MEDICAL EXPENSES DEFINITIONS**

. . .

14. "Personal injury" means injury, . . . arising out of one or more of the following offenses:

. . .

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**THE UNDERLYING *HAIR ART* ACTION**

15. On or about March 22, 2005, Angles filed a First Amended Complaint against Hair Art International, Inc. ("Hair Art"). A true and correct copy of the complaint in the *Hair Art* Action is attached hereto as **Exhibit "3."**

16. On or about April 18, 2005, Hair Art filed a Counterclaim against Angles. A true and correct copy of the Counterclaim is attached hereto as **Exhibit "4."**

17. On or about April 29, 2005, Hair Art filed its First Amended Counterclaim against Angles. A true and correct copy of the First Amended Counterclaim is attached hereto as **Exhibit "5."**

18. On or about July 19, 2006 Hair Art served its Supplemental Interrogatory Responses. A true and correct copy of the Supplemental Interrogatory Responses is attached hereto as **Exhibit "6."**

**PLAINTIFF'S TENDERS OF THE *HAIR ART* ACTION**

19. On or about October 20, 2005, Angles provided notice of the *Hair Art* counterclaim to FGIC and requested defense and indemnity in the *Hair Art* Action. A true and correct copy of FGIC's October 20, 2005 letter acknowledging the tender is attached hereto as **Exhibit "7."**

20. On July 24, 2006, via e-mail, Angles provided Hair Art's discovery responses to

1  FGIC. A true and correct copy of the July 24, 2006 e-mail is attached hereto as **Exhibit "8."**

2      21.    On August 25, 2006, FGIC denied it had a duty to defend Angles in the *Hair Art*
3  Action. A true and correct copy of the August 25, 2008 correspondence is attached hereto as **Exhibit**
4  **"9."**

5      22.    On June 30, 2008, Angles tendered the Hair Art Counterclaims to Hartford. A true
6  and correct copy of the June 30, 2008 letter is attached hereto as **Exhibit "10."**

7      23.    On July 2, 2008, Angles re-tendered the Hair Art Counterclaims and discovery
8  responses to FGIC. A true and correct copy of the July 2, 2008 letter is attached hereto as **Exhibit**
9  **"11."**

10      24.    On July 3, 2008, Angles advised Hartford of the settlement conference scheduled in
11  the *Hair Art* Action, tendered the discovery responses and provided Hartford with a detailed tender. A
12  true and correct copy of the July 3, 2008 letter is attached hereto as **Exhibit "12."**

13      25.    On July 9, 2008, Angles advised FGIC of Hair Art's settlement demand and
14  requested FGIC's attendance and participation at the settlement conference. A true and correct copy
15  of the July 9, 2008 correspondence is attached hereto as **Exhibit "13."**

16      26.    On July 11, 2008, Hartford acknowledged receipt of Angles' tender. A true and
17  correct copy of the July 11, 2008 letter is attached hereto as **Exhibit "14."**

18      27.    On August 4, 2008, Angles forwarded Hair Art's settlement demand letter to Hartford
19  and requested Hartford's attendance and participation at the settlement conference. A true and correct
20  copy of the August 4, 2008 correspondence is attached hereto as **Exhibit "15."**

21      28.    On August 4, 2008 Angles again advised FGIC of Hair Art's settlement demand and
22  requested FGIC's attendance and participation at the settlement conference. A true and correct copy
23  of the August 4, 2008 correspondence is attached hereto as **Exhibit "16."**

24      29.    On August 6, 2008, FGIC once again denied a duty to defend Angles in the *Hair Art*
25  Action. A true and correct copy of the August 6, 2008 letter is attached hereto as **Exhibit "17."**

26      30.    On August 6, 2008, Angles explained in detail why FGIC's denial was in error and
27  requested FGIC to acknowledge its defense and settlement duties and attend the settlement

28

**COMPLAINT FOR BREACH OF CONTRACT**

1    conference. A true and correct copy of the August 6, 2008 correspondence is attached hereto as

2    **Exhibit "18."**

3        31.    On August 7, 2008, Angles provided further clarification on FGIC's erroneous denial.

4    A true and correct copy of the August 7, 2008 correspondence is attached hereto as **Exhibit "19."**

5        32.    On August 7, 2008, FGIC advised that it would send a representative to the August

6    13, 2008 settlement conference. A true and correct copy of the August 7, 2008 correspondence is

7    attached hereto as **Exhibit "20."**

8        33.    On August 8, 2008, Angles acknowledged FGIC's attendance at the settlement

9    conference and addressed several misstatements in FGIC's August 7, 2008 letter. A true and correct

10   copy of the August 8, 2008 correspondence is attached hereto as **Exhibit "21."**

11       34.    On August 7, 2008, Angles advised Hartford's coverage counsel of Hartford's failure

12   to provide Angles with complete policies for the applicable years and again explained why Hartford

13   had a duty to defend and settle the *Hair Art* Action. A true and correct copy of the August 7, 2008

14   correspondence is attached hereto as **Exhibit "22."**

15       35.    At the August 13, 2008 settlement conference, a reasonable demand, within policy

16   limits, was made, but FGIC and Hartford failed to accept and fund the reasonable settlement within

17   policy limits.

18       36.    On August 15, 2008, Angles informed Hartford of the court's order that no further

19   settlement conferences will be held and again explained why Hartford had breached its duty to defend

20   and settle the *Hair Art* Action. A true and correct copy of the August 15, 2008 correspondence is

21   attached hereto as **Exhibit "23."**

22       37.    On August 15, 2008, Angles informed FGIC of the court's order that no further

23   settlement conferences will be held and again explained why FGIC had breached its duty to defend

24   and settle the *Hair Art* Action. A true and correct copy of the August 15, 2008 correspondence is

25   attached hereto as **Exhibit "24."**

26       38.    On August 15, 2008, Angles informed both Hartford and FGIC of the court's order

27   setting the trial date in the *Hair Art* Action for September 30, 2008. A true and correct copy of the

28

**COMPLAINT FOR BREACH OF CONTRACT**

1  August 15, 2008 correspondences are attached hereto as **Exhibits "25-26."**

2  **POTENTIALLY COVERED ALLEGATIONS IN THE *HAIR ART* ACTION**

3  39.    The allegations in the Hair Art counterclaim included the following allegations which

4  triggered FGIC's defense duty:

5
6  63.    [Hair Art] is the owner of several nationally-recognized trademarks, including but not limited to, the word mark "Hair Art" and the letter mark "HAI".

7
8  64.    [Hair Art] or its related companies or its predecessors in interest have used the Hair Art and HAI marks in commerce in the U.S. continuously for over 20 years in connection with hair-related products.

9  * * *

10  66.    At all times relevant to the acts complained of herein, [Hair Art] or its related companies or predecessors in interest have used the HAI Marks to

11  identify HAI's goods and services and to distinguish them from the goods and services made and sold or offered by, among other things,

12  prominently displaying the marks on HAI's goods and on their containers, packaging and advertising.

13
14  67.    The presence of the HAI Marks on the containers, packaging and advertising for [Hair Art's] products indicates to the public that the goods or

15  services bearing those marks have been manufactured and/or distributed by [Hair Art]. [Hair Art] adheres to strict quality standards in the manufacture of

16  its hair products. Thus, the consuming public has come to associate the HAI Marks with hair products of the highest quality. As a consequence, the HAI

17  Marks have attained considerable value and the goodwill associated with them represents a valuable business asset.

18
19  68.    [Hair Art] is informed and believes, and based thereon it alleges, that the Counterdefendants are importing, selling, trafficking in, distributing and

20  offering for sale in the United States hair-related products that are the same as, or are similar to, [Hair Art's] products and that Counterdefendants' are using

21  marks for those goods that are identical to, or are confusingly similar to, the

22  HAI Marks.

23  69.    [Hair Art] is informed and believes, and based thereon it alleges, that at the time Counterdefendants adopted their marks, they were familiar with

24  [Hair Art], with the HAI Marks, and with the quality of [Hair Art's] goods. [Hair Art] is further informed and it believes, and based thereon it alleges, that

25  at the time they adopted their marks, Counterdefendant had actual notice of the '468 Registration and, by adopting their marks, Counterdefendants were

26  attempting to usurp for themselves the goodwill that [Hair Art] had built up in

27  the HAI Marks.

28

- 8 -

In the Prayer for Relief, HAI alleges:

> 7.    For an order permanently enjoining Countedefendants [sic] and their officers, agents, employees, and all those acting in concert or conspiracy with them from:
>
>> a.    Directly or indirectly manufacturing, producing, printing, distributing, importing, trafficking in, selling, offering for sale, possessing, advertising, promoting, moving or displaying any hair care products bearing the "Hair Art" or "HAI" marks or simulation, reproduction, counterfeit, copy of colorable imitation of those marks;
>>
>> b.    Instructing or directing any third parties to make containers, labels or packaging bearing the "Hair Art" or "HAI" marks or any simulation, reproduction, counterfeit, copy or colorable imitation of those marks.
>
> * * *
>
> 10.    For a monetary award in favor of Counterclaimant [Hair Art's] favor in an amount equal to (i) [Hair Art's] actual damages and (ii) to the extent not included in actual damages, the Counterdefendants' profits arising from the acts alleged above, such damages and profits to be trebled under 15 U.S.C. § 1117(a).

40.    Hair Art filed an amended counterclaim that includes the same allegations.

41.    Hair Art alleges potentially covered "disparagement" by alleging that Angles made statements to Hair Art's customers at a trade show and other times which conveyed to existing and potential customers that Hair Art was infringing Angles' trademark and which caused Hair Art to lose sales and suffer damage to its reputation.

42.    Hair Art's discovery responses clarified these claims further by stating in pertinent part:

**Interrogatory No. 11:**

> Explain in detail all facts upon which You base Your contention that Richard Ouellette slandered You personally. . . .

**Supplemental Response to Interrogatory No. 11:**

> Richard Ouellette attended a trade show a couple of years ago in his capacity as Angles CEO for the purpose of attracting new customers and increasing the sales of Angles' products and services. Tom Donahue, an independent sales representative from Donahue & Associates in Texas,

COMPLAINT FOR BREACH OF CONTRACT

attended the same show. Mr. Ouellette engaged in conversation with Mr. Donahue. When Mr. Ouellette learned, among other things, that Mr. Donahue represented [Hair Art] and Jackie, Mr. Ouellette stated words to the effect that he was having trouble with [Hair Art] and/or Yu because they were using Angles' name. Mr. Ouellette's statement was false and Mr. Donahue understood it as an accusation that [Hair Art] and Yu were trademark infringers and, thus, engaged in unethical business practices.

[Hair Art] believes that Mr. Ouellette's comment was not an isolated occurrence and that he and other Angles employees, such as Camillo Schuchardt, made similar comments to other persons on other occasions.

**Interrogatory No. 20:**

Explain in detail all facts upon which You base the allegations in paragraph twenty (20) of the First Amended counterclaim that "[Hair Art] has suffered damage to its business, reputation and goodwill and the loss of profits and sales it would have made but for counterdefendants' conduct." . . .

**Supplemental Response to Interrogatory No. 20:**

The use by Angles of the name "Hair Art and Information" and its use of the Composite Mark is causing confusion in the marketplace, which Angles has admitted. As a consequence of this confusion, some prospective customers have labeled [Hair Art] an "infringer" because they wrongly believe that [Hair Art] is a junior user that is infringing the alleged rights of Angles in and to the term "Hair Art and Information" and the Composite Mark. In fact, [Hair Art] is the senior user of the marks that are at issue in the case and being wrongly labeled as an "infringer" is damaging to [Hair Art's] business and reputation.

In addition, as a consequence of Angles use of the "Hair Art and Information" name and the Composite Mark, one of [Hair Art's] long-standing customers, i.e., Sally Beauty, the largest retail seller of beauty products in the United States, cut back its purchases of products from [Hair Art] because its buyers believed that [Hair Art], which sells at the wholesale level, was competing with Sally Beauty at the retail level. This belief was caused by the fact Angles was selling products at the retail level under the "Hair Art and Information" name and the Composite Mark which confused Sally Beauty's buyers into thinking that the products in question originated with [Hair Art].

Moreover, as Camillo Schuchardt testified, at some point between 2001 and 2003, Angles imported and distributed a hair pressing iron that had a very high failure rate. The Composite Mark was affixed to both the iron and the box in which this particular iron was packaged. However, neither the iron nor the box contained Angles' corporate name or its address. Since Angles'

**COMPLAINT FOR BREACH OF CONTRACT**

failed to affix its name and/or address to the box or the irons in question, a substantial number of persons thought that the irons originated with, or were associated with, [Hair Art] and when the irons failed, it caused these persons to think that [Hair Art] made poor quality products. This injured [Hair Art's] business reputation.

Finally, as a consequence of the confusion Angles is intentionally causing in the marketplace, some prospective customers have dealt with, and purchased from, Angles believing they were dealing with, and purchasing from, [Hair Art].

**Interrogatory No. 21:**

Explain in detail all facts upon which You base the allegation in paragraph twenty-one (21) of the First Amended Counterclaim that "Counterdefendants' acts of copying and using the [Hair Art] Marks in connection with hair-related products and services have caused and will continue to cause irreparable and immediate injury to [Hair Art] for which Hai has no adequate remedy at law." . . .

**Supplemental Response to Interrogatory No. 21:**

The use by Angles of the name "Hair Art and Information" and its use of the Composite Mark is causing, and has caused, confusion in the marketplace. Angles has admitted that there is confusion in the marketplace that is being caused by [Hair Art's] use of the "HAIRART" mark and by Angles' concurrent use of the term "Hair Art and Information" and the Composite Mark. Angles has also admitted that some members of the public have labeled [Hair Art] an "infringer" because they believe, wrongly, that [Hair Art] is a junior user that is infringing the alleged rights of Angles in and to the term "Hair Art and Information" and the Composite Mark.

Angles' employees have reinforced this erroneous belief by telling people in the trade that [Hair Art] and Yu are using Angles' marks, which is tantamount to calling them infringers. In fact, [Hair Art] is the senior user of the marks that are at issue in the case and it is Angles that is using [Hair Art's] trademarks. . . .

**FIRST CLAIM**

**BREACH OF INSURANCE CONTRACT – DUTY TO DEFEND**

43.    Plaintiffs incorporate by this reference each and every allegation set forth in the preceding paragraphs of this Complaint as though fully realleged herein.

44.    As alleged above, a valid contract exists between Plaintiffs and Defendants, namely Defendants' insurance policies.

45.     Plaintiffs fully performed and complied with all of its obligations and conditions pursuant to the Policies, except those obligations and conditions that were waived or excused.

46.     Pursuant to the terms of the contract, Defendants were and are obligated to provide Plaintiffs with an immediate and complete defense to the claims made in the *Hair Art* Action, and to pay for Plaintiffs' legal fees and costs incurred in the *Hair Art* Action.

47.     That obligation was due immediately in October 2005 when Angles tendered the *Hair Art* Action to FGIC and provided FGIC with a copy of the *Hair Art* Counterclaim.

48.     That obligation was due immediately on June 30, 2008 when Angles tendered the *Hair Art* action to Hartford and provided Hartford with a copy of the *Hair Art* Counterclaim.

49.     An insurer must defend whenever the factual allegations of the complaint, and facts made known or available to the insurer, trigger a potential for coverage.  As noted above, the *Hair Art* Action alleges claims potentially within the "personal injury" provisions of the policies.

50.     By failing and/or refusing to reimburse Plaintiffs for legal expenses already incurred in defense of the *Hair Art* Action, Defendants have failed to perform their contractual obligations and materially breached the terms of the Policies, without justification or excuse.

51.     As a direct and proximate result of Defendants' material breaches of the policies, Plaintiffs have suffered damages in the form of unreimbursed attorneys' fees and costs, plus interest thereon at the maximum legal rate from the date of each invoice.

## SECOND CLAIM

## BREACH OF CONTRACT- DUTY TO SETTLE

52.     Plaintiffs incorporate by this reference each and every allegation set forth in the preceding paragraphs of the Complaint as though fully realleged herein.

53.     The covenant of good faith and fair dealing implied in all insurance policies, including the Policy, requires FGIC and Hartford to fund any reasonable settlement within policy limits in the *Hair Art* Action.

54.     Both FGIC and Hartford were advised of Hair Art's settlement demands and their attendance and participation were requested at the August 13, 2008 settlement conference.

COMPLAINT FOR BREACH OF CONTRACT

1    55.    At the August 13, 2008 settlement conference, a reasonable demand, within policy

2    limits, was made, but both FGIC and Hartford failed to accept and fund that reasonable settlement

3    within policy limits.

4    56.    As a direct and proximate result of FGIC's and Hartford's failure to fund the

5    reasonable settlement demand, FGIC and Hartford are liable for all damages consequential to that

6    breach, including but not limited to any subsequent judgment or settlement plus interest thereon at the

7    maximum legal rate, regardless of coverage or of policy limits.

8                                    **PRAYER FOR RELIEF**

9    Wherefore, Angles prays as follows:

10    1.    Awarding Angles all unreimbursed post-notice attorneys' fees and costs in the

11        *Hair Art* Action from the October 2005 date of tender, plus prejudgment

12        interest from the date of invoice for FGIC and from the June 30, 2008 date of

13        tender, plus prejudgment interest from the date of invoice for Hartford;

14    2.    Awarding Angles all damages resulting from FGIC's and Hartford's breach

15        of its duty to settle the *Hair Art* Action.

16    3.    For costs of suit in this action; and

17    4.    For such other and further relief as the court may deem just and proper.

18

19    Date:  August 19 , 2008                    **LITTLE, REID & KARZAI, LLP**

20

21                                            By:

22                                            Eric R. Little
                                            Najwa Tarzi Karzai
23                                            Attorneys for Plaintiff
                                            Angles Beauty Care Group, Inc. and
                                            Richard Ouellette

24

25

26

27

28

- 13 -
**COMPLAINT FOR BREACH OF CONTRACT**

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues triable to a jury.

Dated:  August _19_, 2008.

LITTLE, REID & KARZAI, LLP

By: _____
    Eric R. Little
    Najwa Tarzi Karzai
    Attorneys for Plaintiff
    Angles Beauty Care Group, Inc.

**EXHIBIT LIST**

| No. | Description |
|-----|-------------|
| 1 | FGIC's commercial general liability policy |
| 2 | Hartford's commercial general liability policy |
| 3 | First Amended Complaint in the *Hair Art* Action |
| 4 | Hair Art's April 18, 2005 Counterclaim against Angles |
| 5 | Hair Art's April 29, 2005 First Amended Counterclaim against Angles |
| 6 | Hair Art's July 19, 2006 Supplemental Interrogatory Responses |
| 7 | FGIC's October 20, 2005 letter acknowledging tender of the *Hair Art* counterclaim |
| 8 | Angles' July 24, 2006 e-mail providing Hair Art's discovery responses to FGIC. |
| 9 | FGIC's August 25, 2006 correspondence denying a duty to defend Angles in the *Hair Art* Action |
| 10 | Angles' June 30, 2008 tender of *Hair Art* Action to Hartford |
| 11 | Angles' July 2, 2008 correspondence re-tendering the Hair Art Counterclaims and discovery responses to FGIC |
| 12 | Angles' July 3, 2008 correspondence to Hartford |
| 13 | Angles' July 9, 2008 correspondence to FGIC |
| 14 | Hartford's July 11, 2008 correspondence acknowledging tender |
| 15 | Angles' August 4, 2008 correspondence to Hartford |
| 16 | Angles' August 4, 2008 correspondence to FGIC |
| 17 | FGIC's August 6, 2008 correspondence, once again denying a duty to defend Angles in the *Hair Art* Action |
| 18 | Angles' August 6, 2008 correspondence to FGIC |
| 19 | Angles' August 7, 2008 correspondence to FGIC |
| 20 | FGIC's August 7, 2008 correspondence |

**COMPLAINT FOR BREACH OF CONTRACT**

| 21 | Angles' August 8, 2008 correspondence |
|----|----|
| 22 | Angles' August 7, 2008 correspondence to Hartford's coverage counsel |
| 23 | Angles' August 15, 2008 correspondence to Hartford |
| 24 | Angles' August 15, 2008 correspondence to FGIC |
| 25 | Angles' August 15, 2008 correspondence to Hartford re trial date |
| 26 | Angles' August 15, 2008 correspondence to FGIC re trial date |

**COMPLAINT FOR BREACH OF CONTRACT**

**EXHIBIT 1**

Policy Number: BK01935424

# Disclosure Notice – Terrorism Risk Insurance Act of 2002

The premium for this policy includes **$  0.00** for coverage for insured losses covered by the Terrorism Insurance Program established by the Terrorism Risk Insurance Act of 2002. This premium does not include any charges for the portion of loss covered by the Federal Government under the Act.

This premium and coverage do not apply to any insuring agreements or coverage parts in this policy for which you did not accept our offer of such terrorism coverage. For all other insuring agreements or coverage parts, if $0 is shown for the amount above, this policy provides such coverage at no premium charge for otherwise covered losses.

The Terrorism Insurance Program established by the Terrorism Risk Insurance Act of 2002 applies to certain losses, if otherwise covered by your policy, that result from an "act of terrorism," as defined in and certified under that Act. The United States Government shares in the payment of insured losses under that program and the amount of its share is 90% of such losses that exceed the applicable insurer deductible. There is a cap on our liability to pay for such losses if the aggregate amount of insured losses under the Terrorism Risk Insurance Act of 2002 exceeds $100,000,000,000 during the applicable period for all insureds and all insurers combined. In that case, we will not be liable for the payment of any amount which exceeds that aggregate amount of $100,000,000,000.

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

**Exhibit "1"**
**17**

A01620

ST PAUL
TRAVELERS

## <u>Automated Safety and Health Services</u>

When a loss occurs, the impact to your bottom line can be significant. Loss of production, loss of a key customer or loss of a seasoned employee has a bigger effect on your bottom line than the direct cost of the claim. St. Paul Travelers now offers you free access to information that could potentially save you money or more importantly, save a life.

- **http://www.stpaultravelers.com/business_insurance/risk_control/index.html - your new access to safety and health information.** There are several key features that our web site has to offer:

  - *Free consultations* via email with our experts in construction, product liability, property protection, business continuity, ergonomics, industrial hygiene, commercial auto and general safety and health.

  - Safety and health bulletins, with full text, on over 400 topics

  - Safety and health databases that contain a wealth of information

  - Hot links to other safety and health areas such as OSHA, NFPA, CDC, etc.

- **Fax On Demand**

  - By calling 1-800-505-0173, you have access to over 400 safety and health bulletins.  Topics range from Crisis Management to Sprinkler System Maintenance.  Your selection will be faxed to you immediately.

- **Telephone Consultations**

  - We now have a hotline where you can call a St. Paul Travelers Risk Control Specialist who can assist you with the safety and health questions that affect your business.  Call 1-800-332-3232 at any time for consultation.

- **Safety Academy**

  - Provided *FREE* to St. Paul Travelers policyholders, the Academy offers a wide variety of results-oriented courses that can impact both worker safety and your bottom line.  See **http://www.stpaultravelers.com/business_insurance/risk_control/index.html** for course listings and locations.

The St. Paul Travelers Risk Control has developed these easy access resources to help answer questions that may impact your operations.

**We appreciate your business and hope that you find that these resources provide the answers you need.**

### MINIMIZING LOSSES .... MAXIMIZING PROFITS

<u>Disclaimer</u>

The information contained in this publication was obtained from sources believed to be reliable. Any opinions expressed herein are not necessarily those of St. Paul Travelers.  St. Paul Travelers makes no representation or guarantee as to the correctness or sufficiency of any information contained herein, nor a guarantee of results based upon the use of this information, and disclaims all warranties whether implied, express or statutory, including without limitation, implied warranties of merchantability, fitness for use and fitness for a particular purpose. The entire risk as to the use of information is assumed by you, and St. Paul Travelers assumes no liability in connection with either the information presented or use of suggestions made in this publication. Further, this document does not amend, or otherwise affect, the terms, conditions or coverages of any insurance policy issued by The St. Paul Travelers.  No part of this document or any of our other risk control documents is a representation that coverage does or does not exist or does not exist for any particular claim or type of claim under any such policy. Whether coverage exists or does not exist for any particular claim under any such policy depends on the facts and circumstances involved in the claim and all applicable policy wording.



CONFIDENTIAL
EXHIBIT MAY
ATTORNEYS' EYES
18 ONLY

A01621

Policy Number: BK01935424

# HIGHLIGHTS OF CHANGES FOR "MOLD OR OTHER FUNGI" OR "BACTERIA" EXCLUSION ENDORSEMENTS
## (For Property and Inland Marine Coverage)

This is a summary of how your coverage changes as a result of one or more endorsements when renewing your Business Insurance Policy. **No coverage is provided by this summary, nor does it replace any provisions of your policy. The policy alone determines the scope of your insurance protection.** Please read it carefully and review its Declarations for complete information on your coverage. If you have any questions about your coverage, please contact an insurance agent for The St. Paul.

One or more of the following exclusion endorsements that apply to certain property and inland marine insuring agreements are a part of your policy. If you have more than one property or inland marine insuring agreement as part of your policy, then more than one exclusion endorsement will also be part of your policy.

- "Mold Or Other Fungi," Or "Bacteria" With Exception For Certain Causes Of Loss Exclusion Endorsement.
- "Mold Or Other Fungi," Or "Bacteria" With Limited Exception For Certain Causes Of Loss Exclusion Endorsement.

Each of these endorsements that contains an exception for certain causes of loss, excludes or limits coverage under your policy for mold or other fungi, wet or dry rot, or bacteria, unless it is a result of certain named causes of loss.

Each of these endorsements that contains a limited exception for certain causes of loss, excludes or limits coverage under your policy for mold or other fungi, wet or dry rot, or bacteria, but provides a sublimit of coverage if the mold or other fungi, wet or dry rot, or bacteria is a result of certain named causes of loss.

In addition, some of these endorsements modify an existing Seepage or Leakage exclusion to exclude coverage for all losses, including mold or other fungi, wet or dry rot, or bacteria losses, caused by any seepage or leakage that takes place over a period of 14 days or more.

## Special Notices

### Special Notice for Policies Issued or Delivered in the State of New York:

In accordance with New York Statute Section 3426(g), you are entitled to loss information upon written request, which we will furnish within 20 days of receipt of such request.

### Special Notice for Policies Issued or Delivered in the State of Wisconsin:

In accordance with Wisconsin Statute Section 631.36(5)(a), if this notice is mailed or delivered to you within 60 days of the renewal date of the policy, you may elect to cancel the renewal policy at any time during a 60-day period which begins on the date this notice is mailed or delivered.

### Special Notice for Policies Issued or Delivered in the State of Missouri:

In accordance with Missouri Regulation 20 CSR 500-1.100(3)(A), this additional information is being provided to you. If you wish to secure coverages from another insurance carrier, contact your agent or broker immediately. You or your agent or broker may also apply to the Missouri Property Insurance Placement Facility for insurance coverages. Application may be made by mail or in person to the following address:

Missouri Property Insurance Placement Facility
906 Olive Street, Suite 1000
St. Louis, Missouri 63101
Phone (314) 421-0170

Any excess premium must be refunded within thirty (30) days.

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

A01622

Exhibit "1"
19



# The St. Paul Business Foundation Series

**Common Policy Declarations**



**ST PAUL TRAVELERS**

**Your Insurance Company is:**
**Fidelity and Guaranty Insurance Company**
**4200 Corporate Drive**
**West Des Moines, Iowa  50266-5964**

**A Stock Insurance Company**

| **Policy Number:** | **Renewal Of:** | **Reason For Issuance** |
|---|---|---|
| BK01935424 | BK01535303 | Renewal |

| **Named Insured** | **Your Agent** |
|---|---|
| ANGLES BEAUTY CARE GROUP INC. | MFC&V INSURANCE SERVICES |
| DBA COLLECTIONS SALON & DAY SPA, ANGLES BEAUTY | 1025 CHAPALA ST |
| Please see CL/00 99 01. | SANTA BARBARA, CA 93101 |
| 12245 WORLD TRADE DRIVE | |
| SAN DIEGO, CA 92128 | Agent Code:  043019 |
| | *Nally Larson* |
| Client Number:  3310554845 | Agent's Signature: |

**Policy Period:  From 10/31/2004  12:01 a.m.  to 10/31/2005 12:01a.m., standard time**    at the mailing address shown.

In return for the payment of the premium and subject to all the terms of this policy, we agree to provide the insurance as stated in this policy.  This policy consists of the following Coverage Part(s) for which a premium is indicated.  This premium may be subject to adjustment.  The Annual Policy Writing Minimum Premium is  $500.

| Coverages | Premium |
|---|---|
| Liability | $    352.00 |
| Property | $18,465.00 |
| Commercial Umbrella Liability | $  1,050.00 |
| **Total Policy Premium:** | **$ 19,867.00** |

**Forms and Endorsements Applicable to This Coverage Part:**

See attached Schedule of Forms and Endorsements CL/BF 00 35.

CONFIDENTIAL
ATTORNEYS' EYES
ONLY
**Exhibit "1"**
**20**

A01623

INSURED
CL/BF 00 10 09 99
Print Date: 08/11/2004

**Direct Bill Number**
4400083200
25% down/8 Installments

Policy Number: BK01935424

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
This endorsement modifies insurance provided under the following:

It is agreed that the **NAMED INSURED** section of The St. Paul Business Foundation Series Policy Common Declarations page is amended as follows:

ANGLES BEAUTY CARE GROUP INC.
DBA COLLECTIONS SALON & DAY SPA, ANGLES BEAUTY
CARE GROUP, INC. DBA ANGLES COLORS, CUTS AND PERM
AND DBA HAI

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

Exhibit "1"
21

A01624

CL/00 99 01 01 87

Page 1 of 1

This policy includes the following:

- Common Policy Declarations

- Common Policy Conditions

- A Schedule of Forms and Endorsements

- A Schedule of Premises

- Two or more Coverage Parts. A Coverage Part consists of:

  - Declarations for the form of coverage provided:

  - A Coverage Form; and

  - Any applicable endorsements.

- Endorsements applicable to all Coverage Parts, if any.

This Company has caused this policy to be signed by its President and its Secretary
and countersigned by a duly authorized representative.

## UNITED STATES FIDELITY AND GUARANTY COMPANY
### FIDELITY AND GUARANTY INSURANCE UNDERWRITERS, INC.
### FIDELITY AND GUARANTY INSURANCE COMPANY

*Secretary*

Bruce Backberg
Secretary

*Jay S. Fishman*

Jay S. Fishman
President

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

Exhibit
22

A01625

CL/BF 00 15 09 02

# The St. Paul Business Foundation Series
## Schedule Of Forms And Endorsements

**ST PAUL TRAVELERS**

| Policy Number: | Reason For Issuance: |
|---|---|
| BK01935424 | Renewal |

## Forms and Endorsements Applicable to All Coverage Parts:

| | |
|---|---|
| CL/BF 00 10 09 99 | Common Policy Declarations |
| CL/OO 99 01 01 87 | Named Insured Manuscript Endorsement |
| CL/BF 00 15 09 02 | Countersignature Form |
| CL/BF 00 30 09 02 | Common Policy Conditions |
| CL/BF 00 35 03 95 | Schedule of Forms and Endorsements |
| CL/BF 00 40 04 97 | Schedule of Premises |
| CL/BF 00 81A 12 02 | Disclosure Notice-Terrorism Risk Insurance Act of 2002 |
| CL/BF 85 04 09 02 | California Changes |

## Forms and Endorsements Applicable to the Property Coverage Part:

| | |
|---|---|
| CL/BF 10 05 09 02 | Property Coverage Part Declarations |
| CL/BF 10 10 09 99 | Property Coverage Part |
| CL/BF 11 65 06 98 | Loss Payable Provisions |
| CL/BF 11 68 09 02 | Property Coverage Change Endorsement |
| CL/BF 13 00 09 99 | Suspension of Protective Systems |
| CL/BF 13 40 01 03 | "Mold Or Other Fungi" Or "Bacteria" With Exception For Certain Causes Of Loss Exclusion Endorsement |

## Forms and Endorsements Applicable to the Liability Coverage Part:

| | |
|---|---|
| CL/BF 20 05 04 97 | Liability Coverage Part Declarations |
| CL/BF 20 10 11 02 | Liability Coverage Part |
| CL/BF 21 15 11 02 | Hired and Non-Owned Auto Liability Coverage |
| CL/BF 22 40 11 02 | OLC-Scheduled Person or Organization Additional Insured |

## Forms and Endorsements Applicable to the Golf Facilities Management Liability Protection Coverage Part:

## Forms and Endorsements Applicable to the Limited Above Ground Pollution Liability Coverage Part:

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

Exhibit 23

CL/BF 00 35 03 95

A01626

# The St. Paul Business Foundation Series
Schedule Of Forms And Endorsements

---

**Forms and Endorsements Applicable to the Community Association Management Liability Coverage Part:**

**Forms and Endorsements Applicable to the Construction and Installation Coverage Part:**

**Forms and Endorsements Applicable to the Equipment and Mobile Property Coverage Part:**

**Forms and Endorsements Applicable to the Golf Facilities Maintenance Equipment and Golf Car Protection Coverage Part:**

**Forms and Endorsements Applicable to Other Inland Marine Coverages:**

**Forms and Endorsements Applicable to the Commercial Umbrella Liability Coverage Part:**

| | |
|---|---|
| CL/IL 191 11 02 | Umbrella Liability Coverage Part Declarations |
| CL/UL 00 01 11 02 | Umbrella Liability Coverage Form |
| CL/UL 21 16 11 02 | Lead - Exclusion |
| CL/UL 21 18 11 02 | "Professional Services" - Exclusion |
| CL/UL 21 99 11 02 | Nuclear Energy Liability Exclusion (Broad Form) |
| CL/UL 22 03 11 02 | "Barbers and Beauticians Professional Services" -Exclusion |
| CL/UL 22 09 11 02 | Cosmetic Services -Exclusion |

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

Exhibit "1"
24

A01627

# The St. Paul Business Foundation Series

**Schedule Of Premises**



**Your Insurance Company is:**
**Fidelity and Guaranty Insurance Company**
**4200 Corporate Drive**
**West Des Moines, Iowa  50266-5964**

**A Stock Insurance Company**

| Policy Number: | Reason For Issuance: |
|---|---|
| BK01935424 | Renewal |

**Description of Premises:**

| Premises Number | Location/ Occupancy | Construction |
|---|---|---|
| 0001 | 12245 World Trade Drive  SAN DIEGO CA 92128 | Joisted Masonry |

    BLDG:   Primary Class:   (Not Covered)
               Secondary Class:   (Not Covered)
    BPP:    Primary Class: 612240-Buildings or Premises - Office - Premise
           Secondary Class: 070200-Offices and Banks - Not Governmental Of

| 0002 | 200 East Via Rancho Parkway #279  ESCONDIDO CA 92025 | Masonry Non-Combustible |

    BLDG:   Primary Class:   (Not Covered)
               Secondary Class:   (Not Covered)
    BPP:    Primary Class: 723105-Beauty Parlor (including Nails, Manicure
           Secondary Class:   (Not Covered)

| 0003 | 2800 N. Main St., Space 208  SANTA ANA CA 92705 | Non-Combustible |

    BLDG:   Primary Class:   (Not Covered)
               Secondary Class:   (Not Covered)
    BPP:    Primary Class: 723105-Beauty Parlor (including Nails, Manicure
           Secondary Class:   (Not Covered)

| 0004 | 1 Mills Circle, Suite 610  ONTARIO CA 91764 | Masonry Non-Combustible |

    BLDG:   Primary Class:   (Not Covered)
               Secondary Class:   (Not Covered)
    BPP:    Primary Class: 723105-Beauty Parlor (including Nails, Manicure
           Secondary Class:   (Not Covered)

| 0005 | 7007 Friars Rd. #355 & 353  SAN DIEGO CA 92128 | Frame |

    BLDG:   Primary Class:   (Not Covered)
               Secondary Class:   (Not Covered)
    BPP:    Primary Class: 723105-Beauty Parlor (including Nails, Manicure
           Secondary Class:   (Not Covered)

| 0006 | 20 City Blvd. West, Suite 505  ORANGE CA 92868 | Masonry Non-Combustible |

**Exhibit "1"**
**25**

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

CL/BF 00 40 04 97

A01628

# The St. Paul Business Foundation Series

Schedule Of Premises

| Premises Number | Location/ Occupancy | | | Construction |
|---|---|---|---|---|
| | BLDG: | Primary Class: | (Not Covered) | |
| | | Secondary Class: | (Not Covered) | |
| | BPP: | Primary Class: 723105-Beauty Parlor (including Nails, Manicure | | |
| | | Secondary Class: | (Not Covered) | |
| 0007 | 1600 Azusa Ave., Space 533  CITY OF INDUSTRY CA 91748 | | | Masonry Non-Combustible |
| | BLDG: | Primary Class: | (Not Covered) | |
| | | Secondary Class: | (Not Covered) | |
| | BPP: | Primary Class: 723105-Beauty Parlor (including Nails, Manicure | | |
| | | Secondary Class: | (Not Covered) | |

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

Exhibit
26

A01629

# The St. Paul Business Foundation Series

Property Coverage Part Declarations


**ST PAUL TRAVELERS**

**Your Insurance Company is:**
**Fidelity and Guaranty Insurance Company**
**4200 Corporate Drive**
**West Des Moines, Iowa 50266-5964**

A Stock Insurance Company

| Policy Number: | Reason For Issuance: |
|---|---|
| BK01935424 | Renewal |

**Limits of Insurance:**

| | | |
|---|---|---|
| $ | 25,000 | Depositor's Forgery |
| $ | 25,000 | Employee Dishonesty |
| Included In Employee Dishonesty for Named Plans | | Employee Dishonesty (ERISA only) |
| | | Name of Plans: |
| $ | 25,000 | Fine Arts |
| $ | 25,000 | Property Off Premises |
| | | Money and Securities: |
| $ | 10,000 | Inside the Premises |
| $ | 5,000 | Outside the Premises |
| $ | 25,000 | Valuable Records |

**Deductible:** $250

(The Deductible does not apply to coverage for Accounts Receivable, "Business Income," Extended Business Income, "Extra Expense," Action By Civil Authority and "Expediting Expense," Counterfeit Currency and Money Orders, and Fire Department Service Charge.)

**If Building Coverage exists, Property Value Guard Automatic Increase:** 3%  - CA
**If Business Personal Property Coverage exists, Property Value Guard Automatic Increase:** 3%  -
**Business Income and Extra Expense Covered Time Period:** 12 Months

| Premises Number | Building Limit of Insurance | Building Valuation | Business Personal Property Limit of Insurance | Business Personal Property Valuation |
|---|---|---|---|---|
| 0001 | Not Covered | Not Covered | $  95,481 | Repl. Cost |

Exhibit "1"

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

27

A01630

# The St. Paul Business Foundation Series

Property Coverage Part Declarations

| Premises Number | Building Limit of Insurance | Building Valuation | Business Personal Property Limit of Insurance | Business Personal Property Valuation | | |
|---|---|---|---|---|---|---|
| | Accounts Receivable Limit of Insurance | | | | $ | 25,000 |
| | Debris Removal Additional Limit of Insurance | | | | $ | 15,000 |
| | Demolition Cost and Increased Cost of Construction | | | | | |
| | Outdoor Trees, Shrubs, Plants and Lawns: | | | | $ | 3,000 |
| | Seasonal Automatic Increase In Business Personal Property | | | | | 25% |
| | Sewer Backup | | | | $ | 25,000 |
| | Mortgagee: | | | | | |
| 0002 | Not Covered | Not Covered | $  212,180 | Repl. Cost | | |
| | Accounts Receivable Limit of Insurance | | | | $ | 25,000 |
| | Debris Removal Additional Limit of Insurance | | | | $ | 15,000 |
| | Demolition Cost and Increased Cost of Construction | | | | | |
| | Outdoor Trees, Shrubs, Plants and Lawns: | | | | $ | 3,000 |
| | Seasonal Automatic Increase In Business Personal Property | | | | | 25% |
| | Sewer Backup | | | | $ | 25,000 |
| | Mortgagee: | | | | | |
| 0003 | Not Covered | Not Covered | $  159,135 | Repl. Cost | | |
| | Accounts Receivable Limit of Insurance | | | | $ | 25,000 |
| | Debris Removal Additional Limit of Insurance | | | | $ | 15,000 |
| | Demolition Cost and Increased Cost of Construction | | | | | |
| | Outdoor Trees, Shrubs, Plants and Lawns: | | | | $ | 3,000 |
| | Seasonal Automatic Increase In Business Personal Property | | | | | 25% |
| | Sewer Backup | | | | $ | 25,000 |
| | Mortgagee: | | | | | |

**Exhibit "1"**

CONFIDENTIAL28
ATTORNEYS' EYES
ONLY

A01631

# The St. Paul Business Foundation Series

Property Coverage Part Declarations

**ST PAUL TRAVELERS**

| Premises Number | Building Limit of Insurance | Building Valuation | Business Personal Property Limit of Insurance | Business Personal Property Valuation | | |
|---|---|---|---|---|---|---|
| 0004 | Not Covered | Not Covered | $ 132,613 | Repl. Cost | | |
| | Accounts Receivable Limit of Insurance | | | | $ | 25,000 |
| | Debris Removal Additional Limit of Insurance | | | | $ | 15,000 |
| | Demolition Cost and Increased Cost of Construction | | | | | |
| | Outdoor Trees, Shrubs, Plants and Lawns: | | | | $ | 3,000 |
| | Seasonal Automatic Increase In Business Personal Property | | | | | 25% |
| | Sewer Backup | | | | $ | 25,000 |
| | Mortgagee: | | | | | |
| 0005 | Not Covered | Not Covered | $ 503,928 | Repl. Cost | | |
| | Accounts Receivable Limit of Insurance | | | | $ | 25,000 |
| | Debris Removal Additional Limit of Insurance | | | | $ | 15,000 |
| | Demolition Cost and Increased Cost of Construction | | | | | |
| | Outdoor Trees, Shrubs, Plants and Lawns: | | | | $ | 3,000 |
| | Seasonal Automatic Increase In Business Personal Property | | | | | 25% |
| | Sewer Backup | | | | $ | 25,000 |
| | Mortgagee: | | | | | |
| 0006 | Not Covered | Not Covered | $ 200,828 | Repl. Cost | | |

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Exhibit "1"

29

A01632

CL/BF 10 05 09 02

# The St. Paul Business Foundation Series
Property Coverage Part Declarations

| Premises Number | Building Limit of Insurance | Building Valuation | Business Personal Property Limit of Insurance | Business Personal Property Valuation | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | Accounts Receivable Limit of Insurance | | | | $ | 25,000 |
| | Debris Removal Additional Limit of Insurance | | | | $ | 15,000 |
| | Demolition Cost and Increased Cost of Construction | | | | | |
| | Outdoor Trees, Shrubs, Plants and Lawns: | | | | $ | 3,000 |
| | Seasonal Automatic Increase In Business Personal Property | | | | | 25% |
| | Sewer Backup | | | | $ | 25,000 |
| | Mortgagee: | | | | | |
| | | | | | | |
| 0007 | Not Covered | Not Covered | $ 212,180 | Repl. Cost | | |
| | Accounts Receivable Limit of Insurance | | | | $ | 25,000 |
| | Debris Removal Additional Limit of Insurance | | | | $ | 15,000 |
| | Demolition Cost and Increased Cost of Construction | | | | | |
| | Outdoor Trees, Shrubs, Plants and Lawns: | | | | $ | 3,000 |
| | Seasonal Automatic Increase In Business Personal Property | | | | | 25% |
| | Sewer Backup | | | | $ | 25,000 |
| | Mortgagee: | | | | | |

**Forms and Endorsements Applicable to This Coverage Part:**

See attached Schedule of Forms and Endorsements CL/BF 00 35.

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

A01633

Policy Number: BK01935424

# "MOLD OR OTHER FUNGI" OR "BACTERIA" WITH EXCEPTION FOR CERTAIN CAUSES OF LOSS
### EXCLUSION ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

PROPERTY COVERAGE PART.

## Schedule

**Premises Number:**

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

The following changes apply to the premises shown in the Schedule above. If no premises are scheduled, the changes apply to all premises covered by the Property Coverage Part.

Unless otherwise specified, this endorsement also applies to **SECTION I – COVERAGE, A. Coverage Provided., 4. Additional Coverage., k. Newly Acquired or Constructed Property.** and **SECTION I - COVERAGE, A. Coverage Provided., 4. Additional Coverage., o. Property Off Premises.**

1. The following replaces **SECTION I – COVERAGE, C. Exclusions., 2.j. Other Types of Loss., (2):**

    **(2)** Rust, corrosion, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

2. The following replaces **SECTION I – COVERAGE, C. Exclusions., 2.l. Substance Seepage or Leakage.:**

    **l. Substance Seepage or Leakage.** Seepage or leakage of any substance, or the presence or condensation of humidity, moisture, or vapor, that has manifested and is then continuous or repeated over a period of 14 days or longer.

3. The following exclusion is added to **SECTION I – COVERAGE, C. Exclusions.,1.:**

    **"Mold or other fungi", wet or dry rot, or "bacteria".** "Mold or other fungi", wet or dry rot, or "bacteria", unless caused by or resulting from one or more of the following:

    **(1)** A "specified cause of loss"; or

    **(2)** Flood, earthquake, earth movement, or sewer backup, if such "mold or other fungi", wet or dry rot, or "bacteria" loss occurs at a premises that has coverage for flood, earthquake, earth movement, or sewer back up under the Property Coverage Part. However, the most we will pay for such covered loss is the applicable limit of insurance afforded for flood, earthquake, earth movement, or sewer backup.

    We will not pay for the costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "mold or other fungi", wet or dry rot, or "bacteria".

**Exhibit "1"**

**31**

CL/BF 13 40 01 03        Includes copyrighted material of Insurance Services Office, Inc. with its permission.        Page 1 of 2
Copyright, Insurance Services Office, Inc 2001

A01634

4.  The following definitions are added to **SECTION V – DEFINITIONS**:

"Mold or other fungi" means:

a.  Any type or form of mold or mildew;

b.  Any other type or form of fungus; or

c.  Any mycotoxin, spore, scent, or byproduct produced or released by such mold, mildew, or other fungus.

"Bacteria" means any type or form of bacterium, or any mycotoxin, spore, scent, or byproduct produced or released by such bacterium.

All other terms of your policy remain the same.

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

A01635

**Exhibit "1"**

**32**

CL/BF 13 40 01 03

Includes copyrighted material of Insurance Services Office, Inc. with its permission.
Copyright, Insurance Services Office, Inc 2001

# The St. Paul Business Foundation Series

**Quick Reference Liability Coverage Part**
**PLEASE READ YOUR POLICY CAREFULLY.**

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

| Table of Contents | Page |
|---|---|
| **I. COVERAGE** | 1 |
| **A.1. Liability Insuring Agreement** | 1 |
| "Bodily Injury" and "Property Damage" | 1 |
| "Personal Injury" | 1 |
| "Advertising Injury" | 2 |
| First Manifested Injury | 2 |
| **A.2. Exclusions Applicable To The Liability Coverage** | 2 |
| Expected Or Intended "Bodily Injury" Or "Property Damage" | 2 |
| Contractual Liability | 2 |
| Liquor Liability | 3 |
| Workers' Compensation and Similar Laws | 3 |
| Employer's Liability | 3 |
| "Employment-Related Practices" | 4 |
| Asbestos | 4 |
| Pollution | 4 |
| Aircraft, "Auto", Snowmobile or Watercraft | 6 |
| "Mobile Equipment" | 7 |
| War | 7 |
| "Professional Services" | 7 |
| Damage To Property | 8 |
| Damage To "Your Product" | 8 |
| Damage To "Your Work" | 9 |
| Damage To "Impaired Property" Or Property Not Physically Injured | 9 |
| Recall Of "Your Products," "Your Work" Or "Impaired Property" | 9 |
| False Material | 9 |
| Material Published Or Used Prior To Policy Period | 9 |
| Knowing Violation of Criminal Law | 9 |
| Knowing Violation Of Rights | 9 |
| Breach Of Contract | 10 |
| Wrong Description Of Prices Or Failure To Conform To Statements Of Quality Or Performance | 10 |
| Intellectual Property | 10 |
| Media Or Internet Business | 10 |
| Lead | 11 |
| **A.3. Tenant Legal Liability** | 11 |
| **B.1. Medical Payments Insuring Agreement** | 12 |
| **B.2. Exclusions Applicable To The Medical Payments Coverage** | 12 |
| **C. Supplementary Payments** | 13 |
| **D. Nuclear Energy Liability Exclusion** | 15 |
| **II. WHO IS AN INSURED** | 16 |
| Individual | 16 |
| Partnership or Joint Venture | 16 |
| Limited Liability Company | 16 |
| Trust | 16 |
| Other Organization | 17 |
| "Employees" Or "Volunteer Workers" | 17 |
| Real Estate Manager | 18 |
| Executor, Administrator Or Trustee | 18 |
| Temporary Custodian | 18 |
| Legal Representative | 18 |
| Architect, Engineer or Surveyor | 18 |
| Condominium Association | 18 |
| Additional Insured By Contract Or Agreement | 18 |
| Equipment Lessor | 18 |
| Grantor Of Franchise | 18 |
| Premises Owner, Lessor, Or Manager | 18 |
| Permit Issuer – Premises | 19 |
| Permit Issuer – Operations | 19 |
| "Mobile Equipment" Driver | 19 |
| Newly Acquired Or Formed Organization | 19 |
| **III. LIMITS OF LIABILITY** | 20 |
| General Aggregate | 20 |
| Products-Completed Operations Aggregate | 20 |
| Personal and Advertising Injury Limit | 20 |
| Each Occurrence Limit | 20 |
| Medical Payments Limit | 21 |
| Tenant Legal Liability Limit | 21 |
| Retained Limit – Property Damage | 21 |
| **IV. CONDITIONS** | 21 |
| Bankruptcy | 21 |
| Duties In The Event Of An "Occurrence", Offense, Claim or "Suit" | 21 |
| Financial Responsibility Laws | 22 |
| Legal Action Against Us | 22 |
| "Other Insurance" | 22 |
| Representations | 24 |

CL/BF 20 00 11 02

Exhibit 1
33

A01636

| Table of Contents | Page |
|---|---|
| Separation Of Insureds | 24 |
| Transfer Of Rights Of Recovery And Proceeds Against Others To Us | 24 |
| When We Do Not Renew | 24 |
| | |
| **V. DEFINITIONS** | **25** |

Exhibit "1"
CONFIDENTIAL
ATTORNEYS' EYES
ONLY

A01637

# The St. Paul Business Foundation Series

**ST PAUL TRAVELERS**

Liability Coverage Part Declarations

Your Insurance Company is:
**Fidelity and Guaranty Insurance Company**
**4200 Corporate Drive**
**West Des Moines, Iowa  50266-5964**

**A Stock Insurance Company**

| Policy Number: | Reason For Issuance: |
|---|---|
| BK01935424 | Renewal |

**Limits of Liability:**

| | |
|---|---|
| $ 1,000,000 | Each Occurrence Limit |
| $ 1,000,000 | Personal and Advertising Injury Limit |
| $ 2,000,000 | General Aggregate Limit (Other than Products - Completed Operations) |
| $ 2,000,000 | Products - Completed Operations Aggregate Limit |
| $     10,000 | Medical Payments Limit (Any One Person) |
| $    300,000 | Tenant Legal Liability Limit |
| $          0 | Retained Limit Property Damage ($0 Unless Otherwise Indicated) |

**Form Of Business:**

☐ Individual   ☐ Partnership   ☒ Corporation   ☐ Limited Liability Company   ☐ Other:

**Premium Schedule:**

| Classification | Premises Number | Code Number | Premium Basis | | Territory | Rate | Advance Premium |
|---|---|---|---|---|---|---|---|
| Buildings or Premises - Office - Premises Occupied by Employees of the Insured | 0001 | 612240CA | $    1,500 | (A) | 004 | 172.0 | $    258.00 |
| Premises Operations | | | | | | | |

CONFIDENTIAL
ATTORNEYS EYES
ONLY
EXHIBIT "1"
95

A01638

CL/BF 20 05 04 97

# The St. Paul Business Foundation Series
## Liability Coverage Part Declarations

**Premium Schedule:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Buildings or Premises - Office - Premises Occupied by Employees of the Insured | 0001 | 612240CA | $ | 1,500 | (A) | 004 | Included    Included |

Products and Completed Operations

| **Options** | **Premium** |
|---|---|
| Hired and Nonowned Auto Liability | $    94.00 |
| **Total** | $    352.00 |

**Audit Period:** None

**Forms and Endorsements Applicable to This Coverage Part:**

See attached Schedule of Forms and Endorsements CL/BF 00 35.

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

**Exhibit "1"**

36

A01639

CL/BF 20 05 04 97

Policy Number: BK01935424

# Liability Coverage Part

Various provisions in this Liability Coverage Part and the rest of this policy restrict coverage. Please read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this Liability Coverage Part the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this Liability Coverage Part. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under **SECTION II. WHO IS AN INSURED.**

Other words and phrases that appear in quotation marks have or include special meaning. Please refer to **SECTION V. DEFINITIONS.**

## SECTION I. COVERAGE

### A. Liability

1.  **Insuring Agreement**

    a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. We may, at our discretion, investigate any "occurrence" or "personal injury" or "advertising injury" offense and settle any claim or "suit" that may result. But:

        (1) The amount we will pay for damages is limited as described in **SECTION III. LIMITS OF LIABILITY;** and

        (2) Our right and duty to defend end when the applicable Limits of Liability in this Liability Coverage part has been used up with the payment of judgments or settlements under Paragraph **A. Liability** or medical payments under Paragraph **B. Medical Payments.**

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Paragraph **C. Supplementary Payments.**

    b.  This insurance applies to:

        (1) "Bodily injury" or "property damage":

            (a) Caused by an "occurrence" that takes place in the "coverage territory";

            (b) That occurs during the policy period; and

            (c) Subject to Paragraph **e.** below, that no "described insured" knew, prior to the policy period, had occurred, in whole or in part. If any "described insured" knew, prior to the policy period, that the "bodily injury" or "property damage" had occurred, in whole or in part, then any continuation, change or resumption of that "bodily injury" or "property damage", during or after the policy period, will be deemed "bodily injury" or "property damage" that a "described insured" knew, prior to the policy period, had occurred;

        (2) "Personal injury":

            (a) Arising out of your business; and

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

Exhibit "1"
37

Includes copyrighted material of Insurance Services Office with its permission
Copyright Insurance Services Office, Inc., 2001

A01640

**(b)** Caused by an offense committed in the "coverage territory" and during the period that this "personal injury" liability coverage is in effect; or

**(3)** "Advertising injury":

**(a)** Arising out of the "advertising" of your goods, products or services; and

**(b)** Caused by an offense committed in the "coverage territory" and during the period that this "advertising injury" liability coverage is in effect.

However, the placing of "advertising", borders or frames for or of other persons or organizations, or links for or to other persons or organizations, on or in your Web site is not considered "advertising" of your goods, products or services.

**c.** Subject to Paragraph **e.** below, "bodily injury" or "property damage" will be deemed to have been known by a "described insured" to have occurred at the earliest time when, for all or any part of that "bodily injury" or "property damage", any "described insured":

**(1)** Reports such "bodily injury" or "property damage" to us or any person or organization providing "other insurance";

**(2)** Receives a "suit" or a written or verbal demand or claim for damages because of such "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that such "bodily injury" or "property damage" has occurred or has begun to occur.

**d.** Subject to Paragraph **e.** below, "bodily injury" or "property damage" that occurs during the policy period and that no "described insured" knew, prior to the policy period, had occurred, in whole or

in part, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**e.** Paragraphs **b.(1)(c)**, **c.**, and **d.** above, only apply if the continuation, change or resumption of "bodily injury" or "property damage" that the "described insured" knew, prior to the policy period, had occurred, in whole or in part, would otherwise be covered under this insurance because of a continuous, multiple or other trigger of coverage required under the law that applies.

**2. Exclusions Applicable To The Liability Coverage**

**a. Expected Or Intended "Bodily Injury" Or "Property Damage"**

**(1)** This insurance does not apply to "bodily injury" or "property damage" expected or intended from the standpoint of the insured.

**(2)** This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

**(1)** This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" for which the insured has assumed liability in a contract or agreement.

**(2)** This exclusion does not apply to liability for damages:

**(a)** That the insured would have in the absence of the contract or agreement; or

**(b)** Because of "bodily injury", "property damage", "personal injury" or "advertising injury" assumed by you in a contract or agreement that is an "insured contract".



CONFIDENTIAL
ATTORNEYS' EYES
ONLY

**Exhibit "1"**
**38**

Includes copyrighted material of Insurance Services Office with its permission
Copyright Insurance Services Office, Inc., 2001

CL/BF 20 10 11 02

Page 2 of 32

A01641

(3) Subject to Paragraph **C. Supplementary Payments, 2.** below, solely for the purpose of liability assumed by you in such "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a person or organization, other than any insured, are deemed to be damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" provided:

(a) Liability to such person or organization for, or for the cost of, that person's or organization's defense has also been assumed by you in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that person or organization against a civil or alternative dispute resolution proceeding in which damages because of "bodily injury", "property damage", "personal injury" or "advertising injury", to which this insurance applies, are alleged.

c. **Liquor Liability**

(1) This insurance does not apply to "bodily injury" or "property damage" for which any insured may be held liable by reason of:

(a) Causing or contributing to the intoxication of any person;

(b) The furnishing of alcoholic beverages to any person under the legal drinking age or under the influence of alcohol; or

(c) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

(2) This exclusion applies only if you are in the business of manufacturing,

distributing, selling, serving or furnishing alcoholic beverages.

d. **Workers' Compensation Or Similar Laws**

This insurance does not apply to any obligation of the insured under any workers' compensation, disability benefits or unemployment compensation law or any similar common, regulatory or statutory law of any jurisdiction.

e. **Employer's Liability**

(1) This insurance does not apply to "bodily injury" to:

(a) Any "employee" of the insured arising out of and in the course of:

(i) Employment by the insured; or

(ii) Performing duties related to the conduct of the insured's business; or

(b) The spouse, or any child, fetus, embryo, parent, brother, sister, domestic partner or any member of the household of that "employee", as a consequence of Paragraph (a) above.

(2) This exclusion applies:

(a) Whether the insured may be liable as an employer or in any other capacity; and

(b) To any obligation of the insured to share damages with or repay another person or organization that must pay damages because of that "bodily injury".

(3) This exclusion does not apply to liability for damages because of "bodily injury" assumed by you in a contract or agreement that is an "insured contract".

CONFIDENTIAL ATTORNEYS' EYES ONLY

Exhibit "1"
39

CL/BF 20 10 11 02    Includes copyrighted material of Insurance Services Office with its permission    Page 3 of 32
Copyright Insurance Services Office, Inc., 2001

A01642

f.  **"Employment -Related Practices"**

(1) This insurance does not apply to "bodily injury" or "personal injury" to:

   (a) Any person including any "independent contractor" of any insured, arising out of any "employment-related practices"; or

   (b) The spouse, or any child, fetus, embryo, parent, brother, sister, domestic partner or member of the household of that person, as a consequence of Paragraph (a) above.

(2) This exclusion applies to any obligation of the insured to share damages with or to repay another person or organization that must pay damages because of that "bodily injury" or "personal injury".

g.  **Asbestos**

(1) This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of any actual, alleged or threatened:

   (a) Absorption, ingestion or inhalation of asbestos in any form by any person; or

   (b) Existence of asbestos in any form.

(2) This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of any actual, alleged or threatened:

   (a) Absorption, ingestion or inhalation of any other solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals

and "waste", in any form by any person; or

   (b) Existence of any such other irritant or contaminant in any form;

and that is part of any claim or "suit" that also alleges any "bodily injury", "property damage", "personal injury" or "advertising injury" described in Paragraph (1) above.



(3) This insurance does not apply to any loss, cost or expense arising out of any request, demand, order or statutory or regulatory requirement that any insured or other persons or organizations:

   (a) Test for, monitor, clean up, remove, contain, treat, detoxify or neutralize asbestos in any form; or

   (b) In any way respond to or assess the effects of, asbestos in any form.

(4) Because asbestos and any such other irritants or contaminants are "pollutants", this exclusion applies in addition to any of the following exclusions that apply:

   (a) Paragraph **h. Pollution** below; or

   (b) Any other pollution-related exclusion made part of this policy.

h.  **Pollution**

(1) This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of any actual, alleged or threatened existence, discharge, dispersal, seepage, migration, release or escape of "pollutants":

**CONFIDENTIAL ATTORNEYS' EYES ONLY**

**Exhibit "1"**

CL/BF 20 10 11 02    Includes copyrighted material of Insurance Services Office with its permission
Copyright Insurance Services Office, Inc., 2001



(a) At or from any premises, site or location that is or was at any time owned or occupied by, or rented or loaned to, any insured;

(b) At or from any premises, site or location that is or was at any time used by or for any insured or other persons or organizations for the handling, storage, disposal, processing or treatment of "waste";

(c) That are or were at any time transported, handled, stored, treated, disposed of or processed as "waste" by or for any insured or any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

  (i) If the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

  (ii) If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to or assess the effects of "pollutants".

(2) This insurance does not apply to any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or

other persons or organizations test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or "suit" by or on behalf of any person, organization or governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to, or assessing the effects of, "pollutants".

(3) Paragraph (1)(a) of this exclusion does not apply to:

(a) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

(b) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to this policy as an additional insured with respect to your ongoing operations performed for that additional insured at such premises, site or location, and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured;

(c) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire"; or

(d) "Bodily injury" or "property damage" included in the "products — completed operations hazard", except if

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

Exhibit "1"

41

Includes copyrighted material of Insurance Services Office with its permission
Copyright Insurance Services Office, Inc., 2001

A01644

the products or completed work are "waste products or completed work".

**(4)** Paragraph **(1)(d)(i)** of this exclusion does not apply to:

**(a)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids that are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a "mobile equipment" part designed to hold, store or receive them. This exception does not apply if the fuels, lubricants or other operating fluids are:

**(i)** Intentionally discharged, dispersed or released; or

**(ii)** Brought on or to the premises, site or location with the intent to be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(b)** "Bodily injury" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(c)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(5)** Paragraphs **(1)(b)** and **(d)** of this exclusion do not apply to "bodily injury" or "property damage" included in the "products — completed operations hazard", except if the products or completed work are "waste products or completed work".

**(6)** Paragraph **(2)** of this exclusion does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement or such claim or "suit" by or on behalf of any person or organization or governmental authority.

**i.** **Aircraft, "Auto", Snowmobile Or Watercraft**

**(1)** This insurance does not apply to "bodily injury" or "property damage" arising out of the:

**(a)** Ownership, maintenance, use, operation, "loading or unloading" or entrustment to other persons or organizations; or

**(b)** "Supervision of others" in or for the maintenance, use, operation, "loading or unloading" or entrustment to other persons or organizations;

of any aircraft, "auto", snowmobile (or any trailer designed for use, operation or "loading or unloading" with any snowmobile) or watercraft owned, chartered or operated by, or rented or loaned to, any insured.

**(2)** This exclusion does not apply to:

**(a)** A watercraft while ashore on premises you own or rent;

**(b)** A watercraft you do not own that is:

CONFIDENTIAL ATTORNEYS' EYES ONLY

**Exhibit "1"**

42

Includes copyrighted material of Insurance Services Office with its permission
Copyright Insurance Services Office, Inc., 2001

A01645

(i)   Less than 75 feet long; and

(ii)  Not being used to carry persons or property for a charge;

(c)  Parking or operating an "auto" on, or on the ways next to, premises owned by, or rented or loaned to, you provided the "auto" is not owned by, or rented or loaned to, any insured;

(d)  Liability for damages because of "bodily injury" or "property damage" assumed by you in a contract or agreement that is an "insured contract" and is for the ownership, maintenance, use, operation or "loading or unloading" of aircraft or watercraft; or

(e)  "Bodily injury" or "property damage" arising out of the operation of any of the following equipment:

(i)   Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; or

(ii)  Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

j.   "Mobile Equipment"

This insurance does not apply to "bodily injury" or "property damage" arising out of:

(1)  The transportation of "mobile equipment" by an "auto" owned or operated by, or rented or loaned to, any insured; or

(2)  The use, operation or "loading and unloading" of "mobile equipment" in, while in practice for or while being prepared for any prearranged racing, speed, demolition or stunting activity.

k.   War

This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of:

(1)  Declared or undeclared war;

(2)  Warlike action by a military force or other agents of any government, sovereign or other authority;

(3)  Civil war, insurrection, rebellion, revolution or seizure of power; or

(4)  Anything done, or that should have been done, to hinder or defend against such actions.

l.   "Professional Services"

(1)  This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of any rendering of, or failure to render, any "professional services" by or on behalf of any insured.

(2)  This exclusion does not apply to:

(a)  The rendering of, or failure to render, any:

(i)   Services of an optician employed by the insured whose operations include a retail optical goods business;

(ii)  Services of a hearing aid technician employed by the insured whose operations include a retail hearing aid business;

**CONFIDENTIAL ATTORNEYS' EYES ONLY**

**Exhibit "1"**

CL/BF 20 10 11 02    Includes copyrighted material of Insurance Services Office with its permission
Copyright Insurance Services Office, Inc., 2001    Page 7 of 32

A01646

**(iii)** Services of a druggist or pharmacist employed by the insured whose operations include a retail drugstore or pharmacy business; or

**(b)** "Bodily injury" due to the rendering of, or failure to render, first aid to a person, other than a co-"employee" or "volunteer worker", by any of your "employees" who are not employed as a doctor or nurse, by you.

**m. Damage To Property**

**(1)** This insurance does not apply to "property damage" to:

**(a)** Property owned or occupied by, or rented to, you;

**(b)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of that premises;

**(c)** Property loaned to you;

**(d)** Personal property in the care, custody or control of any insured;

**(e)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(f)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

**(2)** Paragraph **(1)(b)** of this exclusion does not apply if the premises are "your work" and were never

occupied, rented or held for rental by you.

**(3)** Paragraphs **(1)(c)**, **(d)** and **(e)** of this exclusion do not apply to liability assumed under a sidetrack agreement, provided the "property damage" occurs after the sidetrack agreement is made.

**(4)** Paragraph **(1)(f)** of this exclusion does not apply to:

**(a)** "Property damage" included in the "products-completed operations hazard"; or

**(b)** Liability assumed under a sidetrack agreement, provided the "property damage" occurs after the sidetrack agreement is made.

**n. Damage To "Your Product"**

This insurance does not apply to "property damage" to "your product" arising out of "your product" or any part of it.

**o. Damage To "Your Work"**

**(1)** This insurance does not apply to "property damage" to "your work" arising out of "your work" or any part of it and included in the "products-completed operations hazard".

**(2)** This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**p. Damage To "Impaired Property" Or Property Not Physically Injured**

**(1)** This insurance does not apply to "property damage" to "impaired property" or property that has not been physically injured, arising out of:

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

**Exhibit "1"**

Includes copyrighted material of Insurance Services Office with its permission
Copyright Insurance Services Office, Inc., 2001



A01647

**(a)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(b)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

**(2)** This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to:

    **(a)** "Your product" after it has been put to its intended use; or

    **(b)** "Your work" after it has been put to its intended use.

**q. Recall Of "Your Product", "Your Work" Or "Impaired Property"**

This insurance does not apply to damages claimed for any loss, cost or expense incurred by you or other persons or organizations for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**r. False Material**

This insurance does not apply to "personal injury" or "advertising injury" arising out of any publication of false material, if the insured knew the material was false when it was published.

**s. Material Published Or Used Prior To Policy Period**

This insurance does not apply to "personal injury" or "advertising injury" arising out of:

**(1)** Any material that was first published before this policy begins;

**(2)** Another person's or organization's "advertising idea" in your "advertising" whose unauthorized use was first committed before this policy begins; or

**(3)** Another person's or organization's copyright, trade dress or "slogan" in your "advertising" whose infringement was first committed before this policy begins.

**t. Knowing Violation Of Criminal Law**

This insurance does not apply to "personal injury" or "advertising injury" arising out of any actual or alleged violation of any criminal law:

**(1)** By or at the direction; or

**(2)** With the knowledge or consent;

of the insured.

**u. Knowing Violation Of Rights**

**(1)** This insurance does not apply to "personal injury" or "advertising injury" caused by, or an offense committed by or at the direction of, the insured with knowledge that the rights of another person or organization would be violated and that injury or damage would result.

**(2)** This exclusion does not apply to "personal injury" caused by malicious prosecution.

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

Exhibit "1"
45

**v. Breach Of Contract**

(1) This insurance does not apply to "personal injury" or "advertising injury" arising out of the failure of any insured to do what is required by a contract or agreement.

(2) This exclusion does not apply to "advertising injury" arising out of the unauthorized use of another person's or organization's "advertising idea" in your "advertising" if such use is not specifically prohibited by that contract or agreement.

**w. Wrong Description Of Prices Or Failure To Conform To Statements Of Quality Or Performance**

This insurance does not apply to "advertising injury" arising out of:

(1) The wrong description of the price of any goods, products or services; or

(2) The failure of goods, products or services to conform with any statement of quality or performance;

made in your " advertising".

**x. Intellectual Property**

(1) This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of any actual or alleged infringement or violation of any of the following rights or laws, or any other "bodily injury", "property damage", "personal injury" or "advertising injury" that is alleged in any claim or "suit" that also alleges such infringement or violation:

(a) Copyright;

(b) Patent;

(c) Trade name;

(d) Trade secret;

(e) Trademark; or

(f) Other intellectual property rights or laws. 

(2) This exclusion does not apply to:

(a) "Advertising injury" arising out of any infringement upon another person's or organization's copyright, trade dress or trademarked "slogan" in your "advertising"; or

(b) "Bodily injury" or "property damage" included in the "products-completed operations hazard".

**y. Media Or Internet Business**

(1) This insurance does not apply to "personal injury" arising out of one of the following offenses committed by or for any insured whose business is "advertising", "broadcasting" or "publishing" if such offense is committed in any "advertising", "broadcasting" or "publishing" done by or for that insured: 

(a) Publication of "insured material" that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

(b) Publication of "insured material" that violates a person's right of privacy.

(2) This insurance does not apply to "advertising injury" arising out of an offense committed by or for any insured whose business is "advertising", "broadcasting" or "publishing".

(3) This insurance does not apply to "personal injury" or "advertising"

**CONFIDENTIAL ATTORNEYS' EYES ONLY**

**Exhibit "1"**

46

injury" arising out of an offense committed by or for any insured whose business is an Internet search, access, content or service provider for another person or organization.

(4) For the purpose of this exclusion, the placing of frames or borders for or of other persons or organizations, or links for or to other persons or organizations, on or in any insured's Web site does not by itself deem that insured's business to be "advertising".

**z. Lead**

(1) This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of any actual, alleged or threatened:

    (a) Absorption, ingestion or inhalation of lead in any form by any person; or

    (b) Existence of lead in any form.

(2) This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of any actual, alleged or threatened:

    (a) Absorption, ingestion or inhalation of any other solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and "waste", in any form by any person; or

    (b) Existence of any such other irritant or contaminant in any form;

and that is part of any claim or "suit" that also alleges any "bodily injury", "property damage", "personal injury" or "advertising



injury" described in Paragraph **(1)** above.

(3) This insurance does not apply to any loss, cost or expense arising out of any request, demand, order or statutory or regulatory requirement that any insured or other persons or organizations:

    (a) Test for, monitor, clean up, remove, contain, treat, detoxify or neutralize lead in any form; or

    (b) In any way respond to, or assess the effects of, lead in any form.

(4) Because lead is a "pollutant", this exclusion applies in addition to any of the following exclusions that apply:

    (a) Paragraph **h. Pollution** above; or

    (b) Any other pollution-related exclusion made part of this policy.

**3. Tenant Legal Liability**

a. With respect to "property damage" by fire to premises while rented to you or temporarily occupied by you with permission of the owner, only Paragraphs **2. Exclusions Applicable To The Liability Coverage, a. Expected Or Intended "Bodily Injury" Or "Property Damage", b. Contractual Liability** and **k. War** apply.

b. With respect to "property damage" other than by fire to:

(1) Premises while rented to you or temporarily occupied by you with permission of the owner; or

(2) The business personal property of premises rented to you for a period of 7 or fewer consecutive days;

**Exhibit "1"**
**47**

only Paragraphs **2. Exclusions Applicable To The Liability Coverage, a. Expected Or Intended "Bodily Injury" or "Property Damage", b. Contractual Liability, g. Asbestos, h. Pollution, k. War** and **z. Lead** apply.

**c.** This insurance for "property damage":

**(1)** By fire to premises while rented to you or temporarily occupied by you with permission of the owner; or

**(2)** Other than by fire to such premises or such business personal property;

applies to those sums that the insured becomes legally obligated to pay as damages because of "property damage" caused by an "occurrence" covered by this Liability Coverage Part, but only if that "property damage" is caused by or results from a Covered Cause of Loss as provided in the Tenant Legal Liability Causes of Loss endorsement that is part of this policy. The Tenant Legal Liability Limit of Liability applies to this "property damage" coverage as described in **SECTION III. LIMITS OF LIABILITY.**

**B. Medical Payments**

**1. Insuring Agreement**

CONFIDENTIAL ATTORNEYS' EYES ONLY

**a.** We will pay medical payments to which this insurance applies for "bodily injury" caused by an accident:

**(1)** On premises owned by, or rented to, you;

**(2)** On ways next to premises owned by, or rented to, you; or

**(3)** Because of your operations;

provided that:

**(1)** The accident takes place in the "coverage territory" and occurs during the policy period;

**(2)** The medical payments are for expenses incurred and reported to

us within three years of the date of the accident; and

**(3)** The person sustaining the "bodily injury" submits to examination, at our expense, by physicians of our choice as often as we reasonably require. 

**b.** We will make these medical payments regardless of fault. The amount we will pay for such medical payments is limited as described in **SECTION III. LIMITS OF LIABILITY.** This insurance applies to medical payments for reasonable expenses incurred for necessary:

**(1)** First aid administered at the time of an accident;

**(2)** Medical, surgical, x-ray and dental services;

**(3)** Prosthetic devices; and

**(4)** Ambulance, hospital, professional nursing and funeral services.

**2. Exclusions Applicable To The Medical Payments Coverage** 

**a. Any Insured**

This insurance does not apply to medical payments for "bodily injury" to any insured, other than any of your "volunteer workers".

**b. Hired Person**

This insurance does not apply to medical payments for "bodily injury" to a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

This insurance does not apply to medical payments for "bodily injury" to a person injured on that part of premises owned by, or rented to, you and that the person normally occupies.

Exhibit "1"
48

Includes copyrighted material of Insurance Services Office with its permission
Copyright Insurance Services Office, Inc., 2001

**d. Workers' Compensation Or Similar Laws**

This insurance does not apply to medical payments for "bodily injury" to a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under any workers' compensation, disability benefits or unemployment compensation law or any similar common, regulatory or statutory law of any jurisdiction.

**e. Athletic Activities**

This insurance does not apply to medical payments for "bodily injury" to a person injured while taking part in athletics.

**f. "Products-Completed Operations Hazard"**

This insurance does not apply to medical payments for "bodily injury" included within the "products-completed operations hazard".

**g. Coverage A. Exclusions**

This insurance does not apply to medical payments for "bodily injury" excluded under Paragraph **A. Liability, 2. Exclusions Applicable To The Liability Coverage** above.

**h. Persons In The Care Of Any Insured**

This insurance does not apply to medical payments for "bodily injury" to any person being treated, cared for, detained or imprisoned by:

(1) Any insured;

(2) That insured's "employees", "temporary workers" or "volunteer workers"; or

(3) Any person or organization under contract with that insured to provide medical services;

in any day-care or health care facility, halfway or settlement house, or penal

institution operated by or on behalf of that insured.

**C. Supplementary Payments**

These payments do not reduce the Limits of Liability in this Liability Coverage Part.

1. We will pay, with respect to any claim we investigate or settle or any "suit" against any insured we defend:

   a. All expenses we incur;

   b. Up to $2,500 for the cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which Paragraph **A. Liability** above, applies. We do not have to furnish these bonds;

   c. The cost of bonds to release attachments, but only for bond amounts that are within the applicable Limit of Liability in this Liability Coverage Part. We do not have to furnish these bonds;

   d. All reasonable expenses incurred by the insured at our request to assist us in the investigation of the claim or the defense of the "suit", including actual loss of earnings up to $500 a day because of time off from work;

   e. All costs taxed against the insured in the "suit", but only if such costs are for "bodily injury", "property damage", "personal injury" or "advertising injury to which this insurance applies;

   f. Pre-judgment interest awarded against the insured on that part of the judgment we pay. However, if we make an offer to pay the applicable Limit of Liability in this Liability Coverage Part, we will not pay any pre-judgment interest based on the period of time after that offer; and

   g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment to which this insurance applies and is within the

CONFIDENTIAL ATTORNEYS' EYES ONLY

Exhibit "1"

CL/BF 20 10 11 02          Includes copyrighted material of Insurance Services Office with its permission          Page 13 of 32
Copyright Insurance Services Office, Inc., 2001

A01652

applicable Limit of Liability in this Liability Coverage Part.

2. If we defend you against a "suit" and your indemnitee is also named as a party to the "suit", we will defend that indemnitee against the "suit" if all of the following conditions are met:

   a. The "suit" against that indemnitee seeks damages for which you have assumed the liability of that indemnitee in a contract or agreement that is an "insured contract";

   b. This insurance applies to such liability assumed by you;

   c. The obligation to defend, or the cost of the defense of that indemnitee, has also been assumed by you in the same "insured contract";

   d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between your interests and the interests of that indemnitee;

   e. That indemnitee and you ask us to conduct and control the defense of that indemnitee against the "suit" and agree that we can assign the same counsel to defend you and that indemnitee; and

   f. That indemnitee:

      (1) Agrees in writing to:

         (a) Cooperate with and, when requested, assist us in the investigation, settlement or defense of the "suit";

         (b) Immediately send us copies of any demands, notices, summonses or legal papers pertaining to the "suit";

         (c) Notify any person or organization providing "other insurance" whose coverage is available to that indemnitee for the "suit"; and

**CONFIDENTIAL ATTORNEYS' EYES ONLY**

**Exhibit "1"**

         (d) Cooperate with and, when requested, assist us with respect to coordinating any such "other insurance"; and

      (2) Provides us with written authorization to:

         (a) Obtain records and other information related to the "suit"; and

         (b) Conduct and control the defense of that indemnitee in the "suit".

So long as the above conditions are met, attorneys fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by that indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **A. Liability, 2. Exclusions Applicable To The Liability Coverage, b. Contractual Liability** above, such payments will not be deemed to be damages for "bodily injury", "property damage", "personal injury" or "advertising injury" and will not be subject to the Limits of Liability in this Liability Coverage Part.

3. Our obligation to defend your indemnitee and to pay for attorney's fees and necessary litigation expenses as Supplementary Payments ends when:

   a. The applicable Limit of Liability in this Liability Coverage Part has been used up with the payment of judgments, settlements under Paragraph **A. Liability** or medical payments under Paragraph **B. Medical Payments;** or

   b. The conditions set forth in Paragraph **2.** above are no longer met.

D. **Nuclear Energy Liability Exclusion**

1. Coverage provided under Paragraph **A. Liability** above does not apply to "bodily injury", "property damage" or "personal injury" including all forms of radioactive contamination of property:



a. With respect to which any insured under the policy is also an insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada, or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

b. Resulting from the "hazardous properties" of "nuclear material" and with respect to which:

   (1) Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954 or any law amendatory thereof; or

   (2) The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2. Coverage provided under Paragraph **B. Medical Payments** above, does not apply to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

3. Coverage provided under Paragraph **A. Liability** above, does not apply to "bodily injury", "property damage" or "personal injury", including all forms of radioactive contamination of property, resulting from the "hazardous properties" of "nuclear material", if:

   a. The "nuclear material":

      (1) Is at any "nuclear facility" owned by, or operated by or on behalf of any insured; or

   (2) Has been discharged or dispersed therefrom;

   b. The "nuclear material" is contained in "spent fuel" or "nuclear waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of any insured; or

   c. The "bodily injury", "property damage" or "personal injury", including all forms of radioactive contamination of property, arises out of the furnishing by any insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion, Paragraph **c.**, applies only to "property damage", including all forms of radioactive contamination of property, to such "nuclear facility" and any property thereat.

4. For the purpose of this exclusion:

   a. "Source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

   b. "Hazardous properties" includes radioactive, toxic or explosive properties;

   c. "Nuclear facility":

      (1) means:

         (a) Any "nuclear reactor";

         (b) Any equipment or device designed or used for:

            (i) Separating the isotopes of uranium or plutonium;

            (ii) Processing or utilizing "spent fuel"; or

CONFIDENTIAL ATTORNEYS' EYES ONLY

Exhibit "1"

**(iii)** Handling, processing or packaging "nuclear waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof or more than 250 grams of uranium 235; or

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "nuclear waste"; and

**(2)** Includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

**d.** "Nuclear material" means "source material", "special nuclear material" or "by-product material";

**e.** "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

**f.** "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor"; and

**g.** "Nuclear waste" means any "waste" material:

**(1)** Containing "by-product material" other than the tailings or "wastes" produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content; and

**(2)** Resulting from the operation by any person or organization of any "nuclear facility" included under Paragraph c.(1)(a) or (b) above, of the definition of "nuclear facility".

## SECTION II. WHO IS AN INSURED

**1.** If you are designated in the Liability Coverage Part Declarations as:

**a. Individual**

An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner;

**b. Partnership Or Joint Venture**

A partnership or joint venture, you are an insured. Your partners or your members, and their spouses, are also insureds, but only with respect to the conduct of your business;

**c. Limited Liability Company**

A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers;

**d. Trust**

A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as your trustees; or

**e. Other Organization**

An organization other than a partnership, joint venture, limited liability company or trust, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your "executive officers" or directors. Your stockholders are also insureds, but only with respect to their liability as your stockholders.

*CONFIDENTIAL ATTORNEY'S EYES ONLY*

**Exhibit "1"**

However, no person or organization is an insured with respect to the conduct of any current or past partnership, joint venture, limited liability company or trust that is not shown as a Named Insured in the Liability Coverage Part Declarations. This provision does not apply if that person or organization is otherwise an insured under Paragraph **2.** below.

2. Each of the following is also an insured.

   a. **"Employees" Or "Volunteer Workers"**

      (1) Your "volunteer workers" only while acting at your direction and performing duties related to the conduct of your business, or your "employees", other than your "executive officers" (if you are an organization other than a partnership, joint venture, limited liability company or trust), your managers (if you are a limited liability company) or your trustees (if you are a trust), but only for acts within the scope of their employment by you, or while performing duties related to the conduct of your business.

      (2) However, none of these "employees" or "volunteer workers" are insureds for:

         (a) "Bodily injury" or "personal injury":

            (i) To you, to any of your partners or members (if you are a partnership or joint venture), to any of your members (if you are a limited liability company), to any co-"employee" while in the course of his or her employment by you or performing duties related to the conduct of your business, or to your other "volunteer workers" while acting at your direction

performing duties related to the conduct of your business;

            (ii) To the spouse, or any child, fetus, embryo, parent, brother, sister, domestic partner, or any member of the household of that co-"employee" or other "volunteer worker", as a consequence of Paragraph **(i)** above; or

            (iii) For which there is any obligation of the insured to share damages with or repay another person or organization that must pay damages because of the "bodily injury" or "personal injury" described in Paragraphs **(i)** or **(ii)** above; or

         (b) "Property damage" to property:

            (i) Owned, occupied or used by; or

            (ii) Rented or loaned to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

         you, any of your "employees", any of your "volunteer workers", any of your partners or members (if you are a partnership or joint venture) or any of your members (if you are a limited liability company).

   b. **Real Estate Manager**

      Any person (other than any of your "employees" or "volunteer workers") or any organization while acting as your real estate manager.

   c. **Executor, Administrator Or Trustee**

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

Exhibit "1"
**53**

Any executor or administrator of your estate, or trustee of your living trust, while acting within the scope of his or her duties as such. That executor, administrator, or trustee will have all your rights and duties under this Liability Coverage Part.

**d. Temporary Custodian**

Any person or organization properly having temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**e. Legal Representative**

Your legal representative if you die, but only with respect to his or her duties as such. That representative will have all your rights and duties under this Liability Coverage Part.

**f. Architect, Engineer Or Surveyor**

Any architect, engineer or surveyor hired by or for you, but only with respect to liability arising out of your premises or "your work". However, no such architect, engineer or surveyor is an insured with respect to "bodily injury", "property damage", "personal injury" or "advertising injury" that does not arise out of your negligence.

**g. Condominium Association**

If you are a Condominium Association, each unit owner, other than the developer, but only with respect to the unit owner's liability arising out of the:

**(1)** Unit owner's membership in the Association; or

**(2)** Ownership, maintenance or repair of that portion of the premises which is not owned solely by the unit owner.

**h. Certain Additional Insureds By Contract Or Agreement**

Any of the following persons or organizations that you agree to add as an insured under this Liability Coverage Part in a written contract or agreement that is made before, and in effect when, the "bodily injury" or "property damage" occurs or the offense that causes "personal injury" or "advertising injury" is first committed.

**(1) Equipment Lessor**

**(a)** Such person or organization is an insured only with respect to that person's or organization's liability arising out of the maintenance, use or operation by you of equipment leased to you by such person or organization.

**(b)** This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" that does not arise out of your negligence.

**(2) Grantor Of Franchise**

Such person or organization is an insured only with respect to that person's or organization's liability as a grantor of franchise to you.

**(3) Premises Owner, Lessor Or Manager**

**(a)** Such person or organization is an insured only with respect to that person's or organization's liability arising out of the ownership, maintenance or use of that part of the premises leased to you.

**(b)** This insurance does not apply to:

**(i)** "Bodily injury", "property damage", "personal injury"

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

**Exhibit "1"**
54



Includes copyrighted material of Insurance Services Office with its permission
Copyright Insurance Services Office, Inc., 2001

A01657

or "advertising injury" arising out of structural alterations, new construction or demolition operations performed by or on behalf of that person or organization; or

(ii) "Bodily injury", "property damage", "personal injury" or "advertising injury" that does not arise out of your negligence.

### i. Permit Issuer - Premises

Any state or political subdivision that has issued a permit in connection with premises owned or occupied by, or rented or loaned to, you, but only with respect to liability arising out of the existence, ownership, use, maintenance, repair, construction, erection or removal of "advertising" signs, awnings, canopies, cellar entrances, coal holes, driveways, manholes, marquees, hoist away openings, sidewalk vaults, elevators, street banners or decorations for which that state or political subdivision has issued such permit.

### j. Permit Issuer - Operations

Any state or political subdivision that has issued a permit, but only with respect to liability arising out of operations performed by you or on your behalf for which that state or political subdivision has issued such permit.

However, no such state or political subdivision is an insured for:

(1) "Bodily injury", "property damage", "personal injury" or "advertising injury" arising out of operations performed for the state or political subdivision; or

(2) "Bodily injury" or "property damage" included within the "products - completed operations hazard".

### 3. "Mobile Equipment" Driver

With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person, other than any of your "employees", "temporary workers" or "volunteer workers", is an insured while driving such "mobile equipment" along a public highway with your permission. Any other person or organization responsible for the conduct of the person driving such "mobile equipment" is also an insured, but only with respect to liability arising out of the operation of such "mobile equipment", and only if no "other insurance" is available to that person or organization for that liability. However, no person driving such "mobile equipment" or any other person or organization is an insured with respect to:

a. "Bodily injury" to a co-"employee", of the person driving such "mobile equipment" or that co-"employee's" spouse, or any child, fetus, embryo, parent, brother, sister, domestic partner or any member of the household of that co-"employee" as a consequence of that "bodily injury"; or

b. "Property damage" to property owned, occupied or used by, rented or loaned to, or in the care, custody or control of, you or the employer of the person driving such "mobile equipment".

### 4. Newly Acquired Or Formed Organization

Any organization you newly acquire or form, other than a partnership, joint venture, limited liability company or trust, and in which you maintain a controlling interest, will qualify as a Named Insured, but only if there is no similar "other insurance" available to that organization. However, coverage under this provision:

a. Is afforded only until the 180th day after you acquire or form the organization or the end of the policy period, whichever is earlier; and

b. Does not apply to "bodily injury" or "property damage" that occurred, or any

CONFIDENTIAL ATTORNEYS' EYES ONLY

**Exhibit "1"**

Includes copyrighted material of Insurance Services Office with its permission
Copyright Insurance Services Office, Inc., 2001

A01658

offense that causes "personal injury" or "advertising injury" that is first committed, before you acquired or formed the organization.

## SECTION III. LIMITS OF LIABILITY

1. The Limits of Liability shown in the Liability Coverage Part Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit:

   a. Is the most we will pay for the sum of all:

      (1) Damages, under **SECTION I. COVERAGE, A. Liability** above, because of:

         (a) "Bodily injury" and "property damage"; and

         (b) "Personal injury" and "advertising injury"; and

      (2) Medical payments, under **SECTION I. COVERAGE, B. Medical Payments** above;

   b. Will apply separately to the sum of all:

      (1) Damages because of "bodily injury" and "property damage", under **SECTION I. COVERAGE, A. Liability** above; and

      (2) Medical payments for "bodily injury", under **SECTION I. COVERAGE, B. Medical Payments** above;

      arising out of each location listed in the Schedule of Premises; and

   c. Does not apply to damages because of:



CONFIDENTIAL
ATTORNEYS' EYES
ONLY

   (1) "Bodily injury" or "property damage", under **SECTION I. COVERAGE, A. Liability** above, included in the "products-completed operations hazard"; or

   (2) "Property damage", under **SECTION I. COVERAGE, A. Liability, 3. Tenant Legal Liability** above, to:

      (a) Premises while rented to you or temporarily occupied by you with permission of the owner; or

      (b) The business personal property of premises rented to you for a period of 7 or fewer consecutive days.

3. The Products-Completed Operations Aggregate Limit is the most we will pay, under **SECTION I. COVERAGE, A. Liability** above, for the sum of all damages because of all "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph **2.** above, the Personal and Advertising Injury Limit is the most we will pay under **SECTION I. COVERAGE, A. Liability** for the sum of all damages because of all "personal injury" and "advertising injury" sustained by any one person or organization.

5. Subject to Paragraphs **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of all:

   a. Damages because of "bodily injury" and "property damage", under **SECTION I. COVERAGE, A. Liability** above; and

   b. Medical Payments for "bodily injury", under **SECTION I. COVERAGE, B. Medical Payments** above;

   caused by any one "occurrence".

For the purpose of determining the applicable Each Occurrence Limit, all related renderings of, or failures to render, covered 

**Exhibit "1"**

**56**

Includes copyrighted material of Insurance Services Office with its permission
Copyright Insurance Services Office, Inc., 2001

A01659

"professional services", to any one person, will be deemed to be one "occurrence".

6.  Subject to Paragraph **5.** above, the Medical Payments Limit is the most we will pay, under **SECTION I. COVERAGE, B. Medical Payments** above, for all medical payments for all "bodily injury" sustained by any one person.

7.  The Tenant Legal Liability Limit is the most we will pay, under **SECTION I. COVERAGE, A. Liability, 3. Tenant Legal Liability** above, for the sum of all damages because of "property damage" to:

    a.  Any premises while rented to you or temporarily occupied by you with permission of the owner; and

    b.  The business personal property of that premises while rented to you for a period of 7 or fewer consecutive days.

8.  If a Retained Limit - Property Damage is shown on the Liability Coverage Part Declarations, this insurance applies in excess of the Retained Limit - Property Damage. We have no obligation to pay damages because of "property damage" for the amount of such damages that is within the Retained Limit – Property Damage. We also have no duty to defend the insured against any "suit" seeking such damages that are within the Retained Limit - Property Damage.

    The Retained Limit - Property Damage shall apply separately to all damages because of "property damage" caused by any one "occurrence" regardless of the number of:

    a.  Insureds;

    b.  Claims made or "suits" brought; or

    c.  Persons or organizations making claims or bringing "suits".

9.  The Limits of Liability in this Liability Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Liability Coverage Part

Declarations. However, if the policy period shown in the Liability Coverage Part Declarations is extended after issuance for an additional period of less than 12 months, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Liability in this Liability Coverage Part.

## SECTION IV. CONDITIONS

1.  **Bankruptcy**

    Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Liability Coverage Part.

2.  **Duties In The Event Of An "Occurrence", "Personal Injury" Or "Advertising Injury" Offense, Claim Or "Suit"**

    a.  You or any other involved insured must notify us as soon as possible if there is an "occurrence" or offense that may result in damages or other amounts which may be covered under this Liability Coverage Part, even if no demand has been made against you or any other insured. Such notice should include all of the following information that is reasonably available:

        (1) The time, place and specific nature of the "occurrence" or offense;

        (2) The type of demand that has been or may be made against you or any other insured;

        (3) The name and address of each person or organization known that may make a claim or bring a "suit";

        (4) The name and address of each person who may be a witness; and

        (5) The name and address of each person or organization that may be involved and is insured under this Liability Coverage Part.

    b.  If a claim is made or "suit" is brought against any insured, you or any other

CONFIDENTIAL ATTORNEYS' EYES ONLY

**Exhibit "1"**

**57**

involved insured must, as soon as possible, send us a copy of:

(1) All written demands made; and

(2) All legal documents pertaining to any "suit" brought;

against you or any other insured.

c. You and any other involved insured must cooperate with and, when requested, assist us in:

(1) Securing and giving evidence;

(2) Attending hearings and trials;

(3) Obtaining the attendance of witnesses; and

(4) Taking other reasonable steps to help us investigate or settle a claim or "suit" or defend any insured against a "suit".

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any financial obligation or incur any expense, other than for first aid given to other persons at the time of an accident, without our consent.

**3. Financial Responsibility Laws**

a. When this policy is certified as proof of financial responsibility for the future under the provisions of any jurisdiction's motor vehicle financial responsibility law, the insurance provided by this Liability Coverage Part for "bodily injury" liability and "property damage" liability will comply with the provision of that law to the extent of the coverage and limits of liability required by that law in that jurisdiction.

b. With respect to "mobile equipment" to which this insurance applies, the insurance provided by this Liability Coverage Part will provide any liability, uninsured motorists, underinsured motorists, no-fault or other coverages required by any jurisdiction's motor vehicle law to the extent of the coverage

and limits of liability required by that law in that jurisdiction.

**4. Legal Action Against Us**

a. No person or organization has a right under this Liability Coverage Part:

(1) To join us as a party or otherwise bring us into a "suit" against any insured; or

(2) To sue us to recover under this Liability Coverage Part unless all of its terms have been fully complied with.

b. A person or organization may sue us to recover under this Liability Coverage Part on an agreed settlement or on a final judgment against any insured. However, we will not be liable for damages that are not payable under the terms of this Liability Coverage Part or that are in excess of the applicable Limit of Liability in this Liability Coverage Part. For the purpose of this condition, an agreed settlement means a settlement and release of liability signed by us, and the claimant or the claimant's legal representative.

**5. "Other Insurance"**

If applicable "other insurance" is available to the insured for "bodily injury", "property damage", "personal injury" or "advertising injury" covered, under **SECTION I. COVERAGE. A. Liability** above, our obligations are limited as follows.

a. **Primary Insurance**

(1) This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the "other insurance" that applies is also primary. If any of the "other insurance" that applies is also primary, we will share with all that "other insurance" by the method described in Paragraph **c.** below.

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

Exhibit "1"
59





**(2)** However, this insurance will be considered to be primary to, and non-contributory with, "other insurance" issued directly to a person or organization added as an additional insured, under **SECTION II. WHO IS AN INSURED, 2. h. Certain Additional Insureds By Contract Or Agreement** above, if you specifically agree, in that written contract or agreement, that this insurance must be primary to, and non-contributory with, such "other insurance". This insurance will then be applied as primary insurance for damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies, and we will not share those damages with such "other insurance".

**b.  Excess Insurance**

**(1)** This insurance is excess over any "other insurance" whether primary, excess, contingent or on any other basis:

   **(a)** That is available to any insured covering direct physical loss of or damage to property;

   **(b)** That is available to any insured with respect to the conduct of any past partnership, joint venture, limited liability company or trust;

   **(c)** That is available to any insured for:

     **(i)** Work or operations performed on that insured's behalf; or

     **(ii)** That insured's acts or omissions in connection with the general supervision of such work or operations;

**CONFIDENTIAL ATTORNEYS' EYES ONLY**

   **(d)** That is available to any insured covering liability for damages arising out of the premises or operations for which any insured has been added as an additional insured;

   **(e)** If the "bodily injury", "property damage", "personal injury" or "advertising injury", to which this insurance applies, arises out of the maintenance, use, operation, "loading and unloading" or entrustment to other persons or organizations of any aircraft, "auto", snowmobile (or any trailer designed for use, operation or "loading or unloading" with any snowmobile) or watercraft; or

   **(f)** That is available to you covering liability arising out of products manufactured, sold, handled or distributed by a manufacturer or distributor for which you have been added as an additional insured because you are a vendor for such manufacturer's or distributor's products.

**(2)** When this insurance is excess, we will have no duty, under **SECTION I. COVERAGE, A. Liability** above, to defend any "suit" if any person or organization providing "other insurance" has a duty to defend the insured against that "suit". If no other person or organization providing "other insurance" defends the insured against that "suit", we will undertake to do so, but we will be entitled to the insured's rights against any person or organization providing "other insurance".

**(3)** When this insurance is excess over "other insurance", we will pay only our share of the damages, if any, that exceeds the sum of:

**Exhibit "1"**

CL/BF 20 10 11 02     Includes copyrighted material of Insurance Services Office with its permission     Page 23 of 32
Copyright Insurance Services Office, Inc., 2001

A01662

(a) The total amount that all such "other insurance" would pay for the "bodily injury", "property damage", "personal injury" or "advertising injury", to which this insurance applies, in the absence of this insurance; and

(b) The total of all deductible and self-insured amounts under all such "other insurance".

### c. Method Of Sharing

(1) If all of the "other insurance" permits contribution by equal shares, we will follow this method also. Under this method, each person or organization providing the "other insurance" contributes equal amounts until all applicable limits of liability have been paid or none of the covered damages remain, whichever comes first.

(2) If any of the "other insurance" does not permit contribution by equal shares, we will contribute by limits. Under this method, each person or organization providing the "other insurance" contributes a share based on the ratio of that person's or organization's applicable limit of liability to the total of all applicable limits of liability.

### 6. Representations

We have issued this Liability Coverage Part in reliance upon your representations. By accepting this policy, you agree:

a. The statements in the Declarations and the Liability Coverage Part Declarations are accurate and complete; and

b. Those statements are based upon representations you made to us.

### 7. Separation Of Insureds

Except with respect to the Limits of Liability in this Liability Coverage Part and any rights or duties specifically assigned in this Liability Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom the claim is made or "suit" is brought.

### 8. Transfer Of Rights Of Recovery And Proceeds Against Others To Us

If any insured has rights to recover all or part of any payment we have made under this Liability Coverage Part, those rights and the proceeds of any settlement or judgment that may result from the exercise of those rights, belong to us. You and all other insureds that are, or may be, involved in an "occurrence", or offenses that causes "personal injury" or "advertising injury", for which we make, or may make, a payment must do all that is possible after that "occurrence" or offense to:

a. Preserve those rights and proceeds; and

b. Cooperate with us in any attempt to exercise such rights or recover such proceeds.

### 9. When We Do Not Renew

a. If we decide not to renew this Liability Coverage Part, we will mail or deliver to the first Named Insured shown in the Liability Coverage Part Declarations written notice of the non-renewal not less than 30 days before the expiration date of this Liability Coverage Part.

b. If that notice is mailed, proof of mailing will be sufficient proof of such notice.

### SECTION V. DEFINITIONS

1. "Advertising" means attracting the attention of other persons or organizations by any means for the purpose of seeking customers or supporters or increasing sales or business.

2. "Advertising idea" means a manner or style of "advertising" that other persons or

**CONFIDENTIAL ATTORNEYS' EYES ONLY**

Exhibit "1"

60



organizations use and intend to attract attention in their "advertising".

However, information used to identify or record customers or supporters, such as a list of customers or supporters, will not be deemed to be an "advertising idea".

3. "Advertising injury" means injury, other than "bodily injury" or "personal injury", caused by one or more of the following offenses:

a. Publication of "insured material", in your "advertising", that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b. Publication of "insured material", in your "advertising", that violates a person's right of privacy;

c. Unauthorized use of another person's or organization's "advertising idea" in your "advertising"; or

d. Infringement upon another person's or organization's copyright, trade dress or "slogan" in your "advertising".

4. "Auto" means a land motor vehicle, or trailer or semi-trailer used with a land motor vehicle, designed for travel on public streets or roads, including any attached machinery or equipment. "Auto" does not include "mobile equipment".

5. "Bodily injury" means any physical harm, including sickness or disease, to the physical health of other persons. It includes any of the following that results, at any time, from such physical harm, sickness or disease:

a. Mental anguish, injury or illness; and

b. Emotional distress; or

c. Care, loss of services or death.

6. "Broadcasting" means transmitting any audio or visual material for any purpose:

a. By radio or television; or

b. In or with any other electronic means of communication, such as the Internet, if that material is part of:

(1) Radio or television programming;

(2) Other entertainment, educational, instructional, music or news programming; or

(3) "Advertising" transmitted with that programming.

7. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

c. All parts of the world if:

(1) The injury or damage arises out of:

(a) Goods or products made or sold by you in the territory described in Paragraph a. above;

(b) The activities of a person whose domicile is in the territory described in Paragraph a. above, but is away for a short period of time on your business; or

(c) "Personal injury" or "advertising injury" offenses committed through the Internet or similar electronic means of communication; and

(2) The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph a. above, or in a settlement agreed to by us.

8. "Described insured" means any insured described in **SECTION II. WHO IS AN INSURED, 1.** above or any of your

**CONFIDENTIAL ATTORNEYS' EYES ONLY**

**Exhibit "1"**

61

Includes copyrighted material of Insurance Services Office with its permission
Copyright Insurance Services Office, Inc., 2001

A01664

"designated employees" or "designated volunteer workers".

9. "Designated employee" means any of your "employees" who is or acts as:

    a. A supervisor or manager for you;

    b. Your insurance or risk manager; or

    c. Holds a position in your insurance, risk management or legal department.

10. "Designated volunteer worker" means any of your "volunteer workers" who is or acts as:

    a. A supervisor or manager for you;

    b. Your insurance or risk manager; or

    c. Holds a position in your insurance, risk management or legal department.

11. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

12. "Employment-related practices" means:

    a. Refusal to employ a person;

    b. Termination of a person's employment; or

    c. Other employment-related act, omission, policy or practice, committed upon or applied to a person, such as coercion, libel or slander, demotion, discipline, discrimination, evaluation, harassment, humiliation, or reassignment of or against that person, or violation of that person's right of privacy.

13. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any similar governing document.

14. "Hostile fire" means a fire that becomes uncontrollable or breaks out from where it was intended to be.

15. "Impaired property" means "tangible property", other than "your product" or "your

work", that cannot be used or is less useful because:

    a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

    b. You have failed to fulfill the terms of any contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

16. "Independent contractor" means any person who is not the insured's "employee", "temporary worker" or "volunteer worker", but who performs duties related to the conduct of the insured's business in the course of that person's independent employment in accordance with a contract or agreement between the insured and that person for specified services.

17. "Insured contract":

    a. Means any of the following contracts or agreements executed or made before the "bodily injury" or "property damage" to which this insurance applies occurs or before the offense that causes "personal injury" or "advertising injury" to which this insurance applies is committed:

        (1) A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by a Covered Cause of Loss as provided in the Tenant Legal Liability Causes of Loss form that is part of this policy, to the premises while rented to you or temporarily occupied by you with permission of the owner or to the business personal property of that premises rented to you for a period of 7 or fewer consecutive days is not an "insured contract";

        (2) A sidetrack agreement;


CONFIDENTIAL
ATTORNEYS' EYES
ONLY

**Exhibit "1"**

**(3)** Any easement or license agreement;

**(4)** Any obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**(5)** An elevator maintenance agreement; or

**(6)** That part of any other contract or agreement pertaining to your business under which you assume the "tort liability" of another person or organization to pay damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to a third person or organization; and

**b.** Does not include that part of any contract or agreement as defined in Paragraph **a. (6)** above:

**(1)** That indemnifies any architect, engineer, surveyor, construction contractor or construction management service for injury or damage arising out of:

**(a)** Preparing, approving or failing to prepare or approve any map, shop drawing, opinion, report, survey, field order, change order, design, specification, recommendation, permit application, payment request, manual, instruction, computer program for design systems, or selection of a contractor or sub-contractor; or

**(b)** Giving directions or instructions or failing to give them, if that is the primary cause of the injury or damage; or

**(2)** Under which you, if an architect, engineer, surveyor, construction contractor or construction management service assume liability for injury or damage arising out of the insured's rendering of, or failure to render, "professional

services" including those listed in Paragraph **(1)** above and supervisory, inspection or engineering services.

**18.** "Insured material":

**a.** Means any material in any form of expression, including material published in or with any electronic means of communication, such as the Internet; and

**b.** Does not include:

**(1)** Any Web site, part of a Web site, or content of a Web site, that is designed, built, maintained or determined for another person or organization by or for any insured whose business is designing, building or maintaining or determining the content of, Web sites for other persons or organizations; or

**(2)** Any material published in an electronic chatroom or bulletin board over which any insured exercises control, or that any insured hosts or owns.

**19.** "Leased worker" means a person leased to you by a labor leasing company, under a contract or agreement between you and that company, to perform duties related to the conduct of your business. "Leased worker" does not include any "temporary worker".

**20.** "Loading or unloading":

**a.** Means the handling of property:

**(1)** After the property is moved from the place where the property is accepted for movement into or onto an aircraft, "auto", snowmobile or watercraft;

**(2)** While the property is in or on an aircraft, "auto", snowmobile or watercraft; or

*CONFIDENTIAL ATTORNEYS' EYES ONLY*

**Exhibit "1"**
**63**

Includes copyrighted material of Insurance Services Office with its permission
Copyright Insurance Services Office, Inc., 2001



A01666

(3) While the property is being moved from an aircraft, "auto", snowmobile or watercraft to the place where the property is finally delivered; and

b. Does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, "auto", snowmobile or watercraft.

**CONFIDENTIAL ATTORNEYS' EYES ONLY**

21. "Mobile equipment":

a. Means any of the following types of land vehicles, including any attached machinery or equipment:

(1) Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

(2) Vehicles maintained for use solely on or next to premises owned or occupied by, rented or loaned to, you;

(3) Vehicles that travel on crawler treads;

(4) Vehicles, whether self-propelled or not, on which are permanently mounted:

(a) Power cranes, shovels, loaders, diggers or drills; or

(b) Road construction or resurfacing equipment such as graders, scrapers or rollers;

(5) Vehicles not described in Paragraphs (1), (2), (3) or (4) above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(a) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(b) Cherry pickers and similar devices used to raise or lower workers; or

(6) Vehicles not described in Paragraphs (1), (2), (3) or (4) above maintained primarily for purposes other than the transportation of persons or cargo; and

b. Does not include self-propelled vehicles with the following types of permanently attached equipment that are not "mobile equipment", but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; or

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing.equipment.

22. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same generally harmful conditions.

23. "Other insurance" means insurance or the funding of losses, that is provided by or through:

a. Another insurance company;

b. Us, except under this Liability Coverage Part;

c. Any of our affiliated insurance companies;

d. A risk retention group;

**Exhibit "1"**



CL/BF 20 10 11 02          Includes copyrighted material of Insurance Services Office with its permission
Copyright Insurance Services Office, Inc., 2001

A01667

e. Any self-insured method or program, other than any funded by you and over which this Liability Coverage Part applies; or

f. Any similar risk transfer or risk management method.

24. "Personal injury" means injury, other than "bodily injury" or "advertising injury", caused by one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its' owner, landlord or lessor;

d. Publication of "insured material" that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

e. Publication of "insured material" that violates a person's right of privacy.

25. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and "waste".

26. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage":

(1) Occurring away from premises owned or occupied by, or rented or loaned to, you unless your business includes the selling, handling or distribution of "your product" for consumption on that premises; and

(2) Arising out of "your product" or "your work" except:

(a) Products that are still in your physical possession; or

(b) Work that has not yet been:

(i) Abandoned by you; or

(ii) Completed.

"Your work" will be deemed completed at the earliest of the following times:

a) When all of the work called for in your contract has been completed;

b) When all of the work to be done at the job site has been completed, if your contract calls for work at more than one job site; or

c) When that part of the work done at the job site has been put to its intended use by any other person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed; and

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured; or

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

**Exhibit "1"**

CL/BF 20 10 11 02        Includes copyrighted material of Insurance Services Office with its permission        Page 29 of 32
Copyright Insurance Services Office, Inc., 2001

A01668

(2) The existence of tools, uninstalled equipment or abandoned or unused materials.

27. "Professional services" means any service requiring specialized skill or training, including any:

a. Legal, accounting, "advertising", real estate, travel or consulting service;

b. Claim, investigation, adjustment, appraisal, survey, audit, or inspection service;

c. Medical, surgical, dental, chiropractic, x-ray or nursing service, treatment, advice or instruction, including any food or beverages given with such service, treatment, advice or instruction;

d. Furnishing or dispensing of any drug or medical, dental or surgical supply or appliance;

e. Health or therapeutic service, treatment, advice or instruction;

f. Service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming or therapy, including any of the following:

(1) Eyebrow arching, tweezing or plucking;

(2) Removal of unwanted hair by shaving, use of wax or use of depilatory preparation;

(3) Back, face or neck massaging;

(4) Manicuring or pedicuring;

(5) E-Serenity Derma Systems; or

(6) Any tanning device owned, operated or maintained by, or rented or loaned to, any insured;

g. Medical or diagnostic testing, technique or procedure used for:

(1) The detection, diagnosis or treatment of any sickness, disease, condition or injury; or

(2) Evaluation of a patient's response to treatment or medication; and the reporting or reliance upon the results of such medical or diagnostic testing, technique or procedure;

h. Ophthalmology or optometry service, including the prescribing, preparation, fitting, demonstration or distribution of any ophthalmic lens or similar product;

i. Hearing aid service including sale, handling, prescription, preparation, fit, demonstration, distribution, treatment, advice or instruction of any hearing aid device;

j. Body piercing service;

k. Pharmacy or drug store service, treatment, advice or instruction;

l. Law enforcement, fire-fighting, or security service;

m. Handling or treatment of a dead body, including any autopsy, organ donation, embalming, disposal, burial, cremation or disinterment;

n. Service, treatment, advice or instruction relating to physical fitness, including service, treatment, advice or instruction in connection with any diet, cardio-vascular fitness, body building or physical training program;

o. Counseling or advisory service with respect to mental health, crisis prevention, social, religious or spiritual service, drug and alcohol rehabilitation or similar service;

p. Preparation, approval, or failing to prepare or approve any map, shop drawing, opinion, report, survey, field order, change order, design, specification, recommendation, permit application, payment request, manual, instruction, computer program for design

CONFIDENTIAL
ATTORNEYS EYES
ONLY
66

Includes copyrighted material of Insurance Services Office with its permission
Copyright Insurance Services Office, Inc., 2001



systems, or selection of a contractor or sub-contractor;

q. Inspection, architectural or engineering activity or service, construction contractor or construction management service; or

r. Lithography, electrotyping, engraving, photoengraving, stereotyping or other printing service.

**28.** "Property damage" means:

a. Physical injury to "tangible property", of another person or organization, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of "tangible property", of another person or organization that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

**29.** "Publishing":

a. Means creating and producing any material in any format for distribution or sale to other persons or organizations for any purpose; and

b. Does not mean creating or producing:

(1) Correspondence written in the conduct of your business; or

(2) Material that describes or reports your business activities, including bulletins, financial or annual reports, and newsletters in any format.

**30.** "Slogan":

a. Means a phrase that other persons or organizations use and intend to attract attention in their "advertising"; and

b. Does not include a phrase used as, or in, the name of:

(1) Any person or organization, other than you; or

(2) Any business or any of the premises, goods, products or services of any person or organization, other than you.

**31.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**32.** "Supervision of others" means:

a. The directing, managing or supervising of an "employee", "temporary worker" or "volunteer worker", including his or her employment, hiring, evaluation, training or work; or

b. The directing, monitoring, safekeeping or supervising of any other person or organization for any reason.

**33.** "Tangible property" does not include data.

**34.** "Temporary worker" means a person who is hired to temporarily substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**35.** "Tort liability" means a liability that would be imposed by law in the absence of any contract or agreement.

**36.** "Volunteer worker" means a person who:

a. Is not the insured's "employee";

b. Donates his or her work;

c. Acts at the direction of and within the scope of duties determined by the insured; and

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

Exhibit "1"
67

CL/BF 20 10 11 02

Includes copyrighted material of Insurance Services Office with its permission.
Copyright Insurance Services Office, Inc., 2001

A01670

**d.** Is not paid a fee, salary or other compensation by anyone for work performed for the insured.

**37.** "Waste" includes material to be recycled, reconditioned or reclaimed.

**38.** "Waste products or completed work" means:

**a.** "Your product" or "your work" that is or was at any time handled, stored, disposed of, processed or treated as "waste" at, on, or in any premises, site or location that is or was at any time used by or for any insured or other persons or organizations for the handling, storage, disposal, processing or treatment of "waste";

**b.** "Your products" or "your work" that are or were "pollutants"; that are or were at any time transported, handled, stored, treated, disposed of or processed as "waste" by or for any insured or any person or organization for whom you may be legally responsible; or

**c.** "Your product" or "your work" that is being used for cleaning up, containing, detoxifying, disposal of, handling, monitoring, neutralizing, processing, removing, storing, testing for, transporting or treating any "pollutant" at, on, or in any premises, site or location that is or was at any time used by or for any insured or other persons or organizations for the handling, storage, disposal, processing or treatment of "waste".

**39.** "Your product":

**a.** Means:

**(1)** Any goods or products (other than real property), manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Another person or organization trading under your name; or

**(c)** Another person or organization whose business or assets you have acquired; or

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products;

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions; and

**c.** Does not include vending machines or other property rented to or located for the use of other persons or organization, but not sold.

**40.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations; and

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

CONFIDENTIAL
ATTORNEYS' EYES
ONLY

**Exhibit "1"**

CL/BF 20 10 11 02
Includes copyrighted material of Insurance Services Office with its permission
Copyright Insurance Services Office, Inc., 2001

A01671



THE HARTFORD - PRODUCTION STATUS CENTER
HARTFORD PLAZA   HO-GL-19
HARTFORD, CT  06115

THE HARTFORD - SCIC

BROWNWOOD BLDG.  KOGER CENTER  4440 PIEDRAS DR. SOUTH, 2ND FL

SAN ANTONIO                   TX 78228

16879

*0100072LH07630101

**Exhibit "2"**
**69**

REGIONAL OFFICE INSTRUCTION SHEET

POLICY NUMBER: 72 SBA LH0763   DX

ROUTING INSTRUCTIONS

_SEND TO PSU FOR COMPLETION OF PC-110 - UMBRELLA COVERAGE

_SEND TO RECORDS.   TRANSFER CORR IF APPLICABLE.

TERMINAL ID: U0DCWH7S
         08/26/00   72 SBA LH0763   DX  (10/31/01)   PAGE   1

**Exhibit "2"**
**70**

POLICY FACE SHEET

63
07 INSURED:
LH HARTFORD CASUALTY INSURANCE COMPANY
SBA

POLICY NO. 72 SBA LH0763 DX                RECORDS RETENTION - PERMANENT

DECLARATIONS
ITEMS
1. NAMED INSURED AND             ANGLES BEAUTY CARE GROUP INC
   MAILING ADDRESS:              SEE FORM IH1200
                                 12245 WORLD TRADE DR STE H
                                 SAN DIEGO, SAN DIEGO
                                 CA. 92128

2. POLICY PERIOD:                10/31/00    10/31/01      1
                                 INCEPTION   EXPIRATION   YEAR

   AGENT'S CODE: 251316
   AGENT'S NAME: MFC & V INSURANCE SERVICES/SCIC

   PREVIOUS POLICY NO. 72 SBA LH0763

3. THE NAMED INSURED IS: CORP

   POLICY STATUS: ACTIVE
   LOB LEVEL OF SUPPORT: SP-S
   MARKET SEGMENTATION:  810

   SELECT CUSTOMER
   AGENT SALES AGREEMENT          (COMMISSION STATUS   )
   DIRECT ACCOUNT BILL NUMBER - 42521259A
   DEDUCTIBLE
   RATED RISK
   ADDITIONAL INSURED(S)
                                          AUTOMATICALLY BOOKED
                            ABBREVIATED POLICY ISSUED

TRANS TYPE: RENL    CNTL#: 001
POLICY FACE SHEET   TERMINAL ID: U0DCWH7S   PAGE   2
           08/26/00   72 SBA LH0763   DX   (10/31/01)

**Exhibit "2"**

**71**

16880

*0100072LH07630101

**SPECTRUM POLICY DECLARATIONS (Continued)**
POLICY NUMBER: 72 SBA LH0763

| BUSINESS LIABILITY | LIMITS OF INSURANCE |
|---|---|
| LIABILITY AND MEDICAL EXPENSES | $1,000,000 |
| MEDICAL EXPENSES - ANY ONE PERSON | $    10,000 |
| PERSONAL AND ADVERTISING INJURY | $1,000,000 |
| FIRE LEGAL LIABILITY - FIRE, LIGHTNING, OR EXPLOSION | $   300,000 |
| AGGREGATE LIMITS | |
| PRODUCTS-COMPLETED OPERATIONS | $2,000,000 |
| GENERAL AGGREGATE | $2,000,000 |

BUSINESS LIABILITY OPTIONAL
COVERAGES

| | |
|---|---|
| HIRED/NON-OWNED AUTO LIABILITY   FORM:   SS 04 38 | $1,000,000 |
| BEAUTY SHOP PROFESSIONAL LIABILITY   FORM:   SS 04 37 | $1,000,000 |
| UMBRELLA LIABILITY - SEE   SCHEDULE ATTACHED | |

16889

*010007ZLH07630101

**Exhibit "2"**

**SPECTRUM POLICY DECLARATIONS (Continued)**
**POLICY NUMBER:** 72 SBA LH0763

**ADDITIONAL INSUREDS:   THE FOLLOWING ARE ADDITIONAL INSUREDS FOR BUSINESS
                        LIABILITY COVERAGE IN THIS POLICY.**

```
LOCATION: 001 BUILDING: 001

   TYPE:  MANAGER/LESSOR:

   NAME:  SEE FORM IH 12 00

LOCATION: 002 BUILDING: 001

   TYPE:  MANAGER/LESSOR:

   NAME:  SANTA ANA VENTURE
          MAIN PLACE SANTA ANA

LOCATION: 003 BUILDING: 001

   TYPE:  MANAGER/LESSOR:

   NAME:  SEE FORM IH 12 00

LOCATION: 005 BUILDING: 001

   TYPE:  MANAGER/LESSOR:

   NAME:  SEE FORM IH 12 00

LOCATION: 007 BUILDING: 001

   TYPE:  MANAGER/LESSOR:

   NAME:  THE MANIFEST GROUP 100 E SARATOGA
          MARSHALL MI 56258 LN#715738
```

**Exhibit "2"**
**73**

**Form SS 00 02 11 93 T** Printed in U.S.A. (NS)     Page 018 (CONTINUED ON NEXT PAGE)
**Process Date:** 08/26/00                          **Policy Expiration Date:** 10/31/01

**SPECTRUM POLICY DECLARATIONS (Continued)**
**POLICY NUMBER:** 72 SBA LH0763

```
LOSS PAYEE:  FORM SS 12 12
SEE FORM IH 12 00
```

16890

*0100072LH07630101

**Form Numbers of Forms and Endorsements that apply:**

```
SS 00 01 04 93      SS 00 05 06 96      SS 00 07 07 97      SS 00 08 02 98
SS 01 21 08 97      SS 04 07 03 92      SS 04 37 10 96      SS 04 38 05 99
SS 04 41 07 97      SS 04 42 07 97      SS 04 46 10 96      SS 04 47 10 96
SS 04 74 12 98      IH 10 01 09 86      SS 05 05 03 92      SS 05 41 02 98
SS 12 12 03 92      SX 80 01 06 97
   IH 12 00 11 85 NAMED INSURED
   IH 12 00 11 85 ADDITIONAL  INSURED  - MANAGER/LESSOR
   IH 12 00 11 85 LOSS PAYEE
```

**Exhibit "2"**

**Form SS 00 02 11 93 T** Printed in U.S.A. (NS)     **74   Page** 019
**Process Date:** 08/26/00                          **Policy Expiration Date:** 10/31/01

**POLICY NUMBER:** 72 SBA LH0763



### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

NAMED INSURED


ANGLES BEAUTY CARE GROUP, INC.
DBA: COLLECTIONS SALON & DAY SPA (LOC 1,2,4,5)
DBA: ANGLES COLORS CUTS AND PERMS (LOC 3,6)
DBA: HAI

**Exhibit "2"**
**75**

POLICY NUMBER: 72 SBA LH0763



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

ADDITIONAL INSURED - MANAGER/LESSOR

LOC 001
WESTFIELD AMERICA INC.
272 E VIA RANCHO PARKWAY
ESCONDIDO, CA 92025

LOC 003
BANK OF THE WEST
1450 TREAT BLVD.
WALNUT CREEK, CA 94596

ONTARIO MILLS LTD. PARTNERSHIP

LOC 005

FASHION VALLEY CENTER
THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE U.S.
LEND LEASE REAL ESTATE INVESTMENTS INC.
LASALLE PARTNERS MANAGEMENT SERVICES INC.
7007 FRIARS RD STE 392
SAN DIEGO CA 92108

H.G. FENTON COMPANY
MEISSNER JACQUET INVESTMENT MANAGEMENT SERVICES
3870 MURPHY CANYON ROAD, #300
SAN DIEGO, CA 92123
RE LOCATION 4

16891

*0100072LH07630101

**POLICY NUMBER:** 72 SBA LH0763



## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

LOSS PAYEE

LOC 001

PITNEY BOWES CREDIT CORP
PO BOX 909
SHELTON, CT 06484
BUSINESS PERSONAL PROPERTY

LUCENT TECHNOLOGIES PRODUCT FINANCE
C/O ABIC SPECIALTY SERVICES
PO BOX 979220
MIAMI, FL 33197
BUSINESS PERSONAL PROPERTY
LOC 002

PITNEY BOWES CREDIT CORP
PO BOX 909
SHELTON, CT 06484
BUSINESS PERSONAL PROPERTY

LOC 003

PITNEY BOWES CREDIT CORP
PO BOX 909
SHELTON, CT 06484
BCL CAPITOL
115 WEST COLLEGE DRIVE
MARSHALL, MN 56258
BUSINESS PERSONAL PROPERTY

BANK VEST
ATTN DAN MULCAHY
200 NICKERSON RD BOX 9170
MARLBORO, MA 01752
LAP TOP COMPUTER: TOSHIBA TECRA 800, MODEL #PATBOOU,
                 SERIAL #29451785A-3

LOC 004

PITNEY BOWES CREDIT CORP
PO BOX 909

**POLICY NUMBER:** 72 SBA LH0763



## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

LOSS PAYEE

16892

SHELTON, CT 06484
BUSINESS PERSONAL PROPERTY

LOC 007
THE MANIFEST GROUP
100 E SARATOGA
MARSHALL MI 56258
LN#715738

*0100072LH07630101

**Form IH 12 00 11 85 T SEQ. NO.** 003    **Printed In U.S.A.** **Page** 002

**Exhibit "2"**

78

**Process Date:** 08/26/00                    **Expiration Date:** 10/31/01

UW COPY

# BUSINESS LIABILITY COVERAGE FORM

**Exhibit "2"**
**79**

**Form SS 00 08 02 98**  Printed in U.S.A. (NS)

© 1998,  The Hartford,

**QUICK REFERENCE**
**BUSINESS LIABILITY COVERAGE FORM**
**READ YOUR POLICY CAREFULLY**

| **BUSINESS LIABILITY COVERAGE FORM** | **Beginning on Page** |
|---|---|
| **A.  COVERAGES** | **1** |
| Business Liability | 1 |
| Coverage Extension - Supplementary Payments | 1 |
| Medical Expenses | 2 |
| Professional Services Coverages | 2 |
| Incidental Malpractice | 3 |
| **B.  EXCLUSIONS** | **3** |
| **C.  WHO IS AN INSURED** | **8 - 9** |
| **D.  LIABILITY AND MEDICAL EXPENSES:** | |
| **LIMITS OF INSURANCE** | **12** |
| **E.  LIABILITY AND MEDICAL EXPENSES GENERAL CONDITIONS** | **12** |
| **1.**  Bankruptcy | **12** |
| **2.**  Duties in The Event of Occurrence, Claim or Suit | **12** |
| **3.**  Financial Responsibility Laws | **12** |
| **4.**  Legal Action Against Us | **12** |
| **5.**  Separation of Insureds | **13** |
| **6.**  Unintentional Failure To Disclose Hazards | **13** |
| **F.  OPTIONAL COVERAGES** | **13** |
| **1-7** Additional Insured | **13 -14** |
| **G.  LIABILITY AND MEDICAL EXPENSES LIABILITY DEFINITIONS** | **15 - 18** |

**Exhibit "2"**
**80**

Form SS 00 08 02 98  Printed in U.S.A. (NS)

© 1998, The Hartford,



# BUSINESS LIABILITY COVERAGE FORM



Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under SECTION **C.** - WHO IS AN INSURED.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION **G.** - LIABILITY AND MEDICAL EXPENSES DEFINITIONS.

## A. COVERAGES

### 1. Business Liability

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury" or "advertising injury" to which this insurance does not apply.

We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in SECTION **D.** - LIABILITY AND MEDICAL EXPENSES LIMITS OF INSURANCE; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements or medical expenses.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under COVERAGE EXTENSION - SUPPLEMENTARY PAYMENTS.

b. This insurance applies to:

(1) "Bodily injury" and "property damage" only if:

(a) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(b) The "bodily injury" or "property damage" occurs during the policy period.

(2) "Personal injury" caused by an offense arising out of your business.

(3) Advertising injury" caused by an "advertisement" of your goods, products or services;

but only if the offense causing the "personal injury" or the "advertising injury" was committed in the "coverage territory" and during the policy period.

c. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

d. "Property damage" that is loss of use of tangible property that is not physically injured will be deemed to occur at the time of the "occurrence" that caused it.

e. **Coverage Extension - Supplementary Payments**

In addition to the Limits of Insurance, we will pay, with respect to any claim or "suit" we defend:

(1) All expenses we incur.

(2) Up to $1,000 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which Business Liability Coverage for "bodily injury" applies. We do not have to furnish these bonds.

(3) The cost of bonds to release attachments, but only for bond amount within our Limits of Insurance. We do not have to furnish these bonds.

(4) All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of

**Exhibit "2"**
**81**

Form SS 00 08 02 98  Printed in U.S.A. (NS)

Page 1 of 18

© 1998, The Hartford

**BUSINESS LIABILITY COVERAGE FORM**

earnings up to $500 a day because of time off from work.

**(5)** All costs taxed against the insured in the "suit."

**(6)** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the Limits of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**(7)** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within our Limits of Insurance.

**2. Medical Expenses**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within three years of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the Limit of Insurance. We will pay reasonable expenses for:

**(1)** First aid at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**3. Professional Services Coverages**

When your operations include:

**a.** Optician or hearing aid establishment, Exclusion **j. (7)** in Section **B.** - EXCLUSIONS does not apply.

**b.** Retail druggist or drugstore, Exclusion **j. (10)** in Section **B.** - EXCLUSIONS does not apply.

**c.** Funeral director or funeral parlors, the following professional services coverage is added:

**(1)** The Business Liability Coverage applies to damages arising out of professional services by you or your employees in the course of your mortician or funeral parlor business. Subject to Limits of Insurance stated in SECTION **D.** of this form, we will pay those sums that the insured becomes legally obligated to pay as damages for "bodily injury" including mental anguish, and "property damage" because of any:

**(a)** Professional malpractice, error or omission in the:

**(I)** Removal;

**(II)** Handling;

**(III)** Disposition;

**(IV)** Cremation;

**(V)** Burial; or

**(VI)** Embalming;

**(VII)** Disinterment,

of any "deceased human body";

**(VIII)** Conduct of any memorial service even though no "deceased human body" actually be present;

**(IX)** Injury to, destruction of or interference with the right of burial of a "deceased human body."

**(b)** Professional service by any insured as a member of:

**(I)** Formal accreditation board; or

**(II)** Similar professional board or committee.

**(2)** This insurance also applies to damages for "property damage" caused by an "occurrence" to:

**(a)** Urns;

**(b)** Caskets, linings or fittings;

**(c)** Casket cases;

**(d)** Crypts or mausoleums; or

**(e)** Other facilities belonging to others that are in the care, custody or control of the insured and used for

Form SS 00 08 02 98  Printed in U.S.A.  (NS)

© 1998, The Hartford

**BUSINESS LIABILITY COVERAGE FORM**

the purpose of burying or caring for a "deceased human body."

(3) Only Exclusions **d.**, **e.**, **f.** and **k.** in **B. EXCLUSIONS** apply to this coverage.

(4) **Additional Definition**

"Deceased human body" includes any part of a human body severed therefrom and ashes of a deceased human body after legal cremation.

4. **Incidental Malpractice**

a. The definition of "bodily injury" in SECTION **G. - LIABILITY AND MEDICAL EXPENSES DEFINITIONS** is amended to include injury arising out of the rendering or failure to render medical or paramedical services to persons by any physician, dentist, nurse, emergency medical technician or paramedic who is employed by you to provide such services.

b. Paragraph **2.a.(2)** in SECTION **C. - WHO IS AN INSURED** does not apply to nurses, emergency medical technicians or paramedics referred to in **a.** above.

c. Paragraph **(1)** of Exclusion **e.** in SECTION **B. - EXCLUSIONS** does not apply to injury to the emotions or reputation of a person arising out of such services.

This Incidental Malpractice does not apply if you are engaged in the business or occupation of providing any services referred to in **a.** above.

## B. EXCLUSIONS

1. **Applicable to Business Liability Coverage**

This insurance does not apply to:

a. **Expected or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b. **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

(2) That the insured would have in the absence of the contract or agreement.

Solely for the purpose of liability assumed in an "insured contract," reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured, are deemed to be damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" provided:

(1) Liability to such party, or for the cost of that party's defense has also been assumed in the same "insured contract," and

(2) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

c. **Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

d. **Workers Compensation and Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e. **Employer's Liability**

"Bodily injury" to:

(1) An employee of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business, or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of (1) above.

This exclusion applies:

**Exhibit "2"**
**83**

© 1998, The Hartford

**BUSINESS LIABILITY COVERAGE FORM**

    (a) Whether the insured may be liable as an employer or in any other capacity; and

    (b) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract."

**f. Pollution**

    (1) "Bodily injury", "property damage", "personal injury" or "advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

        (a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to any insured;

        (b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

        (c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

        (d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

            (I) If the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor, or

            (II) If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

        Subparagraphs (a) and (d)(I) do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

        As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

    (2) Any loss, cost or expense arising out of any:

        (a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

        (b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**g. Aircraft, Auto or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and loading or unloading.

This exclusion does not apply to:

    (1) Aircraft that is:

        (a) Hired, chartered or loaned with a paid crew; but

        (b) Not owned by any insured;

    (2) A watercraft while ashore on premises you own or rent; or

    (3) A watercraft you do not own that is:

        (a) Less than 51 feet long; and

        (b) Not being used to carry persons for a charge.

        This provision (3) applies to any person who with your expressed or implied consent either uses or is responsible for use of a watercraft.

Provisions under paragraphs (1) and (3) of this Exclusion g. do not apply if the insured has any other insurance for "bodily injury" or "property damage" liability that would also be covered under those provisions, whether the other insurance is primary, excess, contingent or on any other basis. In that

**Exhibit "2"**
84

© 1998, The Hartford

**BUSINESS LIABILITY COVERAGE FORM**

case, provisions **(1)** and **(3)** above do not provide any insurance.

**(4)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(5)** Liability assumed under any "insured contract" for the ownership, maintenance, or use of aircraft or watercraft; or

**(6)** "Bodily injury" or "property damage" arising out of the operation of any of the following equipment:

    **(a)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    **(b)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geo-physical exploration, lighting and well servicing equipment.

**h.  Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice or preparation for, a prearranged racing, speed or demolition contest or in any stunting activity.

**i.  War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incidental to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**j.  Professional Service**

"Bodily injury," "property damage," "personal injury" or "advertising injury" due to rendering or failure to render any professional service. This includes but is not limited to:

**(1)** Legal, accounting or advertising services;

**(2)** Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;

**(3)** Supervisory, inspection or engineering services;

**(4)** Medical, surgical, dental, x-ray or nursing services or treatment;

**(5)** Any health service or treatment;

**(6)** Any cosmetic or tonsorial service or treatment;

**(7)** Optical or hearing aid services including prescribing, preparation, fitting, demonstration, or distribution of ophthalmic products or hearing aid devices;

**(8)** Optometric services including but not limited to examination of the eyes and prescribing of ophthalmic lenses and exercises;

**(9)** Ear piercing service;

**(10)** Services in the practice of pharmacy.

Paragraphs **(4)** and **(5)** of this exclusion do not apply to Incidental Malpractice coverage afforded under paragraph **4.** in SECTION A. - COVERAGE.

**k.  Damage to Property**

"Property damage" to:

**(1)** Property you own, rent or occupy;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)** and **(6)** of this exclusion do not apply to the use of elevators.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(4)** of this exclusion does not apply to "property damage" to borrowed

**BUSINESS LIABILITY COVERAGE FORM**

equipment while not being used to perform operations at job site.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**l.  Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

But this exclusion does not apply to:

  **(1)** The use of elevators; or

  **(2)** Liability assumed under a sidetrack agreement.

**m.  Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**n.  Property Damage**

Loss of use of tangible property which has not been physically injured or destroyed resulting from:

  **(1)** A delay in or lack of performance by you or on your behalf of any contract or agreement; or

  **(2)** The failure of "your product" or "your work" to meet the level of performance, quality, fitness or durability warranted or represented by you or on your behalf.

The exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of:

  **(1)** "Your product"; or

  **(2)** "Your work,"

after such product or work has been put to its intended use.

**o.  Property Damage**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

  **(1)** "Your product";

  **(2)** "Your work"; or

  **(3)** Any property of which "your product" or "your work" forms a part,

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**p.  "Personal injury" or "advertising injury:"**

  **(1)** Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

  **(2)** Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

  **(3)** Arising out of a criminal act committed by or at the direction of any insured;

  **(4)** Arising out of a violation of any anti-trust law;

  **(5)** Caused by an offense committed by, at the direction or with the consent or acquiescence of the insured with the expectation of inflicting "personal injury" or "advertising injury;"

  **(6)** For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement;

  **(7)** Arising out of any breach of contract, except an implied contract to use another's "advertising idea" in your "advertisement;"

  **(8)** Arising out of the fluctuation in price or value of any stocks, bonds or other securities; or

  **(9)** Arising out of an offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting. However, this exclusion does not apply to paragraphs **a.**, **b.** and **c.** under the definition of "personal injury."

**q.  "Advertising injury" arising out of:**

  **(1)** Infringement of trademark, trade name, service mark or other designation of origin or authenticity;

  **(2)** The failure of goods, products or services to conform with advertised quality or performance;

  **(3)** The wrong description of the price of goods, products or services; or

  **(4)** An interactive conversation between or among persons through a computer network.

**Exhibit "2"**
**86**

Form SS 00 08 02 98   Printed in U.S.A.  (NS)

© 1998, The Hartford

**BUSINESS LIABILITY COVERAGE FORM**

Exclusions **c.**, **d.**, **e.**, **f.**, **g.**, **h.**, **i.**, **k.**, **l.**, **m.**, **n.**, and **o.** do not apply to damage by fire, lightning or explosion to premises rented to you. A separate Limit of Insurance applies to this coverage as described in SECTION **D.** - LIABILITY AND MEDICAL EXPENSES LIMITS OF INSURANCE.

2. **Applicable to Medical Expenses Coverage**

   We will not pay expenses for "bodily injury":

   **a.** To any insured.

   **b.** To a person hired to do work for or on behalf of any insured or a tenant of any insured.

   **c.** To a person injured on that part of premises you own or rent that the person normally occupies.

   **d.** To a person, whether or not an employee of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

   **e.** To a person injured while taking part in athletics.

   **f.** Included with the "products-completed operations hazard."

   **g.** Excluded under Business Liability Coverage.

   **h.** Due to war, whether or not declared, or any act or condition incidental to war. War includes civil war, insurrection, rebellion or revolution.

3. **Applicable to both Business Liability Coverage and Medical Expenses Coverage - Nuclear Energy Liability Exclusion**

   This insurance does not apply:

   **a.** Under Business Liability Coverage, to "bodily injury" or "property damage":

   **(1)** With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

   **(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which:

   **(a)** Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

   **(b)** The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   **b.** Under Medical Expenses Coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   **c.** Under Business Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material"; if:

   **(1)** The "nuclear material":

   **(a)** Is at any "nuclear facility" owned by, or operated by or on behalf of, an insured; or

   **(b)** Has been discharged or dispersed therefrom;

   **(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

   **(3)** The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility"; but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

   As used in this exclusion:

   "byproduct material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

   "hazardous properties" include radioactive, toxic or explosive properties;

   "nuclear facility" means:

   **(a)** Any "nuclear reactor";

   **(b)** Any equipment or device designed or used for:

**Exhibit "2"**

**87**

© 1998, The Hartford

**BUSINESS LIABILITY COVERAGE FORM**

(I) Separating the isotopes of uranium or plutonium;

(II) Processing or utilizing "spent fuel"; or

(III) Handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear material" means "source material," "special nuclear material" or "byproduct material";

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"property damage" includes all forms of radioactive contamination of property;

"source material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"special nuclear material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

"waste" means any waste material:

(a) Containing "byproduct material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content; and

(b) Resulting from the operation by any person or organization of any "nuclear facility" included under paragraphs (a) and (d) of the definition of "nuclear facility."

## C. WHO IS AN INSURED

1. If you are designated in the Declarations as:

   a. An **individual**, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A **partnership** or joint venture, you are an insured. Your members, your partners and their spouses are also insureds, but only with respect to the conduct of your business.

   c. A **limited liability company**, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your manager.

   d. An organization other than a partnership or joint venture or limited liability company you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

   a. Your "employees", other than your "executive officers", but only for acts within the scope of their employment by you. However, none of these employees is an insured for:

      (1) "Bodily injury" or "personal injury," to you or to a co-employee while in the course of his or her employment or to the spouse, child, parent, brother or sister of that co-employee as a consequence of such "bodily injury" or "personal injury," or for any obligation to share damages with or repay someone else who must pay damages because of the injury.

      (2) "Bodily injury" or "personal injury," arising out of his or her providing or failing to provide professional health care services; or

      (3) "Property damage" to property owned or occupied by or rented or loaned to that employee, any of your other employees, or any of your partners or members (if you are a partnership or joint venture).

**Exhibit "2"**
**88**

© 1998, The Hartford

**b.** Any person (other than your employee), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this policy.

**e.** Any "employee" of the insured while acting in the scope of his/her duties as a retail pharmacist, or optician or optometrist.

**f.** **Additional Insureds by Contract, Agreement or Permit**

Any person or organization with whom you agreed, because of a written contract or agreement or permit, to provide insurance such as is afforded under this Business Liability Coverage Form, but only with respect to your operations, "your work" or facilities owned or used by you.

However, coverage under this provision does not apply:

(1) Unless the written contract or agreement has executed or permit has been issued prior to the "bodily injury," "property damage," "personal injury" or "advertising injury."

(2) To any person or organization included as an insured under provision **g.** (Broad Form Vendors).

(3) To any other person or organization shown in the Declarations as an Additional Insured.

**Coverage under this provision includes the following:**

(1) When an **engineer, architect** or **surveyor** becomes an insured under provision **2.f.**, the following additional exclusion applies:

"Bodily injury," "property damage," "personal injury," or "advertising injury" arising out of the rendering of or the failure to render any professional services by or for you including:

(a) The preparing, approving, or failure to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; and

(b) Supervisory, inspection, or engineering services.

(2) When a **lessor of leased equipment** becomes an insured under provision **2.f.**, the following additional exclusions apply:

(a) To any "occurrence" which takes place after the equipment lease expires; or

(b) To "bodily injury" or "property damage" arising out of the sole negligence of the lessor.

(3) When **owners or other interests from whom land has been leased** become an insured under provision **2.f.**, the following additional exclusions apply:

(a) Any "occurrence" which takes place after you cease to lease that land; or

(b) Structural alterations, new construction or demolition operations performed by or on behalf of the owners or other interests from whom land has been leased.

(4) When **managers or lessors of premises** become an insured under provision **2.f.**, the following exclusions apply:

(a) Any "occurrence" which takes place after you cease to be a tenant in that premises; or

(b) Structural alterations, new construction or demolition operations performed by or on behalf of the manager or lessors of the premises.

**g.** **Additional Insured - Broad Form Vendors**

Any person or organization with whom you agreed, because of a written contract or agreement to provide insurance, but only with respect to "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business, subject to the following additional exclusions:

(1) The insurance afforded the vendor does not apply to:

(i) "Bodily injury" or "property damage" for which the vendor is obligated to pay

© 1998, The Hartford

**BUSINESS LIABILITY COVERAGE FORM**

damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

(ii) Any express warranty unauthorized by you;

(iii) Any physical or chemical change in product made intentionally by the vendor;

(iv) Repackaging, unless unpacked solely for the purpose of inspection, demonstration, testing, or substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

(v) Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

(vi) Demonstration, installation, servicing or repair operations performed at the vendor's premises in connection with the sale of the product;

(vii) Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor.

(2) This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

(3) This provision **g.** does not apply to any vendor included as an insured by an endorsement issued by us and made a part of this Coverage Part.

(4) This provision **g.** does not apply if "bodily injury" or "property damage" included within the "products-completed operation hazard" is excluded either by the provisions of the Coverage Part or by endorsement.

**h. Broad Form Named Insured**
Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain ownership

majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

(1) Coverage under this provision is afforded only until the 180th day after you acquire or form the organization or the end of the policy period, whichever is earlier; and

(2) Coverage under this provision does not apply to:
  (a) "Bodily injury" or "property damage" that occurred; or
  (b) "Personal injury" or "advertising injury" arising out of an offense committed;
  before you acquired or formed the organization.

**i. Newly Formed or Acquired Organizations**
Any subsidiary and subsidiary thereof, of yours which is a legally incorporated entity of which you own a financial interest of more than 50% of the voting stock on the effective date of this policy.

The insurance afforded herein for any subsidiary not shown in the Declarations as a named insured does not apply to injury or damage with respect to which an insured under this policy is also an insured under another policy or would be an insured under such policy but for its termination or upon the exhaustion of its limits of insurance.

**j. Additional Insured - Volunteers**
Any person(s) who are volunteer worker(s) for you, but only while acting at the direction of, and within the scope of their duties for you.

(1) However, no volunteer worker(s) are insureds for:
  (a) "Bodily injury," "property damage," "personal injury" or "advertising injury" arising out of rendering or the failure to render professional services by a volunteer worker.
  (b) "Bodily injury" or "personal injury:"
    (i) To you, to your partners or members (if you are a partnership or joint venture), to your other volunteer worker(s) or to your "employees" arising out of and in the course of their duties for you;
    (ii) To the spouse, child, parent, brother or sister of your

Exhibit "2"
90

Form SS 00 08 02 98   Printed in U.S.A. (NS)

© 1998, The Hartford

BUSINESS LIABILITY COVERAGE FORM

volunteer worker(s) or your "employees" as a consequence of paragraph **(1) (a)** above; or

**(c)** "Property damage" to property:

    **(I)** Owned, occupied or used by,

    **(II)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by:

you, any of your other volunteer worker(s), your "employees" or if you are a partnership or joint venture, any partner or member.

**(2)** Exclusion **B.2.a.** Applicable to Medical Expenses Coverage is replaced by the following:

    **2.a.** To any insured, except volunteer workers.

**(3)** When used in this provision **J.**, volunteer worker(s) means a person who is not paid a fee, salary or other compensation.

**3. Additional Insured - Mobile Equipment**

With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

**a.** "Bodily injury" to a co-employee of the person driving the equipment; or

**b.** "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

**D. LIABILITY AND MEDICAL EXPENSES LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of number of:

    **a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits."

**2. Aggregate Limits**

The most we will pay for:

**a.** Injury or damages under the "products-completed operations hazard" arising from all "occurrences" during the policy period is the Product-Completed Operations Aggregate Limit shown in the Declarations.

**b.** All other injury or damages, including medical expenses, arising from all "occurrences" during the policy period is the General Aggregate Limit shown in the Declarations.

This General Aggregate Limit applies separately to each of your "locations" owned by or rented to you.

"Location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway or right-of-way of a railroad.

This aggregate limit does not apply to "property damage" to premises rented to you arising out of fire, lightning or explosion.

The limits of this policy apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**3.** Subject to item **2.** above, the most we will pay for the sum of all damages because of all "bodily injury", "property damage" and medical expenses arising out of any one "occurrence" is the Liability and Medical Expenses Limit shown in the Declarations.

The most we will pay for all medical expenses because of "bodily injury" sustained by any one person is the Medical Expenses Limit shown in the Declarations.

**4.** Subject to item **2.** above, the most we will pay for the sum of all damages because of all "personal injury" and "advertising injury" sustained by any one person or organization is the Personal Injury and Advertising Injury Limit shown in the Declarations.

Exhibit "2"
91

© 1998, The Hartford

**BUSINESS LIABILITY COVERAGE FORM**

5. The most we will pay under Business Liability Coverage for damages because of "property damage" to premises rented to you arising out of any one fire, lightning or explosion is the Fire Legal Liability Limit shown in the Declarations.

   The Fire Legal Liability Limit applies to all damage proximately caused by the same event, whether such damage results from fire, lightning or explosion or any combination of the three.

## E. LIABILITY AND MEDICAL EXPENSES GENERAL CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under the policy.

2. **Duties In The Event of Occurrence, Claim Or Suit**

   a. You must see to it that we are notified promptly of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place; and

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

      This condition applies only when the "occurrence" is known to:

      (1) You, if you are an individual;

      (2) A partner, if you are a partnership; or

      (3) A manager if you are a limited liability company;

      (4) An "executive officer" or insurance manager, if you are a corporation.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive a written notice of the claim or "suit" as soon as practicable.

      But this condition will not be considered breached unless the breach occurs after such claim or suit is known to:

   (1) You, if you are an individual;

   (2) A partner, if you are a partnership; or

   (3) A manager if you are a limited liability company;

   (4) An "executive officer" or insurance manager, if you are a corporation.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Financial Responsibility Laws**

   a. When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, the insurance provided by the policy for "bodily injury" liability and "property damage" liability will comply with the provisions of the law to the extent of the coverage and limits of insurance required by that law.

   b. With respect to "mobile equipment" to which this insurance applies, we will provide any liability, uninsured motorists, underinsured motorists, no-fault or other coverage required by any motor vehicle law. We will provide the required limits for those coverages.

4. **Legal Action Against Us**

   No person or organization has a right under this policy:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

Page 12 of 18

**Exhibit "2"**
92

Form SS 00 08 02 98   Printed in U.S.A. (NS)

© 1998, The Hartford

**BUSINESS LIABILITY COVERAGE FORM**

b. To sue us on this policy unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

5. **Separation of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this policy to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

6. **Unintentional Failure To Disclose Hazards**

It is agreed that based on our reliance on your representations as to existing hazards, if unintentionally you should fail to disclose all such hazards at the inception date of your policy, we shall not deny any coverage under this Coverage Part because of such failure.

7. **Other Insurance    -   Primary Additional Insured**

If the written contract or agreement or permit requires this insurance to be primary for any person or organization with whom you agree to include in **WHO IS AN INSURED**, this Other Insurance Provision is applicable.

If other valid and collectible insurance is available for a loss we cover under this Business Liability Coverage Form, our obligations are limited as follows:

a. **Primary Insurance**

This insurance is primary. We will not seek contributions from other insurance available to the person or organization with whom you agree to include in **WHO IS AN INSURED**, except when b. applies.

b. **Excess Insurance**

This insurance is excess over any of the other insurance whether primary, excess, contingent or on any other basis:

(1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work;"

(2) That is Fire, lightning or explosion insurance for premises rented to you; or

temporarily occupied by you with permissions of the owner; or

(3) If the loss arises out of the maintenance or use of aircraft, "auto" or watercraft to the extent not subject to Exclusion **g.** of this Business Liability Coverage Form (Section I).

When this insurance is excess, we will have no duty to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

c. **Method of Sharing**

If all the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any or the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's base on the ratio of its applicable limits of insurance of all insurer.

d. This provision provides such insurance as is afforded under this policy, but only with respect to your operations, "your work" or facilities owned or used by you.

F. **OPTIONAL COVERAGES**

If listed or shown as applicable in the Declarations, one or more of the following Optional Coverages also apply. These coverages are subject to the terms and conditions applicable to Business Liability Coverage in this policy, except as provided below:

1. **Additional Insured - Designated Person or Organization**

**Exhibit "2"**
**93**

© 1998, The Hartford

**BUSINESS LIABILITY COVERAGE FORM**

WHO IS AN INSURED under SECTION **C.** is amended to include as an insured the person or organization shown in the Declarations, but only with respect to liability arising out of your operations or premises owned by or rented to you:

**2. Additional Insured - Managers or lessors of Premises**

a. WHO IS AN INSURED under SECTION **C.** is amended to include as an insured the person(s) or organization(s) shown in the Declarations; but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Declarations and subject to the following additional exclusions

b. Additional Exclusions

This insurance does not apply to:

(1) Any "occurrence" which takes place after you cease to be a tenant in that premises.

(2) Structural alterations, new constructions or demolition operations performed by or for that person or organization.

**3. Additional Insured - Grantor of Franchise**

WHO IS AN INSURED under SECTION **C.** is amended to include as an insured the person(s) or organization(s) shown in the Declarations, but only with respect to their liability as grantor of franchise to you.

**4. Additional Insured - Lessor of Leased Equipment**

a. WHO IS AN INSURED under SECTION **C.** is amended to include as an insured the person(s) or organization(s) shown in the Declarations, but only with respect to their liability arising out of the maintenance, operation or use by you of equipment leased to you by such person(s) or organization(s).

b. Additional Exclusions:

This insurance does not apply:

(1) To any "occurrence" which takes place after the equipment lease expires,

(2) To "bodily injury" or "property damage" arising out of the sole negligence of the lessor.

**5. Additional Insured - Owners Or Other Interests From Whom Land Has Been Leased**

WHO IS AN INSURED under SECTION **C.** is amended to include as an insured the person or organization shown in the Declarations, but only with respect to liability arising out of the owner-ship, maintenance or use of that part of the land

leased to you and shown in the Declarations and subject to the following additional exclusion:

This insurance does not apply to:

a. Any "occurrence" that takes place after you cease to lease that land; or

b. Structural alterations, new construction or demolition operations performed by or for the person or organization shown in the Declarations.

**6. Additional Insured - State or Political Subdivision - Permits**

a. WHO IS AN INSURED under SECTION **C.** is amended to include as an insured the state or political subdivision shown in the Declarations, but only with respect to operations performed by you or on your behalf for which the state or political subdivision has issued a permit.

b. Additional Exclusions

This insurance does not apply to:

(1) "Bodily injury," "property damage," "personal injury" or "advertising injury" arising out of operations performed for the state or political subdivision; or

(2) "Bodily injury" or "property damage" included in the "product-completed operations" hazard.

**7. Additional Insured - Vendors**

a. WHO IS AN INSURED under SECTION **C.** is amended to include as an insured the person(s) or organization(s) (referred to below as vendor) shown in the Declarations, but only with respect to "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business.

b. Additional Exclusions

(1) The insurance afforded the vendor does not apply to:

(a) "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

(b) Any express warranty unauthorized by you;

Exhibit "2"    94

© 1998, The Hartford

**BUSINESS LIABILITY COVERAGE FORM**

    (c) Any physical or chemical change in the product made intentionally by the vendor;

    (d) Repackaging, unless unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

    (e) Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the product;

    (f) Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

    (g) Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor.

  (2) This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

## G. LIABILITY AND MEDICAL EXPENSES DEFINITIONS

1. "Advertising injury" means injury arising out of one or more of the following offenses:

    a. Oral or written publication of material in your "advertisement" that slanders or libels a person or disparages a person's or organization's goods, products or services;

    b. Oral or written publication of material in your "advertisement" that violates a person's right of privacy;

    c. Copying, in your "advertisement", a person's or organization's "advertising idea" or style of "advertisement"; or

    d. Infringement of copyright, slogan, or title of any literary or artistic work, in your "advertisement"

2. "Advertisement" means a dissemination of information or images that has the purpose of inducing the sale of goods, products or services through:

    a. (1) Radio;

      (2) Television;

      (3) Billboard;

      (4) Magazine;

      (5) Newspaper; or

    b. Any other publication that is given widespread public distribution.

However, "advertisement" does not include the design, printed material, information or images contained in, on or upon the packaging or labeling of any goods or products.

3. "Advertising idea" means any idea for an "advertisement".

4. "Auto" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment."

5. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including mental anguish or death resulting from any of these at any time.

6. "Coverage Territory" means:

    a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

    b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in a. above; or

    c. All parts of the world if:

      (1) The injury or damage arises out of:

        (a) Goods or products made or sold by you in the territory described in a. above; or

        (b) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; and

      (2) The insured's responsibility to pay damages is determined in a "suit" on the merits in the territory described in a. above or in a settlement we agree to.

7. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**Exhibit "2"**
**95**

© 1998, The Hartford

**BUSINESS LIABILITY COVERAGE FORM**

8. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

9. "Insured Contract" means:

   a. A lease of premises;

   b. A sidetrack agreement;

   c. Any easement or license agreement;

   d. Any obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement; or

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of municipality in connection with work performed for a municipality) under which you assume the liability of another party to pay for "bodily injury" or "property damage" to a third person or organization.

   An "insured contract" does not include that part of any contract or agreement:

   (1) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

       (a) Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

       (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

   (2) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (a) above and supervisory, inspection or engineering services; or

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or Unloading" means the handling of property:

    a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

    b. While it is in or on an aircraft, watercraft or "auto"; or

    c. While it is being moved from an aircraft, watercraft of "auto" to the place where it is finally delivered;

    but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto."

12. "Mobile Equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    b. Vehicles maintained for use solely on or next to premises you own or rent;

    c. Vehicles that travel on crawler treads;

    d. Vehicles, whether self-propelled or not, on which are permanently mounted:

       (1) Power cranes, shovels, loaders, diggers or drills; or

       (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

    e. Vehicles not described in a., b., c., or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

       (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

       (2) Cherry pickers and similar devices used to raise or lower workers;

    f. Vehicles not described in a., b., c., or d. above maintained primarily for purposes other than the transportation of persons or cargo.

       However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

       (1) Equipment designed primarily for:

           (a) Snow removal;

           (b) Road maintenance, but not construction or resurfacing;

           (c) Street cleaning;

**Exhibit "2"**

**96**

© 1998, The Hartford

**BUSINESS LIABILITY COVERAGE FORM**

Paragraph f.(1), (a), (b), (c) does not apply to self-propelled vehicles of less than 1,000 pounds gross vehicle weight.

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal Injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. Wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that the person occupies, by or on behalf of its owner, landlord or lessor;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication of material that violates a person's rights of privacy; or

f. Discrimination or humiliation that results in injury to the feelings or reputation of a natural person but only if such discrimination or humiliation is:

(1) Not done intentionally by or at the direction of:

(a) The insured; or

(b) Any executive officer, director, stockholder, partner or member of the insured; and

(2) Not directly or indirectly related to the employment, prospective employment or termination of employment of any person or persons by any insured.

This paragraph f. does not apply in the States of Nebraska, Ohio and Kansas.

15. "Products-Completed Operations Hazard" includes all "bodily injury" and "property damage" arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned.

The "bodily injury" or "property damage" must occur away from premises you own or rent, unless your business includes the selling, handling or distribution of "your product" for consumption on premises you own or rent.

b. "Your work" will be deemed completed at the earliest of the following times:

(1) When all of the work called for in your contract has been completed.

(2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

(3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

c. This hazard does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it; or

(2) The existence of tools, uninstalled equipment or abandoned or unused materials.

16. "Property Damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of "occurrence" that caused it.

17. "Suit" means a civil proceeding in which damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

**Exhibit "2"**

**97**

© 1998, The Hartford

**BUSINESS LIABILITY COVERAGE FORM**

    **a.** An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

    **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

**18.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**19.** "Your Product" means:

    **a.** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

      **(1)** You;

      **(2)** Others trading under your name; or

      **(3)** A person or organization whose business or assets you have acquired; and

    **b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    "Your product" includes:

    **a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    **b.** The providing of or failure to provide warnings or instructions. "Your product" does not include vending machines or other property rented to or located for the use of others, but not sold.

**20.** "Your Work" means:

    **a.** Work or operations performed by you or on your behalf; and

    **b.** Materials, parts or equipment furnished in connection with such work or operations.

    "Your work" includes:

    **a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

    **b.** The providing of or failure to provide warnings or instructions.

**Exhibit "2"**
**98**

Form SS 00 08 02 98   Printed in U.S.A.  (NS)

© 1998, The Hartford

**EXHIBIT 3**

ORIGINAL

FILED

05 MAR 22 PH 4: 08

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

1  NEIL F. MARTIN  (CAL. SBN: 41677)
   JOHN L. HALLER (CAL. SBN 61392)
2  SUSAN B. MEYER (CAL. SBN: 204931)
   GORDON & REES LLP
3  101 West Broadway
   Suite 1600
4  San Diego, CA 92101
   Telephone:    (619) 696-6700
5  Facsimile:    (619) 696-7124

6  Attorneys for Plaintiff,
   ANGLES BEAUTY CARE GROUP, INC..
7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN  DISTRICT OF CALIFORNIA

10

11  ANGLES BEAUTY CARE GROUP, INC.,      )  CASE NO. 05 CV 0166  JAH  (RBB)
    a California corporation,             )
12                                        )
                        Plaintiff,        )  FIRST AMENDED COMPLAINT FOR
13                                        )  PRELIMINARY AND PERMANENT
             v.                           )  INJUNCTION AND FOR DAMAGES
14                                        )  FOR:
    HAIR ART INTERNATIONAL, INC., a       )
15  California Corporation; and JACKIE YU, )  1.  TRADEMARK
    an individual,                        )      INFRINGEMENT
16                                        )
                        Defendants.       )  2.  FEDERAL UNFAIR
17  _____  )      COMPETITION

18                                           3.  DECLARATORY JUDGMENT

19                                           4.  UNFAIR COMPETITION
                                                 UNDER CAL. BUS. & PROF.
20                                               CODE 17200

21                                           5.  INTENTIONAL
                                                 INTERFERENCE WITH
22                                               CONTRACT/PROSPECTIVE
                                                 ECONOMIC ADVANTAGE
23

24                                               DEMAND FOR JURY TRIAL

25

26      Plaintiff, ANGLES BEAUTY CARE GROUP, INC.., a California corporation

27  (hereinafter "Plaintiff" or "ANGLES"), for its claims for relief against Defendants, HAIR ART

28  INTERNATIONAL, INC., and Jackie Yu, of 3000 E. Las Hermanas St. Rancho Dominguez

Exhibit "3"
99

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1  California 90221, an individual (hereinafter "HAIR ART" and "YU" respectively, or collectively

2  "Defendants"), hereby aver and allege:

3  <u>**AVERMENTS COMMON TO ALL CLAIMS FOR RELIEF**</u>

4  The following averments are common to, and are incorporated by reference in all claims

5  for relief which follow:

6  <u>**Jurisdiction and Venue**</u>

7  1.  This is an action for injunctive relief and damages for federal trademark

8  infringement and unfair competition arising under the Trademark Act, 15 U.S.C.. § 1125, *et seq*;

9  under the United States Declaratory Judgment Act, 38 USC § § 2201 and 2202;, under the

10  California Business & Professions Code §17200, and common law relating to trademark and

11  trade name infringement, unfair competition and intentional interference with contract and

12  prospective economic advantage.  This Court has subject matter jurisdiction under 15 U.S.C.

13  §1121(a), 28 U.S.C. §1331 and 28 U.S.C. §1338(a) and (b); and supplemental or pendant

14  jurisdiction under 28 U.S.C. §§1338(b) and 1367(a).

15  2.  Venue is proper in this Court under 28 U.S.C. § 1391(b) in that Defendants do

16  business in this judicial district and a substantial part of the events giving rise to the claims

17  asserted occurred in this judicial district.

18  <u>**The Parties**</u>

19  3.  Plaintiff, ANGLES BEAUTY CARE GROUP, INC., is a corporation organized

20  and existing under the laws of the State of California, with its principal place of business located

21  at 12155 Paine Place, Poway, CA  92064.

22  4.  Plaintiff is informed and believes and on that basis alleges that Defendant, HAIR

23  ART INTERNATIONAL, INC., is a California Corporation, sometimes doing business as "Hair

24  Art International" with its principal place of business located at 8112 W. 3rd Street, Los Angeles,

25  CA 90048.

26  5.  Plaintiff is informed and believes and on that basis alleges that Defendant YU is a

27  resident of Los Angeles County, CA.

28  ///

**Exhibit "3"**

**100**     2

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND FOR
DAMAGES FOR TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION

6.    Plaintiff is informed and believes and on that basis alleges that Defendant YU is a principal and/or an employee or agent of Defendant HAIR ART. Plaintiff is further informed and believes and on that basis alleges that at all times relevant herein, the conduct of Defendant YU complained of herein was undertaken by Defendant YU, for and on behalf of himself and as an agent for Defendant HAIR ART.

## COMMON FACTS

7.    Plaintiff is an exclusive manufacturer and wholesaler of certain goods and services to the hair care industry ("the HAI Products"), including flat irons for straightening hair, and is the holder of a family of trademarks (hereinafter "the HAI Marks" or "the Marks"), including the following:

(a)    Hair Art and Information (first use 1999 and subject to Federal Registration application 78/337317 filed Dec. 5, 2003 for hair care products, namely, hair sprays, hair sheens and hair spray gels; scissors; hair styling tools, namely, electric flat irons, electric curling irons and electric hair dryers);

(b)    Hair Art (first use 1999 and subject of Federal Registration application 78/337,311 for hair care products, namely, hair sprays, hair sheens and hair spray gels; scissors; hair styling tools, namely, electric flat irons, electric curling irons and electric hair dryers);

(c)    Hair Art and Information first use as a trade name since 1999;

(d)    HAI (first use 1999 and subject of Federal Registration Application Serial No. 75/787,522 filed August 30, 1999 and registered December 11, 2001, Registration No. 2518282 for educational services namely conducting courses and seminars in the field of hair care);

(e)    HAI logo (first use 1999 and subject of Federal Registration application Serial No. 78/337,353 filed Dec. 5, 2003 for hair care products, namely, hair sprays, hair sheens and hair spray gels; scissors; hair styling tools, namely, electric flat irons, electric curling irons and electric hair dryers);

(f)    HAI Elite (first use 1999 and subject to a Federal Registration application Serial 76/379,609 filed March 4, 2004 on hair products, hair styling tools, hair clippers and

**Exhibit "3"**
**101**    3

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1    razors and electric hair dryers).

2        8.    Plaintiff's marks, "Hair Art" "Hair Art and Information" and "HAI" (Marks) were

3    first adopted and used on hair irons and related services (Products) prior to any use thereof by

4    Defendants on hair iron products and therefore Plaintiff has exclusive right to use these marks.

5        9.    Plaintiff has widely advertised its Products , so that purchasers of the Products

6    associate the Marks with the source and producer of the Products.

7        10.    Plaintiff's right to exclusive use of its marks is unchallenged by others and

8    conceded by Defendants' failure over an extended time after notice to maintain any claim to

9    exclusive rights.

10        11.    Plaintiff has not abandoned its Marks.

11        12.    Plaintiff's Marks were obtained by complying with all applicable trademark laws

12    of the United States and the common law.

13        13.    Plaintiff has continuously maintained the exclusive use of its Marks, and has not

14    permitted any third parties to use or sublicense its Marks in a manner that would misrepresent the

15    source of the Products that are marketed under the Marks.

16        14.    Because of the length and manner of use of Plaintiff's Marks, the Marks have

17    acquired secondary meaning.

18        15.    Plaintiff, ANGLES, holds the exclusive right to license the Marks.

19        16.    Defendants began using the trademark HAI on flat irons long after 1999.

20        17.    Defendants had actual knowledge of the Plaintiffs prior use of HAI on flat irons

21    when they intentionally began using HAI on flat irons and representing Defendant's company as

22    HAI and therefore Defendants violation of the Plaintiff's rights was willful.

23        18.    Defendants have sold flat irons with warranty language copied from Plaintiff and

24    that include Plaintiff's address as the warranty provider.

25        19.    Defendants have intentionally represented their company and products, as "HAI"

26    to purchasers and prospective purchasers in order to mislead those purchasers as to the source of

27    Defendant's products.

28        20.    Defendants have intentionally represented to purchasers and prospective

**Exhibit "3"**

**102**    4

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1    purchasers that Plaintiff's products and Defendant's products are in the same product line, but

2    that Plaintiff's product is the low-end product in that line.

3        21.    On or about February 23, 2000, Defendants made a cease and desist demand to

4    Plaintiff that Plaintiff stop using Defendants Mark "Hair Art". Thereafter, Plaintiff responded

5    *inter alia* that they have the right to use Hair Art as a part of their tradename Hair Art and

6    Information and that they intended to continue using Hair Art. The Defendants responded

7    defending the term Hair Art as not being descriptive. Later, Defendants allowed their

8    registration and pending trademark application for Hair Art to become abandoned and have

9    failed to counter the Plaintiffs assertion of Plaintiff's right to use Hair Art.

10        22.    Plaintiff has changed it's position and relied upon Defendant's failure to continue

11    it's demands or to take action in respect thereof for a period of almost 4 years .

12    ### FIRST CLAIM FOR RELIEF

13    **(Infringement of Trademarks under the Lanham 43(a)**

14    **15 U.S.C. §§ 1114, et seq. and common law)**

15        23.    Plaintiff, Angles Beauty Care Group, Inc. incorporates by reference in this claim

16    for relief the averments contained in Paragraphs 1 through 22 inclusive, above, as though fully

17    set forth in this claim for relief.

18        24.    Defendants' conduct of knowingly continuing to offer goods and services under

19    Plaintiff's Marks constitutes willful infringement of Plaintiff's Marks.

20        25.    As a direct and proximate result of the unauthorized activities of Defendants as set

21    forth above, Defendants are likely to cause and have caused confusion, mistake or deception as

22    to the source of Defendants' goods and services.

23        26.    Plaintiff has suffered damages and continues to suffer damages in an amount to be

24    ascertained.

25        27.    The harm to Plaintiff resulting from the conduct of the Defendants has been

26    irreparable, continuing, and not fully compensable by monetary damages. Unless Defendants are

27    enjoined from their unauthorized use of Plaintiff's Marks, Plaintiff will continue to suffer

28    damages to its reputation, goodwill, and to the strength, integrity and value of Plaintiff's famous

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

Exhibit "3"
**103**    5

1   Marks.

2                    **SECOND CLAIM FOR RELIEF**

3                    **(Federal Unfair Competition**

4                    **15 U.S.C. . §§ 1125, et seq.)**

5          28.    Plaintiff, Angles Beauty Care Group, Inc. incorporates by reference in this claim

6   for relief the averments contained in Paragraphs 1 through 22, inclusive, and 24 through 27

7   inclusive, above, as though fully set forth in this claim for relief.

8          29.    Defendants' conduct as alleged above in willfully continuing its unauthorized use

9   of Plaintiff's Marks constitutes unfair competition.

10         30.    Defendants' use of Plaintiff's warranty language and Plaintiff's address as the

11  warranty provider; Defendant's misrepresentations about Plaintiff's and Defendants' products

12  being in the same product line; and Defendants' false representations about Plaintiff's product

13  being the low-end product in the same product line as Defendants' products constitute false or

14  misleading description of fact, false or misleading representation of fact, and false designation of

15  origin.

16         31    As a direct proximate result of Defendants' conduct, Plaintiff ANGLES has

17  suffered and will continue to suffer irreparable injury to its business reputation and goodwill, and

18  to the value and integrity of Plaintiff's Marks.

19         32    Plaintiff's remedy at law is not by itself sufficient to compensate Plaintiff for its

20  injuries resulting from Defendants' unauthorized use of Plaintiff's Marks. Accordingly, Plaintiff

21  is entitled to injunctive relief to prohibit Defendants from continuing their illegal action.

22         33    Plaintiff ANGLES is also entitled to an award of actual and treble damages, and

23  profits and to recovery of its costs and attorney's fees.

24                    **THIRD CLAIM FOR RELIEF**

25                    **(Declaratory Judgment**

26         **under Declaratory Judgment Act, 38 USC § § 2201 and 2202)**

27         34    Plaintiff, Angles Beauty Care Group, Inc. incorporates by reference in this claim

28  for relief the averments contained in Paragraphs 1 through 22 inclusive, above, 24 through 27

**Exhibit "3"**
**104**                6

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1    inclusive, above, and 29 through 33 inclusive, as though fully set forth in this claim for relief..

2    35    Plaintiff alleges that a genuine controversy has arisen and exists between Plaintiff

3    and Defendants as to the ownership of the Marks, and that said case and controversy is ripe for

4    judicial determination.  As a direct and proximate result of the activities of Defendants as set

5    forth above, Plaintiff further alleges that it is unable to effectively conduct business and to use its

6    Marks effectively until a judicial determination of the dispute over ownership of the Marks is

7    obtained.  Plaintiff therefore requests a swift and decisive judicial determination by the Court

8    that Plaintiff unequivocally owns the entire right, title and interest in the Marks on hair care

9    products, namely, hair sprays, hair sheens and hair spray gels; scissors; hair styling tools,

10    namely, electric flat irons, electric curling irons and electric hair dryers; hair brushes; and

11    educational services, namely, conducting courses and seminars in the field of hair care.

12    ## FOURTH CLAIM FOR RELIEF

13    ### (Unfair Competition under

14    ### Cal. Bus. & Prof. Code §§17200 *et seq.* and common law)

15    36.    Plaintiff Angles Beauty Care Group, Inc. incorporates by reference in this claim

16    for relief Paragraphs 1 through 22 inclusive, above, 24 through 27 inclusive, above, 29 through

17    33 inclusive, and 35 as though fully set forth in this claim for relief.

18    37.    The acts of Defendants as alleged herein constitute unfair competition in violation

19    of California Business and Professions Code §§17200 *et seq.* and California common law.

20    38.    As a result of the activities of Defendants, Plaintiff has suffered and will continue

21    to suffer irreparable injury to its business reputation and goodwill and to the value and integrity

22    of its Marks.  Plaintiff's remedy at law is not by itself sufficient to compensate Plaintiff for

23    injuries inflicted and threatened by Defendants.  Thus, Plaintiff is entitled to injunctive relief to

24    prohibit Defendants from continuing its illegal action.

25    39.    Plaintiff is also entitled to an award of actual compensatory and punitive damages

26    (under California common law), and recovery of its costs and attorney's fees.

27    ///

28    ///

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

**Exhibit "3"**
**105**    7

## SIXTH CLAIM FOR RELIEF

### (Intentional Interference with Contract/Prospective Economic Advantage under the Common Law)

40.    Plaintiff Angles Beauty Care Group, Inc. incorporates by reference in this claim for relief Paragraphs 1 through 22 inclusive, above, 24 through 27 inclusive, above, 29 through 33 inclusive, 35, and 37 through 39 inclusive as though fully set forth in this claim for relief.

41.    Plaintiff has either entered into contracts with third parties or had the expectancy of an economic advantage with third parties.  Defendants were aware of these contracts and economic expectancies.

42.    Despite the existence of third party contracts and/or economic expectancies between Plaintiff and these third parties, and Defendants' awareness of these third party contracts and/or economic expectancies, Defendants intentionally interfered with and/or disrupted such contracts and economic expectancies, by engaging in acts alleged herein, including but not limited to, making misrepresentations about the source of Defendants' products, the relationship between Plaintiff's and Defendants' products, and the quality of Plaintiff's products.

43.    The above acts by Defendants were intended to and did actually disrupt and interfere with contracts and/or expectancies between Plaintiff and third parties, and Plaintiff has been damaged as a result, in an amount to be proven at trial.  Damages include, but are not limited to loss of goodwill, status, reputation in the industry and loss of revenues.

44.    Defendants acts were committed with malice, oppression and fraud and were done with the intent to interfere with Plaintiff's contracts and economic expectances with third parties such that Plaintiff is entitled to recover punitive damages as a result.

## PRAYER

WHEREFORE, Plaintiff ANGLES prays for judgment against Defendants HAIR ART, INC., and  YU, and both of them, as follows:

1.    That this Court adjudge that Defendants, and both of them, by their unauthorized use of Plaintiff's Marks, have violated Plaintiff's common law trademark rights and that

**Exhibit "3"**

**106**        8

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND FOR
DAMAGES FOR TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1  Defendants have done so willfully and for the purpose of damaging Plaintiff's goodwill and

2  reputation under Plaintiff's Marks;

3      2.  That this Court issue a preliminary and permanent injunction restraining and

4  enjoining Defendants, and both of them, their servants, employees, successors, licensees,

5  subsidiaries, transferees, representatives and assignees, and any persons in active concert or

6  participation with them, or either of them, from using or displaying Plaintiff's Marks, or any of

7  Plaintiff's Marks, or any confusingly similar marks, either alone or in combination with other

8  words or phrases or symbols, in any manner whatsoever, including an order that Defendants, and

9  both of them, their servants, employees, successors, licensees, subsidiaries, transferees,

10  representatives and assignees, and any persons in active concert or participation with them, or

11  either of them, immediately cease from any and all further use of Plaintiff's Marks on goods

12  including hair care products, namely, hair sprays, hair sheens and hair spray gels, scissors, hair

13  styling tools, namely, electric flat irons, electric curling irons and electric hair dryers, hair

14  brushes, and educational services, namely, conducting courses and seminars in the field of hair

15  care; and from doing or allowing any act or thing calculated or likely to cause confusion or

16  mistake in the minds of members of the public or the trade, into believing that there is some

17  association between Plaintiff ANGLES and Defendants, or either of them, or with any of

18  Defendants' current goods and/or services, or otherwise competing unfairly with Plaintiff;

19      3.  That this Court issue an order requiring Defendants, and both of them, to deliver up to

20  Plaintiff for destruction any and all packaging, goods, supplies, labeling, stationary, business

21  cards, marketing materials, advertising materials, signage, and promotional materials or any

22  other material they may possess or control on which any of Plaintiff's Marks or any confusingly

23  similar marks are used;

24      4.  That this Court declare that Plaintiff has established its right to the Marks in

25  connection with its products and services: hair care products, namely, hair sprays, hair sheens

26  and hair spray gels, scissors, hair styling tools, namely, electric flat irons, electric curling irons

27  and electric hair dryers, hair brushes, and educational services, namely, conducting courses and

28  seminars in the field of hair care.

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

**Exhibit "3"**
**107**
9

5.  That this Court issue an order requiring Defendants to pay damages to Plaintiff for

infringement of Plaintiff's Marks, according to proof;

6.  That this Court issue an order requiring Defendants to pay treble damages to Plaintiff

for its willful infringement of Plaintiff's Marks;

7.    That this Court issue an order requiring Defendants to pay punitive damages to

Plaintiff for its acts of unfair competition and interference with contract/prospective economic

advantage;

8.    That this Court issue an order requiring Defendants to pay Plaintiff's attorneys fees

and costs;

9.    And for such other and further relief as this Court may deem just and proper.

Dated:  March 22, 2005

GORDON & REES LLP
Neil F. Martin
John L. Haller
Susan B. Meyer


By _____
John L. Haller
Attorneys for Plaintiff,
ANGLES BEAUTY CARE GROUP, INC..

## DEMAND FOR JURY TRIAL

Plaintiff ANGLES hereby demands trial by jury of each claim for relief herein

that is triable by jury.

Dated:  March 22, 2005

GORDON & REES LLP
Neil F. Martin
John L. Haller
Susan B. Meyer


By _____
John L. Haller
Attorneys for Plaintiff,
ANGLES BEAUTY CARE GROUP, INC.

**Exhibit "3"**
**108**      10

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

BABCG\103084\247014.1

FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTION AND FOR
DAMAGES FOR TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION

1  Danton K. Mak - State Bar No. 115924
   Douglas H. Morseburg - State Bar No. 126205
2  SHELDON & MAK
   225 South Lake Avenue, 9th Floor
3  Pasadena, California  91101
   Telephone: 626.796.4000
4  Facsimile: 626.795.6321
   Email:    doug@usip.com
5
   Attorneys for Defendants and
6  Counterclaimants Hair Art
   International, Inc. and Jackie Yu
7

FILED

05 APR 18 AM11:33

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:_____DEPUTY

8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10

11 ANGLES BEAUTY CARE GROUP,      )
   INC., a California             )    No. 05 CV 0166 JAH (RBB)
12 corporation,                   )
                                  )
13           Plaintiff,           )    ANSWER OF DEFENDANTS HAIR ART
                                  )    INTERNATIONAL, INC. AND
14      v.                        )    JACKIE YU TO FIRST AMENDED
                                  )    COMPLAINT
15 HAIR ART INTERNATIONAL, INC.,  )
   a California corporation;      )
16 JACKIE YU, an individual,      )    COUNTERCLAIM OF HAIR ART
                                  )    INTERNATIONAL, INC. AND
17           Defendants.          )    JACKIE YU FOR:
                                  )    (1)  FALSE DESIGNATION
18 _____)         OF ORIGIN;
                                  )    (2)  COMMON LAW TRADEMARK
19 HAIR ART INTERNATIONAL, INC.,  )         INFRINGEMENT;
   a California corporation,      )    (3)  STATUTORY UNFAIR
20                                )         COMPETITION;
            Counterclaimant,      )    (4)  COMMON LAW UNFAIR
21                                )         COMPETITION;
       v.                         )    (5)  CANCELLATION OF
22                                )         TRADEMARK REGISTRATION;
   ANGLES BEAUTYCARE GROUP, INC., )         AND
23 a California corporation;      )    (6)  DECLARATORY RELIEF
   RICHARD QUELLETTE, an          )
   individual, and DOES 1 through )    REQUEST FOR JURY TRIAL
24 10,                            )
                                  )
25          Counterdefendants.    )
   _____)

26

27

28
                    Exhibit "4"
                      109

001 Answer and Counterclaim.wpd            ANSWER AND COUNTERCLAIM OF HAIR ART AND YU

1       Defendants Hair Art International, Inc. and Jackie Yu

2  (collectively "Defendants") respond to the First Amended

3  Complaint of Plaintiff Angles BeautyCare Group, Inc. as follows:

4

5                   JURISDICTION AND VENUE

6     1.  In response to paragraph 1, Defendants admit that the

7  First Amended Complaint ("FAC") purports to state claims for

8  trademark infringement, unfair competition and declaratory relief

9  under federal law and for trademark and trade name infringement,

10  unfair competition and intentional interference with contract and

11  prospective economic advantage under the common law and

12  California statutory law.  Defendants further admit that this

13  court has subject matter jurisdiction over the within action.

14  Defendants are without information sufficient to enable them to

15  form a belief as to the remaining allegations of paragraph 1 and,

16  on that basis, they deny them.

17     2.  In response to paragraph 2, Defendants admit only that

18  venue is proper in this court.  Defendants deny the remaining

19  allegations of paragraph 2.

20

21                   THE PARTIES

22     3.  Defendants are without information sufficient to enable

23  them to form a belief as to the truth of the allegations of

24  paragraph 3 and, on that basis, they deny them.

25     4.  In response to paragraph 4, Defendants admit that Hair

26  Art International, Inc. is a California corporation.  Defendants

27  deny the remaining allegations of paragraph 4.

28     5.  Defendants admit the allegations of paragraph 5.

**Exhibit "4"**
**110**

1        6.   In response to paragraph 6, Defendants admit that

2    Defendant Jackie Yu is the president of Defendant Hair Art

3    International, Inc.  Defendants deny the remaining allegations of

4    paragraph 6.

5

6    <u>COMMON FACTS</u>

7        7.   In response to paragraph 7, Defendants admit that

8    Plaintiff has (i) application serial No. 78/337317 pending in the

9    U.S. Patent and Trademark Office ("PTO") to register the term

10   "Hair Art and Information" for some of the goods specified in

11   paragraph 7(a), (ii) application serial No. 78/337311 pending in

12   the PTO to register the term "Hair Art" for some of the goods

13   specified in paragraph 7(b), (iii) trademark Registration No.

14   2,518,282 for the word mark "HAI" in stylized form for some of

15   the services specified in paragraph 7(d), (iv) application serial

16   No. 78/337353 pending in the PTO to register the mark "HAI Plus

17   Design" for some of the goods specified in paragraph 7(e), and

18   (v) application serial No. 78/379609 pending in the PTO to

19   register the word mark "HAI Elite" for the goods specified in

20   paragraph 7(f).  Defendants are without information sufficient to

21   enable them to form a belief as to the remaining allegations of

22   paragraph 7 and, on that basis, they deny them.

23       8.   Defendants deny the allegations of paragraph 8 of the

24   FAC.

25       9.   Defendants deny the allegations of paragraph 9 of the

26   FAC.

27       10.  Defendants deny the allegations of paragraph 10 of the

28   FAC.

**Exhibit "4"**
**111**

1     11.   Defendants are without information sufficient to enable

2 them to form a belief as to the truth of the allegations of

3 paragraph 11 and, on that basis, they deny them.

4     12.   Defendants deny the allegations of paragraph 12 of the

5 FAC.

6     13.   Defendants deny the allegations of paragraph 13 of the

7 FAC.

8     14.   Defendants deny the allegations of paragraph 14 of the

9 FAC.

10     15.   Defendants deny the allegations of paragraph 15 of the

11 FAC.

12     16.   Defendants deny the allegations of paragraph 16 of the

13 FAC.

14     17.   Defendants deny the allegations of paragraph 17 of the

15 FAC.

16     18.   Defendants deny the allegations of paragraph 18 of the

17 FAC.

18     19.   Defendants deny the allegations of paragraph 19 of the

19 FAC.

20     20.   Defendants deny the allegations of paragraph 20 of the

21 FAC.

22     21.   In response to paragraph 21 of the FAC, Defendants

23 admit that on or about February 23, 2000, a letter, the terms of

24 which speak for themselves, was sent to Hair Art and Information.

25 Except as so admitted, Defendants deny the remaining allegations

26 of paragraph 21.

27     22.   Defendants deny the allegations of paragraph 22 of the

28 FAC.

**Exhibit "4"**
**112**

1                              FIRST CLAIM FOR RELIEF

2          23.  In response to paragraph 23, Defendants repeat and re-

3  allege their responses to the allegations contained in paragraphs

4  1 through 22, above, as though fully set forth in this paragraph.

5          24.  Defendants deny the allegations of paragraph 24 of the

6  FAC.

7          25.  Defendants deny the allegations of paragraph 25 of the

8  FAC.

9          26.  Defendants deny the allegations of paragraph 26 of the

10  FAC.

11         27.  Defendants deny the allegations of paragraph 27 of the

12  FAC.

13

14                            SECOND CLAIM FOR RELIEF

15         28.  In response to paragraph 28, Defendants repeat and re-

16  allege their responses to the allegations contained in paragraphs

17  1 through 22 and 24 through 27, above, as though fully set forth

18  in this paragraph.

19         29.  Defendants deny the allegations of paragraph 29 of the

20  FAC.

21         30.  Defendants deny the allegations of paragraph 30 of the

22  FAC.

23         31.  Defendants deny the allegations of paragraph 31 of the

24  FAC.

25         32.  Defendants deny the allegations of paragraph 32 of the

26  FAC.

27         33.  Defendants deny the allegations of paragraph 33 of the

28  FAC.
                                 **Exhibit "4"**
                                    **113**

001 Answer and Counterclaim.wpd                    - 5 -    ANSWER AND COUNTERCLAIM OF HAIR ART AND YU

1

<u>THIRD CLAIM FOR RELIEF</u>

2      34.   In response to paragraph 34, Defendants repeat and re-

3  allege their responses to the allegations contained in paragraphs

4  1 through 22, 24 through 27 and 29 through 33, above, as though

5  fully set forth in this paragraph.

6      35.   In response to paragraph 35 of the FAC, Defendants

7  admit that a controversy exists as between them, on the one hand,

8  and Plaintiff, on the other, regarding the parties' respective

9  rights in and to the marks "Hair Art" and "HAI" and that said

10  controversy is ripe for judicial determination.  Except as so

11  admitted, Defendants deny the remaining allegations of

12  paragraph 35.

13

14              <u>FOURTH CLAIM FOR RELIEF</u>

15      36.   In response to paragraph 36, Defendants repeat and re-

16  allege their responses to the allegations contained in paragraphs

17  1 through 22, 24 through 27, 29 through 33 and 35, above, as

18  though fully set forth in this paragraph.

19      37.   Defendants deny the allegations of paragraph 37 of the

20  FAC.

21      38.   Defendants deny the allegations of paragraph 38 of the

22  FAC.

23      39.   Defendants deny the allegations of paragraph 39 of the

24  FAC.

25

26              <u>SIXTH CLAIM FOR RELIEF</u>

27      40.   In response to paragraph 40, Defendants repeat and re-

28  allege their responses to the allegations contained in paragraphs

**Exhibit "4"**

**114**

1    1 through 22, 24 through 27, 29 through 33, 35 and 37 through 39,

2    above, as though fully set forth in this paragraph.

3       41.   Defendants deny the allegations of paragraph 41 of the

4    FAC.

5       42.   Defendants deny the allegations of paragraph 42 of the

6    FAC.

7       43.   Defendants deny the allegations of paragraph 43 of the

8    FAC.

9       44.   Defendants deny the allegations of paragraph 44 of the

10    FAC.

11

12               <u>AFFIRMATIVE DEFENSES</u>

13             <u>FIRST AFFIRMATIVE DEFENSE</u>

14       45.   The complaint, and each purported claim for relief

15    contained therein, fails to allege facts sufficient to constitute

16    a claim for relief against Defendants.

17

18             <u>SECOND AFFIRMATIVE DEFENSE</u>

19       46.   Plaintiff is barred from recovery herein by the

20    doctrine of laches.

21

22             <u>THIRD AFFIRMATIVE DEFENSE</u>

23       47.   Plaintiff is barred from recovery herein by the

24    doctrine of estoppel.

25

26             <u>FOURTH AFFIRMATIVE DEFENSE</u>

27       48.   Plaintiff is barred from recovery herein by the

28    doctrine of waiver.    **Exhibit "4"**
                      **115**

**FIFTH AFFIRMATIVE DEFENSE**

49.  Plaintiff is barred from recovery herein by the doctrine of acquiescence.

**SIXTH AFFIRMATIVE DEFENSE**

50.  Plaintiff's alleged rights are unenforceable due to unclean hands.

**SEVENTH AFFIRMATIVE DEFENSE**

51.  The Plaintiff is entitled to no recovery on any of the claims set forth in its First Amended Complaint because Defendants, at all times, acted in good faith.

**EIGHTH AFFIRMATIVE DEFENSE**

52.  Plaintiff has no trademark rights in the terms "Hair Art" or "HAI" because, at the time Plaintiff commenced using those terms, it knew that defendant Hair Art International, Inc. was using them as a trademark for hair-related products. Plaintiff's adoption of those terms as marks, as well as terms that are similar to them, was in bad faith.

**NINTH AFFIRMATIVE DEFENSE**

53.  Plaintiff has no trademark rights in the term "Hair Art" because, at the time Plaintiff commenced using that term, defendant Hair Art International, Inc. owned U.S. registration no. 1,958,468 (the "'468 Registration") for use of the term in connection with certain hair-related products.  On information and belief, Plaintiff had actual notice of the '468 Registration

**Exhibit "4"**

**116**

1    at the time it commenced using the term "Hair Art".   Thus,

2    Plaintiff's adoption of that term as a mark was in bad faith.   In

3    the alternative, the '468 Registration served to give constructive

4    notice to Plaintiff of Hair Art International, Inc.'s exclusive

5    rights in the term "Hair Art".

6

7                        TENTH AFFIRMATIVE DEFENSE

8        54.   If Plaintiffs suffered any damages by virtue of any of

9    the acts complained of in the FAC, which Defendants deny, those

10   damages were caused by persons other than Defendants.

11

12                              COUNTERCLAIM

13       For their counterclaim, Hair Art International, Inc. and

14   Jackie Yu (hereafter, collectively, "Counterclaimants") allege as

15   follows:

16

17                              THE PARTIES

18       55.   Counterclaimant Hair Art International, Inc. ("HAI") is

19   a corporation organized under the laws of the State of California

20   with its principal place of business in Los Angeles County,

21   California.

22       56.   Counterclaimant Jackie Yu ("YU") is an individual who

23   resides in Los Angeles County, California.

24       57.   On information and belief, counterdefendant Angles

25   BeautyCare Group, Inc. ("Angles") is a corporation organized

26   under the laws of the State of California with its principal

27   place of business in San Diego County, California.

28       58.   On information and belief, counterdefendant Richard

**Exhibit "4"**

**117**

1   Quellette ("Quellette") is an individual residing in San Diego

2   County, California.  On further information and belief, Quellette

3   participated in, directed or approved the acts complained of

4   below on behalf of himself and on behalf of counterdefendant

5   Angles.

6       59.  On information and belief, the counterdefendants sued

7   herein as Does 1-10 are individuals and entities whose names and

8   identities are currently unknown to Counterclaimants and who are

9   engaged in the acts described below.  Counterclaimants will amend

10  their counterclaim to identify these individuals or entities as

11  soon as their identities become known.

12      60.  Counterclaimants are informed and believe and, based

13  thereon they allege, that at all times relevant to this

14  counterclaim, there existed a relationship between each of the

15  counterdefendants in the nature of a joint venture, partnership,

16  principal and agent, employer and employee, master and servant,

17  aider and abettor, and principal and/or conspirator.  Each and

18  every act of each of the counterdefendants was duly authorized or

19  ratified by each of the other counterdefendants and carried out

20  within the course and scope of such relationship.  Hereafter,

21  counterdefendants Angles, Quellette and DOES 1-10 shall be

22  referred to collectively as "Counterdefendants".

23

24              JURISDICTION AND VENUE

25      61.  The court has original jurisdiction over this

26  counterclaim under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331,

27  1338(a) and 1338(b) in that this case arises under the Trademark

28  Laws of the United States, 15 U.S.C. §§ 1051, et seq.  This court

Exhibit "4"
**118**

001 Answer and Counterclaim.wpd                   - 10 -    ANSWER AND COUNTERCLAIM OF HAIR ART AND YU

1   has supplemental jurisdiction over the non-federal claims set

2   forth herein under 28 U.S.C. § 1367 in that those claims are so

3   related to the federal claims that they form part of the same

4   case or controversy.  In addition, Counterdefendants have invoked

5   the jurisdiction of this Court by way of their complaint.

6        62.  Venue is proper in this district under 28 U.S.C.

7   § 1400(b) in that the Counterdefendants reside here and have

8   committed acts of infringement here.  In addition, they have

9   invoked the jurisdiction of this Court by way of their complaint.

10

11                         HAI'S TRADEMARKS

12        63.  HAI is the owner of several nationally-recognized

13   trademarks, including but not limited to, the word mark "Hair

14   Art" and the letter mark "HAI".

15        64.  HAI or its related companies or its predecessors in

16   interest have used the Hair Art and HAI marks in commerce in the

17   U.S. continuously for over 20 years in connection with hair-

18   related products.

19        65.  At times relevant to the acts complained of in this

20   complaint, HAI owned a federal trademark registration for the

21   "Hair Art" mark, namely, U.S. Registration No. 1,958,468 (the

22   "'468 Registration").

23        66.  At all times relevant to the acts complained of herein,

24   HAI or its related companies or predecessors in interest have

25   used the HAI Marks to identify HAI's goods and services and to

26   distinguish them from the goods and services made and sold or

27   offered by others by, among other things, prominently displaying

28   the marks on HAI's goods and on their containers, packaging and

**Exhibit "4"**

**119**

1    advertising.

2        67.  The presence of the HAI Marks on the containers,

3    packaging and advertising for HAI's products indicates to the

4    public that the goods or services bearing those marks have been

5    manufactured and/or distributed by HAI.  HAI adheres to strict

6    quality standards in the manufacture of its hair products.  Thus,

7    the consuming public has come to associate the HAI Marks with

8    hair products of the highest quality.  As a consequence, the HAI

9    Marks have attained considerable value and the goodwill

10   associated with them represents a valuable business asset.

11

12            THE COUNTERDEFENDANTS' ACTIVITIES

13       68.  HAI is informed and believes, and based thereon it

14   alleges, that the Counterdefendants are importing, selling,

15   trafficking in, distributing and offering for sale in the United

16   States hair-related products that are the same as, or are similar

17   to, HAI's products and that Counterdefendants' are using marks

18   for those goods that are identical to, or are confusingly similar

19   to, the HAI MArks.

20       69.  HAI is informed and believes, and based thereon it

21   alleges, that at the time Counterdefendants adopted their marks,

22   they were familiar with HAI, with the HAI Marks, and with the

23   quality of HAI's goods.  HAI is further informed and it believes,

24   and based thereon it alleges, that at the time they adopted their

25   marks, Counterdefendants had actual notice of the '468

26   Registration and that, by adopting their marks, Counterdefendants

27   were attempting to usurp for themselves the goodwill that HAI had

28   built up in the HAI Marks.

**Exhibit "4"**
**120**

## FIRST CLAIM FOR RELIEF

(By HAI Against All Counterdefendants for False
Designation of Origin Under 15 U.S.C. § 1125(a))

70.  HAI repeats and re-alleges paragraphs 55 through 69, as though fully set forth in this paragraph.

71.  The HAI Marks are owned by HAI and HAI or its related companies or its predecessors in interest have continuously used the HAI Marks for over 20 years.  HAI has never authorized or consented to the Counterdefendants' use of these marks in connection with hair-related products or services related to hair.

72.  Counterdefendants' unauthorized use of the HAI Marks on, and in connection with, Counterdefendants' products and services is likely to cause confusion, mistake or deception as to the affiliation, connection or association of the Counterdefendants with HAI, or as to the origin, sponsorship or approval of Counterdefendants' products or services by HAI in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

73.  HAI is informed and it believes and, based thereon it alleges that the Counterdefendants' acts, as alleged herein, have been undertaken with full knowledge of HAI's rights in and to the HAI Marks and with the willful and deliberate intent to cause confusion, mistake and deception among members of the relevant public and to trade on the goodwill associated with the HAI Marks.

74.  By reason of Counterdefendants' acts, as alleged herein, HAI has suffered damage to its business, reputation and

**Exhibit "4"**
**121**

001 Answer and Counterclaim.wpd          - 13 -   ANSWER AND COUNTERCLAIM OF HAIR ART AND YU

1   goodwill and the loss of profits and sales it would have made but

2   for Counterdefendants' conduct.

3       75.   Counterdefendants' acts of copying and using the HAI

4   Marks in connection with hair-related products and services have

5   caused and will continue to cause irreparable and immediate

6   injury to HAI for which HAI has no adequate remedy at law.

7   Unless Counterdefendants are restrained by this Court from

8   continuing their copying and unauthorized use of these marks,

9   these injuries will continue to occur.

10

11                    SECOND CLAIM FOR RELIEF

12              (By HAI Against All Counterdefendants for
                  Common Law Trademark Infringement)
13

14      76.   HAI repeats and re-alleges paragraphs 55 through 69 and

15   71 through 75, as though fully set forth in this paragraph.

16      77.   By reason of Counterdefendants' acts, as alleged

17   herein, HAI has suffered damage to its business, reputation and

18   goodwill and the loss of profits and sales it would have made but

19   for Counterdefendants' conduct.

20      78.   The above-described acts of Counterdefendants

21   constitute common law trademark infringement.  Such acts have

22   caused and will continue to cause irreparable and immediate

23   injury to HAI for which HAI has no adequate remedy at law.

24   Unless Counterdefendants are restrained by this Court from

25   continuing the acts alleged herein, these injuries will continue

26   to occur.

27      79.   On information and belief, the foregoing acts of the

28   Counterdefendants are willful and malicious in that they have

                         Exhibit "4"
                            122

001 Answer and Counterclaim.wpd        - 14 -   ANSWER AND COUNTERCLAIM OF HAIR ART AND YU

1  been undertaken with a conscious disregard of HAI's rights and

2  with a desire to injure HAI's business and to improve their own.

3

4  THIRD CLAIM FOR RELIEF

5  (By HAI Against All Counterdefendants for Unfair
   Competition, Cal. Bus. & Prof. Code § 17200)

6

7      80.  HAI repeats and re-alleges paragraphs 55 through 69, 71

8  through 75, and 77 through 79, as though fully set forth in this

9  paragraph.

10     81.  The above-described acts of Counterdefendants

11 constitute unfair competition within the meaning of California

12 Business and Professions Code section 17200.  Such acts have

13 caused and will continue to cause irreparable and immediate

14 injury to HAI for which HAI has no adequate remedy at law.

15 Unless Counterdefendants are restrained by this Court from

16 continuing the acts alleged herein, these injuries will continue

17 to occur.

18

19 FOURTH CLAIM FOR RELIEF

20 (BY HAI Against All Counterdefendants
   for Common Law Unfair Competition)

21

22     82.  HAI repeats and re-alleges paragraphs 55 through 69, 71

23 through 75, 77 through 79 and 80 through 81, as though fully set

24 forth in this paragraph.

25     83.  By reason of Counterdefendants' acts, as alleged

26 herein, HAI has suffered damage to its business, reputation and

27 goodwill and the loss of profits and sales it would have made but

28 for Counterdefendants' conduct.

Exhibit "4"
123

001 Answer and Counterclaim.wpd                - 15 -    ANSWER AND COUNTERCLAIM OF HAIR ART AND YU

1        84.  The above-described acts of Counterdefendants

2   constitute common law unfair competition in that

3   Counterdefendants are passing off their goods as those of HAI.

4   Such acts have caused and will continue to cause irreparable and

5   immediate injury to HAI for which HAI has no adequate remedy at

6   law.  Unless Counterdefendants are restrained by this Court from

7   continuing the acts alleged herein, these injuries will continue

8   to occur.

9        85.  On information and belief, the foregoing acts of the

10  Counterdefendants are willful and malicious in that they have

11  been undertaken with a conscious disregard of HAI's rights and

12  with a desire to injure HAI's business and to improve their own.

13

14                    FIFTH CLAIM FOR RELIEF

15        (By HAI Against Counterdefendant Angles for Cancellation
              of Trademark Registration Under 15 U.S.C. § 1119)
16

17       86.  HAI repeats and re-alleges paragraphs 55 through 69, 71

18  through 75, 77 through 79, 80 through 81 and 83 through 85, as

19  though fully set forth in this paragraph.

20       87.  On or about December 11, 2001, the U.S. Patent and

21  Trademark Office issued trademark registration no. 2,518,282 (the

22  "'282 Registration") to Angles Beauty Care Products, Inc. for use

23  of the mark "HAI Plus Design" in connection with the conduct of

24  courses and seminars in the field of hair care.  HAI is informed

25  and it believes and, based thereon it alleges, that the '282

26  Registration was subsequently assigned to counterdefendant

27  Angles.

28       88.  HAI is informed and it believes and, based thereon it

                            **Exhibit "4"**
                                 **124**

1  alleges, that its adoption and use of the HAI Marks in connection

2  with the sale of hair-related goods was prior to the filing date

3  of the application that matured into the '282 Registration and

4  prior to the priority date of Angles' predecessor-in-interest.

5      89. Counterdefendant Angles' use of the "HAI Plus Design"

6  Mark that is the subject of the '282 Registration on or in

7  connection with the services identified above is likely to cause

8  confusion, mistake or deception in violation of Section 2(d) of

9  the Lanham Act, 15 U.S.C. § 1052(d), in that persons familiar

10 with the HAI Marks would be likely to utilize Angles' services

11 believing they are offered by HAI or to believe that Angles or

12 Angles' services are offered or sponsored by, or otherwise

13 associated with, HAI.  Furthermore, any objection or fault found

14 with Angles' services would likely reflect upon HAI, and

15 irreparably and seriously injure HAI's reputation and goodwill.

16     90. Angles' ownership of the '282 Registration for the

17 services identified above also places Angles in a position to vex

18 and harass HAI and to cause annoyance to HAI as the registration

19 gives Angles the prima facie right to use the "HAI Plus Design"

20 mark, thereby impairing and injuriously affecting HAI's rights in

21 the HAI Marks, as evidenced by Angles' assertion of the '282

22 Registration against HAI in connection with the First Amended

23 Complaint filed in the within matter.

24     91. Unless the '282 Registration is canceled, the above-

25 described injuries to HAI will continue.

26

27                    SIXTH CLAIM FOR RELIEF

28  (By HAI and Yu Against Counterdefendant Angles for Declaratory
              Declaratory Relief Under 28 U.S.C. §§ 2201 and 2202)
                                Exhibit 4
                              **125**

001 Answer and Counterclaim.vpd                    - 17 -    ANSWER AND COUNTERCLAIM OF HAIR ART AND YU

92. Counterclaimants HAI and YU repeat and re-allege paragraphs 55 through 69 as though they were fully set forth in this paragraph.

93. There is an actual controversy between HAI and YU, on the one hand, and counterdefendant Angles, on the other, regarding the validity and infringement of counterdefendant Angles' alleged federal and common law trademark rights, as to the alleged unfairness of the competition between HAI and YU and counterdefendant Angles and as to the alleged interference by HAI and YU with Angles' contracts and/or prospective economic advantage.

94. Counterdefendant Angles contends that it is the owner of, and/or that it has trademark rights in, a family of trademarks that make use of the terms "Hair Art" and "HAI" in connection with hair care products and that HAI and YU infringe those rights. HAI and YU contend that they do not infringe any valid trademark rights of Angles.

95. Counterdefendant Angles contends that HAI and YU have unfairly competed with it by using the terms "Hair Art" and "HAI". HAI and YU contend that they have not unfairly competed with counterdefendant Angles.

96. Counterdefendant Angles contends that it has certain contractual rights and/or prospective economic advantages and that HAI and YU have interfered with those rights/advantages. HAI and YU contend that they have not interfered with any of Angles' rights or advantages.

97. Pursuant to 28 U.S.C. §§ 2201 and 2202, HAI and YU are entitled to a judicial declaration with respect to whether they

**Exhibit "4"**
**126**

1   have (i) infringed any valid trademark rights of Angles,

2   (ii) unfairly competed with Angles, and (iii) interfered with any

3   contractual rights and/or prospective economic advantages of

4   Angles.

5

6                          PRAYER FOR RELIEF

7        WHEREFORE, HAI and YU pray for relief as follows:

8        1.   For a judicial declaration that they have not infringed

9   any valid trademark rights of Angles;

10       2.   For a judicial declaration that they have not competed

11  unfairly with Angles;

12       3.   For a judicial declaration that they have not

13  interfered with any contracts or prospective economic advantages

14  of Angles;

15       4.   That Angles take nothing by its First Amended

16  Complaint;

17       5.   That Angles' request for injunctive relief be denied;

18       6.   That the First Amended Complaint be dismissed with

19  prejudice and that judgment on the First Amended Complaint be

20  entered in favor of HAI and YU;

21       7.   For an order permanently enjoining Countedefendants and

22  their officers, agents, employees, and all those acting in

23  concert or conspiracy with them from:

24            a.   Directly or indirectly manufacturing, producing,

25  printing, distributing, importing, trafficking in, selling,

26  offering for sale, possessing, advertising, promoting, moving or

27  displaying any hair care products bearing the "Hair Art" or "HAI"

28  marks or any simulation, reproduction, counterfeit, copy or

                          Exhibit "4"
                              127

1    colorable imitation of those marks;

2            b.    Instructing or directing any third parties to

3    make containers, labels or packaging bearing the "Hair Art" or

4    "HAI" marks or any simulation, reproduction, counterfeit, copy or

5    colorable imitation of those marks;

6            c.    Imitating, copying, making unauthorized use of,

7    or otherwise infringing, HAI's rights in and to the "Hair Art" or

8    "HAI" marks;

9        8.    For an order directing Counterdefendants to deliver for

10   destruction all products, labels, boxes, signs, prints, packages,

11   wrappers, and artwork in their possession, or under their

12   control, bearing or intended to bear the "Hair Art" or "HAI"

13   marks or any simulation, reproduction, counterfeit, copy or

14   colorable imitation of those marks, including all plates, molds,

15   matrices and other means of making the same;

16       9.    For a finding that the Counterdefendants' acts were

17   willful within the meaning of 15 U.S.C. § 1117(c)(2);

18       10.    For a monetary award in favor of Counterclaimant HAI's

19   favor in an amount equal to (i) HAI's actual damages and (ii) to

20   the extent not included in actual damages, the Counterdefendants'

21   profits arising from the acts alleged above, such damages and

22   profits to be trebled under 15 U.S.C. § 1117(a);

23       11.    For an award of pre-judgment interest and post-judgment

24   interest in the maximum amount permitted by law;

25       12.    For a finding that this is an exceptional case within

26   the meaning of, and for an award of attorneys' fees pursuant to,

27   15 U.S.C. § 1117(a);

28       13.    For a finding that the Counterdefendants' acts were

**Exhibit "4"**

**128**

1  undertaken intentionally, maliciously and/or with a reckless and

2  wanton disregard of Counterclaimant HAI's common law trademark

3  rights and for an award of exemplary damages pursuant to

4  California Civil Code section 3295 in an amount sufficient to

5  punish, deter, and make an example of Counterclaimdefendants for

6  the acts complained of herein;

7      14.  For an award of costs under 15 U.S.C. § 1117(a), or as

8  otherwise provided by law; and

9      15.  For such other and further relief as the court deems

10  just and proper.

11

12  Dated: April 14, 2005                  SHELDON & MAK

13

14  By: _Douglas H. Morseburg_

15          Douglas H. Morseburg

16  Attorneys for Defendants and
    Counterclaimants Hair Art
    International, Inc. and Jackie
17  Yu

18

19

20

21

22

23

24

25

26

27

28

**Exhibit "4"**
**129**

001 Answer and Counterclaim.wpd          - 21 -   ANSWER AND COUNTERCLAIM OF HAIR ART AND YU

1

<u>REQUEST FOR JURY TRIAL</u>

2    Defendants and Counterclaimaints Hair Art International,

3 Inc. ("HAI") and Jackie Yu ("YU") hereby request a trial by jury

4 of all issues raised by the First Amended Complaint and by their

5 answer to the First Amended Complaint, including their

6 affirmative defenses that are properly triable to a jury.  In

7 addition, HAI and YU request a trial by jury of all issues raised

8 by their counterclaim that are properly triable to a jury.

9

10 Dated: April _14_, 2005         SHELDON & MAK

11

12                   By: _Douglas H. Moseburg._

13                      Douglas H. Morseburg

14                 Attorneys for Defendants and
Counterclaimants Hair Art

15                 International, Inc. and Jackie
Yu

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit "4"**
**130**

## PROOF OF SERVICE
1013a (3) C.C.P. Revised 5/1/88

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18, and not a party to the within action; my business address is 225 South Lake Avenue, Ninth Floor, Pasadena, California 91101-3021.

On **April 14, 2005**, I served the foregoing documents, described as:

**ANSWER OF DEFENDANTS HAIR ART INTERNATIONAL, INC. AND JACKIE YU TO FIRST AMENDED COMPLAINT; COUNTERCLAIM OF HAIR ART INTERNATIONAL, INC. AND JACKIE YU; REQUEST FOR JURY TRIAL**

on the interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope addressed as follows:

### SEE ATTACHED SERVICE LIST

[X]  **(BY U.S. MAIL)** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. postal service on that same day, with postage thereon fully prepaid at Pasadena, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ]  **(BY PERSONAL SERVICE)** I caused such envelope to be delivered by hand to the above addressee(s).

[ ]  **(VIA FEDERAL EXPRESS)** I caused such envelope to be delivered to the above addressee(s) via Federal Express.

[ ]  **(FACSIMILE)** I caused such document(s) to be transmitted to the above addressee(s) via facsimile. **As Noted Above.**

[ ]  **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this Court, at whose direction the service was made.

Executed on **April 14, 2005**, at Pasadena, California.

Donald K. Piper

**Exhibit "4"**
**131**

<u>Angles Beauty Care Group, Inc. v. Hair Art International, Inc.</u>
USDC-SDCal, Case No. 05 CV 0166 JAH (RBBx)


## SERVICE LIST

Neil F. Martin, Esq.                    Attorneys for Plaintiff and Counterclaimant
John L. Haller, Esq.                    ANGLES BEAUTY CARE GROUP, INC. and
Susan B. Meyer, Esq.                    Counterclaimant RICHARD QUELLETTE
GORDON & REES LLP
101 West Broadway, Suite 1600
San Diego, California 92101

AO 120 (Rev. 2/99)

| TO: Commissioner of Patents and Trademarks Washington, DC 20231 | REPORT ON THE FILING OR DETERMINATION OF AN ACTION REGARDING A PATENT OR TRADEMARK |
|---|---|

In Compliance with 35 § 290 and/or 15 U.S.C. § 1116 you are hereby advised that a court action has been

filed in the U.S. District Court _Southern District of California_   on the following   ☐ Patents or   ☒ Trademarks:

| DOCKET NO. 05 CV 0166 JAH (RBBx) | DATE FILED 1/27/05 | U.S. DISTRICT COURT Southern District of California |
|---|---|---|
| PLAINTIFF ANGLES BEAUTY CARE GROUP, INC. | | DEFENDANT HAIR ART INTERNATIONAL, INC. and JACKIE YU |

| PATENT OR TRADEMARK NO. | DATE OF PATENT OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|
| 1  2,518,282 | 12/11/01 | ANGLES BEAUTYCARE GROUP, INC. |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |

In the above—entitled case, the following patent(s) have been included:

| DATE INCLUDED | INCLUDED BY ☐ Amendment   ☐ Answer   ☐ Cross Bill   ☐ Other Pleading |  |
|---|---|---|
| PATENT OR TRADEMARK NO. | DATE OF PATENT OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |

In the above—entitled case, the following decision has been rendered or judgement issued:

| DECISION/JUDGEMENT |
|---|
| |

| CLERK | (BY) DEPUTY CLERK | DATE |
|---|---|---|
| | | |

Copy 1—Upon initiation of action, mail this copy to Commissioner     Copy 3—Upon termination of action, mail this copy to Commissioner
Copy 2—Upon filing document adding patent(s), mail this copy to Commissioner     Copy 4—Case file copy

EXHIBIT

133

## PROOF OF SERVICE
### 1013a (3) C.C.P. Revised 5/1/88

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18, and not a party to the within action; my business address is 225 South Lake Avenue, Ninth Floor, Pasadena, California 91101-3021.

On **April 14, 2005,** I served the foregoing documents, described as:

### REPORT ON THE FILING OR DETERMINATION OF AN ACTION REGARDING A PATENT OR TRADEMARK

on the interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope addressed as follows:

### SEE ATTACHED SERVICE LIST

[X]   **(BY U.S. MAIL)** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. postal service on that same day, with postage thereon fully prepaid at Pasadena, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ]   **(BY PERSONAL SERVICE)** I caused such envelope to be delivered by hand to the above addressee(s).

[ ]   **(VIA FEDERAL EXPRESS)** I caused such envelope to be delivered to the above addressee(s) via Federal Express.

[ ]   **(FACSIMILE)** I caused such document(s) to be transmitted to the above addressee(s) via facsimile. **As Noted Above.**

[ ]   **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this Court, at whose direction the service was made.

Executed on **April 14, 2005,** at Pasadena, California.

Donald K. Piper

**Exhibit "4"**
**134**

Angles Beauty Care Group, Inc. v. Hair Art International, Inc.
USDC-SDCal, Case No. 05 CV 0166 JAH (RBBx)

## SERVICE LIST

Neil F. Martin, Esq.                    Attorneys for Plaintiff and Counterclaimant
John L. Haller, Esq.                    ANGLES BEAUTY CARE GROUP, INC. and
Susan B. Meyer, Esq.                    Counterclaimant RICHARD QUELLETTE
GORDON & REES LLP
101 West Broadway, Suite 1600
San Diego, California 92101

J:\HAIRART\15848.22 Angles\Pld\Proof of Service.wpd

AO 120 (Rev. 2/99)

| TO: Commissioner of Patents and Trademarks Washington, DC 20231 | REPORT ON THE FILING OR DETERMINATION OF AN ACTION REGARDING A PATENT OR TRADEMARK |
|---|---|

In Compliance with 35 § 290 and/or 15 U.S.C. § 1116 you are hereby advised that a court action has been filed in the U.S. District Court _Southern District of California_ on the following ☐ Patents or ☒ Trademarks:

| DOCKET NO. 05 CV 0166 JAH (RBBx) | DATE FILED 1/27/05 | U.S. DISTRICT COURT Southern District of California |
|---|---|---|
| PLAINTIFF ANGLES BEAUTY CARE GROUP, INC. | | DEFENDANT HAIR ART INTERNATIONAL, INC. and JACKIE YU |

| PATENT OR TRADEMARK NO. | DATE OF PATENT OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|
| 1  2,518,282 | 12/11/01 | ANGLES BEAUTYCARE GROUP, INC. |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |

In the above—entitled case, the following patent(s) have been included:

| DATE INCLUDED | INCLUDED BY ☐ Amendment ☐ Answer ☐ Cross Bill ☐ Other Pleading | |
|---|---|---|
| PATENT OR TRADEMARK NO. | DATE OF PATENT OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |

In the above—entitled case, the following decision has been rendered or judgement issued:

| DECISION/JUDGEMENT |
|---|
| |

| CLERK | (BY) DEPUTY CLERK | DATE |
|---|---|---|
| | | |

Copy 1—Upon initiation of action, mail this copy to Commissioner    Copy 3—Upon termination of action, mail this copy to Commissioner
Copy 2—Upon filing document adding patent(s), mail this copy to Commissioner    Copy 4—Case file copy

Exhibit 4
136

# PROOF OF SERVICE

1013a (3) C.C.P. Revised 5/1/88

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18, and not a party to the within action; my business address is 225 South Lake Avenue, Ninth Floor, Pasadena, California 91101-3021.

On **April 14, 2005,** I served the foregoing documents, described as:

### REPORT ON THE FILING OR DETERMINATION OF AN ACTION REGARDING A PATENT OR TRADEMARK

on the interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope addressed as follows:

### SEE ATTACHED SERVICE LIST

[X]    **(BY U.S. MAIL)** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. postal service on that same day, with postage thereon fully prepaid at Pasadena, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ]    **(BY PERSONAL SERVICE)** I caused such envelope to be delivered by hand to the above addressee(s).

[ ]    **(VIA FEDERAL EXPRESS)** I caused such envelope to be delivered to the above addressee(s) via Federal Express.

[ ]    **(FACSIMILE)** I caused such document(s) to be transmitted to the above addressee(s) via facsimile. **As Noted Above.**

[ ]    **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this Court, at whose direction the service was made.

Executed on **April 14, 2005,** at Pasadena, California.

Donald K. Piper

**Exhibit "4"**

J:\HAIRART\15848.22 Angles\Pld\Proof of Service.wpd

<u>Angles Beauty Care Group, Inc. v. Hair Art International, Inc.</u>
USDC-SDCal, Case No. 05 CV 0166 JAH (RBBx)


## SERVICE LIST

Neil F. Martin, Esq.  
John L. Haller, Esq.  
Susan B. Meyer, Esq.  
GORDON & REES LLP  
101 West Broadway, Suite 1600  
San Diego, California 92101

Attorneys for Plaintiff and Counterclaimant  
ANGLES BEAUTY CARE GROUP, INC. and  
Counterclaimant RICHARD QUELLETTE

**EXHIBIT 5**



ORIGINAL

FILED

05 APR 29 PM 4:22

DEPUTY

```
 1 | Danton K. Mak - State Bar No. 115924
   | Douglas H. Morseburg - State Bar No. 126205
 2 | SHELDON & MAK PC
   | 225 South Lake Avenue, 9th Floor
 3 | Pasadena, California  91101
   | Telephone: 626.796.4000
 4 | Facsimile: 626.795.6321
   | Email:    doug@usip.com
 5 |
   | Attorneys for Defendants and
 6 | Counterclaimants Hair Art
   | International, Inc. and Jackie Yu
 7 |
```

8              UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

```
11 | ANGLES BEAUTY CARE GROUP,    ) No. 05 CV 0166 JAH (RBB)
    | INC., a California          )
12 | corporation,                 ) FIRST AMENDED COUNTERCLAIM OF
    |                             ) HAIR ART INTERNATIONAL, INC.
13 |          Plaintiff,          ) AND JACKIE YU FOR:
    |                             ) (1)  FALSE DESIGNATION
14 |     v.                       )       OF ORIGIN;
    |                             ) (2)  COMMON LAW TRADEMARK
15 | HAIR ART INTERNATIONAL, INC., )      INFRINGEMENT;
    | a California corporation;    ) (3)  STATUTORY UNFAIR
16 | JACKIE YU, an individual,    )       COMPETITION;
    |                             ) (4)  COMMON LAW UNFAIR
17 |          Defendants.         )       COMPETITION;
    |                             ) (5)  CANCELLATION OF
18 | _____ )       TRADEMARK REGISTRATION;
    | HAIR ART INTERNATIONAL, INC., )      AND
19 | a California corporation;    ) (6)  DECLARATORY RELIEF
    | JACKIE YU, an individual;    )
20 |                             ) REQUEST FOR JURY TRIAL
    |          Counterclaimants,   )
21 |                             )
    |     v.                      )
22 |                             )
    | ANGLES BEAUTYCARE GROUP, INC.,)
23 | a California corporation;     )
    | RICHARD OUELLETTE, an        )
24 | individual, and DOES 1 through)
    | 10,                         )
25 |                             )
    |          Counterdefendants.  )
26 | _____ )
27 |
28 |
```

Exhibit "5"
169

003 Amended Counterclaim.wpd

1    For their counterclaim, Hair Art International, Inc. and

2    Jackie Yu (hereafter, collectively, "Counterclaimants") allege as

3    follows:

4

5                        THE PARTIES

6        1.    Counterclaimant Hair Art International, Inc. ("HAI") is

7    a corporation organized under the laws of the State of California

8    with its principal place of business in Los Angeles County,

9    California.

10       2.    Counterclaimant Jackie Yu ("YU") is an individual who

11   resides in Los Angeles County, California.

12       3.    On information and belief, counterdefendant Angles

13   BeautyCare Group, Inc. ("Angles") is a corporation organized

14   under the laws of the State of California with its principal

15   place of business in San Diego County, California.

16       4.    On information and belief, counterdefendant Richard

17   Ouellette ("Ouellette") is an individual residing in San Diego

18   County, California.  On further information and belief, Ouellette

19   participated in, directed or approved the acts complained of

20   below on behalf of himself and on behalf of counterdefendant

21   Angles.

22       5.    On information and belief, the counterdefendants sued

23   herein as Does 1-10 are individuals and entities whose names and

24   identities are currently unknown to Counterclaimants and who are

25   engaged in the acts described below.  Counterclaimants will amend

26   their counterclaim to identify these individuals or entities as

27   soon as their identities become known.

28       6.    Counterclaimants are informed and believe and, based

Exhibit "5"
140

003 Amended Counterclaim.wpd

- 2 -

FIRST AMENDED COUNTERCLAIM
OF HAIR ART AND YU

1   thereon they allege, that at all times relevant to this
2   counterclaim, there existed a relationship between each of the
3   counterdefendants in the nature of a joint venture, partnership,
4   principal and agent, employer and employee, master and servant,
5   aider and abettor, and principal and/or conspirator.   Each and
6   every act of each of the counterdefendants was duly authorized or
7   ratified by each of the other counterdefendants and carried out
8   within the course and scope of such relationship.   Hereafter,
9   counterdefendants Angles, Ouellette and DOES 1-10 shall be
10  referred to collectively as "Counterdefendants".

11

12                          JURISDICTION AND VENUE

13      7.   The court has original jurisdiction over this
14  counterclaim under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331,
15  1338(a) and 1338(b) in that this case arises under the Trademark
16  Laws of the United States, 15 U.S.C. §§ 1051, et seq.   This court
17  has supplemental jurisdiction over the non-federal claims set
18  forth herein under 28 U.S.C. § 1367 in that those claims are so
19  related to the federal claims that they form part of the same
20  case or controversy.   In addition, Counterdefendants have invoked
21  the jurisdiction of this Court by way of their complaint.

22      8.   Venue is proper in this district under 28 U.S.C.
23  § 1400(b) in that the Counterdefendants reside here and have
24  committed acts of infringement here.   In addition, they have
25  invoked the jurisdiction of this Court by way of their complaint.

26

27                          HAI'S TRADEMARKS

28      9.   HAI is the owner of several nationally-recognized
                            **Exhibit "5"**
                               141

FIRST AMENDED COUNTERCLAIM
OF HAIR ART AND YU

1 trademarks, including but not limited to, the word mark "Hair

2 Art" and the letter mark "HAI".

3    10.  HAI or its related companies or its predecessors in

4 interest have used the Hair Art and HAI marks in commerce in the

5 U.S. continuously for over 20 years in connection with hair-

6 related products.

7    11.  At times relevant to the acts complained of in this

8 complaint, HAI owned a federal trademark registration for the

9 "Hair Art" mark, namely, U.S. Registration No. 1,958,468 (the

10 "'468 Registration").

11    12.  At all times relevant to the acts complained of herein,

12 HAI or its related companies or predecessors in interest have

13 used the HAI Marks to identify HAI's goods and services and to

14 distinguish them from the goods and services made and sold or

15 offered by others by, among other things, prominently displaying

16 the marks on HAI's goods and on their containers, packaging and

17 advertising.

18    13.  The presence of the HAI Marks on the containers,

19 packaging and advertising for HAI's products indicates to the

20 public that the goods or services bearing those marks have been

21 manufactured and/or distributed by HAI.  HAI adheres to strict

22 quality standards in the manufacture of its hair products.  Thus,

23 the consuming public has come to associate the HAI Marks with

24 hair products of the highest quality.  As a consequence, the HAI

25 Marks have attained considerable value and the goodwill

26 associated with them represents a valuable business asset.

27

28
**Exhibit "5"**
**142**

1        <u>THE COUNTERDEFENDANTS' ACTIVITIES</u>

2     14.  HAI is informed and believes, and based thereon it

3 alleges, that the Counterdefendants are importing, selling,

4 trafficking in, distributing and offering for sale in the United

5 States hair-related products that are the same as, or are similar

6 to, HAI's products and that Counterdefendants' are using marks

7 for those goods that are identical to, or are confusingly similar

8 to, the HAI MArks.

9     15.  HAI is informed and believes, and based thereon it

10 alleges, that at the time Counterdefendants adopted their marks,

11 they were familiar with HAI, with the HAI Marks, and with the

12 quality of HAI's goods in that Counterdefendants had previously

13 purchased from HAI goods bearing one or more of the HAI Marks.

14 HAI is further informed and it believes, and based thereon it

15 alleges, that at the time they adopted their marks,

16 Counterdefendants had actual notice of the '468 Registration and

17 that, by adopting their marks, Counterdefendants were attempting

18 to usurp for themselves the goodwill that HAI had built up in the

19 HAI Marks.

20

21       <u>FIRST CLAIM FOR RELIEF</u>

22    (By HAI Against All Counterdefendants for False<br>Designation of Origin Under 15 U.S.C. § 1125(a))

23

24     16.  HAI repeats and re-alleges paragraphs 1 through 15, as

25 though fully set forth in this paragraph.

26     17.  The HAI Marks are owned by HAI and HAI or its related

27 companies or its predecessors in interest have continuously used

28 the HAI Marks for over 20 years.  HAI has never authorized or

<b>Exhibit "5"</b><br>143

1  consented to the Counterdefendants' use of these marks in

2  connection with hair-related products or services related to

3  hair.

4      18.  Counterdefendants' unauthorized use of the HAI Marks

5  on, and in connection with, Counterdefendants' products and

6  services is likely to cause confusion, mistake or deception as to

7  the affiliation, connection or association of the

8  Counterdefendants with HAI, or as to the origin, sponsorship or

9  approval of Counterdefendants' products or services by HAI in

10  violation of Section 43(a) of the Lanham Act, 15 U.S.C.

11  § 1125(a).

12      19.  HAI is informed and it believes and, based thereon it

13  alleges that the Counterdefendants' acts, as alleged herein, have

14  been undertaken with full knowledge of HAI's rights in and to the

15  HAI Marks and with the willful and deliberate intent to cause

16  confusion, mistake and deception among members of the relevant

17  public and to trade on the goodwill associated with the HAI

18  Marks.

19      20.  By reason of Counterdefendants' acts, as alleged

20  herein, HAI has suffered damage to its business, reputation and

21  goodwill and the loss of profits and sales it would have made but

22  for Counterdefendants' conduct.

23      21.  Counterdefendants' acts of copying and using the HAI

24  Marks in connection with hair-related products and services have

25  caused and will continue to cause irreparable and immediate

26  injury to HAI for which HAI has no adequate remedy at law.

27  Unless Counterdefendants are restrained by this Court from

28  continuing their copying and unauthorized use of these marks,

Exhibit "5"
144

003 Amended Counterclaim.wpd

- 6 -

FIRST AMENDED COUNTERCLAIM
OF HAIR ART AND YU

1  these injuries will continue to occur.

2

3  SECOND CLAIM FOR RELIEF

4  (By HAI Against All Counterdefendants for
   Common Law Trademark Infringement)

5

6  22.  HAI repeats and re-alleges paragraphs 1 through 15 and

7  17 through 21, as though fully set forth in this paragraph.

8  23.  By reason of Counterdefendants' acts, as alleged

9  herein, HAI has suffered damage to its business, reputation and

10 goodwill and the loss of profits and sales it would have made but

11 for Counterdefendants' conduct.

12 24.  The above-described acts of Counterdefendants

13 constitute common law trademark infringement.  Such acts have

14 caused and will continue to cause irreparable and immediate

15 injury to HAI for which HAI has no adequate remedy at law.

16 Unless Counterdefendants are restrained by this Court from

17 continuing the acts alleged herein, these injuries will continue

18 to occur.

19 25.  On information and belief, the foregoing acts of the

20 Counterdefendants are willful and malicious in that they have

21 been undertaken with a conscious disregard of HAI's rights and

22 with a desire to injure HAI's business and to improve their own.

23

24 THIRD CLAIM FOR RELIEF

25 (By HAI Against All Counterdefendants for Unfair
   Competition, Cal. Bus. & Prof. Code § 17200)

26

27 26.  HAI repeats and re-alleges paragraphs 1 through 15, 17

28 through 21 and 23 through 25, as though fully set forth in this

Exhibit "5"

145

003 Amended Counterclaim.wpd                    - 7 -                    FIRST AMENDED COUNTERCLAIM
                                                                          OF HAIR ART AND YU

1  paragraph.

2      27.   The above-described acts of Counterdefendants

3  constitute unfair competition within the meaning of California

4  Business and Professions Code section 17200.   Such acts have

5  caused and will continue to cause irreparable and immediate

6  injury to HAI for which HAI has no adequate remedy at law.

7  Unless Counterdefendants are restrained by this Court from

8  continuing the acts alleged herein, these injuries will continue

9  to occur.

10

11                    FOURTH CLAIM FOR RELIEF

12              (By HAI Against All Counterdefendants
                  for Common Law Unfair Competition)
13

14      28.   HAI repeats and re-alleges paragraphs 1 through 15, 17

15  through 21, 23 through 25 and 27, as though fully set forth in

16  this paragraph.

17      29.   By reason of Counterdefendants' acts, as alleged

18  herein, HAI has suffered damage to its business, reputation and

19  goodwill and the loss of profits and sales it would have made but

20  for Counterdefendants' conduct.

21      30.   The above-described acts of Counterdefendants

22  constitute common law unfair competition in that

23  Counterdefendants are passing off their goods as those of HAI.

24  Such acts have caused and will continue to cause irreparable and

25  immediate injury to HAI for which HAI has no adequate remedy at

26  law.   Unless Counterdefendants are restrained by this Court from

27  continuing the acts alleged herein, these injuries will continue

28  to occur.

**Exhibit "5"**
**146**

003 Amended Counterclaim.wpd

- 8 -

FIRST AMENDED COUNTERCLAIM
OF HAIR ART AND YU

1    31.  On information and belief, the foregoing acts of the

2    Counterdefendants are willful and malicious in that they have

3    been undertaken with a conscious disregard of HAI's rights and

4    with a desire to injure HAI's business and to improve their own.

6                        FIFTH CLAIM FOR RELIEF

7         (By HAI Against Counterdefendant Angles for Cancellation
               of Trademark Registration Under 15 U.S.C. § 1119)

9    32.  HAI repeats and re-alleges paragraphs 1 through 15, 17

10   through 21, 23 through 25, 27 and 29 through 31, as though fully

11   set forth in this paragraph.

12   33.  On or about December 11, 2001, the U.S. Patent and

13   Trademark Office issued trademark registration no. 2,518,282 (the

14   "'282 Registration") to Angles Beauty Care Products, Inc. for use

15   of the mark "HAI Plus Design" in connection with the conduct of

16   courses and seminars in the field of hair care.  HAI is informed

17   and it believes and, based thereon it alleges, that the '282

18   Registration was subsequently assigned to counterdefendant

19   Angles.

20   34.  HAI is informed and it believes and, based thereon it

21   alleges, that its adoption and use of the HAI Marks in connection

22   with the sale of hair-related goods was prior to the filing date

23   of the application that matured into the '282 Registration and

24   prior to the priority date of Angles' predecessor-in-interest.

25   35.  Counterdefendant Angles' use of the "HAI Plus Design"

26   Mark that is the subject of the '282 Registration on or in

27   connection with the services identified above is likely to cause

28   confusion, mistake or deception in violation of Section 2(d) of

                         **Exhibit "5"**
                              147

003 Amended Counterclaim.wpd                - 9 -              FIRST AMENDED COUNTERCLAIM
                                                                 OF HAIR ART AND YU

1   the Lanham Act, 15 U.S.C. § 1052(d), in that persons familiar

2   with the HAI Marks would be likely to utilize Angles' services

3   believing they are offered by HAI or to believe that Angles or

4   Angles' services are offered or sponsored by, or otherwise

5   associated with, HAI.  Furthermore, any objection or fault found

6   with Angles' services would likely reflect upon HAI, and

7   irreparably and seriously injure HAI's reputation and goodwill.

8       36.  Angles' ownership of the '282 Registration for the

9   services identified above also places Angles in a position to vex

10  and harass HAI and to cause annoyance to HAI as the registration

11  gives Angles the prima facie right to use the "HAI Plus Design"

12  mark, thereby impairing and injuriously affecting HAI's rights in

13  the HAI Marks, as evidenced by Angles' assertion of the '282

14  Registration against HAI in connection with the First Amended

15  Complaint filed in the within matter.

16      37.  Unless the '282 Registration is canceled, the above-

17  described injuries to HAI will continue.

18              SIXTH CLAIM FOR RELIEF

19  (By HAI and Yu Against Counterdefendant Angles for Declaratory
          Declaratory Relief Under 28 U.S.C. §§ 2201 and 2202)

20

21      38.  Counterclaimants HAI and YU repeat and re-allege

22  paragraphs 1 through 15, as though fully set forth in this

23  paragraph.

24      39.  There is an actual controversy between HAI and YU, on

25  the one hand, and counterdefendant Angles, on the other,

26  regarding the validity and infringement of counterdefendant

27  Angles' alleged federal and common law trademark rights, as to

28  the alleged unfairness of the competition between HAI and YU and

**Exhibit "5"**

148

1  counterdefendant Angles and as to the alleged interference by HAI

2  and YU with Angles' contracts and/or prospective economic

3  advantage.

4      40.  Counterdefendant Angles contends that it is the owner

5  of, and/or that it has trademark rights in, a family of

6  trademarks that make use of the terms "Hair Art" and "HAI" in

7  connection with hair care products and that HAI and YU infringe

8  those rights.  HAI and YU contend that they do not infringe any

9  valid trademark rights of Angles.

10     41.  Counterdefendant Angles contends that HAI and YU have

11 unfairly competed with it by using the terms "Hair Art" and

12 "HAI".  HAI and YU contend that they have not unfairly competed

13 with counterdefendant Angles.

14     42.  Counterdefendant Angles contends that it has certain

15 contractual rights and/or prospective economic advantages and

16 that HAI and YU have interfered with those rights/advantages.

17 HAI and YU contend that they have not interfered with any of

18 Angles' rights or advantages.

19     43.  Pursuant to 28 U.S.C. §§ 2201 and 2202, HAI and YU are

20 entitled to a judicial declaration with respect to whether they

21 have (i) infringed any valid trademark rights of Angles,

22 (ii) unfairly competed with Angles, and (iii) interfered with any

23 contractual rights and/or prospective economic advantages of

24 Angles.

25

26                        PRAYER FOR RELIEF

27     WHEREFORE, HAI and YU pray for relief as follows:

28     1.   For a judicial declaration that they have not infringed

Exhibit "5"
149

003 Amended Counterclaim.wpd

- 11 -

FIRST AMENDED COUNTERCLAIM
OF HAIR ART AND YU

1    any valid trademark rights of Angles;

2        2.    For a judicial declaration that they have not competed
3    unfairly with Angles;

4        3.    For a judicial declaration that they have not
5    interfered with any contracts or prospective economic advantages
6    of Angles;

7        4.    That Angles take nothing by its First Amended
8    Complaint;

9        5.    That Angles' request for injunctive relief be denied;

10        6.    That the First Amended Complaint be dismissed with
11    prejudice and that judgment on the First Amended Complaint be
12    entered in favor of HAI and YU;

13        7.    For an order permanently enjoining Countedefendants and
14    their officers, agents, employees, and all those acting in
15    concert or conspiracy with them from:

16            a.    Directly or indirectly manufacturing, producing,
17    printing, distributing, importing, trafficking in, selling,
18    offering for sale, possessing, advertising, promoting, moving or
19    displaying any hair care products bearing the "Hair Art" or "HAI"
20    marks or any simulation, reproduction, counterfeit, copy or
21    colorable imitation of those marks;

22            b.    Instructing or directing any third parties to
23    make containers, labels or packaging bearing the "Hair Art" or
24    "HAI" marks or any simulation, reproduction, counterfeit, copy or
25    colorable imitation of those marks;

26            c.    Imitating, copying, making unauthorized use of,
27    or otherwise infringing, HAI's rights in and to the "Hair Art" or
28    "HAI" marks;

**Exhibit "5"**
**150**

1  8. For an order directing Counterdefendants to deliver for

2 destruction all products, labels, boxes, signs, prints, packages,

3 wrappers, and artwork in their possession, or under their

4 control, bearing or intended to bear the "Hair Art" or "HAI"

5 marks or any simulation, reproduction, counterfeit, copy or

6 colorable imitation of those marks, including all plates, molds,

7 matrices and other means of making the same;

8  9. For a finding that the Counterdefendants' acts were

9 willful within the meaning of 15 U.S.C. § 1117(c)(2);

10  10. For a monetary award in favor of Counterclaimant HAI's

11 favor in an amount equal to (i) HAI's actual damages and (ii) to

12 the extent not included in actual damages, the Counterdefendants'

13 profits arising from the acts alleged above, such damages and

14 profits to be trebled under 15 U.S.C. § 1117(a);

15  11. For an award of pre-judgment interest and post-judgment

16 interest in the maximum amount permitted by law;

17  12. For a finding that this is an exceptional case within

18 the meaning of, and for an award of attorneys' fees pursuant to,

19 15 U.S.C. § 1117(a);

20  13. For a finding that the Counterdefendants' acts were

21 undertaken intentionally, maliciously and/or with a reckless and

22 wanton disregard of Counterclaimant HAI's common law trademark

23 rights and for an award of exemplary damages pursuant to

24 California Civil Code section 3295 in an amount sufficient to

25 punish, deter, and make an example of Counterdefendants for the

26 acts complained of herein;

27  14. For an award of costs under 15 U.S.C. § 1117(a), or as

28 otherwise provided by law; and

**Exhibit "5"**

**151**

003 Amended Counterclaim.wpd

- 13 -

FIRST AMENDED COUNTERCLAIM
OF HAIR ART AND YU

1      15.   For such other and further relief as the court deems

2   just and proper.

3

4   Dated: April 27, 2005                    SHELDON & MAK

5

6                                            By: _Douglas H. Morseburg_

7                                            Douglas H. Morseburg

8                                            Attorneys for Defendants and
                                             Counterclaimants Hair Art
                                             International, Inc. and Jackie
9                                            Yu

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit "5"
152

003 Amended Counterclaim.wpd                 - 14 -          FIRST AMENDED COUNTERCLAIM
                                                               OF HAIR ART AND YU

REQUEST FOR JURY TRIAL

Defendants and Counterclaimaints Hair Art International, Inc. ("HAI") and Jackie Yu ("YU") hereby request a trial by jury of all issues raised by the First Amended Complaint and by their answer to the First Amended Complaint, including their affirmative defenses that are properly triable to a jury.  In addition, HAI and YU request a trial by jury of all issues raised by their First Amended counterclaim that are properly triable to a jury.

Dated: April 27, 2005            SHELDON & MAK PC

                                By: _Douglas H. Morseburg_
                                    Douglas H. Morseburg

                                Attorneys for Defendants and
                                Counterclaimants Hair Art
                                International, Inc. and Jackie Yu

Exhibit "5"

153

EXHIBIT 6

1  Danton K. Mak - State Bar No. 115924
   Douglas H. Morseburg - State Bar No. 126205
2  SHELDON & MAK PC
   225 South Lake Avenue, 9th Floor
3  Pasadena, California 91101
   Telephone: 626.796.4000
4  Facsimile: 626.795.6321
   Email:   doug@usip.com
5
   Attorneys for Defendants and
6  Counterclaimants Hair Art
   Int'l, Inc. and Jackie Yu
7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11  ANGLES BEAUTY CARE GROUP, )     No. 05 CV 0166 JAH (CAB)
    INC., a California corporation, )
12                                )
              Plaintiff,          )
13                                )   HAIR ART INT'L INC.'S
         v.                       )   SUPPLEMENTAL RESPONSES TO
14                                )   RICHARD OUELLETTE'S FIRST
    HAIR ART INTERNATIONAL,       )   SET OF INTERROGATORIES
15  INC., a California corporation; )  (NOS. 1-21)
    JACKIE YU, an individual,     )
16                                )
              Defendants.         )
17  _____ )
                                  )
18  AND RELATED COUNTERCLAIM.     )
    _____ )
19

20

21  PROPOUNDING PARTY:    Richard Ouellette

22  RESPONDING PARTY:     Hair Art Int'l, Inc

23  SET NO.:              One

24

25       Defendant and Counterclaimant Hair Art Int'l, Inc. ("HAI") provides the

26  following supplemental responses to the First Set of Interrogatories of Counterclaim

27  Defendant Richard Ouellette ("Ouellette"):

Exhibit "6"
154

28

## GENERAL OBJECTIONS

A.    While Ouellette's First Set of Interrogatories purports to contain 21 interrogatories, most of the individual interrogatories contain implicit, discrete subparts. The use of implicit subparts causes the First Set of Interrogatories to number in excess of 1,000 questions. Rule 33 of the Federal Rules of Civil Procedure ("Rule 33") prohibits the service of written interrogatories that exceed 25 in number, including discrete subparts. Local Rule 33.1 provides that, without prior leave of Court, no party may serve in excess of 25 written interrogatories, including discrete subparts. Thus, HAI objects to the First Set of Interrogatories in its entirety on the grounds that it exceeds the maximum number of individual interrogatories allowed under Rule 33 and Local Rule 33.1 and HAI expressly declines to respond substantively to any of the interrogatories contained in it. See Safeco of America v. Rawstron, 181 F.R.D. 441, 443 (C.D. Cal. 1997) (use of unnumbered, implicit subparts in violation of 25 interrogatory limits is not permitted).

B.    HAI generally objects to the Interrogatories to the extent they purport to call for information that is protected by the attorney-client privilege and/or the attorney work product doctrine.

C.    HAI generally objects to Interrogatories on the grounds that the "Instructions" and "Definitions" sections are confusing and overly broad and upon the further grounds that they purport to impose upon HAI obligations that are in excess of those imposed by the Federal Rules of Civil Procedure.

D.    HAI specifically objects to the definition of the terms "Hair Art International, Inc.", "Defendant", You" and "Your" on the grounds that they are overly broad.

E.    HAI specifically objects to the definition of the term "Angles" on the grounds that it is overly broad.

**Exhibit "6"**

**155**

## RESPONSES

Interrogatory No. 1:

Identify and describe in detail all facts upon which You base Your first affirmative defense, that "[t]he complaint, and each purported claim for relief contained therein, fails to allege facts sufficient to constitute a claim for relief against Defendants" and identify each Person with knowledge of one or more of these facts, and each document You contend supports one or more of these facts.

Response to Interrogatory No. 1:

HAI objects to this interrogatory on the grounds that it contains three discrete subparts. See Kendall v. GES Exposition Services, Inc, 174 F.R.D. 684, 686 (D. Nev. 1997) (interrogatory that requests identification of facts and documents contains two discrete subparts).

Supplemental Response to Interrogatory No. 1

HAI's first affirmative defense is based upon the fact that Angles has no rights in any of the marks at issue in this litigation because HAI's rights in each of the marks at issue are superior to Angles' rights and the further fact that, as between HAI and Angles, HAI is the senior user and owner of each mark. The specific details that support this defense are set forth in HAI's recent for motion for partial summary judgment on the parties' respective infringement claims.


Interrogatory No. 2:

Identify and describe in detail all facts upon which You base Your second affirmative defense, that "Plaintiff is barred from recovery . . . by the doctrine of laches," and identify each Person with knowledge of one or more of these facts, and each document You contend supports one or more of these facts.

Response to Interrogatory No. 2

**Exhibit "6"**

HAI objects to this interrogatory on the grounds that it contains three discrete subparts. See Kendall v. GES Exposition Services, Inc; 174 F.R.D. at 686.

1 | Supplemental Response to Interrogatory No. 2

2      HAI's second affirmative defense of laches is based upon the fact that, even if

3 Angles' rights in the marks at issue in this case were superior to HAI's rights (and

4 they are not), Angles would be barred from any recovery against HAI because

5 (i) HAI commenced using the subject marks openly and notoriously long before the

6 date Angles claims to have commenced using them, i.e., January 1999, (ii) at the

7 time Angles commenced using the term "Hair Art and Information", it was aware

8 that HAI was using the term "HAIRART" as a mark, (iii) Angles' has had at least

9 constructive notice that HAI has been using the subject marks since at least January

10 1999, (iv) Angles has had actual notice that HAI has been using the marks at issue

11 since at least April 26, 1999, (v) at no time during the entire time that HAI has been

12 using the marks at issue did Angles ever assert that it owned any rights in any of

13 those marks, and (vi) HAI has been prejudiced by Angles' 6 year delay in asserting

14 any claims against HAI for using any of the marks at issue.

15      People with knowledge of the foregoing facts include: Jackie Yu, James

16 Brunton, Richard Ouellette, Connie Ouellette, Camillo Schuchardt and Adam

17 Shuman.

18

19 | Interrogatory No. 3:

20      Identify and describe in detail all facts upon which You base Your third

21 affirmative defense, that 'Plaintiff is barred from recovery . . . by the doctrine of

22 estoppel," and identify each Person with knowledge of one or more of these facts,

23 and each document You contend supports one or more of these facts.

24 | Response to Interrogatory No. 3:

25      HAI objects to this interrogatory on the grounds that it contains three discrete

26 subparts. See Kendall v. GES Exposition Services, Inc. 174 F.R.D. at 686.

**Exhibit "6"**

27 | Supplemental Response to Interrogatory No. 2

28      HAI's third affirmative defense of estoppel is based upon the fact that, even if

1  Angles' rights in the marks at issue in this case were superior to HAI's rights (and

2  they are not), Angles would be barred from any recovery against HAI because

3  (i) HAI commenced using the subject marks openly and notoriously long before the

4  date Angles claims to have commenced using them, i.e., January 1999, (ii) at the

5  time Angles commenced using the term "Hair Art and Information", it was aware

6  that HAI was using the term "HAIRART" as a mark, (iii) Angles' has had at least

7  constructive notice that HAI has been using the subject marks since at least January

8  1999, (iv) Angles has had actual notice that HAI has been using the marks at issue

9  since at least April 26, 1999, (v) at no time during the entire time that HAI has been

10  using the marks at issue did Angles ever assert that it owned any rights in any of

11  those marks, and (vi) HAI relied to its detriment upon Angles' silence during the

12  period from January 1999 to January 2005 in asserting that it owned any rights in

13  any of the marks at issue.

14       People with knowledge of the foregoing facts include: Jackie Yu, James

15  Brunton, Richard Ouellette, Connie Ouellette, Camillo Schuchardt and Adam

16  Shuman.

17

18  <u>Interrogatory No. 4</u>:

19       Identify and describe in detail all facts upon which You base Your fourth

20  affirmative defense, that "Plaintiff is barred from recovery . .. by the doctrine of

21  waiver," and identify each Person with knowledge of one or more of these facts, and

22  each document You contend supports one or more of these facts.

23  <u>Response to Interrogatory No. 4</u>:

24       HAI objects to this interrogatory on the grounds that it contains three discrete

25  subparts. See <u>Kendall v. GES Exposition Services, Inc.</u>, 174 F.R.D. at 686.

26  <u>Supplemental Response to Interrogatory No. 4</u>

     **Exhibit "6"**

27       HAI's fourth affirmative defense is based upon the fact that, even if Angles'

28  rights in the marks at issue in this case were superior to HAI's rights (and they are

1  not), (i) HAI began using the subject marks openly and notoriously long before the

2  date Angles claims to have commenced using them, i.e., January 1999, (ii) at the

3  time Angles commenced using the term "Hair Art and Information", it was aware

4  that HAI was using the term "HAIRART" as a mark, (iii) Angles' has had at least

5  constructive notice that HAI has been using the subject marks since at least January

6  1999, (iv) Angles has had actual notice that HAI has been using the marks at issue

7  since at least April 26, 1999, (v) at no time during the entire time that HAI has been

8  using the marks at issue did Angles ever assert that it owned any rights in any of

9  those marks, and (vi) Angles' silence in the face of its knowledge that HAI was

10  using the subject marks during the period from January 1999 to January 2005

11  constitutes an implied waiver of any rights it may once have had against HAI in

12  connection with its use of the marks at issue.

13      People with knowledge of the foregoing facts include: Jackie Yu, James

14  Brunton, Richard Ouellette, Connie Ouellette, Camillo Schuchardt and Adam

15  Shuman.

16

17  Interrogatory No. 5:

18      Identify and describe in detail all facts upon which You base Your fifth

19  affirmative defense, that "Plaintiff is barred from recovery . . . by the doctrine of

20  acquiescence," and identify each Person with knowledge of one or more of these

21  facts, and each document You contend supports one of more of these facts.

22  Response to Interrogatory No. 5

23      HAI objects to this interrogatory on the grounds that it contains three discrete

24  subparts. See Kendall v. GES Exposition Services, Inc, 174 F.R.D. at 686.

25  Supplemental Response to Interrogatory No. 5

26      HAI's fifth affirmative defense is based upon the fact that, even if Angles'

**Exhibit "6"**

27  rights in the marks at issue in this case were superior to HAI's rights (and they are

28  not), (i) HAI began using the subject marks openly and notoriously since the date

1  Angles claims to have commenced using them, i.e., January 1999, (ii) at the time

2  Angles commenced using the term "Hair Art and Information", it was aware that

3  HAI was using the term "HAIRART" as a mark, (iii) Angles' has had at least

4  constructive notice that HAI has been using the subject marks since at least January

5  1999, (iv) Angles has had actual notice that HAI has been using the marks at issue

6  since at least April 26, 1999, and (v) by remaining silent in the face of its knowledge

7  that HAI was using the subject marks during the period from January 1999 to

8  January 2005, Angles' acquiesced in HAI's use of those marks.

9        People with knowledge of the foregoing facts include: Jackie Yu, James

10  Brunton, Richard Ouellette, Connie Ouellette, Camillo Schuchardt and Adam

11  Shuman.

12

13  Interrogatory No. 6:

14        Identify and describe in detail all facts upon which You base Your sixth

15  affirmative defense, that "Plaintiff is barred from recovery . . . due to unclean

16  hands," and identify each Person with knowledge of one or more of these facts, and

17  each document You contend supports one or more of these facts.

18  Response to Interrogatory No. 6

19        HAI objects to this interrogatory on the grounds that it contains three discrete

20  subparts. See Kendall v. GES Exposition Services, Inc, 174 F.R.D. at 686.

21  Supplemental Response to Interrogatory No. 6

22        HAI's sixth affirmative defense that Angles is barred from recovery due to

23  unclean hands is based upon the well-established rule that he who seeks equity must

24  do equity and upon the equally well-established rule that equity requires good faith.

25  However, in this case, Angles is guilty of bad faith. The facts that establish Angles'

26  bad faith contexts are as follows:

**Exhibit "6"**

27        On October 12, 1998, Angles filed U.S. trademark application no.

28  75/569,547 (the "'547 Application") with the U.S. Patent and Trademark Office

07-19-2006    05:10pm    From-SHELDON & MAK                6267956321              T-746    P 009/044    F-356

1  ("PTO") stating that it had an intent to use the term "Hair Art and Information" as a

2  trademark in interstate commerce in connection with hair care products and

3  educational services regarding the care of hair.

4          At the time the '547 Application was filed, HAI had a federal trademark

5  registration (the "'468 Registration") for the "HAIRART" mark. Moreover, at the

6  time the '547 Application was filed, HAI had been in business for over 14 years,

7  during which time it had accumulated sales of at approximately $14,000,000. As a

8  consequence of its longevity in the business and its extensive sales, HAI was a well-

9  known supplier of hair-related products to beauty professionals. By 1998, Angles'

10  principal, Richard Ouellette had been in the beauty business for over 30 years.

11  Thus, it is exceedingly unlikely that he or Angles had never heard of HAI and/or the

12  "HAIRART" mark at the time the '547 Application was filed and Adam Shuman has

13  confirmed that Angles was aware of HAI's use of the "HAIRART" mark at the time

14  it (Angles) commenced using the term "Hair Art and Information". Moreover, as a

15  consequence of the '468 Registration, Angles had at least constructive notice of

16  HAI's rights in and to the "HAIRART" mark.

17          On April 26, 1999, the examiner to whom the '547 Application was assigned

18  issued an office action stating, among other things, that the term "Hair Art and

19  Information" was not registrable because it was likely to be confused with the

20  "HAIRART" mark that was the subject of the '468 Registration. As a consequence

21  of the April 26, 1999 office action, Angles had actual notice of HAI's rights in and

22  to the "HAIRART" mark.

23          On August 30, 1999, Angles filed U.S. trademark application no. 75/787,522

24  (the "'522 Application") stating that it had an intent to use the term "HAI" in

25  stylized form as a trademark in interstate commerce in connection with educational

26  services regarding the care of hair. The filing of the '522 Application occurred over

27  four months after the PTO refused to register the term "Hair Art and Information".

28          Angles has contended in filings with the PTO in connection with the '522

Exhibit "6"

1  Application that it began using the mark "HAI" in January 1999. This contention is

2  false. Angles did not use the term "HAI" by itself as a mark at any time between

3  1999 and 2005. Instead, it used a mark that consisted of the words "Hair Art and

4  Information" emblazoned upon an oval that encircled the stylized letters "HAI" (the

5  "Composite Mark"). The term "HAI" that Angles applied to register was a

6  mutilation of the Composite Mark.

7        Angles first used the Composite Mark in connection with the giving of classes

8  and demonstrations relating to the cutting of hair and in connection with the sale of

9  videotapes depicting the cutting of hair. It did so no earlier than the middle of 1999.

10 By this time HAI had been using the "HAIRART" and "HAI" marks for 15 and 5

11 years, respectively.

12       Even assuming that Angles began using the Composite Mark in January 1999,

13 as it claims, its bad faith is inferrable from the fact that Angles had actual

14 knowledge of HAI and its "HAIRART" mark at this time and from the further fact

15 that, rather than adopt a mark that was completely different from HAI's mark,

16 Angles adopted a mark that contained the entirety of HAI's registered mark for

17 services that were related to the goods for which HAI's mark was registered. Even

18 if Angles did not have actual notice of HAI and/or its "HAIRART" mark at this

19 point in time, Angles had constructive notice of the '468 Registration and of HAI's

20 prior rights in and to the term "HAIRART".

21       Angles' CEO, Richard Ouellette, has filed two fictitious business statements

22 with the San Diego County Clerk's Office stating that Angles began conducting

23 business under the name "Hair Art and Information" on October 25 or 26, 1999. In

24 addition, Angles' first promotional materials for any product bearing the Composite

25 Mark were printed in December 1999 or in January 2000. Thus, Angles' first use of

26 the term "Hair Art and Information" as a business name occurred no earlier than

**Exhibit "6"**

27 October 25, 1999 and its first use of the Composite Mark in connection with the

28 sale and promotion of hair styling tools occurred no earlier than January 2000. Its

1  false contention that it commenced using "Hair Art and Information" and the

2  Composite Mark in January 1999 is obvious evidence of bad faith.

3      Without regard to when Angles began using the "Hair Art and Information"

4  name and/or the Composite Mark, HAI and Angles each attended the same trade

5  show in Long Beach in January 2000. It was at this trade show that HAI first

6  learned that Angles had adopted and was using the term "Hair Art and Information"

7  and the Composite Mark in connection with its business.

8      As a consequence, HAI's attorney, James Brunton, sent Angles a letter dated

9  February 23, 2000. In it, Mr Brunton specifically informed Angles about the '468

10  Registration and about the confusion that had resulted at the trade show from

11  Angles' adoption and use of a mark that was confusingly similar to the "HAIRART"

12  mark.

13      Following its receipt of Mr. Brunton's letter of February 23, 2000, Angles

14  continued to use the "Hair Art and Information" name and the Composite Mark. It

15  did so even though it was aware of specific instances in which its use of its mark

16  and its name had caused confusion. The fact that Angles continued to use the "Hair

17  Art and Information" name and the Composite Mark despite the fact that it was

18  aware of the confusion it was causing is evidence of bad faith.

19      On April 6, 2000, Angles' attorney, George Netter, called Mr. Brunton and

20  stated that a response to Mr. Brunton's February 23, 2000 letter was forthcoming.

21  However, no response was ever received. Therefore, on December 12, 2000, Mr.

22  Brunton wrote another letter to Angles.

23      In response, Mr. Netter wrote Mr. Brunton a letter on December 19, 2000. In

24  it, Mr. Netter contended, among other things, that Angles was not causing any

25  confusion, that Angles was using the term "Hair Art and Information" in a

26  descriptive sense, rather than a trademark sense, that HAI's "HAIRART" mark was

**Exhibit "6"**

27  descriptive or generic, and that, in any event, Angles was using the term "HAI" as a

28  mark and not "Hair Art and Information". All of the foregoing statements were

1  false.

2          The true facts were that Angles was well aware that its actions were causing

3  confusion in the marketplace, that on July 31, 2000 Angles had filed a declaration

4  with the PTO in support of the '547 Application which stated that Angles was

5  making trademark use of the term "Hair Art and Information" and that Angles was

6  not using the term "HAI" as a mark, but was instead using the Composite Mark.

7  Moreover, Angles' contention that the term "HAIRART" was generic or descriptive

8  was belied by the fact that Angles itself had filed the '547 Application seeking to

9  register the term "Hair Art and Information" on the principal register.

10          The misrepresentations in Mr. Netter's letter of December 19, 2000 were

11  known to Mr. Ouellette, who oversaw the preparation of the letter. His knowledge

12  of these intentional misrepresentations is evidence of his and Angles' bad faith.

13          On February 1, 2001, Mr. Brunton sent a third letter to Angles through

14  Mr. Netter. It in, Mr. Brunton described additional instances of confusion and again

15  demanded that Angles stop infringing HAI's rights. Angles' continued use of the

16  term "Hair Art and Information" and the Composite Mark in the face of this third

17  letter and its knowledge of these additional instances of confusion is further

18  evidence of Ouellette's and Angles' bad faith.

19          On or about November 30, 2002, the PTO canceled HAI's '468 Registration.

20  The cancellation was solely the result of the fact that HAI had inadvertently failed to

21  file a declaration with the PTO (the "Section 8 Declaration") stating that it was still

22  using the "HAIRART" mark. Notwithstanding its failure to file the Section 8

23  Declaration, HAI continued using the "HAIRART" mark in connection with the

24  nationwide promotion and sale of its hair products.

25          On a date which is unknown to HAI, but which is believed to be around

26  October 2003, Angles learned that the '468 Registration had been canceled. On

27  December 3, 2003, Angles filed U.S. trademark application no. 78/337,311 (the

Exhibit "6"
164

28  "'311 Application") for the mark "HAIR ART". In support of the '311 Application,

1    Ouellette submitted a declaration under penalty of perjury (i) that Angles had a bona

2    fide intention to use the "HAIR ART" mark in commerce for the goods identified in

3    the application, and (ii) that no other person had the right to use that term as a mark.

4        At the time Angles filed the '311 Application, it had no intention of ever

5    using the term "HAIR ART" as a mark in connection with any goods or services.

6    Moreover, at the time the '311 Application was filed, Angles knew that HAI was

7    still using the term "HAIRART" as a trademark and that Angles' use was junior to

8    HAI's use. Thus, the '311 Application is perjurious and fraudulent.

9        Angles' act of trying to obtain a federal registration for the term "HAIR ART"

10    despite the fact that it had no intention of ever using that term as a mark and despite

11    its knowledge that HAI had been using that term continuously for a period of over

12    20 years is evidence of bad faith.

13        On January 27, 2005, Angles commenced the instant action against HAI for,

14    among other things, infringing its alleged rights in and to the "HAIR ART", "HAIR

15    ART AND INFORMATION" and "HAI" marks and for a judicial declaration that

16    Angles is the owner of those marks and for an injunction preventing HAI from using

17    any of those marks.

18        At the time Angles filed its complaint, it was aware that HAI was using the

19    term "HAIRART" as a mark and that it had been doing so for over 20 years.

20    Angles' actions in suing HAI for infringing a mark that Angles has never used and

21    its attempt to obtain a judicial declaration that it owns a mark it has never used and

22    has no intention of ever using and its attempt to enjoin HAI's use of a mark HAI has

23    been using for over 20 years constitutes evidence of bad faith.

24        HAI's use of the "HAIRART" mark predates Angles' use of the "Hair Art

25    and Information" name by at least fifteen years. Angles' deliberate and continued

26    use of that name over the past six years with knowledge of HAI's prior rights and

27    with knowledge that its continued use was causing confusion in the marketplace

28    constitutes powerful evidence of Angles' bad faith. The fact that Angles refused to

Exhibit "6"
165

1  stop using a name that incorporated the entirety of HAI's "HAIRART" mark despite

2  the confusion it was causing also constitutes powerful evidence of bad faith.

3     HAI's use of the "HAIRART" mark predates Angles' use of the Composite

4  Mark by at least five years.  Angles' coupling of the term "HAI" with the term "Hair

5  Art and Information" and its continued use of those terms in the Composite Mark

6  over the past six years has been with knowledge of HAI's prior rights in the

7  "HAIRART" mark and with knowledge that its continued use was causing confusion

8  in the marketplace, which Angles has admitted.  Angles' deliberate use of a mark

9  that it admits is causing confusion constitutes powerful evidence of Angles' bad

10 faith.  The fact that Angles has refused to stop using the Composite Mark, which

11 incorporates the entirety of HAI's "HAIRART" mark, despite the confusion it is

12 causing also constitutes powerful evidence of bad faith.

13    Finally, the manner in which Angles' has conducted this litigation is also

14 evidence of its bad faith.  For example, Angles has continued to pursue claims that it

15 has admitted were completely meritless when brought, obstructed the gathering of

16 evidence by taking possession of, and withholding, relevant documents subpoenaed

17 from third parties, filed declarations that are false on their face and noticed the

18 depositions of witnesses so as to maximize the inconvenience to them.

19

20 Interrogatory No. 7:

21    Identify and describe in detail all facts upon which You base Your seventh

22 affirmative defense, that "Defendants, at all times, acted in good faith," and identify

23 each Person with knowledge of one or more of these facts, and each document You

24 contend supports one or more of these facts.

25 Response to Interrogatory No. 7:

26    HAI objects to this interrogatory on the grounds that it contains three discrete

27 subparts.  See Kendall v. GES Exposition Services, Inc, 174 F.R.D. at 686.

Exhibit "6"

166

28 Supplemental Response to Interrogatory No. 7

1    HAI's seventh affirmative defense is based upon the fact that HAI adopted

2  the "HAIRART" and "HAI" marks in 1984 and 1994, respectively, and that it has

3  been using those marks continuously since those times and in exactly the same

4  manner as it was when it adopted them.  Details regarding these facts are set forth in

5  the papers supporting HAI's recent motion for partial summary judgment on the

6  parties' infringement claims.

7

8  Interrogatory No. 8:

9    Identify and describe in detail all facts upon which You base Your eighth

10  affirmative defense, that "Plaintiff has no trademark rights in the terms ["HAIR

11  ART"] or "HAI" because, at the time Plaintiff commenced using those terms, it

12  knew that defendant Hair Art International, Inc. was using them as a trademark for

13  hair-related products," and identify each Person with knowledge of one or more of

14  these facts, and each document You contend supports one or more of these facts.

15  Response to Interrogatory No. 8

16    HAI objects to this interrogatory on the grounds that it contains three discrete

17  subparts.  See Kendall v. GES Exposition Services, Inc., 174 F.R.D. at 686.

18  Supplemental Response to Interrogatory No. 8

19    HAI's eighth affirmative defense that Angles has no rights in the terms

20  "HAIR ART" or "HAI" is based upon the fact that HAI's rights in the marks "HAIR

21  ART" and "HAI" are superior to Angles' alleged rights, upon the fact that, as

22  between HAI and Angles, HAI is the senior user and owner of those marks, and

23  upon the further fact that the term "HAIR ART AND INFORMATION" is

24  confusingly similar to the "HAIRART" mark.  The details regarding these facts are

25  set forth in HAI's recent for motion for partial summary judgment on the parties'

26  respective infringement claims.

27    HAI's eighth affirmative defense that Angles has no rights in the terms

28  "HAIR ART" or "HAI" is also based upon the following additional facts:

Exhibit "6"
167

1       On October 12, 1998, Angles filed U.S. trademark application no.
2   75/569,547 (the "'547 Application") with the U.S. Patent and Trademark Office
3   ("PTO") stating that it had an intent to use the term "Hair Art and Information" as a
4   trademark in interstate commerce in connection with hair care products and
5   educational services regarding the care of hair.
6       At the time the '547 Application was filed, HAI had a federal trademark
7   registration (the "'468 Registration") for the "HAIRART" mark. Moreover, at the
8   time the '547 Application was filed, HAI had been in business for over 14 years,
9   during which time it had accumulated sales of at approximately $14,000,000. As a
10   consequence of its longevity in the business and its extensive sales, HAI was a well-
11   known supplier of hair-related products to beauty professionals. By 1998, Angles'
12   principal, Richard Ouellette had been in the beauty business for over 30 years.
13   Thus, it is exceedingly unlikely that he or Angles had never heard of HAI and/or the
14   "HAIRART" mark at the time the '547 Application was filed and Adam Shuman has
15   confirmed that Angles was aware of HAI's use of the "HAIRART" mark at the time
16   it (Angles) commenced using the term "Hair Art and Information". Moreover, as a
17   consequence of the '468 Registration, Angles had at least constructive notice of
18   HAI's rights in and to the "HAIRART" mark.
19       On April 26, 1999, the examiner to whom the '547 Application was assigned
20   issued an office action stating, among other things, that the term "Hair Art and
21   Information" was not registrable because it was likely to be confused with the
22   "HAIRART" mark that was the subject of the '468 Registration. As a consequence
23   of the April 26, 1999 office action, Angles had actual notice of HAI's rights in and
24   to the "HAIRART" mark and a party who knowingly adopts and uses a mark that is
25   confusingly similar to another mark acquires no valid trademark rights in the later-
26   adopted mark.
27       On August 30, 1999, Angles filed U.S. trademark application no. 75/787,522
28   (the "'522 Application") stating that it had an intent to use the term "HAI" in

Exhibit "6"
168

1    stylized form as a trademark in interstate commerce in connection with educational

2    services regarding the care of hair. The filing of the '522 Application occurred over

3    four months after the PTO refused to register the term "Hair Art and Information".

4       Angles has contended in filings with the PTO in connection with the '522

5    Application that it began using the mark "HAI" in January 1999. This contention is

6    false. Angles did not use the term "HAI" by itself as a mark at any time between

7    1999 and 2005. Instead, it used a mark that consisted of the words "Hair Art and

8    Information" emblazoned upon an oval that encircled the stylized letters "HAI" (the

9    "Composite Mark").

10      Angles first used the Composite Mark in connection with the giving of classes

11    and demonstrations relating to the cutting of hair and in connection with the sale of

12    videotapes depicting the cutting of hair. It did so no earlier than the middle of 1999.

13    By this time HAI had been using the "HAIRART" and "HAI" marks for 15 and 5

14    years, respectively.

15      Even assuming that Angles began using the Composite Mark in January 1999,

16    as it claims, Angles had actual knowledge of HAI and its "HAIRART" mark at this

17    time. Rather than adopt a mark that was completely different from HAI's mark,

18    Angles adopted a mark (i.e., the Composite Mark) that contained the entirety of

19    HAI's registered mark for services that were related to the goods for which HAI's

20    mark was registered.

21      The Composite Mark is confusingly similar to HAI's "HAIRART" mark, a

22    fact which was known to Angles at the time. A party who knowingly adopts and

23    uses a mark that is confusingly similar to another mark acquires no valid trademark

24    rights in the later-adopted mark. Even if Angles did not have actual notice of HAI

25    and/or its "HAIRART" mark at this point in time, Angles had constructive notice of

26    the '468 Registration and of HAI's prior rights in and to the term "HAIRART".

27      Without regard to when Angles began using the "Hair Art and Information"

28    name and/or the Composite Mark, HAI and Angles each attended the same trade

Exhibit "6"
169

1  show in Long Beach in January 2000. It was at this trade show that HAI first

2  learned that Angles had adopted and was using the term "Hair Art and Information"

3  and the Composite Mark in connection with its business.

4      As a consequence, HAI's attorney, James Brunton, sent Angles a letter dated

5  February 23, 2000. In it, Mr. Brunton specifically informed Angles about the '468

6  Registration and about the confusion that had resulted at the trade show from

7  Angles' adoption and use of a mark that was confusingly similar to the "HAIRART"

8  mark.

9      Following its receipt of Mr. Brunton's letter of February 23, 2000, Angles

10  continued to use the "Hair Art and Information" name and the Composite Mark. It

11  did so even though it was aware of specific instances in which its use of its mark

12  and its name had caused confusion. A party that continues to use a mark, such as

13  the Composite Mark, that it knows is confusingly similar to another's earlier mark

14  acquires no valid trademark rights in the later-adopted mark.

15      On April 6, 2000, Angles' attorney, George Netter, called Mr. Brunton and

16  stated that a response to Mr. Brunton's February 23, 2000 letter was forthcoming.

17  However, no response was ever received. Therefore, on December 12, 2000, Mr.

18  Brunton wrote another letter to Angles.

19      In response, Mr. Netter wrote Mr. Brunton a letter on December 19, 2000. In

20  it, Mr. Netter contended, among other things, that Angles was not causing any

21  confusion, that Angles was using the term "Hair Art and Information" in a

22  descriptive sense, rather than a trademark sense, that HAI's "HAIRART" mark was

23  descriptive or generic, and that, in any event, Angles was using the term "HAI" as a

24  mark and not "Hair Art and Information". All of the foregoing statements were

25  false.

26      The true facts were that Angles was well aware that its actions were causing

27  confusion in the marketplace and a party that intentionally causes confusion in the

Exhibit "6"
170

28  marketplace through its use of a mark that is confusingly similar to another's earlier

1  adopted mark acquires no valid trademark rights in the later-adopted mark.

2      On February 1, 2001, Mr. Brunton sent a third letter to Angles through
3  Mr. Netter. It in, Mr. Brunton described additional instances of confusion and again
4  demanded that Angles stop infringing HAI's rights. Angles' continued use of the
5  term "Hair Art and Information" and the Composite Mark in the face of this third
6  letter and its knowledge of these additional instances of confusion precluded Angles
7  from acquiring any valid trademark rights in the term "Hair Art and Information" or
8  the Composite Mark.

9      On or about November 30, 2002, the PTO canceled HAI's '468 Registration.
10 The cancellation was solely the result of the fact that HAI had inadvertently failed to
11 file a declaration with the PTO (the "Section 8 Declaration") stating that it was still
12 using the "HAIRART" mark. Notwithstanding its failure to file the Section 8
13 Declaration, HAI continued using the "HAIRART" mark in connection with the
14 nationwide promotion and sale of its hair products.

15     On a date which is unknown to HAI, but which is believed to be around
16 October 2003, Angles learned that the '468 Registration had been canceled. On
17 December 3, 2003, Angles filed U.S. trademark application no. 78/337,311 (the
18 "'311 Application") for the mark "HAIR ART". In support of the '311 Application,
19 Ouellette submitted a declaration under penalty of perjury (i) that Angles had a bona
20 fide intention to use the "HAIR ART" mark in commerce for the goods identified in
21 the application, and (ii) that no other person had the right to use that term as a mark.

22     At the time Angles filed the '311 Application, it had no intention of ever
23 using the term "HAIR ART" as a mark in connection with any goods or services.
24 Moreover, at the time the '311 Application was filed, Angles knew that HAI was
25 still using the term "HAIRART" as a trademark and that Angles' use was junior to
26 HAI's use. Thus, the '311 Application is perjurious and fraudulent.

27     Angles' act of trying to obtain a federal registration for the term "HAIR ART"
28 despite the fact that it had no intention of ever using that term as a mark and despite

Exhibit "6"
171

1  its knowledge that HAI had been using that term continuously for a period of over

2  20 years precluded Angles from acquiring any valid trademark rights in the term

3  "HAIR ART".

4        HAI's use of the "HAIRART" mark predates Angles' use of the "HAIR ART

5  AND INFOMATION" name by at least fifteen years. Angles' deliberate and

6  continued use of that name over the past six years with knowledge of HAI's prior

7  rights and with knowledge that its continued use was causing confusion in the

8  marketplace precluded Angles from acquiring any valid trademark rights in the term

9  "HAIR ART AND INFORMATION". The fact that Angles refused to stop using a

10  name that incorporated the entirety of HAI's "HAIRART" mark despite the

11  confusion it was causing precluded Angles from acquiring any valid trademark

12  rights in the term "HAIR ART AND INFORMATION".

13        HAI's use of the "HAIRART" mark predates Angles' use of the Composite

14  Mark by at least five years. Angles' coupling of the term "HAI" with the term "Hair

15  Art and Information" and its continued use of those terms in the Composite Mark

16  over the past six years has been with knowledge of HAI's prior rights in the

17  "HAIRART" mark and with knowledge that its continued use was causing confusion

18  in the marketplace, which Angles has admitted. Angles' deliberate use of a mark

19  that it admits is causing confusion precluded it from acquiring any valid trademark

20  rights in the Composite Mark. The fact that Angles has refused to stop using the

21  Composite Mark, which incorporates the entirety of HAI's "HAIRART" mark,

22  despite the confusion it is causing also precluded Angles from acquiring any valid

23  trademark rights in the Composite Mark.

24

25  Interrogatory No. 9:

26        Identify and describe in detail all facts upon which You base Your ninth

27  affirmative defense, that "[o]n information and belief, Plaintiff had actual notice of

Exhibit "6"
172

28  the '468 Registration at the time it commenced using the term 'Hair Art'. Thus,

1    Plaintiff's adoption of that term as a mark was in bad faith."

2    <u>Response to Interrogatory No. 9</u>

3         HAI objects to this interrogatory on the grounds that Ouellette has exceeded

4    the permissible number of interrogatories.

5    <u>Supplemental Response to Interrogatory No. 9</u>

6         HAI's ninth affirmative defense that Angles' Plaintiff's adoption of the term

7    "Hair Art" as a mark was in bad faith is based upon the fact that, at the time HAI

8    answered the First Amended Complaint, it believed that Angles had adopted and

9    was using that term as a mark, as Angles had alleged in its First Amended

10   Complaint. During discovery, Angles' CEO, Richard Ouellette, admitted that

11   Angles has never used the term "Hair Art" as a mark, that Angles has never had any

12   intention of using that term as a mark, and that, notwithstanding its complaint,

13   Angles was not trying to stop HAI from using that term as a mark.

14        As a consequence of these admissions, HAI does not presently contend that

15   Angles' adoption of the term "Hair Art" was in bad faith. It does, however, assert

16   that Angles' adoption and its continued use of the term "Hair Art and Information"

17   and the Composite Mark was in bad faith. This is based upon the following facts:

18        On October 12, 1998, Angles filed U.S. trademark application no.

19   75/569,547 (the "'547 Application") with the U.S. Patent and Trademark Office

20   ("PTO") stating that it had an intent to use the term "Hair Art and Information" as a

21   trademark in interstate commerce in connection with hair care products and

22   educational services regarding the care of hair.

23        At the time the '547 Application was filed, HAI had a federal trademark

24   registration (the "'468 Registration") for the "HAIRART" mark. Moreover, at the

25   time the '547 Application was filed, HAI had been in business for over 14 years,

26   during which time it had accumulated sales of approximately $14,000,000. As a

27   consequence of its longevity in the business and its extensive sales, HAI was a well-

28   known supplier of hair-related products to beauty professionals. By 1998, Angles'

Exhibit "6"<br>173

1  principal, Richard Ouellette had been in the beauty business for over 30 years.

2  Thus, it is exceedingly unlikely that he or Angles had never heard of HAI and/or the

3  "HAIRART" mark at the time the '547 Application was filed and Adam Shuman has

4  confirmed that Angles was aware of HAI's use of the "HAIRART" mark at the time

5  it (Angles) commenced using the term "Hair Art and Information". Moreover, as a

6  consequence of the '468 Registration, Angles had at least constructive notice of

7  HAI's rights in and to the "HAIRART" mark.

8      On April 26, 1999, the examiner to whom the '547 Application was assigned

9  issued an office action stating, among other things, that the term "Hair Art and

10 Information" was not registrable because it was likely to be confused with the

11 "HAIRART" mark that was the subject of the '468 Registration. As a consequence

12 of the April 26, 1999 office action, Angles had actual notice of HAI's rights in and

13 to the "HAIRART" mark.

14     On August 30, 1999, Angles filed U.S. trademark application no. 75/787,522

15 (the "'522 Application") stating that it had an intent to use the term "HAI" in

16 stylized form as a trademark in interstate commerce in connection with educational

17 services regarding the care of hair. The filing of the '522 Application occurred over

18 four months after the PTO refused to register the term "Hair Art and Information".

19     Angles has contended in filings with the PTO in connection with the '522

20 Application that it began using the mark "HAI" in January 1999. This contention is

21 false. Angles did not use the term "HAI" by itself as a mark at any time between

22 1999 and 2005. Instead, it used a mark that consisted of the words "Hair Art and

23 Information" emblazoned upon an oval that encircled the stylized letters "HAI" (the

24 "Composite Mark"). The term "HAI" that Angles applied to register was a

25 mutilation of the Composite Mark.

26     Angles first used the Composite Mark in connection with the giving of classes

27 and demonstrations relating to the cutting of hair and in connection with the sale of

Exhibit "6"
174

28 videotapes depicting the cutting of hair. It did so no earlier than the middle of 1999.

1  By this time HAI had been using the "HAIRART" and "HAI" marks for 15 and 5

2  years, respectively.

3      Even assuming that Angles began using the Composite Mark in January 1999,

4  as it claims, its bad faith is inferrable from the fact that Angles had actual

5  knowledge of HAI and its "HAIRART" mark at this time and from the further fact

6  that, rather than adopt a mark that was completely different from HAI's mark,

7  Angles adopted a mark that contained the entirety of HAI's registered mark for

8  services that were related to the goods for which HAI's mark was registered. Even

9  if Angles did not have actual notice of HAI and/or its "HAIRART" mark at this

10 point in time, Angles had constructive notice of the '468 Registration and of HAI's

11 prior rights in and to the term "HAIRART".

12     Angles' CEO, Richard Ouellette, has filed two fictitious business statements

13 with the San Diego County Clerk's Office stating that Angles began conducting

14 business under the name "Hair Art and Information" on October 25 or 26, 1999. In

15 addition, Angles' first promotional materials for any product bearing the Composite

16 Mark were printed in December 1999 or in January 2000. Thus, Angles' first use of

17 the term "Hair Art and Information" as a business name occurred no earlier than

18 October 25, 1999 and its first use of the Composite Mark in connection with the

19 sale and promotion of hair styling tools occurred no earlier than January 2000. Its

20 false contention that it commenced using "Hair Art and Information" and the

21 Composite Mark in January 1999 is obvious evidence of bad faith.

22     Without regard to when Angles began using the "Hair Art and Information"

23 name and/or the Composite Mark, HAI and Angles each attended the same trade

24 show in Long Beach in January 2000. It was at this trade show that HAI first

25 learned that Angles had adopted and was using the term "Hair Art and Information"

26 and the Composite Mark in connection with its business.

27     As a consequence, HAI's attorney, James Brunton, sent Angles a letter dated

28 February 23, 2000. In it, Mr. Brunton specifically informed Angles about the '468

**Exhibit "6"**
**175**

1    Registration and about the confusion that had resulted at the trade show from

2    Angles' adoption and use of a mark that was confusingly similar to the "HAIRART"

3    mark.

4          Following its receipt of Mr. Brunton's letter of February 23, 2000, Angles

5    continued to use the "Hair Art and Information" name and the Composite Mark.  It

6    did so even though it was aware of specific instances in which its use of its mark

7    and its name had caused confusion.  The fact that Angles continued to use the "Hair

8    Art and Information" name and the Composite Mark despite the fact that it was

9    aware of the confusion it was causing is evidence of bad faith.

10         On April 6, 2000, Angles' attorney, George Netter, called Mr. Brunton and

11    stated that a response to Mr. Brunton's February 23, 2000 letter was forthcoming.

12    However, no response was ever received.  Therefore, on December 12, 2000, Mr.

13    Brunton wrote another letter to Angles.

14         In response, Mr. Netter wrote Mr. Brunton a letter on December 19, 2000.  In

15    it, Mr. Netter contended, among other things, that Angles was not causing any

16    confusion, that Angles was using the term "Hair Art and Information" in a

17    descriptive sense, rather than a trademark sense, that HAI's "HAIRART" mark was

18    descriptive or generic, and that, in any event, Angles was using the term "HAI" as a

19    mark and not "Hair Art and Information".  All of the foregoing statements were

20    false.

21         The true facts were that Angles was well aware that its actions were causing

22    confusion in the marketplace, that on July 31, 2000 Angles had filed a declaration

23    with the PTO in support of the '547 Application which stated that Angles was

24    making trademark use of the term "Hair Art and Information" and that Angles was

25    not using the term "HAI" as a mark, but was instead using the Composite Mark.

26    Moreover, Angles' contention that the term "HAIRART" was generic or descriptive

27    was belied by the fact that Angles itself had filed the '547 Application seeking to

Exhibit "6"
176

28    register the term "Hair Art and Information" on the principal register.

1    The misrepresentations in Mr. Netter's letter of December 19, 2000 were

2  known to Mr. Ouellette, who oversaw the preparation of the letter. His knowledge

3  of these intentional misrepresentations is evidence of his and Angles' bad faith.

4    On February 1, 2001, Mr. Brunton sent a third letter to Angles through

5  Mr. Netter. It in, Mr. Brunton described additional instances of confusion and again

6  demanded that Angles stop infringing HAI's rights. Angles' continued use of the

7  term "Hair Art and Information" and the Composite Mark in the face of this third

8  letter and its knowledge of these additional instances of confusion is further

9  evidence of Ouellette's and Angles' bad faith.

10    On or about November 30, 2002, the PTO canceled HAI's '468 Registration.

11  The cancellation was solely the result of the fact that HAI had inadvertently failed to

12  file a declaration with the PTO (the "Section 8 Declaration") stating that it was still

13  using the "HAIRART" mark. Notwithstanding its failure to file the Section 8

14  Declaration, HAI continued using the "HAIRART" mark in connection with the

15  nationwide promotion and sale of its hair products.

16    On a date which is unknown to HAI, but which is believed to be around

17  October 2003, Angles learned that the '468 Registration had been canceled. On

18  December 3, 2003, Angles filed U.S. trademark application no. 78/337,311 (the

19  "'311 Application") for the mark "HAIR ART". In support of the '311 Application,

20  Ouellette submitted a declaration under penalty of perjury (i) that Angles had a bona

21  fide intention to use the "HAIR ART" mark in commerce for the goods identified in

22  the application, and (ii) that no other person had the right to use that term as a mark.

23    At the time Angles filed the '311 Application, it had no intention of ever

24  using the term "HAIR ART" as a mark in connection with any goods or services.

25  Moreover, at the time the '311 Application was filed, Angles knew that HAI was

26  still using the term "HAIRART" as a trademark and that Angles' use was junior to

27  HAI's use. Thus, the '311 Application is perjurious and fraudulent.

Exhibit "6"
177

28    Angles' act of trying to obtain a federal registration for the term "HAIR ART"

07-19-2006   05:17pm   From-SHELDON & MAK                    6267956321                    T-746   P.026/044   F-356

1  despite the fact that it had no intention of ever using that term as a mark and despite

2  its knowledge that HAI had been using that term continuously for a period of over

3  20 years is evidence of bad faith.

4          On January 27, 2005, Angles commenced the instant action against HAI for,

5  among other things, infringing its alleged rights in and to the "HAIR ART", "HAIR

6  ART AND INFORMATION" and "HAI" marks and for a judicial declaration that

7  Angles is the owner of those marks and for an injunction preventing HAI from using

8  any of those marks.

9          At the time Angles filed its complaint, it was aware that HAI was using the

10  term "HAIRART" as a mark and that it had been doing so for over 20 years.

11  Angles' actions in suing HAI for infringing a mark that Angles has never used and

12  its attempt to obtain a judicial declaration that it owns a mark it has never used and

13  has no intention of ever using and its attempt to enjoin HAI's use of a mark HAI has

14  been using for over 20 years constitutes evidence of bad faith.

15          HAI's use of the "HAIRART" mark predates Angles' use of the "Hair Art

16  and Information" name by at least fifteen years. Angles' deliberate and continued

17  use of that name over the past six years with knowledge of HAI's prior rights and

18  with knowledge that its continued use was causing confusion in the marketplace

19  constitutes powerful evidence of Angles' bad faith. The fact that Angles refused to

20  stop using a name that incorporated the entirety of HAI's "HAIRART" mark despite

21  the confusion it was causing also constitutes powerful evidence of bad faith.

22          HAI's use of the "HAIRART" mark predates Angles' use of the Composite

23  Mark by at least five years. Angles' coupling of the term "HAI" with the term "Hair

24  Art and Information" and its continued use of those terms in the Composite Mark

25  over the past six years has been with knowledge of HAI's prior rights in the

26  "HAIRART" mark and with knowledge that its continued use was causing confusion

27  in the marketplace, which Angles has admitted. Angles' deliberate use of a mark

28  that it admits is causing confusion constitutes powerful evidence of Angles' bad

Exhibit "6"
178

07-19-2006   05:18pm   From-SHELDON & MAK                6267956321           T-746   P.027/044   F-956

1  faith. The fact that Angles has refused to stop using the Composite Mark, which

2  incorporates the entirety of HAI's "HAIRART" mark, despite the confusion it is

3  causing also constitutes powerful evidence of bad faith.

4      Finally, the manner in which Angles' has conducted this litigation is also

5  evidence of its bad faith. For example, Angles has continued pursuing claims that it

6  has admitted were meritless when filed, obstructed the gathering of evidence by

7  taking possession of, and withholding, relevant documents subpoenaed from third

8  parties, filed declarations that are false on their face and noticed the depositions of

9  witnesses so as to maximize the inconvenience to them.

10

11  <u>Interrogatory No. 10</u>:

12      Identify and describe in detail all facts upon which You base Your tenth

13  affirmative defense, that "[i]f plaintiff suffered any damages by virtue of any of the

14  acts complained of in the [First Amended Complaint] . . . those damages were

15  caused by persons other than Defendants."

16  <u>Response to Interrogatory No. 10</u>

17      HAI objects to this interrogatory on the grounds that Ouellette has exceeded

18  the permissible number of interrogatories.

19  <u>Supplemental Response to Interrogatory No. 10</u>

20      The tenth affirmative defense is based upon the fact that Angles is a

21  trademark infringer that knowingly undertook a deliberate course of action that

22  consisted of the use of the term "Hair Art and Information" and the Composite

23  Mark. It did so despite its knowledge that HAI was already using the mark

24  "HAIRART" and despite the fact that it knew that its concurrent use of the term

25  "Hair Art and Information" and the Composite Mark was causing confusion in the

26  marketplace.

27      The persons who directed and participated in Angles' conduct included

   Exhibit "6"
   179

28  Richard and Connie Ouellette. Therefore, if Angles suffered any damages as a

1   consequence of any of the acts alleged in the First Amended Complaint, which HAI

2   denies, it is they who caused those damages.

3

4   Interrogatory No. 11:

5       Explain in detail all facts upon which You base Your contention that Richard

6   Ouellette slandered You personally.

7   Response to Interrogatory No. 11:

8       HAI objects to this interrogatory on the grounds that Ouellette has exceeded

9   the permissible number of interrogatories.

10  Supplemental Response to Interrogatory No. 11:

11      Richard Ouellette attended a trade show a couple of years ago in his capacity

12  as Angles CEO for the purpose of attracting new customers and increasing the sales

13  of Angles' products and services.  Tom Donahue, an independent sales

14  representative from Donahue & Associates in Texas, attended the same show.

15  Mr. Ouellette engaged in conversation with Mr. Donahue.  When Mr. Ouellette

16  learned, among other things, that Mr. Donahue represented HAI and Jackie Yu, Mr.

17  Ouellette stated words to the effect that he was having trouble with HAI and/or Yu

18  because they were using Angles' name.  Mr. Ouellette's statement was false and

19  Mr. Donahue understood it as an accusation that HAI and Yu were trademark

20  infringers and, thus, engaged in unethical business practices.

21      HAI believes that Mr. Ouellette's comment was not an isolated occurrence

22  and that he and other Angles employees, such as Camillo Schuchardt, made similar

23  comments to other persons on other occasions.

24

25  Interrogatory No. 12:

26      Identify each product You sold bearing the mark "HAI' by identifying the

27  product name and product identification number, the date the product was sold, the

Exhibit "6"
180

28  price at which the product was sold, and the name or identity of the customer to

1   whom the product was sold.

2   Response to Interrogatory No. 12

3        HAI objects to this interrogatory on the grounds that it asks for specific

4   information concerning each of the products HAI has ever sold.  HAI presently sells

5   in excess of 1,000 products.  Thus, this interrogatory contains in excess of 1,000

6   discrete subparts.   See Collaboration Properties, Inc. v. Polycom, Inc, 224 F.R.D.

7   473, 475 (N.D. Cal. 2004) (interrogatory that requested information regarding 26

8   accused products contained 26 discrete subparts).

9        HAI further objects to this interrogatory on the grounds that it is overly broad

10  as to time and upon the grounds that providing the information sought would be

11  unduly burdensome, oppressive and expensive given the needs of the case, the

12  discovery already had in the case and the importance of the issues at stake in the

13  litigation.  HAI further objects to this interrogatory on the grounds that Ouellette has

14  exceeded the maximum number of allowable questions.

15  Supplemental Response to Interrogatory No. 12

16       The information requested by this interrogatory is ascertainable from those

17  documents bearing Bates nos. HAI 02463 - HAI 12786 and the burden of extracting

18  that information from those documents is the same for both HAI and Ouellette.

19

20  Interrogatory No. 13:

21       Identify and describe in detail the factual basis for Your damages claim in this

22  action.  Include the identity of every person with knowledge of this claim and the

23  facts underlying Your claim, every communication relating to this claim and the

24  facts underlying Your claim, as well as every document relating to this claim and the

25  facts underlying Your claim.

26  Response to Interrogatory No. 13

27       HAI objects to this interrogatory on the grounds that it contains four discrete

28  subparts.  See Kendall v. GES Exposition Services, Inc, 174 F.R.D. at 686.  HAI

Exhibit "6"
187

1  further objects to this interrogatory on the grounds that Ouellette has exceeded the

2  maximum number of allowable questions.

3  <u>Supplemental Response to Interrogatory No. 13</u>

4      HAI's damages claim in this case is based upon the following facts:

5      As between HAI and Angles, HAI is the senior user and owner of the

6  "HAIRART" and "HAI" marks.  HAI's rights in those marks are superior to any

7  rights that Angles might have in the term "Hair Art and Information" and/or the

8  Composite Mark.  The facts relating to HAI's senior rights in the marks at issue, the

9  people who are aware of those facts and the documents demonstrating those facts,

10  are set forth in detail in HAI's pending motion for partial summary judgment on the

11  parties' respective infringement claims.

12      Angles has used the term "Hair Art and Information" and the Composite

13  Mark in a variety of ways and in a variety of media.  For example, Angles has used

14  the term "Hair Art and Information" as a trade name and it has used that term as part

15  of the Composite Mark.  It has also physically affixed that term and the Composite

16  Mark to its products and to numerous types of advertisements and promotional

17  materials which it has widely disseminated, including invoices, receipts, purchase

18  orders, business cards, product warranty cards, post cards, posters, one-page flyers,

19  magazine advertisements, Internet websites and product packaging, including boxes.

20      Angles' advertising and promotion of itself under its trade name and of its

21  products under the Composite Mark, has caused massive confusion in the

22  marketplace, which Angles has admitted.  This confusion has harmed HAI in

23  various ways.

24      For example, some members of the public have labeled HAI and Jackie Yu as

25  "infringers" because they believe, wrongly, that HAI is a junior user that is

26  infringing the alleged rights of Angles in and to the term "Hair Art and Information"

27  and the Composite Mark.  Angles itself has reinforced the belief that HAI is an

28  infringer by making untrue representations at trade show that HAI and Yu are using

Exhibit "6"
182

1  Angles' name and marks, when, in fact, the opposite is true.  Being wrongly labeled
2  as an "infringer" is damaging to HAI's business and its reputation and to Yu's
3  reputation.

4      In addition, as a consequence of the fact that Angles used the "Hair Art and
5  Information" name and the Composite Mark, at least one long-standing HAI
6  customer, i.e., Sally Beauty, the largest retail seller of beauty products in the United
7  States, cut back its purchases of products from HAI because its buyers wrongly
8  believed that HAI, which sells at the wholesale level, was competing with Sally
9  Beauty at the retail level.  This belief was caused by the fact that Angles was selling
10  products at the retail level under the "Hair Art and Information" name and the
11  Composite Mark.  This confused Sally Beauty's buyers into thinking that the
12  products in question originated with HAI.

13      Moreover, as Camillo Schuchardt testified, at some point between 2001 and
14  2003, Angles imported and distributed a hair pressing iron that had a very high
15  failure rate.  The Composite Mark was affixed to both the iron and the box in which
16  this particular iron was packaged.  However, neither the iron nor the box contained
17  Angles' corporate name or its address.  Since Angles failed to affix its name and/or
18  address to the box or the irons in question, a substantial number of persons thought
19  that the irons originated with, or were associated with, HAI and when the irons
20  failed, it caused these persons to think that HAI made poor quality products.  This
21  injured HAI's business reputation.

22      Finally, as a consequence of the confusion Angles has caused in the
23  marketplace, some prospective customers have dealt with, and purchased from,
24  Angles believing they were dealing with, and purchasing from, HAI.

25      HAI believes that Angles and its CEO, Ouellette, were fully aware of HAI's
26  rights in the term "Hair Art" when Angles commenced using the term "Hair Art and
27  Information" and the Composite Mark.  Even if they were not aware of HAI's rights
28  from the time Angles first commenced using those terms, however, Angles became

Exhibit "6"
183

07-19-2006   05:20pm   From-SHELDON & MAK                    6267956321              T-746   P.032/044   F-356

1  aware of those rights by February, 2000, at the very latest.

2       Without regard to when Angles and Ouellette first learned of HAI's rights,

3  Angles infringed HAI's rights by using the term "Hair Art and Information" and the

4  Composite Mark for a period of nearly 6 years despite the fact that it was aware that

5  such use was causing confusion in the marketplace and despite the fact that HAI had

6  asked it to stop.

7       As a consequence of the foregoing, at trial, HAI will seek damages from

8  Angles in the form of (i) the amount by which Sally Beauty's purchases from HAI

9  declined, (ii) an award of the profits Angles earned as a consequence of its

10  infringing activities, (iii) a reasonable amount to enable HAI to conduct corrective

11  advertising to remedy the confusion Angles has caused in the marketplace,

12  (iv) treble damages as a consequence of Angles' willful infringement, (v) damages

13  to HAI's reputation, (vi) punitive damages as a consequence of Angles' conscious

14  disregard of HAI's rights in and to the marks in question, (vii) attorneys' fees, and

15  (viii) costs.

16       The amount by which Sally Beauty's purchases from HAI declined may be

17  ascertained by conducting an arithmetic computation from the chart summarizing

18  HAI's annual sales to Sally Beauty, as set forth in the Bates no. HAI 2420.

19       The amount by which Angles was unjustly enriched as a consequence of its

20  infringing activities and the reasonable amount to enable HAI to conduct corrective

21  advertising to remedy the confusion Angles has caused in the marketplace are set

22  forth in the expert report of Dr. Alan Goedde.

23       The amount of enhanced damages as a consequence of Angles' willful

24  infringement will be determined by the trier of fact, as will damages to HAI's

25  reputation and punitive damages.

26       Persons with knowledge of HAI's damages in this case include Jackie Yu,

27  Tom Donahue, Alan Goedde, Camilo Schuchardt, Ms. Connie Ouellette, Kimberly

28  Swelgin and Richard Ouellette.

Exhibit "6"
184

07-19-2006    05:21pm    From-SHELDON & MAK                    6267956321              T-746    P.033/044    F-356

Interrogatory No. 14:

Explain in detail all facts upon which You base the allegations in paragraph nine (9) of the First Amended Counterclaim that "HAI is the owner of several nationally-recognized trademarks, including but not limited to, the word mark 'Hair Art' and the letter mark "HAI'".

Response to Interrogatory No. 14

HAI objects to this interrogatory on the grounds that Ouellette has exceeded the maximum number of allowable questions.

Supplemental Response to Interrogatory No. 14

The allegations in paragraph nine (9) of the First Amended Counterclaim that "HAI is the owner of several nationally-recognized trademarks, including but not limited to, the word mark 'Hair Art' and the letter mark "HAI'" are based upon the facts that HAI has been using the "HAIRART" and "HAI" marks in connection with the advertising, promotion and sale of hair-related products since 1984 and 1994, respectively. As of the date the instant lawsuit was commenced, HAI's sales of products under the "HAIRART" mark since 1984 had totaled nearly $50,000,000 and the expenses it incurred in promoting products under that mark totaled well in excess of $1,000,000.

For many years, HAI has promoted the "HAIRART" and "HAI" marks in a variety of ways, including attendance at trade shows, advertising in trade and beauty magazines and online, direct mailings of product catalogs and promotional flyers, and through the offering of its products by various independent sales representatives. Moreover, from 1984 and 1994, as the case may be, through at least 2000, HAI was the only company offering products at the wholesale level under the "HAIRART" and "HAI" marks. As a consequence of all of the foregoing, HAI's marks became nationally recognized.

Exhibit "6"

185

1  Interrogatory No. 15:

2      Explain in detail all facts upon which You base the allegations in paragraph

3  ten (10) of the First Amended counterclaim that "HAI or its related companies or its

4  predecessors in interest have used the Hair Art and HAI marks in commerce in the

5  U.S. continuously for over 20 years in connection with hair-related products."

6  Response to Interrogatory No. 15:

7      HAI objects to this interrogatory on the grounds that Ouellette has exceeded

8  the maximum number of allowable questions.

9  Supplemental Response to Interrogatory No. 15

10     The foregoing allegation is based upon the following facts: HAI was

11  incorporated on February 24, 1984 under the name "Hair Art America". Its name

12  was changed to "Hair Art Inc." on July 6, 1987. On March 24, 1998, its name was

13  again changed to "Hair Art Int'l, Inc."

14     At its inception, HAI's business consisted of the importation, distribution and

15  sale of hair-related products such as hair clips, hair rollers, "perm rods", mannequin

16  heads and wigs and the provision of hair replacement services, that is, the fitting of

17  custom made hair pieces. Initially, all of HAI's products were marketed nationwide

18  at the wholesale level to beauty stores, beauty industry professionals and students

19  from a warehouse in Inglewood, California. Its wigs and hair pieces and its hair

20  replacement services were also marketed to consumers at a retail salon HAI

21  operated in Los Angeles.

22     Since its inception, HAI has marketed its products nationwide to the beauty

23  industry in a variety of ways. For example, in 1984 and 1985, it marketed its

24  products to beauty supply stores nationwide through direct mailings of brochures

25  and flyers. It also marketed its products to beauty professionals and students

26  through attendance at trade shows across the country. Finally, it utilized a network

27  of independent sales representatives in other states to promote and sell its products

Exhibit "6"
186

28  to beauty distributors and beauty supply stores on a commission basis.

1    In addition to marketing its products to the beauty industry at the wholesale

2  level, since its inception HAI has also marketed its wigs and hairpieces and hair

3  replacement services to consumers in the Los Angeles area through newspaper and

4  telephone book advertising.  Since the day it commenced doing business, HAI has

5  used the term "HAIRART" in connection with the advertising, promotion and sale

6  of its goods and services.  Its use of that name has continued uninterrupted since

7  that time.

8    Over the years, most of the products in HAI's catalog have consistently been

9  physically marked with, or have been in packaging physically marked with, the

10  "HAIRART" mark.  However, the "HAIRART" mark is not the only mark HAI uses

11  in connection with its business.  For example, at least as early as the summer of

12  1994, HAI introduced a line of hair styling tools that bore the mark "HAI".  The first

13  products to which HAI affixed this mark were shears.

14    As were its other products, HAI's "HAI"-branded shears were marketed

15  nationwide to beauty supply stores, salon owners, beauty professionals and beauty

16  students through direct mailings of product catalogs, brochures and fliers, through

17  attendance at trade shows and through independent sales representatives.  Not only

18  were these "HAI"-branded shears physically marked with the "HAI" mark, they

19  were also packaged in velveteen-covered boxes that had the "HAI" mark

20  prominently displayed on the outside.  They were also accompanied by warranty

21  cards that identified them as "HAI" shears.

22    In 1998, HAI made plans to expand its use of the "HAI" mark to other hair

23  tools and, in early 1999, it introduced a "HAI Series" line of hand-held hair dryers

24  and hot air brushes.  As were its other products, HAI's "HAI Series"-branded hair

25  dryers and hot air brushes were marketed nationwide to beauty supply stores, salon

26  owners, beauty professionals and beauty students through direct mailings of

27  "HAIRART" product catalogs, brochures and fliers, to through attendance at trade

28  shows and through independent sales representatives.  These products were

Exhibit "6"
187

1   physically marked with the "HAI" mark.  They were also packaged in boxes that

2   prominently displayed both the "HAIRART" mark and the "HAI" mark.  HAI's use

3   of the "HAI" mark has continued uninterrupted since 1994.

4

5   Interrogatory No. 16:

6         Explain in detail all facts upon which You base the allegations in paragraph

7   eleven (11) of the First Amended Counterclaim that "[a]t times relevant to the acts

8   complained of in this complaint, HAI owned a federal trademark registrations for

9   the 'Hair Art' mark, namely, U.S. Registration NO. 1,958,468 (the "'468

10  Registration')."

11  Response to Interrogatory No. 16

12        HAI objects to this interrogatory on the grounds that Ouellette has exceeded

13  the maximum number of allowable questions.

14  Supplemental Response to Interrogatory No. 16

15        HAI bases this allegation upon the fact that on February 22, 1996, Hair Art

16  received a U.S. federal trademark registration for the "HAIRART" mark from the

17  U.S. Patent and Trademark Office ("PTO").  The registration was assigned U.S.

18  Registration No. 1,958,468 (the "'468 Registration").  On or about November 30,

19  2002, the PTO canceled the '468 Registration.  The cancellation resulted from the

20  fact that Hair Art had inadvertently failed to file a declaration with the PTO stating

21  that it was still using the "HAIRART" mark.

22

23  Interrogatory No. 17:

24        Explain in detail all facts upon which You base the allegations in paragraph

25  thirteen (13) of the First Amended Counterclaim that "HAI adheres to strict quality

26  standards in the manufacture of its hair products."

27  Response to Interrogatory No. 17:   Exhibit "6"
                                         188

28        HAI objects to this interrogatory on the grounds that Ouellette has exceeded

1   the maximum number of allowable questions.

2   Supplemental Response to Interrogatory No. 17

3        The fact upon which this allegation is based is that HAI strives to insure that

4   its products meet the standards of quality expected of like products in the industry.

5

6   Interrogatory No. 18:

7        Explain in detail all facts upon which You base the allegations in paragraph

8   thirteen (13) of the First Amended Counterclaim that "[a]s a consequence, the HAI

9   Marks have attained considerable value and the goodwill associated with them

10  represents a valuable business asset."

11  Response to Interrogatory No. 18:

12       HAI objects to this interrogatory on the grounds that Ouellette has exceeded

13  the maximum number of allowable questions.

14  Supplemental Response to Interrogatory No. 18

15       HAI has been using the "HAIRART" and "HAI" marks in connection with the

16  advertising, promotion and sale of hair-related products since 1984 and 1994,

17  respectively. As of the date the instant lawsuit was commenced, HAI's sales of

18  products under the "HAIRART" mark since 1984 had totaled nearly $50,000,000

19  and the expenses it incurred in promoting products under that mark totaled well in

20  excess of $1,000,000. For many years, HAI has promoted the "HAIRART" and

21  "HAI" marks in a variety of ways, including attendance at trade shows, advertising

22  in trade and beauty magazines and online, direct mailings of product catalogs and

23  promotional flyers, and through the offering of its products by various independent

24  sales representatives. As a consequence of all of the foregoing, HAI has built up a

25  loyal customer base and valuable goodwill in its name and in its marks.

26

27  Interrogatory No. 19:        **Exhibit "6"**
                                      **189**

28       Explain in detail all facts upon which You base the allegations in paragraph

1  fourteen (14) of the First Amended Counterclaim "that the counterdefendants are

2  importing, selling, trafficking in, distributing and offering for sales in the United

3  States hair-related products that are the same as, or are similar to, HAI's products

4  and that Counterdefendants' [sic] are using the marks for those goods that are

5  identical to, or are confusingly similar to, the HAI Marks [sic]."

6  Response to Interrogatory No. 19:

7      HAI objects to this interrogatory on the grounds that Ouellette has exceeded

8  the maximum number of allowable questions.

9  Supplemental Response to Interrogatory No. 19

10      The allegations in paragraph 14 are based upon the fact that, at least as early

11  as 1984 and 1994, HAI began selling hair-related goods under the trademarks

12  "HAIRART" and "HAI", respectively.  By 1996, HAI was using the "HAIRART"

13  and "HAI" marks on hair styling tools and goods relating to hair styling tools,

14  including shears, brushes, combs, hair dryer nozzles, diffusers, "piks" and bonnets.

15      By the first quarter of 1999, HAI's hair-related goods marked with the

16  "HAIRART" and "HAI" marks had expanded to include additional hair styling tools

17  such as hair dryers and hot air brushes.  By the early 2000's HAI's product line

18  included various hair irons, hair clippers and electric razors.  HAI has continued

19  selling all of the above products under those marks since those times.

20      In 1999, Angles commenced preparations to use as trademarks the term "Hair

21  Art and Information" and the Composite Mark in connection with the sale and

22  advertising of goods and services.  In late 1999, Angles imported some products

23  into the United States.  HAI believes that those products bore the Composite Mark.

24  In 2000, Angles began offering for sale and selling hair irons marked with the

25  Composite Mark.  At least as early as February, 2001, Angles also began offering

26  for sale and selling shears marked with the term "HAI".

27      In or about January 2005, Angles expanded its product line and its use of the

28  Composite Mark and the term "HAI" and began offering for sale and selling hair

Exhibit "6"
196

1  dryers and hair brushes. In 2006, Angles again expanded its product line to include

2  electric hair clippers. HAI believes that Angles has continued offering for sale and

3  selling the above products since the above times and that Angles is importing into

4  the United States all of the products it offers to sell and sells.

5

6  Interrogatory No. 20:

7      Explain in detail all facts upon which You base the allegations in paragraph

8  twenty (20) of the First Amended counterclaim that "HAI has suffered damage to its

9  business, reputation and goodwill and the loss of profits and sales it would have

10  made but for counterdefendants' conduct."

11  Response to Interrogatory No. 20

12      HAI objects to this interrogatory on the grounds that Ouellette has exceeded

13  the maximum number of allowable questions.

14  Supplemental Response to Interrogatory No. 20

15      The use by Angles of the name "Hair Art and Information" and its use of the

16  Composite Mark is causing confusion in the marketplace, which Angles has

17  admitted. As a consequence of this confusion, some prospective customers have

18  labeled HAI an "infringer" because they wrongly believe that HAI is a junior user

19  that is infringing the alleged rights of Angles in and to the term "Hair Art and

20  Information" and the Composite Mark. In fact, HAI is the senior user of the marks

21  that are at issue in the case and being wrongly labeled as an "infringer" is damaging

22  to HAI's business and reputation.

23      In addition, as a consequence of Angles use of the "Hair Art and Information"

24  name and the Composite Mark, one of HAI's long-standing customers, i.e., Sally

25  Beauty, the largest retail seller of beauty products in the United States, cut back its

26  purchases of products from HAI because its buyers believed that HAI, which sells at

27  the wholesale level, was competing with Sally Beauty at the retail level. This belief

**Exhibit "6"**

28  was caused by the fact Angles was selling products at the retail level under the

1   "Hair Art and Information" name and the Composite Mark which confused Sally

2   Beauty's buyers into thinking that the products in question originated with HAI.

3        Moreover, as Camillo Schuchardt testified, at some point between 2001 and

4   2003, Angles imported and distributed a hair pressing iron that had a very high

5   failure rate.  The Composite Mark was affixed to both the iron and the box in which

6   this particular iron was packaged.  However, neither the iron nor the box contained

7   Angles' corporate name or its address.  Since Angles' failed to affix its name and/or

8   address to the box or the irons in question, a substantial number of persons thought

9   that the irons originated with, or were associated with, HAI and when the irons

10  failed, it caused these persons to think that HAI made poor quality products.  This

11  injured HAI's business reputation.

12       Finally, as a consequence of the confusion Angles is intentionally causing in

13  the marketplace, some prospective customers have dealt with, and purchased from,

14  Angles believing they were dealing with, and purchasing from, HAI.

15

16  Interrogatory No. 21:

17       Explain in detail all facts upon which You base the allegation in paragraph

18  twenty-one (21) of the First Amended Counterclaim that "Counterdefendants' acts

19  of copying and using the HAI Marks in connection with hair-related products and

20  services have caused and will continue to cause irreparable and immediate injury to

21  HAI for which Hai has no adequate remedy at law."

22  Response to Interrogatory No. 21:

23       HAI objects to this interrogatory on the grounds that Ouellette has exceeded

24  the maximum number of allowable questions.

25  Supplemental Response to Interrogatory No. 21:

26       The use by Angles of the name "Hair Art and Information" and its use of the

27  Composite Mark is causing, and has caused, confusion in the marketplace.  Angles

Exhibit "6"
192

28  has admitted that there is confusion in the marketplace that is being caused by

1  HAI's use of the "HAIRART" mark and by Angles' concurrent use of the term

2  "Hair Art and Information" and the Composite Mark.  Angles has also admitted that

3  some members of the public have labeled HAI an "infringer" because they believe,

4  wrongly, that HAI is a junior user that is infringing the alleged rights of Angles in

5  and to the term "Hair Art and Information" and the Composite Mark.

6      Angles' employees have reinforced this erroneous belief by telling people in

7  the trade that HAI and Yu are using Angles' marks, which is tantamount to calling

8  them infringers.  In fact, HAI is the senior user of the marks that are at issue in the

9  case and it is Angles that is using HAI's trademarks.

10     Being wrongly labeled as an "infringer" is damaging to HAI's and Yu's

11  business, goodwill and reputations.  Damage to HAI's goodwill and its mark is

12  difficult to measure and is, therefore, not compensable in money damages.  Damage

13  to Yu's good name and reputation is also difficult to measure and is, likewise, not

14  compensable in money damages.  Finally, since Angles and Ouellette have been

15  engaged in the above conduct for the past six years, there is no reason to believe

16  that their actions will cease absent an injunction.

17

18  Dated: July 19, 2006                SHELDON & MAK

19

20                              By: _Douglas H. Morseburg_
                                     Douglas H. Morseburg
21
                                Attorneys for Defendants and
22                              Counterclaimants Hair Art Int'l, Inc. and
                                Jackie Yu
23

24

25

26

27                              **Exhibit "6"**
                                    **193**
28

07-19-2006   05:24pm   From-SHELDON & MAK                     6267956321        T-746   P.042/044   F-356

## PROOF OF SERVICE
CCP §§ 1013, 1013a  (New January 1, 2005)

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

1.   At the time of service I was over 18 years of age and **not a party to this action.**

2.   My business address is: 225 South Lake Avenue, 9th Floor, Pasadena, CA 91101.

3.   On **July 19, 2006,** I served the following document(s):

     **HAIR ART INT'L INC.'S SUPPLEMENTAL RESPONSES TO RICHARD OUELLETTE'S FIRST SET OF INTERROGATORIES (NOS. 1-21)**

     ☐  The documents are listed on Attachment "A."

4.   I served the documents on the persons below, as follows:

     a.  **Name** of person served:

     b.  **Address** of person served:

     c.  **Fax Number** or **e-mail address** of person served, if service was by fax or e-mail:

     d.  **Time** of service, if personal service was used:

     X  The names, addresses, and other applicable information about the persons served is on Attachment "B."

5.   The documents were served by the following means (specify):

     a. ☐  **By personal service.** I personally delivered the documents to the persons at the addresses listed in Item 4. (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

     b. X  **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in Item 4 and (specify one):

           (1) ☐  **deposited** the sealed envelope with the United States Postal Service, with the postage fully prepaid

           (2) X  **placed** the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

     I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at Pasadena, California.

**Exhibit 6**

**194**

     c. ☐  **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in Item 4. I

placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

d. ☐  **By messenger service.**  I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in Item 4 and providing them to a professional messenger service for service.  *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

e. X  **By fax transmission.**  Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in Item 4.  No error was reported by the fax machine that I used.  A copy of the record of the fax transmission, which I printed out, is attached.

f. ☐  **By e-mail or electronic transmission.**  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed in Item 4   I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  I further declare that I am employed in the office of a member of the bar of this Court, at whose direction the service was made.

Executed on **July 19, 2006** at Pasadena, California.

_____
Donald K. Piper

## DECLARATION OF MESSENGER

☐  **By personal service.**  I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in Item 4.  (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package, which was clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

At the time of service, I was over 18 years of age.  I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on (date):

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on **July 19, 2006** at San Diego, California.

**Exhibit "6"**

_____          **195**          _____
(Name of Declarant)                                          (Signature of Declarant)

## ATTACHMENT "B" TO PROOF OF SERVICE

**NAMES, ADDRESSES, AND OTHER APPLICABLE INFORMATION ABOUT PERSONS SERVED:**

| Name of Person Served | Address (business or residential), Fax, or E-mail (as applicable) Where Served | Manner of Service |
|---|---|---|
| Andrew D. Skale, Esq. | BUCHANAN INGERSOLL LLP<br>12230 El Camino Real<br>Suite 300<br>San Diego, CA 92130<br>858.509.7300 (t)<br>858.509.7353 (f)<br>skalead@bipc.com<br>www.buchananingersoll.com | U.S. Mail & Facsimile |



37012.003  I

October 20, 2005

Angles Beauty Care Group, Inc.
Attn: Richard Oullette
12155 Paine Place
Poway, CA 92064

RE:  **Insured**          **Angles Beauty Care Group, Inc.**
     **Policy**           660967X8612 & BK01935424
     **Date of Complaint** 04/14/05
     **Description**      **Hair Art International -  Liability Loss**

Dear Richard:

This is to acknowledge our receipt of a claim notice and our actions thereon.  This claim
was sent to Travelers Insurance on 10/20/05.

You should hear from the adjuster within 3 to 5 days.  If you have not been contacted, or
have any questions or problems in the handling of this claim, please call me.

Thank you for letting Brown & Brown of California's Loss Management Department
assist you in this matter.

Respectfully,

*Grace Peprah*
Grace Peprah
Sr. Claims Consultant
Direct 818.444.4825

Cc:  Solomon Ward
     Attn:  Tanya M. Schierling
     401 E Street, Suite 1200
     San Diego, CA 92101

**Brown & Brown of California, Inc.**
California License 0B02587
21515 Vanowen Street, Suite 103, Canoga Park, California 91303
818.999.6014  •  Fax 818.999.1688
www.bbofcal.com

RECEIVED

Exhibit 7
197

**EXHIBIT 8**

**Eric R. Little**

| | |
|---|---|
| **From:** | Mark Wojciechowski [mwojciechowski@crosbyrowell.com] |
| **Sent:** | Monday, July 24, 2006 3:57 PM |
| **To:** | grsmith@stpaultravelers.com |
| **Cc:** | Skale, Andrew |
| **Subject:** | Claim Number MR12110/ABM4957 Policyholder Angles Beauty Care Group Inc. |
| **Attachments:** | HAI Responses.pdf |

Dear Mr. Smith,

We tendered a claim on behal of our client Angles Beauty Care Group, Inc. and received a denial of coverage from St. Paul Travelers in correspondence dated March 17, 2006. The claim involves a lawsuit/counterclaim filed by Hair Art International ("HAI")

Angles defense counsel recently received discovery responses from HAI which are attached to this e-mail for your review. The responses ( Interrogatory No. 13, among others) provide more detail concerning. in particular, claims that fall within the advertising injury coverage of your insureds policy. Other areas of coverage may be triggered as well but for now, I submit this information to you and ask you to re-evaluate St. Paul Travelers coverage position.

Angles is now being represented in the litigation by Andrew Skale and his contact information can be found below.

Andrew D. Skale, Esq.
Buchanan Ingersoll & Rooney LLP
12230 El Camino Real
Suite 300
San Diego, CA 92130
Telephone: (858) 509-7347
Fax: (858) 509-7353
Mobile: (858) 373-7346
skalead@bipc.com

The case is presently proceeding towrd trial and there are apparently some significant motions and discovery coming up which will cost the insured substail sums but also opens up a window of opportunity to settle the case if Angles gets participation from its insurer. The insured has so far paid for its entire defense in this case and asks for your immediate attention to this matter. If you need more information or have questions, please contact me.

Mark J. Wojciechowski

Crosby and Rowell, LLP

The American Bag Building

299 Third St. Second Fl.

**Exhibit "8"**
**198**

6/26/2008

Oakland, CA 94607

P-510-267-0300

Direct-510-267-6201

Cell-510-418-0540

Fax- 510-839-6610

 **ST PAUL TRAVELERS**

*Fidelity & Guaranty Insurance Company*
*P O Box 14244*
*Orange CA 92863-1244*
*714.620.0812 (Phone)*
*866.577.8331 (Fax)*
*grsmith2@travelers.com (email)*

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

August 25, 2006

Buchanan, Ingersoll & Rooney, LLP.
12260 El Camino Real, Suite 300
San Diego CA 92130
Attn: Mr. Andrew D. Skale

RE:    **Hair Art International, Inc. v. Angles Beauty Care Group, Inc., et al.**

|  |  |
|---|---|
| Tracking Number: | MR12110 |
| Claimant: | Hair Art International (HAI) |
| Policyholder: | Angles Beauty Care Group Inc. (ABCG) |
| Policy No.: | BK01935424 |
| Date of Loss: | April 14, 2005 |

Dear Mr. Skale:

Fidelity and Guaranty Insurance Company ("Fidelity") is responding to your email dated August 24, 2006, regarding your request we review the discovery responses from HAI which may trigger coverage within the "advertising injury" portion of Angles policy. I want to clarify that this response letter deals directly with the Fidelity policy only. I have issued a separate letter that will address the issues of our position under the Travelers policy.

### FACTUAL BACKGROUND

Angles Beauty Care Group Inc. ("ABCG") originally brought suit against Hair Art International ("HAI"). HAI answered and counterclaimed against ABCG. The counterclaim lists the following causes of action:

- False Designation of Origin
- Common Law Trademark Infringement
- Statutory Unfair Competition
- Common Law Unfair Competition, and
- Cancellation of Trademark Registration

**Exhibit "9"**
**200**

HAI is seeking monetary damages and attorney fees arising out of their allegation that ABCG falsely used and infringed on their trademark.

The recitation of the allegations of this claim is not meant to imply that Fidelity accepts them as true or factual, but only to provide a context for this coverage discussion.

## POLICY INFORMATION

The policy issued to Angles Beauty Care Group, Inc. dba: Collections salon & Day Spa, Angles Beauty, effective October 31, 2004 through October 31, 2005, provides policy limits of $1 million and $2 million aggregate, and provides the following insuring agreement under the Commercial General Liability Protection, Form CL/BF 2010 (Ed. 11-2002), for the following named insured's: Angles Beauty Care Group, Inc. dba: Collections salon & Day Spa, Angles Beauty, which reads, in relevant part, as follows:

**SECTION I. COVERAGE**

**A. Liability**

   **1. Insuring Agreement**

      **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. We may, at our discretion, investigate any "occurrence" or "personal injury" or "advertising injury" offense and settle any claim or "suit" that may result. But:

         **(1)** The amount we will pay for damages is limited as described in **SECTION III. LIMITS OF LIABILITY**; and

         **(2)** Our right and duty to defend end when the applicable Limits of Liability in this Liability Coverage part has been used up with the payment of judgments or settlements under Paragraph **A. Liability** or medical payments under Paragraph **B. Medical Payments**.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Paragraph **C. Supplementary Payments**.

      **b.** This insurance applies to:

**Exhibit "9"**
**201**

    **(1)** "Bodily injury" or "property damage":

        **(a)** Caused by an "occurrence" that takes place in the "coverage territory";

        **(b)** That occurs during the policy period; and

        **(c)** Subject to Paragraph **e.** below, that no "described insured" knew, prior to the policy period, had occurred, in whole or in part. If any "described insured" knew, prior to the policy period, that the "bodily injury" or "property damage" had occurred, in whole or in part, then any continuation, change or resumption of that "bodily injury" or "property damage", during or after the policy period, will be deemed "bodily injury" or "property damage" that a "described insured" knew, prior to the policy period, had occurred;

    **(2)** "Personal injury":

        **(a)** Arising out of your business; and

        **(b)** Caused by an offense committed in the "coverage territory" and during the period that this "personal injury" liability coverage is in effect; or

    **(3)** "Advertising injury":

        **(a)** Arising out of the "advertising" of your goods, products or services; and

        **(b)** Caused by an offense committed in the "coverage territory" and during the period that this "advertising injury" liability coverage is in effect.

        However, the placing of advertising", borders or frames for or of other persons or organizations, or links for or to other persons or organizations, on or in your Web site is not considered "advertising" of your goods, products or services.

  **c.** Subject to Paragraph **e.** below, "bodily injury" or "property damage" will be deemed to have been known by a "described insured" to have occurred at the earliest time when, for all or

**Exhibit "9"**
**202**

any part of that "bodily injury" or "property damage", any "described insured":

**(1)** Reports such "bodily injury" or "property damage" to us or any person or organization providing "other insurance";

**(2)** Receives a "suit" or a written or verbal demand or claim for damages because of such "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that such "bodily injury" or "property damage" has occurred or has begun to occur.

**d.** Subject to Paragraph **e.** below, "bodily injury" or "property damage" that occurs during the policy period and that no "described insured" knew, prior to the policy period, had occurred, in whole or in part, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**e.** Paragraphs **b.(1)(c), c.** and **d.** above, only apply if the continuation, change or resumption of "bodily injury" or "property damage" that the "described insured" knew, prior to the policy period, had occurred, in whole or in part, would otherwise be covered under this insurance because of a continuous, multiple or other trigger of coverage required under the law that applies.

**Section V DEFINITIONS:**

1.    "Advertising" means attracting the attention of other persons or organizations by any means for the purpose of seeking customers or supporters or increasing sales or business.

30.   "Slogan":
    a.  Means a phrase that other persons or organizations use and intend to attract attention in their "advertising"; and
    b.  Does not include a phrase used as, or in, the name of:
        (1) Any person or organization, other than you; or
        (2) Any business or any of the premises, goods, products or services of any person or organization, other than you.

    The HAI policy does contain an exclusion section that would seem to clearly preclude coverage for this claim.

**Exhibit "9"**
**203**

2. Exclusions Applicable To The Liability Coverage:

**x. Intellectual Property**
(1) This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of any actual or alleged infringement or violation of any of the following rights or laws, or any other "bodily injury", "property damage", "personal injury" or "advertising injury" that is alleged in any claim or "suit" that also alleges such infringement or violation:
(a) Copyright;
(b) Patent;
(c) Trade name;
(d) Trade secret
(e) Trademark; or
(f) Other intellectual property rights or laws.

(2) This exclusion does not apply to:
(a) "Advertising injury" arising out of any infringement upon another person's or organization's copyright, trade dress or trademarked "slogan" in your "advertising"; or
(b) "Bodily injury" or "property damage" included in the "products completed operations hazard".

There clearly is no coverage for "bodily injury" or "property damage" caused by an "occurrence" being made by the plaintiff in this case against Angles. The actions taken by ABCG were not accidental in nature; there has been no "occurrence" as defined in the policy. It also appears clear that there is no "personal injury" offense being made against Angles in the litigation. Although it appears that there is a potential claim for "advertising injury" it clearly is excluded per exclusion "X" listed above and clearly takes away any claims for any trademark/advertising that arises from the advertising or placement of the trademark on any of HAI products.

## CONCLUSION

In summary, there is no potential for coverage of this claim under the Fidelity policy, and for all of the above reasons, Fidelity must decline your request for coverage. If you are aware of any further facts other than the ones you have already, please contact us so that we may consider that information. Also, if the allegations or pleadings should be amended or changed, please keep us advised.

Nothing in this letter should be construed to waive any of Fidelity rights or defenses either at law or as contained in the policy. This letter is not intended to be, nor shall it be construed, as an exhaustive listing of all policy terms, conditions, limitations or

**Exhibit "9"**
**204**

Page 6 of 7
8/25/2006

exclusions which may preclude coverage for the claims against you. Fidelity expressly reserves its right to supplement this letter and does not waive any rights to assert additional defenses to coverage with regard to any aspects of the claims against you.

The California Code of Regulations, Title 10, Chapter 5, Section 2695.7(b)(3) requires that we advise you that, if you think this claim has been wrongfully analyzed, you may have this matter reviewed by the California Department of Insurance. The Department's address is:

California Department of Insurance
Consumer Services Division
300 South Spring Street, 11th Floor
Los Angeles, CA 90013
(800) 927-HELP or (213) 897-5961

If you have any questions about this letter, or if you wish to provide additional materials, you may contact the undersigned at (714) 620-0812.

Very truly yours,

Gary R. Smith
Sr. Technical Specialist
Fidelity & Guaranty Insurance Company
Telephone: (714) 620-0812
Fax: (866) 577-8331
GRSMITH2@TRAVELERS.COM

Cc:

Solomon Ward
401 B Street, Suite 1200
San Diego CA 92101
Attn: Ms. Tanya M. Schierling

Angles Beauty Care Group, Inc.
12245 World Trade Drive, Suite H
San Diego CA 92128
Attn: Mr. Richard Oulette

Brown & Brown of California
5465 Morehouse Drive
San Diego CA 92121

**Exhibit "9"**
**205**

EXHIBIT 10

# LITTLE REID & KARZAI

——LLP——

## ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

Eric R. Little, Esq.
erl@lrkllp.com

June 30, 2008

**Via Overnight Mail**

Claims Manager
The Hartford
One Hartford Plaza
Hartford, CT 06115

> **Re:**   ***Angles Beauty Care Group, Inc. v. Hair Art International, Inc.***
> **United States District Court, Southern District of California, Case No. 05 CV**
> **0166 JAH ("*Hair Art*" Action)**
>
> **Your Insured:   Angles Beauty Care Group, Inc.**
> **Your Policy:     No. 72SBALH0763 [Oct. 31, 1999 – Oct. 31, 2000]**

Dear Gentlepersons:

We represent your insured, Angles Beauty Care Group, Inc., with respect to its insurance claim for the above-entitled *Hair Art* Action. Your insured is represented by Andrew Skale of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. in the defense of the *Hair Art* Action.

Hartford Insurance Company has issued a policy insuring Angles Beauty Care from October 31, 1999 to October 31, 2000. By this letter, your insured provides notice of the *Hair Art* Action, and requests that Hartford honor its duties of defense, settlement and/or indemnity in the *Hair Art* Action and requests that said defense be provided through your insured's chosen counsel, Mr. Andrew Skale, at his firm's standard reasonable hourly rates. Notice is provided herein to Hartford and all its affiliates pursuant to all policies which actually and/or potentially provide coverage for the *Hair Art* Action.

Enclosed are copies of the amended complaint and counterclaims in the *Hair Art* Action. We look forward to Hartford's prompt acceptance of this claim.

**Exhibit "10"**

Should you have any questions, please contact me immediately.

Very truly yours,

Eric R. Little

ERL/MCR:bh

(Enclosure Amended Complaint and Counterclaims)

Cc:     Richard Oullette (via e-mail w/o enclosures)
        Andrew Skale, Esq. (via e-mail w/o enclosures)

**EXHIBIT 11**

# LITTLE REID & KARZAI
—— LLP ——
## ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

Eric R. Little, Esq.
erl@lrkllp.com

July 2, 2008

**Via Fax and E-mail**

Gary R. Smith
St. Paul Travelers
Fidelity & Guaranty Insurance Company
P.O. Box 14244
Orange, CA 92863-1244
Email: grsmith@travelers.com
Fax: 866.577.8331

**Re:**    *Angles Beauty Care Group, Inc. v. Hair Art International, Inc.*
United States District Court, Southern District of California, Case No. 05 CV
0166 JAH ("*Hair Art*" Action)

**Your Insured:**    **Angles Beauty Care Group, Inc.**
**Your Policy:**    **967X8612 [10/31/2004-10/31/2005]**
**Claim No.:**    **ABM4957**

Dear Mr. Smith:

We are insurance coverage counsel for Angles Beauty Care Group, Inc. with respect to its insurance claim to St. Paul Travelers ("Travelers") for the above-entitled *Hair Art* Action. We have reviewed the pleadings and discovery provided to you by Angles' defense counsel and your denial of coverage.

Unfortunately, Travelers failed to consider significant claims included in Hair Art's discovery responses regarding Travelers' insured's alleged defamation and disparagement. Hair Art states, in its responses to interrogatories, that it is seeking damages based upon statements made by Angles to Hair Art's customers at a trade show and other times which conveyed to

**Exhibit "11"**
**208**

existing and potential customers that Hair Art was infringing Angles' trademark and which caused Hair Art to lose sales and suffer damage to its reputation. Hair Art asserts the statements were false.[1]

The Hair Art discovery responses state in pertinent part:

Interrogatory No. 11:

Explain in detail all facts upon which You base Your contention that Richard Ouellette slandered You personally. . . .

Supplemental Response to Interrogatory No. 11:

Richard Ouellette attended a trade show a couple of years ago in his capacity as Angles CEO for the purpose of attracting new customers and increasing the sales of Angles' products and services. Tom Donahue, an independent sales representative from Donahue & Associates in Texas, attended the same show. Mr. Ouellette engaged in conversation with Mr. Donahue. When Mr. Ouellette learned, among other things, that Mr. Donahue represented HAI and Jackie, Mr. Ouellette stated words to the effect that he was having trouble with HAI and/or Yu because they were using Angles' name. Mr. Ouellette's statement was false and Mr. Donahue understood it as an accusation that HAI and Yu were trademark infringers and, thus, engaged in unethical business practices.

HAI believes that Mr. Ouellette's comment was not an isolated occurrence and that he and other Angles employees, such as Camillo Schuchardt, made similar comments to other persons on other occasions.

Interrogatory No. 20:

Explain in detail all facts upon which You base the allegations in paragraph twenty (20) of the First Amended counterclaim that "HAI has suffered damage to its business, reputation and goodwill and the loss of profits and sales it would have made but for counterdefendants' conduct." . . .

Supplemental Response to Interrogatory No. 20:

The use by Angles of the name "Hair Art and Information" and its use of the Composite Mark is causing confusion in the marketplace, which Angles has admitted. As a consequence of this confusion, some prospective customers have labeled HAI an "infringer" because they wrongly believe that HAI is a junior user that is infringing the alleged rights of Angles in and to the term "Hair Art and Information" and the Composite Mark. In fact, HAI is the senior user of the

---

[1] You were provided these discovery responses on July 24, 2006. The pertinent responses are 11, 20 and 21. Another copy is enclosed for your convenience.

**Exhibit "11"**
**209**

marks that are at issue in the case and being wrongly labeled as an "infringer" is damaging to HAI's business and reputation.

In addition, as a consequence of Angles use of the "Hair Art and Information" name and the Composite Mark, one of HAI's long-standing customers, i.e., Sally Beauty, the largest retail seller of beauty products in the United States, cut back its purchases of products from HAI because its buyers believed that HAI, which sells at the wholesale level, was competing with Sally Beauty at the retail level. This belief was caused by the fact Angles was selling products at the retail level under the "Hair Art and Information" name and the Composite Mark which confused Sally Beauty's buyers into thinking that the products in question originated with HAI.

Moreover, as Camillo Schuchardt testified, at some point between 2001 and 2003, Angles imported and distributed a hair pressing iron that had a very high failure rate. The Composite Mark was affixed to both the iron and the box in which this particular iron was packaged. However, neither the iron nor the box contained Angles' corporate name or its address. Since Angles' failed to affix its name and/or address to the box or the irons in question, a substantial number of persons thought that the irons originated with, or were associated with, HAI and when the irons failed, it caused these persons to think that HAI made poor quality products. This injured HAI's business reputation.

Finally, as a consequence of the confusion Angles is intentionally causing in the marketplace, some prospective customers have dealt with, and purchased from, Angles believing they were dealing with, and purchasing from, HAI.

Interrogatory No. 21:

Explain in detail all facts upon which You base the allegation in paragraph twenty-one (21) of the First Amended Counterclaim that "Counterdefendants' acts of copying and using the HAI Marks in connection with hair-related products and services have caused and will continue to cause irreparable and immediate injury to HAI for which Hai has no adequate remedy at law." . . .

Supplemental Response to Interrogatory No. 21:

The use by Angles of the name "Hair Art and Information" and its use of the Composite Mark is causing, and has caused, confusion in the marketplace. Angles has admitted that there is confusion in the marketplace that is being caused by HAI's use of the "HAIRART" mark and by Angles' concurrent use of the term "Hair Art and Information" and the Composite Mark. Angles has also admitted that some members of the public have labeled HAI an "infringer" because they believe, wrongly, that HAI is a junior user that is infringing the alleged rights of Angles in and to the term "Hair Art and Information" and the Composite Mark.

Angles' employees have reinforced this erroneous belief by telling people in the trade that HAI and Yu are using Angles' marks, which is tantamount to calling them infringers. In fact, HAI is the senior user of the marks that are at issue in the case and it is Angles that is using HAI's trademarks. . . .

The Fidelity & Guaranty Insurance Company policy issued to Angles includes a defense duty in any "suit" seeking damages because of "personal injury" or "advertising injury." The policy issued to Angles defines "personal injury" to mean injury that is not "advertising injury" caused by the offense of "publication of 'insured material'[2] that slanders or libels a person or organization or disparages a person's or organization's goods, products or services."[3] Hair Art clearly claimed damages resulting from statements made by Angles that slandered Hair Art by accusing it of being a trademark infringer. Hair Art also claimed that Angles' statements disparaged Hair Art's products by associating them with infringing conduct.

One California appellate court, in addressing a case where the insured accused a competitor of being an infringer, explained the insurer's obligation to defend where facts extrinsic to the complaint show a possibility of coverage under the policy. Here, Travelers' defense duty was triggered by the extrinsic facts provided in Hair Art's discovery responses.

"[A]n insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement. [Citations.] This duty, which applies even to claims that are 'groundless, false, or fraudulent,' is separate from and broader than the insurer's duty to indemnify. [Citation.]" (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19 [44 Cal.Rptr.2d 370, 900 P.2d 619].) The scope of the duty does not depend on the labels given to the causes of action in the third party complaint; instead it rests on whether the alleged facts or known extrinsic facts reveal a possibility that the claim may be covered by the policy. (See *Hurley Construction Co. v. State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 538 [12 Cal.Rptr.2d 629].)

*Atlantic Mutual Ins. Co. v. J. Lamb, Inc.*, 100 Cal.App.4th 1017, 1033-1034 (2002). The court also explained that the allegations that the insured made statements that its competitor was an infringer to potential customers demonstrated a potential for coverage for the personal injury offense of disparagement.

The term "disparagement" has been held to include statements about a competitor's goods that are untrue or misleading and are made to influence potential purchasers not to buy. (See *Sentex Systems, Inc. v. Hartford Acc. & Indem. Co.* (C.D.Cal. 1995) 882 F.Supp. 930, 944.) Whether characterized as a trade libel or product disparagement, an injurious falsehood directed at the

---

[2] "Insured material" is defined as "any material in any form of expression" but does not include certain material that is not relevant here.
[3] The policy includes similar "advertising injury" coverage for the same offense except that it contains a connection to advertising. The Hair Art allegations fit within at least one of the definitions.

Exhibit "11"

organization or products, goods, or services of another falls within the coverage of
the Atlantic Mutual policy. The plain language of the Atlantic Mutual policy
includes in the definition of "personal injury" the publication of any oral or
written statement that not only slanders or libels but also one that disparages an
organization or its goods, products, or services. This amounts to coverage for
product disparagement and trade libel as well as defamation. (See e.g., *Amerisure
Ins. Co. v. Laserage Technology Corp.* (W.D.N.Y. 1998) 2 F.Supp.2d 296, 304
[where the court construed nearly identical policy language and reached the same
conclusion].)

*Id.* at 1035. Similarly here, Hair Art claims that statements made by Angles about Hair Art and
its products were untrue and made for the purpose of influencing customers not to buy Hair Art's
products. In fact, Hair Art specifically identifies customers who were influenced by Angles'
allegedly disparaging or defamatory statements and claims damages resulting from Angles'
allegedly wrongful conduct.

Please advise whether Travelers will honor its defense duty and agree to reimburse Angles
for all defense expenses incurred from July 24, 2006 (the date you received the discovery
responses) through acceptance of the defense. Angles further requests that Travelers agree to
pay defense expenses incurred by Angles' chosen defense counsel given his familiarity with the
litigation, the upcoming trial and Travelers' refusal to defend its insured when it had sufficient
information to determine its defense duty.

We anticipate a settlement conference later this month. Travelers' participation will be
necessary in order to resolve this matter. We look forward to receiving Travelers' agreement to
materially participate in settlement negotiations. Presently, the demand from Hair Art is

Should you have any questions, please contact me immediately.

Very truly yours,

Eric R. Little

ERL/MCR:bh

Enclosure (7.24.06 email and attached discovery responses)

Cc:    Richard Oullette (via e-mail)
       Andrew Skale, Esq. (via e-mail)

**Exhibit "11"**
**212**

# LITTLE REID & KARZAI
—LLP—
## ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Gary R. Smith | Eric R. Little, Esq. |

| COMPANY: | DATE: |
|---|---|
| St. Paul Travelers | 7/2/2008 |

| FAX NUMBER: | TOTAL NO. OF PAGES, INCLUDING COVER: |
|---|---|
| 866.577.8331 | 52 |

**SENDER'S REFERENCE:**

Angles Beauty Care Group, Inc.

**RE:**

Insurance Claim

☐ URGENT     ☐ FOR REVIEW     ☐ PLEASE COMMENT     ☐ PLEASE REPLY     ☐ PLEASE RECYCLE

NOTES/COMMENTS:

**CONFIDENTIALITY NOTICE:** THIS FAX IS PRIVILEGED AND CONFIDENTIAL AND IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED. THE TERM "PRIVILEGED" AND "CONFIDENTIAL" INCLUDES ATTORNEY-CLIENT COMMUNICATIONS, ATTORNEY WORK PRODUCT, TRADE SECRETS AND OTHER PROPRIETARY INFORMATION. NOTHING HEREIN IS INTENDED TO CONSTITUTE A WAIVER OF THE CONFIDENTIALITY OF THIS FAX; IF YOU ARE NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING IS PROHIBITED. IF YOU HAVE RECEIVED THIS FAX IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND DESTROY THE ORIGINAL FAX. THANK YOU.

**Exhibit "11"**

P. 01

# TRANSACTION REPORT

JUL-02-2008 WED 11:20 AM

TX (MEMORY)

| # | DATE | START TM | RECEIVER | COM TIME | PGS | TYPE/NOTE | | DEPT | FILE |
|---|------|----------|----------|----------|-----|-----------|---|------|------|
| 1 | JUL-02 | 11:02 AM | 18665778331 | 0:17:17 | 52 | SG3 | OK | | 103 |
| | | | TOTAL | 0:17:17 | 52 | | | | |

**Exhibit "11"**
**214**

# LITTLE REID & KARZAI
——LLP——
## ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

Eric R. Little, Esq.
erl@lrkllp.com

July 3, 2008

**Via Overnight Mail**

Claims Manager
The Hartford
One Hartford Plaza
Hartford, CT 06115

     *Re:*    *Angles Beauty Care Group, Inc. v. Hair Art International, Inc.*
          **United States District Court, Southern District of California, Case No. 05 CV**
          **0166 JAH ("*Hair Art*" Action)**

     **Your Insured:**  **Angles Beauty Care Group, Inc. ("Angles")**
     **Your Policies:**   **No. 72SBALH0763 [Oct. 31, 1998-Oct. 31, 1999; Oct. 31, 1999 – Oct.**
             **31, 2000 and Oct. 31, 2000 – Oct. 31, 2001]**

Dear Gentlepersons:

    The Magistrate Judge has scheduled a **settlement conference** in this matter for **July 22, 2008**. She has also ordered that representatives of the parties' insurance companies attend. Hair Art's current settlement demand is           In an effort to assist Hartford in reaching a decision timely, Angles provides the following information regarding Hartford's duty to defend that was triggered by allegations in the *Hair Art* Action. The counterclaim includes the following allegations:

    63.    HAI is the owner of several nationally-recognized trademarks, including but not limited to, the word mark "Hair Art" and the letter mark "HAI".

    64.    HAI or its related companies or its predecessors in interest have used the Hair Art and HAI marks in commerce in the U.S. continuously for over 20 years in connection with hair-related products. * * *

**Exhibit "12"**

215

1 | P a g e

66.     At all times relevant to the acts complained of herein, HAI or its related companies or predecessors in interest have used the HAI Marks to identify HAI's goods and services and to distinguish them from the goods and services made and sold or offered by other by, among other things, prominently displaying the marks on HAI's goods and on their containers, packaging and advertising.

67.     The presence of the HAI Marks on the containers, packaging and advertising for HAI's products indicates to the public that the goods or services bearing those marks have been manufactured and/or distributed by HAI. HAI adheres to strict quality standards in the manufacture of its hair products. Thus, the consuming public has come to associate the HAI Marks with hair products of the highest quality. As a consequence, the HAI Marks have attained considerable value and the goodwill associated with them represents a valuable business asset.

68.     HAI is informed and believes, and based thereon it alleges, that the Counterdefendants are importing, selling, trafficking in, distributing and offering for sale in the United States hair-related products that are the same as, or are similar to, HAI's products and that Counterdefendants' are using marks for those goods that are identical to, or are confusingly similar to, the HAI Marks.

69.     HAI is informed and believes, and based thereon it alleges, that at the time Counterdefendants adopted their marks, they were familiar with HAI, with the HAI Marks, and with the quality of HAI's goods. HAI is further informed and it believes, and based thereon it alleges, that at the time they adopted their marks, Counterdefendant had actual notice of the '468 Registration and, by adopting their marks, Counterdefendants were attempting to usurp for themselves the goodwill that HAI had built up in the HAI Marks.

In the Prayer for Relief, HAI alleges:

7.      For an order permanently enjoining Countedefendants [sic] and their officers, agents, employees, and all those acting in concert or conspiracy with them from:

        a.      Directly or indirectly manufacturing, producing, printing, distributing, importing, trafficking in, selling, offering for sale, possessing, advertising, promoting, moving or displaying any hair care products bearing the "Hair Art" or "HAI" marks or simulation, reproduction, counterfeit, copy of colorable imitation of those marks;

        b.      Instructing or directing any third parties to make containers, labels or packaging bearing the "Hair Art" or "HAI" marks or any simulation, reproduction, counterfeit, copy or colorable imitation of those marks.

10.    For a monetary award in favor of Counterclaimant HAI's favor in an amount equal to (i) HAI's actual damages and (ii) to the extent not included in actual damages, the Counterdefendants' profits arising from the acts alleged above, such damages and profits to be trebled under 15 U.S.C. § 1117(a).

HAI filed a first amended counterclaim which includes substantially the same allegations. A copy is enclosed for your reference. Additionally, HAI responded to interrogatories which responses further demonstrate the basis upon which HAI's claims are made and for which damages are sought. A copy of the interrogatory responses is enclosed for your review. The following responses evidence that the claim potentially falls within Hartford's "advertising injury" coverage in the applicable policy years.

Interrogatory No. 6

Identify and describe all facts upon which You base Your sixth affirmative defense, that "Plaintiff is barred from recovery . . . due to unclean hands," and identify each Person with knowledge of one or more of these facts, and each document You contend supports one or more of these facts. . . .

Supplemental Response to Interrogatory No. 6

HAI's sixth affirmative defense that Angles is barred from recovery due to unclean hands is based upon the well-established rule that he who seeks equity must do equity and upon the equally well-established rule that equity requires good faith. However, in this case, Angles is guilty of bad faith. The facts that establish Angles' bad faith contexts are as follows:

On October 12, 1998, Angles filed U.S. trademark application no. 75/569,547 (the "'547 Application") with the U.S. Patent and Trademark Office ("PTO") stating that it had an intent to use the term "Hair Art and Information" as a trademark in interstate commerce in connection with hair care products and educational services regarding the care of hair.

At the time the '547 Application was filed, HAI had a federal trademark registration (the "'468 Registration") for the "HAIRART" mark. Moreover, at the time the '547 Application was filed, HAI had been in business for over 14 years, during which time it had accumulated sales of at approximately $14,000,000. As a consequence of its longevity in the business and its extensive sales, HAI was a well-known supplier of hair-related products to beauty professionals. By 1998, Angles' principal, Richard Ouellette had been in the beauty business for over 30 years. Thus, it is exceedingly unlikely that he or Angles had never heard of HAI and/or the "HAIRART" mark at the time the '547 Application was filed and Adam Shuman has confirmed that Angles was aware of HAI's use of the "HAIRART" mark at the time it (Angles) commenced using the term "Hair Art and Information". Moreover, as a consequence of the '468 Registration, Angles had at least constructive notice of HAI's rights in and to the "HAIRART" mark.

On April 26, 1999, the examiner to whom the '547 Application was assigned issued an office action stating, among other things, that the term "Hair Art and Information" was not registrable because it was likely to be confused with the "HAIRART" mark that was the subject of the '468 Registration. As a consequence of the April 26, 1999 office action, Angles had actual notice of HAI's rights in and to the "HAIRART" mark.

On August 30, 1999, Angles filed U.S. trademark application no. 75/787,522 (the "'522 Application") stating that it had an intent to use the term "HAI" in stylized form as a trademark in interstate commerce in connection with educational services regarding the care of hair. The filing of the '522 Application occurred over four months after the PTO refused to register the term "Hair Art and Information".

Angles has contended in filings with the PTO in connection with the '522 Application that it began using the mark "HAI" in January 1999. This contention is false. Angles did not use the term "HAI" by itself as a mark at any time between 1999 and 2005. Instead, it used a mark that consisted of the words "Hair Art and Information" emblazoned upon an oval that encircled the stylized letters "HAI' (the "Composite Mark"). The term "HAI" that Angles applied to register was a mutilation of the Composite Mark.

Angles first used the Composite Mark in connection with the giving of classes and demonstrations relating to the cutting of hair and in connection with the sale of videotapes depicting the cutting of hair. It did so no earlier that the middle of 1999. By this time HAI had been using the "HAIRART" and "HAI" marks for 15 and 5 years, respectively.

Even assuming that Angles began using the Composite Mark in January 1999, as it claims, its bad faith is inferrable from the fact that Angles had actual knowledge of HAI and its "HAIRART" mark at this time and from the further fact that, rather than adopt a mark that was completely different from HAI's mark, Angles adopted a mark that contained the entirety of HAI's registered mark for services that were related to the goods for which HAI's mark was registered. Even if Angles did not have actual notice of HAI and/or its "HAIRART" mark at this point in time, Angles had constructive notice of the '468 Registration and of HAI's prior rights in and to the term "HAIRART".

Angles' CEO, Richard Ouellette, has filed two fictitious business statements with the San Diego County Clerk's Office stating that Angles began conducting business under the name "Hair Art and Information" on October 25 or 26, 1999. In addition, Angles' first promotional materials for any product bearing the Composite Mark were printed in December 1999 or in January 2000. Thus, Angles' first use of the term "Hair Art and Information" as a business name occurred no earlier than October 25, 1999 and its first use of the Composite Mark in connection with the sale and promotion of hair styling tools occurred no earlier

than January 2000. Is false contention that it commenced using "Hair Art and Information" and the Composite Mark in January 1999 is obvious evidence of bad faith.

Without regard to when Angles began using the "Hair Art and Information" name and/or Composite Mark, HAI and Angles each attended the same trade show in Long Beach in January 2000. It was at this trade show that HAI first learned that Angles had adopted and was using the term "Hair Art and Information" and the Composite Mark in connection with its business.

As a consequence, HAI's attorney, James Brunton, sent Angles a letter dated February 23, 2000. In it, Mr. Brunton specifically informed Angles about the '468 Registration and about the confusion that had resulted at the trade show from Angles' adoption and use of a mark that was confusingly similar to the "HAIRART" mark.

Following its receipt of Mr. Burnton's letter of February 23, 2000, Angles continued to use the "Hair Art and Information" name and the Composite Mark. It did so even though it was aware of specific instances in which its use of its mark and its name had caused confusion. The fact that Angles continued to use the "Hair Art and Information" name and the Composite Mark despite the fact that it was aware of the confusion it was causing is evidence of bad faith.

On April 6, 2000, Angles' attorney, George Netter, called Mr. Brunton and stated that a response to Mr. Brunton's February 23, 2000 letter was forthcoming. However, no response was ever received. Therefore, on December 12, 2000, Mr. Brunton wrote another letter to Angles.

In response, Mr. Netter wrote Mr. Brunton a letter on December 19, 2000. In it, Mr. Netter contended, among other things, that Angles was not causing any confusion, that Angles was using the term "Hair Art and Information" in a descriptive sense, rather than a trademark sense, that HAI's "HAIRART" mark was descriptive or generic, and that, in any event, Angles was using the term "HAI" as a mark and not "Hair Art and Information". All of the foregoing statements were false.

The true facts were that Angles was well aware that its actions were causing confusion in the marketplace, that on July 31, 2000 Angles had filed a declaration with the PTO in support of the '547 Application which stated that Angles was making trademark use of the term "Hair Art and Information" and that Angles was not using the term "HAI" as a mark, but was instead using the Composite Mark. Moreover, Angles' contention that the term "HAIRART" was generic or descriptive was belied by the fact that Angles itself had filed the '547 Application seeking to register the term "Hair Art and Information" on the principal register.

The misrepresentations in Mr. Netter's letter of December 19, 2000 were known to Mr. Ouellette, who oversaw the preparation of the letter. His knowledge of these intentional misrepresentations is evidence of his and Angles' bad faith.

On February 1, 2001, Mr. Brunton sent a third letter to Angles through Mr. Netter. It in, Mr. Brunton described additional instances of confusion and again demanded that Angles stop infringing HAI's rights. Angles' continued use of the term "Hair Art and Information" and the Composite Mark in the face of this third letter and its knowledge of these additional instances of confusion is further evidence of Ouellette's and Angles' bad faith.

On or about November 30, 2002, the PTO canceled HAI's '468 Registration. The cancellation was solely the result of the fact that HAI had inadvertently failed to file a declaration with the PTO (the "Section 8 Declaration") stating that it was still using the "HAIRART" mark. Notwithstanding its failure to file the Section 8 Declaration, HAI continued using the "HAIRART" mark in connection with the nationwide promotion and sale of its hair products.

On a date which is unknown to HAI, but which is believed to be around October 2003, Angles learned that the '468 Registration had been canceled. On December 3, 2003, Angles filed U.S. trademark application no. 78/337,311 (the "'311 Application") for the mark "HAIR ART". In support of the '311 Application, Ouellette submitted a declaration under penalty of perjury (i) that Angles had a bona fide intention to use the "HAIR ART" mark in commerce for the goods identified in the application, and (ii) that no other person had the right to use that term as a mark.

At the time Angles filed the '311 Application, it had no intention of ever using the term "HAIR ART" as a mark in connection with any goods or services. Moreover, at the time the '311 Application was filed, Angles knew that HAI was still using the term "HAIRART" as a trademark and that Angles' use was junior to HAI's use. Thus, the '311 Application is perjurious and fraudulent.

Angles' act of trying to obtain a federal registration for the term "HAIR ART" despite the fact that it had no intention of ever using that term as a mark and despite its knowledge that HAI had been using that term continuously for a period of over 20 years is evidence of bad faith.

On January 27, 2005, Angles commenced that instant action against HAI for, among other things, infringing its alleged rights in and to the "HAIR ART", HAIR ART AND INFORMATION" and "HAI" marks and for a judicial declaration that Angles is the owner of those marks and for an injunction preventing HAI from using any of those marks.

At the time Angles filed its complaint, it was aware that HAI was using the term "HAIRART" as a mark and that it had been doing so for over 20 years. Angles' actions in suing HAI for infringing a mark that Angles has never used and its attempt to obtain a judicial declaration that I owns a mark it has never used and has no intention of ever using and its attempt to enjoin HAI's use of a mark HAI has been using for over 20 years constitutes evidence of bad faith.

HAI's use of the "HAIRART" mark predates Angles' use of the "Hair Art and Information" name by at least fifteen years. Angles' deliberate and continued use of that name over the past six years with knowledge of HAI's prior rights and with knowledge that its continued use was causing confusion in the marketplace constitutes powerful evidence of Angles' bad faith. The fact that Angles refused to stop using a name that incorporated the entirety of HAI's "HAIRART" mark despite the confusion it was causing also constitutes powerful evidence of bad faith.

HAI's use of the "HAIRART" mark predates Angles' use of the Composite Mark by at least five years. Angles' coupling of the term "HAI" with the term "Hair Art and Information" and its continued use of those terms in the Composite Mark over the past six years has been with knowledge of HAI's prior rights in the "HAIRART" mark and with knowledge that its continued use was causing confusion in the marketplace, which Angles has admitted. Angles' deliberate use of a mark that it admits is causing confusion constitutes powerful evidence of Angles' bad faith. The fact that Angles has refused to stop using the Composite Mark, which incorporates the entirety of HAI's "HAIRART" mark, despite the confusion it is causing also constitutes powerful evidence of bad faith.

Finally, the manner in which Angles' has conducted this litigation is also evidence of its bad faith. For example, Angles has continued to pursue claims that it has admitted were completely meritless when brought, obstructed the gathering of evidence by taking possession of, and withholding, relevant documents subpoenaed from third parties, filed declarations that are false on their face and noticed the depositions of witnesses so as to maximize the inconvenience to them.

Interrogatory No. 13

Identify and describe in detail the factual basis for Your damages claim in this action. Include the identity of every person with knowledge of this claim and the facts underlying Your claim, every communication relating to this claim and the facts underlying Your claim, as well as every document relating to this claim and the facts underlying Your claim. . . .

Supplemental Response to Interrogatory No. 13

HAI's damages claim in this case is based upon the following facts:

As between HAI and Angles, HAI is the senior user and owner of the "HAIRART" and "HAI" marks. HAI's rights in those marks are superior to any rights that Angles might have in the term "Hair Art and Information" and/or the Composite Mark. The facts relating to HAI's senior rights in the marks at issue, the people who are aware of those facts and the documents demonstrating those facts, are set forth in detail in HAI's pending motion for partial summary judgment on the parties' respective infringement claims.

Angles has used the term "Hair Art and Information" and the Composite Mark in a variety of ways and in a variety of media. For example, Angles has used the term "Hair Art and Information" as a trade name and it has used that term as part of the Composite Mark. It has also physically affixed that term and the Composite Mark to its products and to numerous types of advertisement and promotional materials which it has widely disseminated, including invoices, receipts, purchase orders, business cards, product warranty cards, post cards, posters, one-page flyers, magazine advertisements, Internet websites and product packaging, including boxes.

Angles' advertising and promotion of itself under its trade name and of its products under the Composite Mark, has caused massive confusion in the marketplace, which Angles has admitted. This confusion has harmed HAI in various ways.

For example, some members of the public have labeled HAI and Jackie Yu as "infringers" because they believe, wrongly, that HAI is a junior user that is infringing the alleged rights of Angles in and to the term "Hair Art and Information" and the Composite Mark. Angles itself has reinforced the belief that HAI is an infringer by making untrue representations at trade show that HAI and Yu are using Angles' name and marks, when, in fact, the opposite is true. Being wrongly labeled as an "infringer" is damaging to HAI's business and its reputation and to Yu's reputation.

In addition, as a consequence of the fact that Angles used the "Hair Art and Information" name and the Composite Mark, at least on long-standing HAI customer, i.e., Sally Beauty, the largest retail seller of beauty products in the United States, cut back its purchases of products from HAI because its buyers wrongly believed that HAI, which sells at the wholesale level, was competing with Sally Beauty at the retail level. This belief was caused by the fact that Angles was selling products at the retail level under the "Hair Art and Information" name and the Composite Mark. This confused Sally Beauty's buyers into thinking that the products in question originated with HAI.

Moreover, as Camillo Schuchardt testified, at some point between 2001 and 2003, Angles imported and distributed a hair pressing iron that had a very

high failure rate. The Composite Mark was affixed to both the iron and the box in which this particular iron was packaged. However, neither the iron nor the box contained Angles' corporate name or its address. Since Angles failed to affix its name and/or address to the box or the irons in question, a substantial number of persons thought that the irons originated with, or were associated with, HAI and when the irons failed, it caused these persons to think that HAI made poor quality products. This injured HAI's business reputation.

Finally, as a consequence of the confusion Angles has caused in the marketplace, some prospective customers have dealt with, and purchased form, Angles believing they were dealing with, and purchasing from, HAI.

HAI believes that Angles and its CEO, Ouellette, were fully aware of HAI's rights in the term "Hair Art" when Angles commenced using the term "Hair Art and Information" and the Composite Mark. Even if they were not aware of HAI's rights from the time Angles first commenced using those terms, however, Angles became aware of those rights by February, 2000, at the very latest.

Without regard to when Angles and Ouellette first learned of HAI's rights, Angles infringed HAI's rights by using the term "Hair Art and Information" and the Composite Mark for a period of nearly 6 years despite the fact that it was aware that such use was causing confusion in the marketplace and despite the fact that HAI had asked it to stop.

As a consequence of the foregoing, at trial, HAI will seek damages from Angles in the form of (i) the amount by which Sally Beauty's purchases from HAI declined, (ii) an award of the profits Angles earned as a consequence of its infringing activities, (iii) a reasonable amount to enable HAI to conduct corrective advertising to remedy the confusion Angles has caused in the marketplace, (iv) treble damages as a consequence of Angles' willful infringement, (v) damages to HAI's reputation, (vi) punitive damages as a consequence of Angles' conscious disregard of HAI's rights in and to the marks in question, (vii) attorneys' fees, and (viii) costs.

The amount by which Sally Beauty's purchases from HAI declined may be ascertained by conducting an arithmetic computation form the chart summarizing HAI's annual sales to Sally Beauty, as set forth in the Bates n. HAI 2420.

The amount by which Angles was unjustly enriched as a consequence of its infringing activities and the reasonable amount to enable HAI to conduct corrective advertising to remedy the confusion Angles has caused in the marketplace are set forth in the expert report of Dr. Alan Goedde.

The amount of enhanced damages as a consequence of Angles' willful infringement will be determined by the trier of fact, as will damages to HAI's reputation and punitive damages.

Persons with knowledge of HAI's damages in this case include Jackie Yu, Tom Donahue, Alan Goedde, Camillo Schuchardt, Ms. Connie Ouellette, Kimberly Swelgin and Richard Ouellette.

### Hartford's Duty to Defend Is Triggered

Hartford must defend Angles because the *Hair Art* Action seeks damages **potentially** within the coverage of the policy. *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 275 (1966); *Wausau Underwriters Ins. Co. v. Unigard Security Ins. Co.*, 68 Cal. App. 4th 1030, 1036 (1998); *North American Bldg. Maint., Inc. v. Fireman's Fund Ins. Co.*, 137 Cal. App. 4th 627, 640 (2006).

Hartford must defend Angles because the *Hair Art* Action seeks damages on a theory that, if proven, would be covered by the policy. In order to avoid its defense obligation, Hartford must establish—through undisputed evidence—that the *Hair Art* Action can, by no conceivable theory, raise a single issue which could bring the *Hair Art* Action within policy coverage. *Montrose Chem. Corp. v. Sup. Ct.*, 6 Cal. 4th 287, 295 (1993); *Gray, supra* 65 Cal. 2d at 275 fn. 15; *Devin v. United Services Auto Ass'n*, 6 Cal. App. 4th 1194, 1157 (1992); *Amato v. Mercury Cas. Co.*, 18 Cal. App. 4th 1784, 1790 (1993).

### The "Misappropriation of Advertising Ideas or Style of Doing Business" Offense

The allegations and discovery responses show that HAI is asserting claims against Angles that are potentially covered under Hartford's policy. Angles allegedly misappropriated HAI's advertising idea in the marks at issue. In *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group*, 50 Cal. App. 4th 548, 557 (1996), the court explained that a trademark is but a species of advertising in finding that a defense was owed in a trademark infringement case.

### The "Use of Another's Advertising Idea" Offense

HAI's fourth claim for relieve is for "Common Law Unfair Competition". As a result, HAI contends that regardless of whether Angles' use of the alleged marks infringe HAI's trademark rights, or whether HAI has trademark rights at all, Angles' use of the alleged marks constitutes common law unfair competition under California law:

The common law tort of unfair competition is generally thought to be synonymous with the act of "passing off" one's goods as those of another. The tort developed as an equitable remedy against the wrongful exploitation of trade names and common law trademarks that were not otherwise entitled to legal protection. (See generally 1 Callmann, Unfair Competition, Trademarks & Monopolies (4th ed. 1981) §§ 2.01-2.03.) According to some authorities, the tort also includes acts analogous to "passing off," such as the sale of confusingly

similar products, by which a person exploits a competitor's reputation in the market.

*Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1263 (1992).

And if Angles use of the alleged marks constitutes common law unfair competition in the form of "passing off" under California law, HAI's alleged marks are within the meaning of the phrase "use of another's advertising idea" under California case law discussing the meaning of the phrase "advertising idea" as used in a general liability policy.

Similarly while the misappropriation of an "advertising idea" certainly would include the theft of an advertising plan from its creator without payment it is also reasonable to apply it to wrongful taking of the manner or means by which another advertises its goods or services.

*Lebas Fashion Imports of the USA, Inc. v. ITT Hartford Ins. Group*, 50 Cal. App. 4th 548, 562 (1996) (analyzing the meaning of the offense "misappropriation of advertising ideas"). In contrast, the "use of another's advertising idea" offense does not require "misappropriation", which the Lebas court concluded meant "theft" or "wrongful taking." Instead, the offense merely requires "use" of an "advertising idea." Regardless of whether HAI has legitimate, superior trademark rights, a dubious claim at best, HAI is claiming that Angles is using the manner or means that HAI advertises its goods, and that that use constitutes unfair competition.

## Extrinsic Facts Also Trigger Hartford's Defense Duty

The 1st District court of appeal found that the insurer's defense duty was triggered by facts extrinsic to the complaint where the complaint did not suggest a potential for liability under the policy. *El-Com Hardware, Inc. v. Fireman's Fund Ins. Co.*, 92 Cal. App. 4th 205, 213 (2001)("Even if the face of the complaint does not suggest a potential for liability under the policy, the extrinsic facts known to the insurer can generate a duty to defend, because current pleadings rules liberally allow amendment and the third party cannot be the arbiter of coverage.") Here, the Counterclaims allege Angles infringed HAI's trademarks in the offer for sale of Angles' goods and services. Angles has also provided extrinsic evidence, in the form of discovery responses that demonstrate that HAI is claiming Angles committed this offense during the Hartford policy periods and in the course of advertising. As such, Angles faces potential liability that is covered under the Hartford policies.

Please immediately contact the undersigned to advise that Hartford will agree to defend Angles in the *Hair Art* Action and that a representative of Hartford will attend the scheduled settlement conference. Additionally, your insured requests Hartford immediately provide copies of the primary and excess general liability policies in effect from 1998 through the termination of Hartford's coverage.

Should you have any questions, please contact me immediately.

Very truly yours,

Eric R. Little

ERL/MCR:bh

(Enclosures: Amended Counterclaims and discovery responses)

Cc:    Richard Ouellette (via e-mail w/ enclosures)
       Andrew Skale, Esq. (via e-mail w/ enclosures)



# Shipment Receipt

**Transaction Date:**    03 Jul 2008
**Tracking Number:**    1Z65A46A2598355241

### Address Information

| **Ship To:** | **Ship From:** | **Return Address:** |
| --- | --- | --- |
| The Hartford | Little, Reid & Karzai | Little, Reid & Karzai |
| Claims Manager | Eric R. Little | Najwa T. Karzai |
| One Hartford Plaza | 3333 Michelson, Ste. 310 | 3333 Michelson, Ste. 310 |
| HARTFORD CT 06115-1701 | IRVINE CA 92612 | Irvine CA 92612 |
| | | |
| Telephone: 800.624.5578 | Telephone: (949) 333-1698 | Telephone: (949) 333-1698 |

### Package Information

| | Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
| --- | --- | --- | --- | --- |
| 1. | Letter | UPS Letter | | {Reference#1 - Angles Beauty} |

### UPS Shipping Service and Shipping Options

**Service:**
UPS Next Day Air
**Guaranteed By:**[1]
10:30 AM Monday, 7/7/2008

| | |
| --- | --- |
| **Shipping Fees Subtotal:** | **32.70 USD** |
| **Transportation** | 25.55 USD |
| **Fuel Surcharge** | 7.15 USD |

**Additional Shipping Options:**
**Delivery Confirmation:**
  Package 1: Delivery Confirmation Letter    1.50 USD
**Quantum View Notify E-mail Notifications:**
  1.  erl@lrkllp.com Ship; Delivery; Exception    No Charge

### Payment Information

**Bill Shipping Charges to:**    Shipper's Account 65A46A

| | |
| --- | --- |
| **Total Charged:** | **34.20 USD** |

Note: Your invoice may vary from the displayed reference rates.

[1] * For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service

**Exhibit "12"**
**227**

**EXHIBIT 13**

# LITTLE REID & KARZAI
——LLP——
### ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

Eric R. Little, Esq.
erl@lrkllp.com

July 9, 2008

**VIA E-MAIL**
jharriso@travelers.com

John Harrison
St. Paul Travelers
21688 Gateway Center Drive
Diamond Bar, CA 92765

> **Re:**    *Angles Beauty Care Group, Inc. v. Hair Art International, Inc.*
> **United States District Court, Southern District of California, Case No. 05 CV**
> **0166 JAH ("*Hair Art*" Action)**

| | |
|---|---|
| **Your Insured:** | Angles Beauty Care Group, Inc. ("Angles") |
| **Your Policy:** | 967X8612 [10/31/2004-10/31/2005] |
| **Your Claim Nos.:** | MR121101; ABM4957 |

Dear Mr. Harrison:

As we previously informed Travelers, Hair Art International, Inc. ("HAI") has made a settlement demand in the amount of                against your insured, Angles Beauty Care Group, Inc. ("Angles") to resolve the *Hair* Art Action. A settlement conference is scheduled for July 22, 2008. A copy of Hair Art's demand is enclosed for your review.

Angles requests Travelers' attendance and participation at the settlement conference. Angles will look to Travelers to fund any reasonable settlement amount within policy limits. Travelers has a duty to accept and fully fund any reasonable settlement offer made by HAI that is within policy limits, irrespective of actual coverage, as explained below. Failure to accept a reasonable offer, no matter how well intentioned, will expose Travelers to extra-contractual damages. It will be wholly responsible for any ensuing judgment covered under the policy regardless of its policy limits. Angles wants Travelers to be fully informed of these potential consequences and its settlement obligations so that it can proceed with the utmost of caution.

1 | P a g e

## I.    TRAVELERS' DUTY TO SETTLE

### A.    Travelers is Obligated to Accept and Fully Fund a Reasonable Settlement of the *Hair Art* Action Without Regard to Any Coverage Issues

Travelers owes four separate yet related obligations to its insured Angles. Travelers must defend Angles against potentially covered claims; [*Buss v. Superior Court*, 16 Cal. 4th 35, 49 (1997)] it must indemnify Angles for actually covered claims; [*Palmer v. Truck Insurance Exchange*, 21 Cal. 4th 1109, 1120, 90 Cal. Rptr. 2d 647, 656 (1999)] it must act in good faith at all times with Angles; [*Kransco v. American Empire Surplus Lines Ins.*, 23 Cal. 4th 390, 400 (2000)] and **it must accept any reasonable offer (within policy limits) to settle a potentially covered suit against Angles, irrespective of whether there is actual coverage,** or assume the risk of an excess judgment and all other damages resulting from its failure to settle [*Blue Ridge Ins. Co. v. Jacobsen*, 25 Cal. 4th 489, 498, 22 P.3d 313 (2001)].

An insurer's duty to settle does not typically appear in the policy. It is, however, born out of the combined effect of the insurer's express promise to defend and indemnify the insured [*Kransco*, 23 Cal. 4th at 401 ("A liability insurance policy's express promise to defend and indemnify the insured against injury claims implies a duty to settle third party claims in an appropriate case.")] in combination with its implied promise of good faith and fair dealing. *Comunale v. Traders & General Ins. Co.*, 50 Cal. 2d 654, 658-59, 328 P.2d 198, 200-01 (1958). The relationship between the duty to settle and the duties of defense and indemnity is clear. In return for the payment of premiums, the insurer expressly promises to protect the insured against certain types of liability up to and including the policy's limit. Implicit in this promise is the insurer's obligation to take reasonable steps to protect the insured against negative consequences flowing from covered (or potentially covered) liability. This includes the obligation to accept a reasonable settlement offer within policy limits. As the California Supreme Court explained in *Commercial Union Assur. v. Safeway Stores, Inc.*, 26 Cal. 3d 912, 918, 164 Cal. Rptr. 709, 712 (1980):

> One of the most important benefits of a maximum limit insurance policy is the assurance that the company will provide the insured with defense and indemnification for the purpose of protecting him from liability. Accordingly, **the insured has the legitimate right to expect that the method of settlement within policy limits will be employed in order to give him such protection.**

(Emphasis added.)

The connection between Travelers' good faith obligations and its duty to settle is no less apparent. The covenant of good faith and fair dealing does not impose affirmative obligations on Travelers as much as it requires Travelers to fulfill its obligations in a way that is objectively reasonable and which appropriately reflects the unique and quasi-fiduciary relationship between an insurer and its insured. *Safeway*, 26 Cal. 3d at 918; *see also Vu v. Prudential Prop. & Cas. Ins. Co.*, 26 Cal. 4th 1142, 1150-51, 113 Cal. Rptr. 2d 70, 76-77 (2001) (recognizing "fiduciary like" relationship between insurer and insured). At minimum, good faith requires Travelers to give Angles' interests the same weight and consideration that it gives its own. *Shade Foods, Inc.*

*v. Innovative Prods.*, 78 Cal. App. 4th 847, 908-09, 93 Cal. Rptr. 2d 364, 406-07 (2000). Where there is an opportunity to settle a suit seeking potentially covered damages within policy limits and the insured would likely face adverse consequences (excess judgment or otherwise) from its continuation, a good faith balancing of the insurer's and insured's interests requires the insurer to accept and fully fund the settlement. *Cathay Mortuary Inc. v. United Pacific Ins. Co.*, 582 F. Supp. 650, 658 (N.D. Cal. 1984).

It is critical to note that **the duty to settle cannot be equated with an insurer's obligation to indemnify the insured for a judgment.** Whereas questions of indemnity turn exclusively on what is (or is not) *actually* covered, **these considerations play no part in evaluating an insurer's settlement obligation.** *Johansen v. California State Auto. Ass'n*, 15 Cal. 3d 9, 16, 123 Cal. Rptr. 288, 292 (1975) (insurer cannot consider coverage issues in evaluating the reasonableness of a settlement opportunity); *Blue Ridge*, 25 Cal. 4th at 498 *citing Johansen*. As discussed above, the obligation to accept a reasonable settlement offer is a prophylactic safeguard designed to protect the insured against adverse consequences which *might* occur if the litigation continues. As such, analyzing whether a particular settlement offer is reasonable involves weighing the amount of the proposed settlement against the likelihood and extent of the adverse consequences sought to be avoided. Coverage is simply not part of the equation.

Correspondingly, any claim that Travelers owes no indemnity obligation because no claims are covered fails to recognize that potentially covered claims are at issue in settlement. Additionally, coverage issues such as allocation between covered and uncovered claims cannot be properly considered when evaluating and effectuating settlement of a suit against the insured. If the proposed settlement is reasonable, Travelers must agree to fund the entire amount. It cannot seek to allocate amongst the claims[1] and it cannot force the insured to contribute to the settlement. *Hamilton v. Maryland Cas. Co.*, 27 Cal. 4th 718, 731, 117 Cal. Rptr. 2d 318, 328 (2002) ("[I]nsurer potentially can be liable for unreasonably coercing an insured to contribute to a settlement fund, even though (by definition) there is no excess judgment where a case is settled."). There is also no authority allowing one insurer to refuse to settle unless a second insurer agrees to contribute toward the settlement. Travelers must meet its independent settlement obligations to Angles.

**B.     The Three-Part Test for an Insurer's Obligation to Settle**

As noted, Travelers' broad obligation to settle claims brought against Angles runs to reasonable settlements. *Hamilton*, 27 Cal. 4th at 725 (insurer is liable if it fails to make a

---

[1] *Johansen*, 15 Cal. 3d at 10, 16, 19, 123 Cal. Rptr. at 289, 292 (an insurer must accept a reasonable settlement offer within policy limits regardless of doubts as to policy coverage; it is free to seek reimbursement from its insured of a settlement payment if it subsequently establishes noncoverage under its policy). Attempting to allocate between covered and uncovered claims and thereby refusing to pay the entire reasonable settlement amount would be a breach of this duty. *See also United States Fire Ins. Co. v. Green Bay Packaging, Inc.*, 66 F. Supp. 2d 987, 999 (E.D. Wis. 1999), a disparagement case holding that "where there is some evidence that some covered conduct was the basis for the damage award" the entire damage award is covered by the policy. If non-covered conduct and covered conduct together contribute to damages, all of the damages are covered unless it can be proven that the uncovered conduct "was the sole cause of the damages." *Id.*

3 | P a g e

**reasonable** settlement).  The question of reasonableness and the duty to settle depends on case-specific analysis which is driven by three distinct, yet related, elements:

    **First,** the underlying suit must be *potentially* covered by the policy in question.  Since the duty to settle is derived from the insurer's implicit obligation to use good faith in fulfilling its contractual obligation to defend its insured in a third party lawsuit, the duty to defend is predicate to any settlement obligation.  *Peerless Lighting Corp. v. American Motorists Ins. Co.*, 82 Cal. App. 4th 995, 1016, 98 Cal. Rptr. 2d 753, 766 (2000) ("no duty to defend the underlying action . . . no duty to settle it").

    HAI states, in its responses to interrogatories, that it is seeking damages based upon statements made by Angles to HAI's customers at a trade show and other times which conveyed to existing and potential customers that HAI was infringing Angles' trademark and which caused HAI to lose sales and suffer damage to its reputation.  HAI asserts the statements were false.

    The Hair Art discovery responses state in pertinent part:

Interrogatory No. 11:

    Explain in detail all facts upon which You base Your contention that Richard Ouellette slandered You personally. . . .

Supplemental Response to Interrogatory No. 11:

    Richard Ouellette attended a trade show a couple of years ago in his capacity as Angles CEO for the purpose of attracting new customers and increasing the sales of Angles' products and services.  Tom Donahue, an independent sales representative from Donahue & Associates in Texas, attended the same show.  Mr. Ouellette engaged in conversation with Mr. Donahue.  When Mr. Ouellette learned, among other things, that Mr. Donahue represented HAI and Jackie, Mr. Ouellette stated words to the effect that he was having trouble with HAI and/or Yu because they were using Angles' name.  Mr. Ouellette's statement was false and Mr. Donahue understood it as an accusation that HAI and Yu were trademark infringers and, thus, engaged in unethical business practices.

    HAI believes that Mr. Ouellette's comment was not an isolated occurrence and that he and other Angles employees, such as Camillo Schuchardt, made similar comments to other persons on other occasions.

Interrogatory No. 20:

    Explain in detail all facts upon which You base the allegations in paragraph twenty (20) of the First Amended counterclaim that "HAI has suffered damage to its business, reputation and goodwill and the loss of profits and sales it would have made but for counterdefendants' conduct." . . .

<u>Supplemental Response to Interrogatory No. 20:</u>

The use by Angles of the name "Hair Art and Information" and its use of the Composite Mark is causing confusion in the marketplace, which Angles has admitted. As a consequence of this confusion, some prospective customers have labeled HAI an "infringer" because they wrongly believe that HAI is a junior user that is infringing the alleged rights of Angles in and to the term "Hair Art and Information" and the Composite Mark. In fact, HAI is the senior user of the marks that are at issue in the case and being wrongly labeled as an "infringer" is damaging to HAI's business and reputation.

In addition, as a consequence of Angles use of the "Hair Art and Information" name and the Composite Mark, one of HAI's long-standing customers, i.e., Sally Beauty, the largest retail seller of beauty products in the United States, cut back its purchases of products from HAI because its buyers believed that HAI, which sells at the wholesale level, was competing with Sally Beauty at the retail level. This belief was caused by the fact Angles was selling products at the retail level under the "Hair Art and Information" name and the Composite Mark which confused Sally Beauty's buyers into thinking that the products in question originated with HAI.

Moreover, as Camillo Schuchardt testified, at some point between 2001 and 2003, Angles imported and distributed a hair pressing iron that had a very high failure rate. The Composite Mark was affixed to both the iron and the box in which this particular iron was packaged. However, neither the iron nor the box contained Angles' corporate name or its address. Since Angles' failed to affix its name and/or address to the box or the irons in question, a substantial number of persons thought that the irons originated with, or were associated with, HAI and when the irons failed, it caused these persons to think that HAI made poor quality products. This injured HAI's business reputation.

Finally, as a consequence of the confusion Angles is intentionally causing in the marketplace, some prospective customers have dealt with, and purchased from, Angles believing they were dealing with, and purchasing from, HAI.

<u>Interrogatory No. 21:</u>

Explain in detail all facts upon which You base the allegation in paragraph twenty-one (21) of the First Amended Counterclaim that "Counterdefendants' acts of copying and using the HAI Marks in connection with hair-related products and services have caused and will continue to cause irreparable and immediate injury to HAI for which Hai has no adequate remedy at law." . . .

<u>Supplemental Response to Interrogatory No. 21:</u>

The use by Angles of the name "Hair Art and Information" and its use of the Composite Mark is causing, and has caused, confusion in the marketplace. Angles has admitted that there is confusion in the marketplace that is being caused by HAI's use of the "HAIRART" mark and by Angles' concurrent use of the term "Hair Art and Information" and the Composite Mark. Angles has also admitted that some members of the public have labeled HAI an "infringer" because they believe, wrongly, that HAI is a junior user that is infringing the alleged rights of Angles in and to the term "Hair Art and Information" and the Composite Mark.

Angles' employees have reinforced this erroneous belief by telling people in the trade that HAI and Yu are using Angles' marks, which is tantamount to calling them infringers. In fact, HAI is the senior user of the marks that are at issue in the case and it is Angles that is using HAI's trademarks. . . .

The Travelers' policy issued to Angles includes a defense duty in any "suit" seeking damages because of "personal injury" or "advertising injury." The policy issued to Angles defines "personal injury" to mean injury that is not "advertising injury" caused by the offense of "publication of 'insured material'[2] that slanders or libels a person or organization or disparages a person's or organization's goods, products or services."[3] Hair Art clearly claimed damages resulting from statements made by Angles that slandered Hair Art by accusing it of being a trademark infringer. Hair Art also claimed that Angles' statements disparaged Hair Art's products by associating them with infringing conduct.

One California appellate court, in addressing a case where the insured accused a competitor of being an infringer, explained the insurer's obligation to defend where facts extrinsic to the complaint show a possibility of coverage under the policy. Here, Travelers' defense duty was triggered by the extrinsic facts provided in HAI's discovery responses.

"[A]n insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement. [Citations.] This duty, which applies even to claims that are 'groundless, false, or fraudulent,' is separate from and broader than the insurer's duty to indemnify. [Citation.]" (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19 [44 Cal.Rptr.2d 370, 900 P.2d 619].) The scope of the duty does not depend on the labels given to the causes of action in the third party complaint; instead it rests on whether the alleged facts or known extrinsic facts reveal a possibility that the claim may be covered by the policy. (See *Hurley Construction Co. v. State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 538 [12 Cal.Rptr.2d 629].)

---

[2] "Insured material" is defined as "any material in any form of expression" but does not include certain material that is not relevant here.

[3] The policy includes similar "advertising injury" coverage for the same offense except that it contains a connection to advertising. The Hair Art allegations fit within at least one of the definitions.

Exhibit 13

*Atlantic Mutual Ins. Co. v. J. Lamb, Inc.*, 100 Cal.App.4th 1017, 1033-1034 (2002). The court also explained that the allegations that the insured made statements that its competitor was an infringer to potential customers demonstrated a potential for coverage for the personal injury offense of disparagement.

> The term "disparagement" has been held to include statements about a competitor's goods that are untrue or misleading and are made to influence potential purchasers not to buy. (See *Sentex Systems, Inc. v. Hartford Acc. & Indem. Co.* (C.D.Cal. 1995) 882 F.Supp. 930, 944.) Whether characterized as a trade libel or product disparagement, an injurious falsehood directed at the organization or products, goods, or services of another falls within the coverage of the Atlantic Mutual policy. The plain language of the Atlantic Mutual policy includes in the definition of "personal injury" the publication of any oral or written statement that not only slanders or libels but also one that disparages an organization or its goods, products, or services. This amounts to coverage for product disparagement and trade libel as well as defamation. (See e.g., *Amerisure Ins. Co. v. Laserage Technology Corp.* (W.D.N.Y. 1998) 2 F.Supp.2d 296, 304 [where the court construed nearly identical policy language and reached the same conclusion].)

*Id.* at 1035. Similarly here, HAI claims that statements made by Angles about HAI and its products were untrue and made for the purpose of influencing customers not to buy HAI's products. In fact, HAI specifically identifies customers who were influenced by Angles' allegedly disparaging or defamatory statements and claims damages resulting from Angles' allegedly wrongful conduct.

**Second,** the insured's exposure must be in excess of the settlement offer. Some courts articulate the rule as requiring likely exposure in excess of policy limits. *See, e.g., Lehto v. Allstate Ins. Co.*, 31 Cal. App. 4th 60, 67, 36 Cal. Rptr. 2d 814, 817 (1994). The California Supreme Court, however, recently held that the duty to settle is triggered by the reasonable likelihood that the insured will be found liable for an amount in excess of the settlement offer. *Blue Ridge*, 25 Cal. 4th at 498.[4]

**Third,** there must not only be *potential* excess exposure but *probable* exposure in excess of the settlement offer thus making the offer reasonable under the circumstances. *Id.* In other words, the amount of the settlement offer must make sense when comparing (1) the extent of the negative consequences that will be potentially suffered by the insured if the suit does not settle, and (2) the likelihood that these negative consequences will occur if the case continues. *Id.*

Since HAI has made a settlement offer that comes within the parameters of the three-part test triggering Travelers' duty to settle, Angles will look to Travelers to accept and fully fund the settlement.

---

[4] "[T]he only permissible consideration in evaluating the reasonableness of a settlement offer . . . [is] whether, in light of the victim's injuries and the probable liability of the insured, the ultimate judgment is likely to exceed the amount of the settlement offer." (citation omitted; emphasis added).

**C.    The Three-Part Test for an Insurer's Obligation to Settle Is Satisfied by any Proposed Settlement Amount Within Limits**

**1.    Element One, the "Potentially Covered" Element of the Duty to Settle Test, Is Met Because the *Hair Art* Action Is Potentially Covered Under Travelers' Policy**

Because the duty to settle is derived, in part, from the duty to defend, an insurer is not obligated to settle a suit against its insured unless it also has an obligation to defend its insured in the same suit. As demonstrated above, Travelers has a duty to defend the *Hair Art* Action.

The question of potential coverage (in connection with the duty to settle) relates solely to the issue of whether the insurer has any settlement obligations in the first instance, not whether the insurer is obligated to accept a particular settlement offer. Once the foundational issue of potential coverage for the suit has been established, the question of whether a settlement offer is reasonable must be resolved strictly through an evaluation of the potential harm that may befall the insured if the suit is allowed to continue. Coverage issues are simply not part of this equation. *Id.* ("[I]n determining whether a settlement offer is reasonable, an insurer may not consider the issue of coverage.").

**2.    Element Two, "Potential Liability in Excess of Settlement Offer or Policy Limits," Is Met Because Angles' Exposure Exceeds Travelers' Policy Limits**

Because coverage is not part of the reasonableness determination, **the question of whether Angles faces excess exposure turns** not on covered liability or even potentially covered liability, but rather on **the overall exposure potentially faced by Angles in the *Hair Art* Action.** *Id.* As long as Angles' exposure is in excess of a particular settlement offer or the policy limits, Travelers is obligated to fund the entire settlement absent other circumstances which render the settlement unreasonable.[5]

Angles' exposure in the *Hair Art* Action is well in excess of Travelers' $1 million policy limits. HAI recently made a settlement demand in the amount of ... .    against Angles to resolve the *Hair Art* Action. In short, Angles has a lot to lose in the *Hair Art* Action and certainly more than the limits of insurance. Travelers must consider this when evaluating any proposed "within limits" offer that HAI might make at the settlement conference.

**3.    Element Three, "Likelihood that Judgment Will Exceed Amount of Settlement Offer," Dictates that Travelers Accept any Proposed Settlement Within Its Policy Limits**

---

[5]*Camelot by the Bay Condominium Owners' Ass'n, Inc. v. Scottsdale Ins. Co.*, 27 Cal. App.4th 33, 48, 32 Cal. Rptr. 2d 354, 362 (1994) ("[T]here is no explicit requirement for bad faith liability that an excess judgment is actually suffered by the insured, since the reasonableness analysis of settlement decisions is performed in terms of the probability or risk that such a judgment may be forthcoming in the future.").

**Exhibit "13"**
**235**

The reasonableness of a settlement is not solely a function of the possibility that the insured will have excess liability or will suffer adverse consequences if the suit is allowed to continue. Properly assessing reasonableness also requires an evaluation of the probability that these negative consequences will occur. *Blue Ridge*, 25 Cal. 4th at 498 (emphasis added):

> In *Johansen*, we held an insurer that fails to accept a reasonable settlement offer within the policy limits because it does not believe the policy provides coverage, assumes the risk it will be held liable for all resulting damages including a judgment that exceeds the policy limits. (*Id.* at pp. 12, 15.) We further concluded that in determining whether a settlement offer is reasonable, an insurer may not consider the issue of coverage. (*Id.* at p. 16.) **Rather "the only permissible consideration in evaluating the reasonableness of the settlement offer . . . [is] whether, in light of the victim's injuries and the probable liability of the insured, the ultimate judgment is likely to exceed the amount of the settlement offer."**

Stated in mathematical terms, a reasonable settlement (*RS*) is one that is less than or equal to the product of exposure (*E*) times likelihood of liability (*L*) ($RS \leq E * L$). *Miller v. Elite Ins. Co.*, 100 Cal. App. 3d 739, 757, 161 Cal. Rptr. 322, 332 (1980) (emphasis added):

> Elite's claim manager, Ryan, assessed the damages at $11,000 and he estimated that Miller's liability was a 50 percent certainty. In evaluating the claim against Miller, therefore, Ryan considered that the liability would be $5,500, or in excess of the policy limits. **The settlement demand of $5,000 was within policy limits and was reasonable as a matter of law where the damages sought would nearly double the amount of the policy limit.**

*See also Isaacson v. California Ins. Guar. Ass'n*, 44 Cal. 3d 775, 794, 244 Cal. Rptr. 655, 668 (1988) (Where "maximum exposure of $750,000 was a 50 percent possibility . . . [the insurer] failed to accept a reasonable settlement offer when it rejected [the injured party's] $500,000 settlement demand, and instead paid $400,000."). Here, Angles' exposure is between $10,200,000 and $10,463,000. Even assuming HAI has a very low likelihood of proving Angles's liability, 25%, a settlement between $2,550,000 and $2,615,750[6] is reasonable as a matter of law under the formula, not even considering the cost of defense. Angles will look to Travelers to fund any settlement.

**D.     Consequences of Travelers Failing to Authorize a Reasonable Settlement: Waiver of Policy Limits**

Failing to authorize a reasonable settlement within limits will constitute a breach of the implied covenant of good faith and fair dealing and thus eradicate Travelers' policy limits.

---

[6]25%(L) x $10,200,000 (E) = $2,550,000 (RS); 25%(L) x $10,463,000(E) = $2,615,750 (RS)

**Exhibit "13"**

Travelers will become liable for all of Angles' damages proximately caused by the breach, including any excess judgment. *Hamilton*, 27 Cal. 4th at 725. It will be responsible to pay the entirety of any such judgment against Angles regardless of policy limits. *Id.*; *see also Wolkowitz v. Redland Ins. Co.*, 112 Cal. App. 4th 154, 162 (2003).

The California Supreme Court in *Johansen*, 15 Cal. 3d at 15-16, summarized these principles. It also clarified that an insurer is liable for an excess judgment even if its denial of coverage is well reasoned and in good faith, but just wrong.

> An insurer who denies coverage does so at its own risk, and, although its position may not have been entirely groundless, if the denial is found to be wrongful it is liable for the full amount which will compensate the insured for all the detriment caused by the insurer's breach of the express and implied obligations of the contract. . . [A]n insurer's 'good faith,' though erroneous belief in noncoverage affords no defense to liability flowing from the insurer's refusal to accept a reasonable settlement offer.

Should Travelers refuse to accept any reasonable settlement offer proposed by HAI, no matter how good Travelers' intentions, it will be wholly responsible for any ensuing judgment covered under the policy regardless of its $1 million policy limits.

## II.    CONCLUSION

Travelers has an obligation to accept and fully fund any reasonable settlement of the *Hair Art* Action within policy limits since there is a potential for coverage in that suit. Angles anticipates that Travelers will not hinder a reasonable settlement opportunity. Failure to authorize a reasonable settlement within limits would constitute a breach of the covenant of good faith and fair dealing, thus, eradicating Travelers' policy limits.

Angles looks forward to Travelers' positive response.

Very truly yours,

Eric R. Little

ERL/NTK
(Enclosure)
Cc:    Richard Ouellette (via e-mail w/ enclosure)
       Andrew Skale, Esq. (via e-mail w/ enclosure)



Printed on Recycled Paper
20% Post Consumer Waste



THE
HARTFORD

July 11, 2008

Eric Little
Little Reid & Karzai, Attorneys at Law
3333 Michelson Drive #310
Irvine, CA 92612

Re:  Insured:       Angles Beauty Care Group, Inc.
     Date of Loss:  12/11/2001
     Claim Number: G L0007977890
     Policy Number: 72 SBA LH0763

Dear Angles Beauty Care Group, Inc.:

 This letter acknowledges receipt of your tender of defense and indemnity for a lawsuit filed against Angels
Beauty Care.

Hartford Casualty Insurance Company (The Hartford) is not in a position to either accept or reject this claim.
While we are investigating this claim, The Hartford reserves all its rights under the policy. The Hartford
specifically reserves the right to deny coverage or raise any policy grounds, conditions, or exclusions to
coverage which may be applicable, pending completion of its coverage investigation.  .

If it is later determined that a defense is owed in this matter, we will make reimbursement of reasonable
attorneys' fees and costs from the date of the tender.

Sincerely,

Jason Beach
Claim Consultant
1 (877) 925-2652 x52458

Writing Company Name:  Hartford Casualty Insurance

Handling ID:
Reservation of Rights General Letter
JBZ

**Exhibit "14"**
**238**

Western Commercial Auto & Liability
Claim Center
P.O. Box 14267
Lexington, KY 40512-4267
Toll Free 877 925 2652
Facsimile 866 809 9793

EXHIBIT 15

# LITTLE REID & KARZAI
——LLP——
ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

Eric R. Little, Esq.
erl@lrkllp.com

August 4, 2008

**Via Fax and Email**

Jason Beach
Claim Consultant
Hartford Casualty Insurance
Western Commercial Auto & Liability Claim Center
P.O. Box 14267
Lexington, KY 40512-4267
Fax: 866.809.9793
Email: Jason.beach@thehartford.com

  **Re:**   *Angles Beauty Care Group, Inc. v. Hair Art International, Inc.*
     **United States District Court, Southern District of California, Case No. 05 CV**
     **0166 JAH ("*Hair Art*" Action)**

  **Your Insured:**   **Angles Beauty Care Group, Inc. ("Angles")**
  **Your Policies:**   **72 SBA LH0763**
  **Your Claim No.:** **GL0009777890**

Dear Mr. Beach:

  I enclose a copy of plaintiff Hair Art's[1] August 1, 2008 confidential settlement demand letter. As can be seen from the settlement demand letter, HAI explicitly seeks damages within Hartford's "advertising injury" coverage as set forth in my letter of July 3, 2008.

---

  [1]Hair Art International, Inc. ("Hair Art").

**Exhibit "15"**
**239**

1 | P a g e

With the settlement conference set for August 13, 2008, and Hartford ordered to attend with "full and unlimited authority to negotiate and enter into a binding settlement", acknowledgement by Hartford of its defense and settlement duties is now imperative.

While Hartford did acknowledge—by July 11, 2008 letter--receipt of Angles' tender of the defense and settlement of the *Hair Art* Action, Hartford has yet to acknowledge its defense and settlement duties, or that it will attend the settlement conference as ordered.

By July 17, 2008 phone conference, I advised Hartford of the continued date for the settlement conference and implored Hartford to make a prompt claim determination. (I've enclosed a copy of my confirming email).

By July 30, 2008 phone conference, I renewed Angles' request for copies of Hartford's policies issued to Angles. You advised that you had a copy of Hartford's policy applicable to this claim, and that you would send me a copy by email. I have yet to receive a copy. (I've enclosed a copy of my July 30, 2008 email forwarding my email address to you, and my July 31, 2008 email confirming our conversation).

Angles requests Hartford's attendance and participation at the settlement conference. Angles will look to Hartford to fund any reasonable settlement amount within policy limits. Hartford has a duty to accept and fully fund any reasonable settlement offer made by HAI that is within policy limits, irrespective of actual coverage, as explained below. Failure to accept a reasonable offer, no matter how well intentioned, will expose Hartford to extra-contractual damages. It will be wholly responsible for any ensuing judgment covered under the policy regardless of its policy limits. Angles wants Hartford to be fully informed of these potential consequences and its settlement obligations so that it can proceed with the utmost of caution.

## I.    HARTFORD'S DUTY TO SETTLE

### A.    Hartford is Obligated to Accept and Fully Fund a Reasonable Settlement of the *Hair Art* Action Without Regard to Any Coverage Issues

Hartford owes four separate yet related obligations to its insured Angles. Hartford must defend Angles against potentially covered claims; [*Buss v. Superior Court*, 16 Cal. 4th 35, 49 (1997)] it must indemnify Angles for actually covered claims; [*Palmer v. Truck Insurance Exchange*, 21 Cal. 4th 1109, 1120, 90 Cal. Rptr. 2d 647, 656 (1999)] it must act in good faith at all times with Angles; [*Kransco v. American Empire Surplus Lines Ins.*, 23 Cal. 4th 390, 400 (2000)] and **it must accept any reasonable offer (within policy limits) to settle a potentially covered suit against Angles, irrespective of whether there is actual coverage**, or assume the risk of an excess judgment and all other damages resulting from its failure to settle [*Blue Ridge Ins. Co. v. Jacobsen*, 25 Cal. 4th 489, 498, 22 P.3d 313 (2001)].

An insurer's duty to settle does not typically appear in the policy. It is, however, born out of the combined effect of the insurer's express promise to defend and indemnify the insured [*Kransco*, 23 Cal. 4th at 401 ("A liability insurance policy's express promise to defend and indemnify the insured against injury claims implies a duty to settle third party claims in an

appropriate case.")] in combination with its implied promise of good faith and fair dealing. *Comunale v. Traders & General Ins. Co.*, 50 Cal. 2d 654, 658-59, 328 P.2d 198, 200-01 (1958). The relationship between the duty to settle and the duties of defense and indemnity is clear. In return for the payment of premiums, the insurer expressly promises to protect the insured against certain types of liability up to and including the policy's limit. Implicit in this promise is the insurer's obligation to take reasonable steps to protect the insured against negative consequences flowing from covered (or potentially covered) liability. This includes the obligation to accept a reasonable settlement offer within policy limits. As the California Supreme Court explained in *Commercial Union Assur. v. Safeway Stores, Inc.*, 26 Cal. 3d 912, 918, 164 Cal. Rptr. 709, 712 (1980):

> One of the most important benefits of a maximum limit insurance policy is the assurance that the company will provide the insured with defense and indemnification for the purpose of protecting him from liability. Accordingly, **the insured has the legitimate right to expect that the method of settlement within policy limits will be employed in order to give him such protection.**

(Emphasis added.)

The connection between Hartford's good faith obligations and its duty to settle is no less apparent. The covenant of good faith and fair dealing does not impose affirmative obligations on Hartford as much as it requires Hartford to fulfill its obligations in a way that is objectively reasonable and which appropriately reflects the unique and quasi-fiduciary relationship between an insurer and its insured. *Safeway*, 26 Cal. 3d at 918; *see also Vu v. Prudential Prop. & Cas. Ins. Co.*, 26 Cal. 4th 1142, 1150-51, 113 Cal. Rptr. 2d 70, 76-77 (2001) (recognizing "fiduciary like" relationship between insurer and insured). At minimum, good faith requires Hartford to give Angles' interests the same weight and consideration that it gives its own. *Shade Foods, Inc. v. Innovative Prods.*, 78 Cal. App. 4th 847, 908-09, 93 Cal. Rptr. 2d 364, 406-07 (2000). Where there is an opportunity to settle a suit seeking potentially covered damages within policy limits and the insured would likely face adverse consequences (excess judgment or otherwise) from its continuation, a good faith balancing of the insurer's and insured's interests requires the insurer to accept and fully fund the settlement. *Cathay Mortuary Inc. v. United Pacific Ins. Co.*, 582 F. Supp. 650, 658 (N.D. Cal. 1984).

It is critical to note that **the duty to settle cannot be equated with an insurer's obligation to indemnify the insured for a judgment.** Whereas questions of indemnity turn exclusively on what is (or is not) *actually* covered, **these considerations play no part in evaluating an insurer's settlement obligation.** *Johansen v. California State Auto. Ass'n*, 15 Cal. 3d 9, 16, 123 Cal. Rptr. 288, 292 (1975) (insurer cannot consider coverage issues in evaluating the reasonableness of a settlement opportunity); *Blue Ridge*, 25 Cal. 4th at 498 *citing Johansen*. As discussed above, the obligation to accept a reasonable settlement offer is a prophylactic safeguard designed to protect the insured against adverse consequences which *might* occur if the litigation continues. As such, analyzing whether a particular settlement offer is reasonable involves weighing the amount of the proposed settlement against the likelihood and extent of the adverse consequences sought to be avoided. Coverage is simply not part of the equation.

Correspondingly, any claim that Hartford owes no indemnity obligation because no claims are covered fails to recognize that potentially covered claims are at issue in settlement. Additionally, coverage issues such as allocation between covered and uncovered claims cannot be properly considered when evaluating and effectuating settlement of a suit against the insured. If the proposed settlement is reasonable, Hartford must agree to fund the entire amount. It cannot seek to allocate amongst the claims[2] and it cannot force the insured to contribute to the settlement. *Hamilton v. Maryland Cas. Co.*, 27 Cal. 4th 718, 731, 117 Cal. Rptr. 2d 318, 328 (2002) ("[I]nsurer potentially can be liable for unreasonably coercing an insured to contribute to a settlement fund, even though (by definition) there is no excess judgment where a case is settled."). There is also no authority allowing one insurer to refuse to settle unless a second insurer agrees to contribute toward the settlement. Hartford must meet its independent settlement obligations to Angles.

### B.  The Three-Part Test for an Insurer's Obligation to Settle

As noted, Hartford's broad obligation to settle claims brought against Angles runs to reasonable settlements. *Hamilton,* 27 Cal. 4th at 725 (insurer is liable if it fails to make a **reasonable** settlement). The question of reasonableness and the duty to settle depends on case-specific analysis which is driven by three distinct, yet related, elements:

> 1.  **First, the underlying suit must be *potentially* covered by the policy in question**

Since the duty to settle is derived from the insurer's implicit obligation to use good faith in fulfilling its contractual obligation to defend its insured in a third party lawsuit, the duty to defend is predicate to any settlement obligation. *Peerless Lighting Corp. v. American Motorists Ins. Co.*, 82 Cal. App. 4th 995, 1016, 98 Cal. Rptr. 2d 753, 766 (2000) ("no duty to defend the underlying action . . . no duty to settle it").

> 2.  **Second, the insured's exposure must be in excess of the settlement offer**

Some courts articulate the rule as requiring likely exposure in excess of policy limits. *See, e.g., Lehto v. Allstate Ins. Co.*, 31 Cal. App. 4th 60, 67, 36 Cal. Rptr. 2d 814, 817 (1994). The California Supreme Court, however, recently held that the duty to settle is triggered by the

---

[2]*Johansen*, 15 Cal. 3d at 10, 16, 19, 123 Cal. Rptr. at 289, 292 (an insurer must accept a reasonable settlement offer within policy limits regardless of doubts as to policy coverage; it is free to seek reimbursement from its insured of a settlement payment if it subsequently establishes noncoverage under its policy). Attempting to allocate between covered and uncovered claims and thereby refusing to pay the entire reasonable settlement amount would be a breach of this duty. *See also United States Fire Ins. Co. v. Green Bay Packaging, Inc.*, 66 F. Supp. 2d 987, 999 (E.D. Wis. 1999), a disparagement case holding that "where there is some evidence that some covered conduct was the basis for the damage award" the entire damage award is covered by the policy. If non-covered conduct and covered conduct together contribute to damages, all of the damages are covered unless it can be proven that the uncovered conduct "was the sole cause of the damages." *Id.*

**Exhibit "15"**

242

4 | P a g e

reasonable likelihood that the insured will be found liable for an amount in excess of the settlement offer. *Blue Ridge*, 25 Cal. 4th at 498.[3]

### 3.    Third, probable exposure in excess of the settlement offer

There must not only be *potential* excess exposure but *probable* exposure in excess of the settlement offer thus making the offer reasonable under the circumstances. *Id.* In other words, the amount of the settlement offer must make sense when comparing (1) the extent of the negative consequences that will be potentially suffered by the insured if the suit does not settle, and (2) the likelihood that these negative consequences will occur if the case continues. *Id.*

Since HAI has made a settlement offer that comes within the parameters of the three-part test triggering Hartford's duty to settle, Angles will look to Hartford to accept and fully fund the settlement.

### C.    The Three-Part Test for an Insurer's Obligation to Settle Is Satisfied by any Proposed Settlement Amount Within Limits

#### 1.    Element One, the "Potentially Covered" Element of the Duty to Settle Test, Is Met Because the *Hair Art* Action Is Potentially Covered Under Hartford's Policy

Because the duty to settle is derived, in part, from the duty to defend, an insurer is not obligated to settle a suit against its insured unless it also has an obligation to defend its insured in the same suit. The counterclaim includes the following allegations:

63.    HAI is the owner of several nationally-recognized trademarks, including but not limited to, the word mark "Hair Art" and the letter mark "HAI".

64.    HAI or its related companies or its predecessors in interest have used the Hair Art and HAI marks in commerce in the U.S. continuously for over 20 years in connection with hair-related products. * * *

66.    At all times relevant to the acts complained of herein, HAI or its related companies or predecessors in interest have used the HAI Marks to identify HAI's goods and services and to distinguish them from the goods and services made and sold or offered by other by, among other things, prominently displaying the marks on HAI's goods and on their containers, packaging and advertising.

67.    The presence of the HAI Marks on the containers, packaging and advertising for HAI's products indicates to the public that the goods or services bearing those marks have been manufactured and/or distributed by HAI. HAI

---

[3] "[T]he only permissible consideration in evaluating the reasonableness of a settlement offer . . . [is] whether, in light of the victim's injuries and the probable liability of the insured, the ultimate judgment is likely to exceed the amount of the **settlement offer**." (citation omitted; emphasis added).

**Exhibit "15"**

adheres to strict quality standards in the manufacture of its hair products. Thus, the consuming public has come to associate the HAI Marks with hair products of the highest quality. As a consequence, the HAI Marks have attained considerable value and the goodwill associated with them represents a valuable business asset.

68.    HAI is informed and believes, and based thereon it alleges, that the Counterdefendants are importing, selling, trafficking in, distributing and offering for sale in the United States hair-related products that are the same as, or are similar to, HAI's products and that Counterdefendants' are using marks for those goods that are identical to, or are confusingly similar to, the HAI Marks.

69.    HAI is informed and believes, and based thereon it alleges, that at the time Counterdefendants adopted their marks, they were familiar with HAI, with the HAI Marks, and with the quality of HAI's goods. HAI is further informed and it believes, and based thereon it alleges, that at the time they adopted their marks, Counterdefendant had actual notice of the '468 Registration and, by adopting their marks, Counterdefendants were attempting to usurp for themselves the goodwill that HAI had built up in the HAI Marks.

In the Prayer for Relief, HAI alleges:

7.    For an order permanently enjoining Countedefendants [sic] and their officers, agents, employees, and all those acting in concert or conspiracy with them from:

a.    Directly or indirectly manufacturing, producing, printing, distributing, importing, trafficking in, selling, offering for sale, possessing, advertising, promoting, moving or displaying any hair care products bearing the "Hair Art" or "HAI" marks or simulation, reproduction, counterfeit, copy of colorable imitation of those marks;

b.    Instructing or directing any third parties to make containers, labels or packaging bearing the "Hair Art" or "HAI" marks or any simulation, reproduction, counterfeit, copy or colorable imitation of those marks.

10.    For a monetary award in favor of Counterclaimant HAI's favor in an amount equal to (i) HAI's actual damages and (ii) to the extent not included in actual damages, the Counterdefendants' profits arising from the acts alleged above, such damages and profits to be trebled under 15 U.S.C. § 1117(a).

HAI filed a first amended counterclaim which includes substantially the same allegations. A copy is enclosed for your reference. The following responses evidence that the claim potentially falls within Hartford's "advertising injury" coverage:

Interrogatory No. 6

    Identify and describe all facts upon which You base Your sixth affirmative defense, that "Plaintiff is barred from recovery . . . due to unclean hands," and identify each Person with knowledge of one or more of these facts, and each document You contend supports one or more of these facts. . . .

Supplemental Response to Interrogatory No. 6

    HAI's sixth affirmative defense that Angles is barred from recovery due to unclean hands is based upon the well-established rule that he who seeks equity must do equity and upon the equally well-established rule that equity requires good faith. However, in this case, Angles is guilty of bad faith. The facts that establish Angles' bad faith contexts are as follows:

    On October 12, 1998, Angles filed U.S. trademark application no. 75/569,547 (the "'547 Application") with the U.S. Patent and Trademark Office ("PTO") stating that it had an intent to use the term "Hair Art and Information" as a trademark in interstate commerce in connection with hair care products and educational services regarding the care of hair.

    At the time the '547 Application was filed, HAI had a federal trademark registration (the "'468 Registration") for the "HAIRART" mark. Moreover, at the time the '547 Application was filed, HAI had been in business for over 14 years, during which time it had accumulated sales of at approximately $14,000,000. As a consequence of its longevity in the business and its extensive sales, HAI was a well-known supplier of hair-related products to beauty professionals. By 1998, Angles' principal, Richard Ouellette had been in the beauty business for over 30 years. Thus, it is exceedingly unlikely that he or Angles had never heard of HAI and/or the "HAIRART" mark at the time the '547 Application was filed and Adam Shuman has confirmed that Angles was aware of HAI's use of the "HAIRART" mark at the time it (Angles) commenced using the term "Hair Art and Information". Moreover, as a consequence of the '468 Registration, Angles had at least constructive notice of HAI's rights in and to the "HAIRART" mark.

    On April 26, 1999, the examiner to whom the '547 Application was assigned issued an office action stating, among other things, that the term "Hair Art and Information" was not registrable because it was likely to be confused with the "HAIRART" mark that was the subject of the '468 Registration. As a consequence of the April 26, 1999 office action, Angles had actual notice of HAI's rights in and to the "HAIRART" mark.

    On August 30, 1999, Angles filed U.S. trademark application no. 75/787,522 (the "'522 Application") stating that it had an intent to use the term "HAI" in stylized form as a trademark in interstate commerce in connection with educational services regarding the care of hair. The filing of the '522 Application

occurred over four months after the PTO refused to register the term "Hair Art and Information".

Angles has contended in filings with the PTO in connection with the '522 Application that it began using the mark "HAI" in January 1999. This contention is false. Angles did not use the term "HAI" by itself as a mark at any time between 1999 and 2005. Instead, it used a mark that consisted of the words "Hair Art and Information" emblazoned upon an oval that encircled the stylized letters "HAI' (the "Composite Mark"). The term "HAI" that Angles applied to register was a mutilation of the Composite Mark.

Angles first used the Composite Mark in connection with the giving of classes and demonstrations relating to the cutting of hair and in connection with the sale of videotapes depicting the cutting of hair. It did so no earlier that the middle of 1999. By this time HAI had been using the "HAIRART" and "HAI" marks for 15 and 5 years, respectively.

Even assuming that Angles began using the Composite Mark in January 1999, as it claims, its bad faith is inferrable from the fact that Angles had actual knowledge of HAI and its "HAIRART" mark at this time and from the further fact that, rather than adopt a mark that was completely different from HAI's mark, Angles adopted a mark that contained the entirety of HAI's registered mark for services that were related to the goods for which HAI's mark was registered. Even if Angles did not have actual notice of HAI and/or its "HAIRART" mark at this point in time, Angles had constructive notice of the '468 Registration and of HAI's prior rights in and to the term "HAIRART".

Angles' CEO, Richard Ouellette, has filed two fictitious business statements with the San Diego County Clerk's Office stating that Angles began conducting business under the name "Hair Art and Information" on October 25 or 26, 1999. In addition, Angles' first promotional materials for any product bearing the Composite Mark were printed in December 1999 or in January 2000. Thus, Angles' first use of the term "Hair Art and Information" as a business name occurred no earlier than October 25, 1999 and its first use of the Composite Mark in connection with the sale and promotion of hair styling tools occurred no earlier than January 2000. Is false contention that it commenced using "Hair Art and Information" and the Composite Mark in January 1999 is obvious evidence of bad faith.

Without regard to when Angles began using the "Hair Art and Information" name and/or Composite Mark, HAI and Angles each attended the same trade show in Long Beach in January 2000. It was at this trade show that HAI first learned that Angles had adopted and was using the term "Hair Art and Information" and the Composite Mark in connection with its business.

**Exhibit "15"**
**246**

8 | P a g e

As a consequence, HAI's attorney, James Brunton, sent Angles a letter dated February 23, 2000. In it, Mr. Brunton specifically informed Angles about the '468 Registration and about the confusion that had resulted at the trade show from Angles' adoption and use of a mark that was confusingly similar to the "HAIRART" mark.

Following its receipt of Mr. Burnton's letter of February 23, 2000, Angles continued to use the "Hair Art and Information" name and the Composite Mark. It did so even though it was aware of specific instances in which its use of its mark and its name had caused confusion. The fact that Angles continued to use the "Hair Art and Information" name and the Composite Mark despite the fact that it was aware of the confusion it was causing is evidence of bad faith.

On April 6, 2000, Angles' attorney, George Netter, called Mr. Brunton and stated that a response to Mr. Brunton's February 23, 2000 letter was forthcoming. However, no response was ever received. Therefore, on December 12, 2000, Mr. Brunton wrote another letter to Angles.

In response, Mr. Netter wrote Mr. Brunton a letter on December 19, 2000. In it, Mr. Netter contended, among other things, that Angles was not causing any confusion, that Angles was using the term "Hair Art and Information" in a descriptive sense, rather than a trademark sense, that HAI's "HAIRART" mark was descriptive or generic, and that, in any event, Angles was using the term "HAI" as a mark and not "Hair Art and Information". All of the foregoing statements were false.

The true facts were that Angles was well aware that its actions were causing confusion in the marketplace, that on July 31, 2000 Angles had filed a declaration with the PTO in support of the '547 Application which stated that Angles was making trademark use of the term "Hair Art and Information" and that Angles was not using the term "HAI" as a mark, but was instead using the Composite Mark. Moreover, Angles' contention that the term "HAIRART" was generic or descriptive was belied by the fact that Angles itself had filed the '547 Application seeking to register the term "Hair Art and Information" on the principal register.

The misrepresentations in Mr. Netter's letter of December 19, 2000 were known to Mr. Ouellette, who oversaw the preparation of the letter. His knowledge of these intentional misrepresentations is evidence of his and Angles' bad faith.

On February 1, 2001, Mr. Brunton sent a third letter to Angles through Mr. Netter. In it, Mr. Brunton described additional instances of confusion and again demanded that Angles stop infringing HAI's rights. Angles' continued use of the term "Hair Art and Information" and the Composite Mark in the face of this

third letter and its knowledge of these additional instances of confusion is further evidence of Ouellette's and Angles' bad faith.

On or about November 30, 2002, the PTO canceled HAI's '468 Registration. The cancellation was solely the result of the fact that HAI had inadvertently failed to file a declaration with the PTO (the "Section 8 Declaration") stating that it was still using the "HAIRART" mark. Notwithstanding its failure to file the Section 8 Declaration, HAI continued using the "HAIRART" mark in connection with the nationwide promotion and sale of its hair products.

On a date which is unknown to HAI, but which is believed to be around October 2003, Angles learned that the '468 Registration had been canceled. On December 3, 2003, Angles filed U.S. trademark application no. 78/337,311 (the "'311 Application") for the mark "HAIR ART". In support of the '311 Application, Ouellette submitted a declaration under penalty of perjury (i) that Angles had a bona fide intention to use the "HAIR ART" mark in commerce for the goods identified in the application, and (ii) that no other person had the right to use that term as a mark.

At the time Angles filed the '311 Application, it had no intention of ever using the term "HAIR ART" as a mark in connection with any goods or services. Moreover, at the time the '311 Application was filed, Angles knew that HAI was still using the term "HAIRART" as a trademark and that Angles' use was junior to HAI's use. Thus, the '311 Application is perjurious and fraudulent.

Angles' act of trying to obtain a federal registration for the term "HAIR ART" despite the fact that it had no intention of ever using that term as a mark and despite its knowledge that HAI had been using that term continuously for a period of over 20 years is evidence of bad faith.

On January 27, 2005, Angles commenced that instant action against HAI for, among other things, infringing its alleged rights in and to the "HAIR ART", HAIR ART AND INFORMATION" and "HAI" marks and for a judicial declaration that Angles is the owner of those marks and for an injunction preventing HAI from using any of those marks.

At the time Angles filed its complaint, it was aware that HAI was using the term "HAIRART" as a mark and that it had been doing so for over 20 years. Angles' actions in suing HAI for infringing a mark that Angles has never used and its attempt to obtain a judicial declaration that I owns a mark it has never used and has no intention of ever using and its attempt to enjoin HAI's use of a mark HAI has been using for over 20 years constitutes evidence of bad faith.

HAI's use of the "HAIRART" mark predates Angles' use of the "Hair Art and Information" name by at least fifteen years. Angles' deliberate and continued

use of that name over the past six years with knowledge of HAI's prior rights and with knowledge that its continued use was causing confusion in the marketplace constitutes powerful evidence of Angles' bad faith. The fact that Angles refused to stop using a name that incorporated the entirety of HAI's "HAIRART" mark despite the confusion it was causing also constitutes powerful evidence of bad faith.

HAI's use of the "HAIRART" mark predates Angles' use of the Composite Mark by at least five years. Angles' coupling of the term "HAI" with the term "Hair Art and Information" and its continued use of those terms in the Composite Mark over the past six years has been with knowledge of HAI's prior rights in the "HAIRART" mark and with knowledge that its continued use was causing confusion in the marketplace, which Angles has admitted. Angles' deliberate use of a mark that it admits is causing confusion constitutes powerful evidence of Angles' bad faith. The fact that Angles has refused to stop using the Composite Mark, which incorporates the entirety of HAI's "HAIRART" mark, despite the confusion it is causing also constitutes powerful evidence of bad faith.

Finally, the manner in which Angles' has conducted this litigation is also evidence of its bad faith. For example, Angles has continued to pursue claims that it has admitted were completely meritless when brought, obstructed the gathering of evidence by taking possession of, and withholding, relevant documents subpoenaed from third parties, filed declarations that are false on their face and noticed the depositions of witnesses so as to maximize the inconvenience to them.

Interrogatory No. 13

Identify and describe in detail the factual basis for Your damages claim in this action. Include the identity of every person with knowledge of this claim and the facts underlying Your claim, every communication relating to this claim and the facts underlying Your claim, as well as every document relating to this claim and the facts underlying Your claim. . . .

Supplemental Response to Interrogatory No. 13

HAI's damages claim in this case is based upon the following facts:

As between HAI and Angles, HAI is the senior user and owner of the "HAIRART" and "HAI" marks. HAI's rights in those marks are superior to any rights that Angles might have in the term "Hair Art and Information" and/or the Composite Mark. The facts relating to HAI's senior rights in the marks at issue, the people who are aware of those facts and the documents demonstrating those facts, are set forth in detail in HAI's pending motion for partial summary judgment on the parties' respective infringement claims.

**Exhibit "15"**

Angles has used the term "Hair Art and Information" and the Composite Mark in a variety of ways and in a variety of media. For example, Angles has used the term "Hair Art and Information" as a trade name and it has used that term as part of the Composite Mark. It has also physically affixed that term and the Composite Mark to its products and to numerous types of advertisement and promotional materials which it has widely disseminated, including invoices, receipts, purchase orders, business cards, product warranty cards, post cards, posters, one-page flyers, magazine advertisements, Internet websites and product packaging, including boxes.

Angles' advertising and promotion of itself under its trade name and of its products under the Composite Mark, has caused massive confusion in the marketplace, which Angles has admitted. This confusion has harmed HAI in various ways.

For example, some members of the public have labeled HAI and Jackie Yu as "infringers" because they believe, wrongly, that HAI is a junior user that is infringing the alleged rights of Angles in and to the term "Hair Art and Information" and the Composite Mark. Angles itself has reinforced the belief that HAI is an infringer by making untrue representations at trade show that HAI and Yu are using Angles' name and marks, when, in fact, the opposite is true. Being wrongly labeled as an "infringer" is damaging to HAI's business and its reputation and to Yu's reputation.

In addition, as a consequence of the fact that Angles used the "Hair Art and Information" name and the Composite Mark, at least on long-standing HAI customer, i.e., Sally Beauty, the largest retail seller of beauty products in the United States, cut back its purchases of products from HAI because its buyers wrongly believed that HAI, which sells at the wholesale level, was competing with Sally Beauty at the retail level. This belief was caused by the fact that Angles was selling products at the retail level under the "Hair Art and Information" name and the Composite Mark. This confused Sally Beauty's buyers into thinking that the products in question originated with HAI.

Moreover, as Camillo Schuchardt testified, at some point between 2001 and 2003, Angles imported and distributed a hair pressing iron that had a very high failure rate. The Composite Mark was affixed to both the iron and the box in which this particular iron was packaged. However, neither the iron nor the box contained Angles' corporate name or its address. Since Angles failed to affix its name and/or address to the box or the irons in question, a substantial number of persons thought that the irons originated with, or were associated with, HAI and when the irons failed, it caused these persons to think that HAI made poor quality products. This injured HAI's business reputation.

Finally, as a consequence of the confusion Angles has caused in the marketplace, some prospective customers have dealt with, and purchased form, Angles believing they were dealing with, and purchasing from, HAI.

HAI believes that Angles and its CEO, Ouellette, were fully aware of HAI's rights in the term "Hair Art" when Angles commenced using the term "Hair Art and Information" and the Composite Mark. Even if they were not aware of HAI's rights from the time Angles first commenced using those terms, however, Angles became aware of those rights by February, 2000, at the very latest.

Without regard to when Angles and Ouellette first learned of HAI's rights, Angles infringed HAI's rights by using the term "Hair Art and Information" and the Composite Mark for a period of nearly 6 years despite the fact that it was aware that such use was causing confusion in the marketplace and despite the fact that HAI had asked it to stop.

As a consequence of the foregoing, at trial, HAI will seek damages from Angles in the form of (i) the amount by which Sally Beauty's purchases from HAI declined, (ii) an award of the profits Angles earned as a consequence of its infringing activities, (iii) a reasonable amount to enable HAI to conduct corrective advertising to remedy the confusion Angles has caused in the marketplace, (iv) treble damages as a consequence of Angles' willful infringement, (v) damages to HAI's reputation, (vi) punitive damages as a consequence of Angles' conscious disregard of HAI's rights in and to the marks in question, (vii) attorneys' fees, and (viii) costs.

The amount by which Sally Beauty's purchases from HAI declined may be ascertained by conducting an arithmetic computation form the chart summarizing HAI's annual sales to Sally Beauty, as set forth in the Bates n. HAI 2420.

The amount by which Angles was unjustly enriched as a consequence of its infringing activities and the reasonable amount to enable HAI to conduct corrective advertising to remedy the confusion Angles has caused in the marketplace are set forth in the expert report of Dr. Alan Goedde.

The amount of enhanced damages as a consequence of Angles' willful infringement will be determined by the trier of fact, as will damages to HAI's reputation and punitive damages.

Persons with knowledge of HAI's damages in this case include Jackie Yu, Tom Donahue, Alan Goedde, Camillo Schuchardt, Ms. Connie Ouellette, Kimberly Swelgin and Richard Ouellette.

---

**Exhibit "15"**

The allegations and discovery responses show that HAI is asserting claims against Angles that are potentially covered under Hartford's policy. Angles allegedly misappropriated HAI's advertising idea in the marks at issue. In *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group*, 50 Cal. App. 4th 548, 557 (1996), the court explained that a trademark is but a species of advertising in finding that a defense was owed in a trademark infringement case.

HAI's fourth claim for relieve is for "Common Law Unfair Competition". As a result, HAI contends that regardless of whether Angles' use of the alleged marks infringe HAI's trademark rights, or whether HAI has trademark rights at all, Angles' use of the alleged marks constitutes common law unfair competition under California law:

> The common law tort of unfair competition is generally thought to be synonymous with the act of "passing off" one's goods as those of another. The tort developed as an equitable remedy against the wrongful exploitation of trade names and common law trademarks that were not otherwise entitled to legal protection. (See generally 1 Callmann, Unfair Competition, Trademarks & Monopolies (4th ed. 1981) §§ 2.01-2.03.) According to some authorities, the tort also includes acts analogous to "passing off," such as the sale of confusingly similar products, by which a person exploits a competitor's reputation in the market.

*Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1263 (1992).

And if Angles use of the alleged marks constitutes common law unfair competition in the form of "passing off" under California law, HAI's alleged marks are within the meaning of the phrase "use of another's advertising idea" under California case law discussing the meaning of the phrase "advertising idea" as used in a general liability policy.

> Similarly while the misappropriation of an "advertising idea" certainly would include the theft of an advertising plan from its creator without payment it is also reasonable to apply it to wrongful taking of the manner or means by which another advertises its goods or services.

The court in *Lebas*, 50 Cal. App. 4th at 562 analyzed the meaning of the offense "misappropriation of advertising ideas". In contrast, the "use of another's advertising idea" offense does not require "misappropriation", which the Lebas court concluded meant "theft" or "wrongful taking." Instead, the offense merely requires "use" of an "advertising idea." Regardless of whether HAI has legitimate, superior trademark rights, HAI is claiming that Angles is using the manner or means that HAI advertises its goods, and that that use constitutes unfair competition.

The question of potential coverage (in connection with the duty to settle) relates solely to the issue of whether the insurer has any settlement obligations in the first instance, not whether the insurer is obligated to accept a particular settlement offer. Once the foundational issue of potential coverage for the suit has been established, the question of whether a settlement offer is reasonable must be resolved strictly through an evaluation of the potential harm that may befall

the insured if the suit is allowed to continue. Coverage issues are simply not part of this equation. *Peerless Lighting Corp. v. American Motorists Ins. Co.*, 82 Cal. App. 4th at 1016, 98 Cal. Rptr. 2d at 766 ("[I]n determining whether a settlement offer is reasonable, an insurer may not consider the issue of coverage.").

> **2.  Element Two, "Potential Liability in Excess of Settlement Offer or Policy Limits," Is Met Because Angles' Exposure Exceeds Hartford's Policy Limits**

Because coverage is not part of the reasonableness determination, **the question of whether Angles faces excess exposure turns** not on covered liability or even potentially covered liability, but rather **on the overall exposure potentially faced by Angles in the *Hair Art* Action.** *Id.* As long as Angles' exposure is in excess of a particular settlement offer or the policy limits, Hartford is obligated to fund the entire settlement absent other circumstances which render the settlement unreasonable.[4]

Angles' exposure in the *Hair Art* Action is well in excess of Hartford's $1 million policy limits. HAI's August 1, 2008 settlement demand is in the amount of $          In short, Angles has a lot to lose in the *Hair Art* Action and certainly more than the limits of insurance. Hartford must consider this when evaluating any proposed "within limits" offer that HAI might make at the settlement conference.

> **3.  Element Three, "Likelihood that Judgment Will Exceed Amount of Settlement Offer," Dictates that Hartford Accept any Proposed Settlement Within Its Policy Limits**

The reasonableness of a settlement is not solely a function of the possibility that the insured will have excess liability or will suffer adverse consequences if the suit is allowed to continue. Properly assessing reasonableness also requires an evaluation of the probability that these negative consequences will occur. *Blue Ridge*, 25 Cal. 4th at 498 (emphasis added):

> In *Johansen*, we held an insurer that fails to accept a reasonable settlement offer within the policy limits because it does not believe the policy provides coverage, assumes the risk it will be held liable for all resulting damages including a judgment that exceeds the policy limits. (*Id.* at pp. 12, 15.) We further concluded that in determining whether a settlement offer is reasonable, an insurer may not consider the issue of coverage. (*Id.* at p. 16.) **Rather "the only permissible consideration in evaluating the reasonableness of the settlement offer . . . [is] whether, in light of the victim's injuries and the probable liability of the**

---

[4] *Camelot by the Bay Condominium Owners' Ass'n, Inc. v. Scottsdale Ins. Co.*, 27 Cal. App.4th 33, 48, 32 Cal. Rptr. 2d 354, 362 (1994) ("[T]here is no explicit requirement for bad faith liability that an excess judgment is actually suffered by the insured, since the reasonableness analysis of settlement decisions is performed in terms of the probability or risk that such a judgment may be forthcoming in the future.").

> insured, the ultimate judgment is likely to exceed the amount
> of the settlement offer."

Stated in mathematical terms, a reasonable settlement (*RS*) is one that is less than or equal to the product of exposure (*E*) times likelihood of liability (*L*) (*RS* ≤ *E* \* *L*). *Miller v. Elite Ins. Co.*, 100 Cal. App. 3d 739, 757, 161 Cal. Rptr. 322, 332 (1980) (emphasis added):

> Elite's claim manager, Ryan, assessed the damages at $11,000 and
> he estimated that Miller's liability was a 50 percent certainty. In
> evaluating the claim against Miller, therefore, Ryan considered that
> the liability would be $5,500, or in excess of the policy limits. **The
> settlement demand of $5,000 was within policy limits and was
> reasonable as a matter of law where the damages sought would
> nearly double the amount of the policy limit.**

*See also Isaacson v. California Ins. Guar. Ass'n*, 44 Cal. 3d 775, 794, 244 Cal. Rptr. 655, 668 (1988) (Where "maximum exposure of $750,000 was a 50 percent possibility . . . [the insurer] failed to accept a reasonable settlement offer when it rejected [the injured party's] $500,000 settlement demand, and instead paid $400,000.").

Here, Angles' exposure is between ⸱          ⸱ and $        ). Even assuming HAI has a very low likelihood of proving Angles's liability, 25%, a settlement between ⸱ and ⸱          [5] is reasonable as a matter of law under the formula, not even considering the cost of defense. Angles will look to Hartford to fund any settlement.

**D.    Consequences of Hartford Failing to Authorize a Reasonable Settlement:
Waiver of Policy Limits**

Failing to authorize a reasonable settlement within limits will constitute a breach of the implied covenant of good faith and fair dealing and thus eradicate Hartford's policy limits. Hartford will become liable for all of Angles' damages proximately caused by the breach, including any excess judgment. *Hamilton*, 27 Cal. 4th at 725. It will be responsible to pay the entirety of any such judgment against Angles regardless of policy limits. *Id.*; *see also Wolkowitz v. Redland Ins. Co.*, 112 Cal. App. 4th 154, 162 (2003).

The California Supreme Court in *Johansen*, 15 Cal. 3d at 15-16, summarized these principles. It also clarified that an insurer is liable for an excess judgment even if its denial of coverage is well reasoned and in good faith, but just wrong.

> An insurer who denies coverage does so at its own risk, and, although its position
> may not have been entirely groundless, if the denial is found to be wrongful it is
> liable for the full amount which will compensate the insured for all the detriment
> caused by the insurer's breach of the express and implied obligations of the
> contract. . . [A]n insurer's 'good faith," though erroneous belief in noncoverage

_____
5.

affords no defense to liability flowing from the insurer's refusal to accept a reasonable settlement offer.

Should Hartford refuse to accept any reasonable settlement offer proposed by HAI, no matter how good Hartford's intentions, it will be wholly responsible for any ensuing judgment covered under the policy regardless of its $1 million policy limits.

## II.    CONCLUSION

Hartford has an obligation to accept and fully fund any reasonable settlement of the *Hair Art* Action within policy limits since there is a potential for coverage. Accordingly, Angles requests Hartford immediately: (1) acknowledge its defense and settlement obligation; (2) attend the August 13, 2008 settlement conference as ordered; and (3) provide a copy of the applicable policies by email as promised.

Angles looks forward to Hartford's positive response.

Very truly yours,

Eric R. Little

ERL/NTK

(Enclosures: Hair Art's August 1, 2008 Settlement Demand Letter; July 31, 2008 email; July 30, 2008 email; and July 17, 2008 email )

Cc:    Richard Ouellette (via e-mail)
       Andrew Skale, Esq. (via e-mail)
       Ben Wagner, Esq. (via e-mail)

SHELDON MAK ROSE & ANDERSON
A PROFESSIONAL CORPORATION
ATTORNEYS
100 EAST CORSON STREET, THIRD FLOOR
PASADENA, CALIFORNIA 91103-3842
FACSIMILE: (626) 795-6321
HOME PAGE: www.usip.com
(626) 796-4000

JEFFREY G. SHELDON
DANTON K. MAK
DENTON L. ANDERSON
DAVID A. FARAH, M.D.
DOUGLAS H. MORSEBURG
ROBERT J. ROSE
WILLIAM J. BRUTOCAO
DANIEL J. COPLAN
KRISTIN C. HIBNER, PH.D.
MARC A. KARISH
MICHAEL F. FEDRICK
A. ERIC BJORGUM
NORMAN VAN TREECK
MARGARET A. CHURCHILL, PH.D.
LISA FREDRICKSON, PH.D.

OTHER CALIFORNIA OFFICES:

RIVERSIDE
UPLAND
VENTURA COUNTY

ROBERT A. SCHROEDER
OF COUNSEL

LEE J WEINSTEIN
SENIOR COUNSEL

WRITER'S DIRECT DIAL
626.356.1217

WRITER'S EMAIL
DOUGLAS.MORSEBURG@SMRALAW.C

August 1, 2008

**CONFIDENTIAL SETTLEMENT COMMUNICATION WITHIN
THE MEANING OF FEDERAL RULE OF EVIDENCE 408,
<u>CALIFORNIA EVIDENCE CODE § 1152 AND ALL SIMILAR STATE STATUTES</u>**

<u>VIA PDF AND U.S. MAIL</u>

Andrew D. Skale, Esq.
Mintz Levin Cohn Ferris Glovsky and Popeo P.C.
3580 Carmel Mountain Road, Suite 300
San Diego, California 92130

     Re:    Angles BeautyCare Group, Inc. v. Hair Art Int'l, Inc., et al.
           USDC Case No. 05 CV 0166 JAH (CAB)
           SMRA File No. 15848.22

Dear Mr. Skale:

    Thank you for meeting with us last month to discuss settlement of the above matter. With all due respect, for the reasons set forth below, I believe you and your client should reconsider your settlement position.

Exhibit "15"
256

Andrew D. Skale, Esq.
Mintz Levin Cohn Ferris Glovsky and Popeo P.C.
August 1, 2008
Page 2

Andrew D. Skale, Esq.
Mintz Levin Cohn Ferris Glovsky and Popeo P.C.
August 1, 2008
Page 3

**Exhibit "15"**
**258**

Andrew D. Skale, Esq.
Mintz Levin Cohn Ferris Glovsky and Popeo P.C.
August 1, 2008
Page 4

Andrew D. Skale, Esq.
Mintz Levin Cohn Ferris Glovsky and Popeo P.C.
August 1, 2008
Page 5

Andrew D. Skale, Esq.
Mintz Levin Cohn Ferris Glovsky and Popeo P.C.
August 1, 2008
Page 6

Andrew D. Skale, Esq.
Mintz Levin Cohn Ferris Glovsky and Popeo P.C.
August 1, 2008
Page 7

Andrew D. Skale, Esq.
Mintz Levin Cohn Ferris Glovsky and Popeo P.C.
August 1, 2008
Page 8

intended for Angeles and likewise, had sent to Angeles badges intended for Univ Art. At the trade

Exhibit "15"
263

Andrew D. Skale, Esq.
Mintz Levin Cohn Ferris Glovsky and Popeo P.C.
August 1, 2008
Page 9

In sum, at trial, Angles' laches defense will fail because (i) it cannot claim prejudice, (ii) its

Andrew D. Skale, Esq.
Mintz Levin Cohn Ferris Glovsky and Popeo P.C.
August 1, 2008
Page 10

Andrew D. Skale, Esq.
Mintz Levin Cohn Ferris Glovsky and Popeo P.C.
August 1, 2008
Page 11

Andrew D. Skale, Esq.
Mintz Levin Cohn Ferris Glovsky and Popeo P.C.
August 1, 2008
Page 12

The motion was granted and these claims were dismissed, which was handled over this point

I look forward to your response.

Very truly yours,

Douglas H. Morseburg

DHM\cs
Enclosure, as stated

cc:    Jackie Yu

84 Letter to Skale 080108

**Exhibit "15"**
**267**



**Exhibit "15"**

Exh. "A"

**Eric R. Little**

| | |
|---|---|
| **From:** | Eric R. Little |
| **Sent:** | Thursday, July 17, 2008 11:07 AM |
| **To:** | 'jason.beach@thehartford.com' |
| **Cc:** | Catherine Reid |
| **Subject:** | Angles adv. HAI (Hartford Claim No. GL7977890) |
| **Attachments:** | 2008_7.14.08 Order Setting Settlement Conference.pdf |

Jason,

Thank you for taking my call today. As I mentioned, Magistrate Bencivengo has continued the settlement conference from Tuesday, July 22 to Tuesday, August 13. The magistrate's order notes that the attendance of "claims adjusters for insured defendants" is required pursuant to her order and local rule.

During our call, you mentioned that I should receive in the mail a letter from Hartford, reserving its rights while it investigates this claim. With the settlement conference rapidly approaching, your efforts to ensure a rapid determination of this claim by Hartford is greatly appreciated.

Since this is the first time I've emailed you, would you send me a return email confirming that you've received my email?

Should you have any questions, please contact me.

-Eric

Eric R. Little, Esq.
**Little Reid & Karzai, LLP**
3333 Michelson Drive, Suite 310
Irvine, CA 92612
mobile: (949) 677-6409
phone: (949) 333-1699
fax: (949) 333-1697
email: erl@lrkllp.com
web: www.lrkllp.com

**Exhibit "15"**
**269**

Case 3:05-cv-00166-JAH-CAB    Document 115    Filed 07/14/2008    Page 1 of 1

## MINUTES OF THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

Case Name:    **Angles Beauty Care Group, Inc. v. Hair Art, Inc.**    Case Number:    **05cv0166-JAH (CAB)**

Hon. Cathy Ann Bencivengo    Ct. Deputy Lori Hernandez    Rptr. Tape:

At the request of the parties, a Settlement Conference shall be held on **August 13, 2008**, at **10:00 a.m.** Counsel shall submit **confidential** settlement statements **directly to chambers** no later than **August 6, 2008**. Each party's settlement statement shall set forth the party's statement of the case, identify controlling legal issues, concisely set out issues of liability and damages, and shall set forth the party's settlement position, including the last offer or demand made by that party, and a separate statement of the offer or demand the party is prepared to make at the settlement conference. **Settlement conference briefs shall not be filed with the Clerk of the Court, nor shall they be served on opposing counsel.**

Pursuant to Local Civil Rule 16.3, all party representatives and claims adjusters for insured defendants with full and unlimited authority[1] to negotiate and enter into a binding settlement, as well as the principal attorney(s) responsible for the litigation, **must be present** and legally and factually prepared to discuss and resolve the case at the settlement conference. Retained outside corporate counsel shall not appear on behalf of a corporation as the party who has the authority to negotiate and enter into a settlement. Failure to attend the conference or obtain proper excuse will be considered grounds for sanctions.

Date:    July 12, 2008

Initials: MA

---

[1]  "Full authority to settle" means that the individuals at the settlement conference must be authorized to fully explore settlement options and to agree at that time to any settlement terms acceptable to the parties. Heileman Brewing Co., Inc. v. Joseph Oat Corp., 871 F.2d 648 (7th Cir. 1989). The person needs to have "unfettered discretion and authority" to change the settlement position of a party. Pitman v. Brinker Intl., Inc., 216 F.R.D. 481, 485-486 (D. Ariz. 2003). The purpose of requiring a person with unlimited settlement authority to attend the conference is that the person's view of the case may be altered during the face to face conference. Id. at 486. A limited or a sum certain authority is not adequate. Nick v. Morgan's Foods, Inc., 270 F.3d 590 (8th Cir. 2001).

Exhibit 15
270

## Eric R. Little

**From:**    Eric R. Little
**Sent:**    Wednesday, July 30, 2008 11:44 AM
**To:**      'jason.beach@thehartford.com'
**Subject:** Contact Info

Eric R. Little, Esq.
**Little Reid & Karzai, LLP**
3333 Michelson Drive, Suite 310
Irvine, CA 92612
mobile: (949) 677-6409
phone: (949) 333-1699
fax: (949) 333-1697
email: erl@lrkllp.com
web: www.lrkllp.com

**Exhibit "15"**
**271**

**Eric R. Little**

| | |
|---|---|
| **From:** | Eric R. Little |
| **Sent:** | Thursday, July 31, 2008 1:30 PM |
| **To:** | 'jason.beach@thehartford.com' |
| **Subject:** | Angles adv. HAI (Hartford Claim No. GL7977890) |

Jason,

When we talked yesterday, you thought that you'd be able to send me an email copy of the Hartford policy that afternoon. Since I have not received the policy, I'm following up today.

Also, our server capacity per email is 5mb, which I understand is standard. So if your attachment is more than 5mb, please break up the attachment into smaller documents and send them attached to separate emails.

Thank you.

-Eric

Eric R. Little, Esq.
**Little Reid & Karzai, LLP**
3333 Michelson Drive, Suite 310
Irvine, CA 92612
mobile: (949) 677-6409
phone: (949) 333-1699
fax: (949) 333-1697
email: erl@lrkllp.com
web: www.lrkllp.com

**Exhibit "15"**
**272**

# LITTLE REID & KARZAI
——LLP——
## ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 ● F: (949) 333-1697
www.lrkllp.com

## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: | FROM: |
| Jason Beach | Eric R. Little, Esq. |
| COMPANY: | DATE: |
| Hartford Casualty Insurance | 8/4/2008 |
| FAX NUMBER: | TOTAL NO. OF PAGES, INCLUDING COVER: |
| 866.809.9793 | 35 |
| SENDER'S REFERENCE: | |
| Angles Beauty Care Group, Inc. | |
| RE: | |
| Insurance Claim | |

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

**CONFIDENTIALITY NOTICE:** THIS FAX IS PRIVILEGED AND CONFIDENTIAL AND IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED. THE TERM "PRIVILEGED" AND "CONFIDENTIAL" INCLUDES ATTORNEY-CLIENT COMMUNICATIONS, ATTORNEY WORK PRODUCT, TRADE SECRETS AND OTHER PROPRIETARY INFORMATION. NOTHING HEREIN IS INTENDED TO CONSTITUTE A WAIVER OF THE CONFIDENTIALITY OF THIS FAX; IF YOU ARE NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING IS PROHIBITED. IF YOU HAVE RECEIVED THIS FAX IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND DESTROY THE ORIGINAL FAX. THANK YOU.

Exhibit "15"
273

P. 01

# TRANSACTION REPORT

AUG−04−2008 MON 03:13 PM

TX (MEMORY)

| # | DATE | START TM | RECEIVER | COM TIME | PGS | TYPE/NOTE | DEPT | FILE |
|---|------|----------|----------|----------|-----|-----------|------|------|
| 1 | AUG−04 | 03:00 PM | 18068099793 | 0:12:44 | 35 | ECM    OK | | 144 |
| | | | TOTAL | 0:12:44 | 35 | | | |

**EXHIBIT 16**



# LITTLE REID & KARZAI
——LLP——
### ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

Eric R. Little, Esq.
erl@lrkllp.com

August 4, 2008

**VIA E-MAIL & OVERNIGHT MAIL**

Rosie Partida
General Liability Claims
St. Paul Travelers
Fidelity & Guaranty Insurance Company
333 City Blvd. W. Suite 1100
Orange, CA 92868

> **Re:**    *Angles Beauty Care Group, Inc. v. Hair Art International, Inc.*
> **United States District Court, Southern District of California, Case No. 05 CV
> 0166 JAH ("*Hair Art*" Action)**
>
> **Your Insured:**    Angles Beauty Care Group, Inc. ("Angles")
> **Your Policy:**    967X8612 [10/31/2004-10/31/2005]
> **Your Claim Nos.:**    MR121101; ABM4957

Dear Ms. Partida:

I enclose a copy of plaintiff Hair Art International, Inc.'s ("HAI") August 1, 2008 confidential settlement demand letter. As can be seen from the settlement demand letter, HAI explicitly seeks damages within Travelers' "personal injury" coverage as set forth in my letters of July 3rd and 9th, 2008.

Simply, Travelers has an obligation to accept and fully fund any reasonable settlement of the *Hair Art* Action within policy limits where there is a potential for coverage. HAI's current settlement demand is reasonable and within policy limits. And the *Hair Art* Action is potentially covered under Travelers' policy.

As a result, Angles requests that Travelers immediately: (1) acknowledge its defense and settlement obligation; and (2) attend the August 13, 2008 settlement conference as ordered.

Exhibit "16"

Angles looks forward to Travelers' positive response.

Very truly yours,

Eric R. Little

ERL/bh
(Enclosure)
Cc:    Richard Ouellette (via e-mail w/ enclosure)
       Andrew Skale, Esq. (via e-mail w/ enclosure)
       Ben Wagner, Esq. (via e-mail w/enclosure)


**TRAVELERS**

215 Shuman Blvd., Suite 106
Naperville, IL 60563
Tel: (630) 961-8673
Fax: (877) 816-4731

**Sharon L. Rice, Counsel**
**Central Coverage Advice Group**
Direct Line: (630) 961-8673
e-mail: slrice@travelers.com

August 6, 2008

_**Via E-Mail and United States Mail**_

Eric R. Little, Esq.
Little Reid & Karzai, LLP
3333 Michelson Drive
Suite 310
Irvine, CA 92612

Re:    _Angles Beauty Care Group, Inc. v. Hair Art International, Inc._
       Case No. 05 CV 0166
       Insured:     Angles Beauty Group, Inc.
       Claimant:   Hair Art International, Inc.
       Claim No.:  ABM4957

Dear Mr. Little:

As coverage counsel for Travelers, I have been asked to review your letter to John Harrison dated July 9, 2008. I have also reviewed the pleadings and interrogatory answers you provided, as well as the Travelers Indemnity Company of Connecticut ("Travelers") policies issued to the insured, Angles Beauty Group, Inc. ("Angles Beauty"). I must respectfully advise that the Travelers policies do not provide any coverage for this lawsuit and Travelers, therefore, will not participate in the defense of this action and will not attend the scheduled mediation. The counterclaim does not allege any potentially covered claim. Your correspondence states that in interrogatory answers, the counterclaimant, Hair Art International, Inc. ("Hair Art"), has asserted that Angles Beauty either defamed or disparaged Hair Art. Extrinsic evidence is sufficient to compel a duty to defend, however, _only_ when the evidence pertains to claims actually asserted by the third party. The counterclaim does not seek recovery for defamation or disparagement and does not contain any factual allegations of defamation or disparagement. Speculation that the Hair Art _could_ have pled defamation or disparagement or might at some unspecified future date amend the counterclaim to allege defamation or disparagement is not sufficient to trigger coverage under the Travelers policies.

The First Amended Counterclaim alleges Hair Art is the owner of several nationally-recognized trademarks, including, but not limited to, the word mark "Hair Art" and the letter mark "HAI." The counterclaim also asserts Hair Art owns a federal trademark registration for the "Hair Art"

Mr. Eric R. Little, Esq.
August 6, 2008
Page 2 of 6

mark. The counterclaimant states consumers have come to associate the Hair Art marks with products of the highest quality and as a consequence, the marks have attained considerable value and good will and represent a valuable business asset.

Hair Art further alleges that Angles Beauty is importing, selling, trafficking in, distributing, and offering for sale hair-related products that are the same as or similar to Hair Art's products and that Angles Beauty is using marks identical to or confusingly similar to Hair Art's marks. Moreover, Hair Art contends that at the time Angles Beauty adopted the marks, Angles Beauty was familiar with Hair Art's marks, the quality of Hair Art's products, and the trademark registration, and that by adopting similar marks, Angles Beauty was attempting to usurp for themselves the good will Hair Art had built up in the Hair Art marks.

The first claim for relief is for false designation of origin in violation of 15 U.S.C. §1125(a). The second claim for relief alleges common law trademark infringement. The third claim for relief alleges unfair competition in violation of Cal. Bus. & Prof. Code §17200. The fourth claim for relief alleges common law unfair competition. The fifth claim for relief seeks cancellation of an Angles Beauty trademark registration for "HAI Plus Design." The sixth claim for relief requests a judicial declaration with respect to whether Hair Art has infringed any valid trademark of Angles, unfairly competed with Angles, or interfered with Angles' contractual rights and/or economic advantages. The counterclaimant requests declaratory relief, injunctive relief, compensatory damages, attorneys' fees, and exemplary damages.

Please refer to Travelers policies, number 967X8612, in effect for the periods February 7, 2003 to February 7, 2004; February 7, 2004 to February 7, 2005; and February 7, 2005 to February 7, 2006. Coverage A in the commercial general liability ("CGL") section of these policies provides coverage for "bodily injury" or "property damage" caused by an "occurrence" if such "bodily injury" or "property damage" occurs during the policy period. "Property Damage" is defined as physical injury to tangible property, including loss of use of that property, or the loss of use of tangible property not physically injured. "Occurrence" is defined as an "accident." The counterclaim does not allege "bodily injury," "property damage," or an "occurrence."

Each of the policies contains a Web Xtend endorsement that deletes and replaces Coverage B in the CGL form. This endorsement states that Travelers will pay those sums the insured is obligated to pay as damages because of "personal injury," "advertising injury," or "web site injury" to which the insurance applies. The endorsement applies to "advertising injury" caused by an offense committed in the course of advertising. "Advertising injury" is defined as injury arising out of one or more of the following offenses:

a.  Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b.  Oral, written or electronic publication of material that violates a person's right of privacy;

Mr. Eric R. Little, Esq.
August 6, 2008
Page 3 of 6

     c.      Infringement of copyright, title or slogan.

The California courts have held that "copyright, title or slogan" does not include trademarks and that suits for trademark infringement do not fall within a CGL policy's coverage for "advertising injury." *Palmer v. Truck Insurance Exchange,* 21 Cal. 4th 1109, 988 P.2d 568 (1999); and, *Aloha Pacific, Inc. v. California Insurance Guarantee Association,* 79 Cal.App.4th 297, 93 Cal.Rptr.2d 148 (2000). Instead, "title" refers only to the name of a literary or artistic work. *Id.* Those cases further state that "slogan" means a brief attention-getting phrase and does not include product names. *Aloha Pacific,* 79 Cal.App.4th at 317, 93 Cal.Rptr.2d at 161 (Product names "Rusty's Island Chips" and "Island Chips" were not slogans for purposes of advertising injury coverage).

The counterclaim, therefore, does not allege any potentially covered advertising injury claim. Your letter, however, states that the counterclaimant's answers to interrogatories suggest the counterclaimant may have an unpled claim for defamation or disparagement and that such a claim could be covered "personal injury" or "advertising injury." In particular, in response to an interrogatory asking "Explain in detail all facts upon which You base Your contention that Richard Ouellette slandered You personally," Hair Art answered:

> Richard Ouellette attended a trade show a couple of years ago in his capacity as Angles CEO for the purpose of attracting new customers and increasing the sales of Angles' products and services. Tom Donahue, an independent sales representative from Donahue & Associates in Texas, attended the same show. Mr. Ouellette engaged in conversation with Mr. Donahue. When Mr. Ouellette learned, among other things, that Mr. Donahue represented HAI and Jackie Yu, Mr. Ouellette stated words to the effect that he was having trouble with HAI and/or Yu because they were using Angles' name. Mr. Ouellette's statement was false and Mr. Donahue understood it as an accusation that HAI and Yu were trademark infringers and, thus, engaged in unethical business practices.

> HAI believes that Mr. Ouellette's comment was not an isolated occurrence and that he and other Angles' employees, such as Camillo Schuchardt, made similar comments to other persons on other occasions.

Neither the interrogatory nor your letter explains where counterclaimant's contention that Richard Ouellette slandered Hair Art appears. Certainly the counterclaim does not contain any factual allegation to that effect, and the counterclaim does not seek damages for defamation or disparagement. Under California law, this extrinsic "fact," which is unconnected to any factual allegation or legal theory asserted in the counterclaim, is not sufficient to trigger coverage under the Travelers policies.

In a similar case, *Storek v. Fidelity & Guaranty Insurance Underwriters, Inc.,* 504 F.Supp.2d 803 (N.D. Cal. 2007), the insureds filed suit against their brother, Glenn Storek, for malfeasance in the management of a family-owned building. Glenn filed a cross-complaint for: an accounting; breach of fiduciary duty; conversion; wasting of trust assets; breach of contract; intentional interference with prospective business advantage; quantum meruit; equitable

**Exhibit "17"**
**279**

Mr. Eric R. Little, Esq.
August 6, 2008
Page 4 of 6

contribution; and fraud. The insureds asked their CGL carrier to provide a defense to the cross-complaint. The insurer denied coverage on the ground that the complaint did not allege potentially covered bodily injury, property damage, personal injury, or advertising injury. In a subsequent declaratory judgment suit against the insurer, the insured argued that they had presented extrinsic evidence showing that they had potential liability to Glenn for covered, but unpled, claims for wrongful eviction and slander, defamation or libel. The court granted summary judgment to the insurer on the grounds that the insurer had no obligation to consider extrinsic evidence unrelated to the claims actually made in the cross-complaint. According to the decision:

> Thus, Plaintiffs argue, insurers have an obligation to provide a defense whenever extrinsic evidence raises the potential for liability.
>
> This syllogism is perhaps supported by the dicta of numerous California cases, but only when the courts' statements are viewed out of context. Placed in its proper context, Plaintiffs' argument is simply contrary to the law. As to the first line of decisions, the cases make it clear that extrinsic evidence is sufficient to compel an insurer to defend only when the evidence pertains to claims actually asserted by the third party. *See, e.g., Horace Mann [Insurance Co. v. Barbara B.], [4 Cal.4th 1076, 1081], 17 Cal.Rptr.2d 210, 846 P.2d 792 [(1993)]* (stating that extrinsic facts "give rise to the duty to defend when they reveal a possibility that *the claim* may be covered by the policy"); *Gray [v. Zurich Ins. Co., 65 Cal.2d 263, 276-277], 54 Cal.Rptr. 104, 419 P.2d 168 [(1966)]* (stating that an insurer's duty to defend is "fixed by the facts which the insurer learns from the complaint, the insured, or other sources," and holding that the insurer has a duty to defend because *the facts pled in the complaint* would have supported alternate, covered claims, notwithstanding "the theory of recovery" actually advanced by the third party); *El-Com Hardware [Inc. v. Fireman's Fund Ins. Co., 92 Cal.App.4th 205, 217], 111 Cal.Rptr.2d 670 [(2001)]* (stating that "extrinsic facts known to the insurer can generate a duty to defend" when "they reveal a possibility the policy *may cover the claim*").
>
> As to the second line of cases regarding the insurer's duty to defend whenever there is the "possibility" or "potential" for coverage, the decisions make clear that this concept, too, is restricted to the nature of the lawsuit actually asserted by the third party. Contrary to Plaintiff's assertion, an insurer owes no duty to defend based upon mere "speculation" as to claims that a third party might have brought. "An insured may not trigger the duty to defend by speculating about extraneous 'facts' regarding potential liability *or ways in which the third party claimant might amend its complaint at some future date*. This approach misconstrues the principle of 'potential liability' under an insurance policy. *Gunderson v. Fire Ins. Exch.*, 37 Cal.App.4th 1106, 1114, 44 Cal.Rptr.2d 272 (1995)…Thus, "the insured may not speculate about unpled third party claims to manufacture coverage." *Hurley Construction Co. v. State Farm Fire & Cas. Co.*, 10 Cal.App.4th 533, 538, 12 Cal.Rptr.2d 629 (1992). That is precisely what plaintiffs purport to do here.

Mr. Eric R. Little, Esq.
August 6, 2008
Page 5 of 6

For whatever reason, Glen decided not to include any allegations about his brothers' "untrue statements" or his exclusion from the Storek Building in his cross-complaint, and he also elected not to advance any claims for wrongful eviction, slander or libel. His complaint thus contains neither the legal claims that would give rise to coverage under the Policy, nor any of the factual allegations that would be necessary to support such claims. Here, as in the Ninth Circuit case of *Microtec Research v. Nationwide Mutual Insurance Co.*, the third party "knew about [the extrinsic facts] before [he] filed suit, perhaps could have sued [based on those facts], but did not." *40 F.3d 968, 971 (9th Cir. 1994).* "Whatever [Glenn's] reasons were for omitting a claim based on [those extrinsic facts], it remains the law of California that when *the underlying suit* raises no potential for a liability covered by the policy, the insurance company's duty to defend is not triggered." *Id.* 504 F. Supp. at 811-812. [Emphasis in the *Storek* opinion.]

*Accord, Gunderson, supra* (extrinsic facts, including complaint letters regarding alleged destruction of a fence and interrogatory responses mentioning destruction of the fence did not trigger a duty to defend where complaint alleged only uncovered claims and none of the extrinsic facts regarding the purported property damage were ever incorporated into the complaint); *Low v. Golden Eagle Insurance Company,* 99 Cal.App.4th 109, 120 Cal.Rptr.2d 827 (2002) (fact that claimant had sustained bodily injury from insured's product did not trigger a duty to defend where claimant chose to forego any bodily injury claim and pursue only uncovered consumer claims); *Sony Computer Entertainment America, Inc. v. American Home Assurance Company,* ___ F.3d ____, 2008 WL 2736012 (9th Cir.) (extrinsic evidence regarding customer complaints about scratches on discs did not trigger duty to defend where allegations of physical damage were never incorporated into third party complaint); and *Butler v. Clarendon America Insurance Co.,* 494 F.Supp.2d 1112 at 1131 (N.D. Cal. 2007) (Insured argued that plaintiff's answer to interrogatories accusing the insured of committing fraud on the small claims court alleged malicious prosecution and triggered the insurer's duty to defend. The court disagreed, noting that the complaint did not allege any potential malicious prosecution tort and that the extrinsic evidence was insufficient to implicate such a claim. "Because an insured may not trigger the duty to defend by speculating about extraneous 'facts' regarding potential liability or ways in which the third party claimant might amend its complaint at some future date, the Court finds no merit in Plaintiff's malicious prosecution coverage theory").

In this case, Hair Art's counterclaim does not contain a single factual allegation that could be construed as defamation or disparagement. Although the interrogatory answer may suggest that Hair Art could have included a claim for defamation or disparagement, or may in the future add a claim for defamation or disparagement, such speculation does not create coverage under the Travelers policies. For whatever reason, Hair Art has chosen not to pursue such theories of liability.

The Travelers policies, therefore, do not provide coverage for the counterclaim. Travelers will not participate in the defense of this counterclaim or attend the scheduled mediation. If Hair Art

Mr. Eric R. Little, Esq.
August 6, 2008
Page 6 of 6

does file an amended counterclaim, please notify the claims adjuster, Vince Marci, immediately. His contact information is:

Vince Marci
205 Lennon Lane
Walnut Creek, CA 94598
Telephone: (925) 945-4465
Fax:    (877) 808-5693
Email: vmarci@travelers.com

In accordance with Section 2695.7(b)3 of the California Insurance Regulations, if you disagree with our determination concerning coverage for this claim, you may have this matter reviewed by the California Department of Insurance, Claims Service Bureau, 300 S. Spring Street, 11th floor, Los Angeles, California 90013, telephone (800) 927-4357 or (213) 897-8921.

The above information is advisory only and is not intended to either encourage or discourage you from contacting the California Department of Insurance.  If you elect to send any correspondence regarding our position concerning coverage for this claim, we ask that you please forward us copies of all such correspondence.

Very truly yours,


Sharon L. Rice

Cc:    Michelle Halverson
       Vince Marci

**EXHIBIT 18**

# LITTLE REID & KARZAI
——LLP——
ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

Eric R. Little, Esq.
erl@lrkllp.com

August 6, 2008

**VIA E-MAIL & FACSIMILE**

Sharon L. Rice, Counsel
Travelers Indemnity Company of Connecticut
Central Coverage Advice Group
215 Shuman Blvd., Suite 106
Naperville, IL 60563
Email: slrice@travelers.com
Fax: 877.816.4731

> Re:   *Angles Beauty Care Group, Inc. v. Hair Art International, Inc.*
>       **United States District Court, Southern District of California, Case No. 05 CV
>       0166 JAH ("*Hair Art*" Action)**

> **Your Insured:**   **Angles Beauty Care Group, Inc. ("Angles")**
> **Your Policy:**    **967X8612 [10/31/2004-10/31/2005]**
> **Your Claim Nos.:**   **MR121101; ABM4957**

Dear Ms. Rice:

We've reviewed Travelers' denial letter of today's date.  The sole basis for Travelers'
denial is Travelers' assertion that Angles is "speculating" that Hair Art International, Inc. ("Hair
Art") is alleging "slander" and "disparagement."  Travelers is wrong on the facts and the law,
and Angles will respond in detail to Travelers' erroneous denial as soon as possible.

Travelers' "speculation" denial, however, is erroneous beyond reasonable dispute. Not
only are "slander" and "disparagement" actionable under the Lanham Act, Hair Art's discovery
responses clearly assert that Hair Art is asserting Angles committed "slander" and
"disparagement" in violation of the Lanham Act.

And were that not enough—and it is—<u>Angles is clearly asserting a separate cause of
action for common law "slander" and "disparagement"</u>.  This separate cause of action—and a

separate cause of action is not required to trigger Travelers' defense and settlement duties—conclusively rebuts Travelers' "speculation" argument.

Travelers' contrary interpretation leads to the inescapable conclusion that Travelers is intentionally placing its financial interests above Angles' financial interests, and that Travelers' denial is unreasonable.

We're enclosing another copy of Hair Art's confidential settlement demand letter, and trust that Travelers will immediately acknowledge its defense and settlement duties and attend the August 13, 2008 settlement conference and fund the entire reasonable settlement of the *Hair Art* Action.

Very truly yours,

Eric R. Little

ERL/bh

(Enclosure)

Cc:     Vince Marci (with enclosure, via facsimile (877.808.5693) and email (vmarci@travelers.com))

# LITTLE REID & KARZAI
——LLP——
## ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Sharon L. Rice, Counsel; Vince Marci | Eric R. Little |

| COMPANY: | DATE: |
|---|---|
| Travelers Indemnity Company of Conn. | 8/6/2008 |

| FAX NUMBER: | TOTAL NO. OF PAGES, INCLUDING COVER: |
|---|---|
| 877.816.4731; 877.808.5693 | 16 |

SENDER'S REFERENCE:

Angles Beauty Care Group, Inc.

RE:

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

**CONFIDENTIALITY NOTICE:** THIS FAX IS PRIVILEGED AND CONFIDENTIAL AND IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED. THE TERM "PRIVILEGED" AND "CONFIDENTIAL" INCLUDES ATTORNEY-CLIENT COMMUNICATIONS, ATTORNEY WORK PRODUCT, TRADE SECRETS AND OTHER PROPRIETARY INFORMATION. NOTHING HEREIN IS INTENDED TO CONSTITUTE A WAIVER OF THE CONFIDENTIALITY OF THIS FAX; IF YOU ARE NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING IS PROHIBITED. IF YOU HAVE RECEIVED THIS FAX IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND DESTROY THE ORIGINAL FAX. THANK YOU.

**Exhibit "18"**
**285**

P. 01

## TRANSACTION REPORT

AUG−06−2008 WED 04:01 PM

BROADCAST

| # | DATE | START TM | RECEIVER | COM TIME | PGS | TYPE/NOTE | | DEPT | FILE |
|---|------|----------|----------|----------|-----|-----------|---|------|------|
| 1 | AUG-06 | 03:49 PM | 18778184731 | 0:06:43 | 16 | SG3 | OK | | 145 |
| 3 | | 03:55 PM | 18778085093 | 0:05:44 | 16 | SG3 | OK | | 145 |
| | | | TOTAL | 0:11:27 | 32 | | | | |

Exhibit "18"
286

# LITTLE REID & KARZAI

——LLP——

## ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

Eric R. Little, Esq.
erl@lrkllp.com

August 7, 2008

**VIA E-MAIL & FACSIMILE**

Sharon L. Rice, Counsel
Travelers Indemnity Company of Connecticut
Central Coverage Advice Group
215 Shuman Blvd., Suite 106
Naperville, IL 60563
Email: slrice@travelers.com
Fax: 877.816.4731

> **Re:** ***Angles Beauty Care Group, Inc. v. Hair Art International, Inc.***
> **United States District Court, Southern District of California, Case No. 05 CV 0166 JAH ("*Hair Art*" Action)**

| | |
|---|---|
| **Your Insured:** | **Angles Beauty Care Group, Inc. ("Angles")** |
| **Your Policy:** | **967X8612 [10/31/2004-10/31/2005]** |
| **Your Claim Nos.:** | **MR121101; ABM4957** |

Dear Ms. Rice:

We have reviewed Travelers' denial letter and provide clarification on Travelers' misunderstanding of the facts and law. The sole basis for Travelers' denial is Travelers' assertion that Angles is speculating that Hair Art International, Inc. ("Hair Art") is alleging slander and disparagement. Travelers, however, is very much aware that Angles is doing no such thing. Angles provided Travelers with Hair Art's discovery responses, i.e. extrinsic facts, on July 24, 2006. Angles provided these responses to show Travelers that Hair Art's claim included slander and disparagement. Angles has not and is not speculating about Hair Art's claims.

As Travelers is well aware, modern procedural rules allow a party to amend affirmative claims at any time before submitting a case to the trier of fact, as long as supporting evidence has been presented. This is particularly important in the duty to defend context because an insured

may discover that a claimant is seeking damages for conduct not expressly alleged in the complaint but for which it may be liable, and that potential liability is covered by insurance. As one California appellate court explained, "In determining whether there is a duty to defend, an insurer is not limited to the facts alleged in the underlying complaint, but may make the determination 'from the total facts it learns from all sources.' " *Saylin v. California Ins. Guarantee Assn.*, 179 Cal.App.3d 256, 263 (1986)(citations omitted). This rule is particularly salient here because Travelers' claim that it has no defense duty is nonsensical when Angles could be found liable for slander or disparagement which would result in Travelers owing indemnity. Travelers position is the exact opposite of California law where the defense duty is broader than the duty to indemnify.

The California Supreme Court not long ago reaffirmed its rule that an insurer owes a defense when it becomes aware of facts that could lead to liability against its insured that would be covered by the policy. "It has long been a fundamental rule of law that an insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement." *Waller v. Truck Ins. Exchange*, 11 Cal.4th 1, 19 (1995). Travelers assertion that Angles is speculating about Hair Art's claim even though the claim is asserted in discovery responses provided in the action misstates California law on speculation. Angles is not speculating about Hair Art's claim, Angles knows Hair Art is claiming slander and disparagement because it has so advised in its discovery responses.

The cases upon which Travelers relies support Angles, not Travelers. Angles retendered its defense to Travelers on July 24, 2006 by presenting extrinsic evidence to show that Hair Art was claiming damage resulting from conduct covered by the Travelers policy. The *Storek* decision, upon which Travelers relies, explains why Travelers owes a defense.

> "Since modern procedural rules focus on the facts of a case rather than the theory of recovery in the complaint, the duty to defend should be fixed by the facts which the insurer learns from the complaint, the insured, or other sources. An insurer, therefore, bears a duty to defend its insured **whenever** it ascertains facts which give rise to the potential of liability under the policy." *Id.* at 276-77, 54 Cal.Rptr. 104, 419 P.2d 168. "[T]hat the precise causes of action pled by the third-party complaint may fall outside policy coverage does not excuse the duty to defend where, under the facts alleged, reasonably inferable, or otherwise known, the **complaint could fairly be amended** to state a covered liability." *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal.4th 643, 654, 31 Cal.Rptr.3d 147, 115 P.3d 460 (2005); *see also El-Com Hardware, Inc. v. Fireman's Fund Ins. Co.*, 92 Cal.App.4th 205, 217, 111 Cal.Rptr.2d 670 (2001) ("The extrinsic facts known to respondent at the time appellants tendered their defense of the [third party] action, considered in light of the complaint's allegations, reveal a possibility of a covered claim.").

*Storek v. Fidelity & Guar. Ins. Underwriters, Inc.*, 504 F.Supp.2d 803, 809 (N.D.Cal. 2007)(emphasis added). The language used by the California Supreme Court does not require the actual amendment of the counterclaim by Hair Art. It is sufficient that Travelers knew of facts which could result in the counterclaim being amended to state a covered liability for slander

or disparagement. In fact, Hair Art has stated in its recent settlement demand letter that it intends to perform this very amendment. Contrary to the discussion in *Storek* relied on by Travelers where the insureds attempted to provide evidence to support their reading of the cross-complaint, Angles has provided actual evidence of Hair Art's claims which are potentially covered by the Travelers policy.

> [T]he cases make it clear that extrinsic evidence is sufficient to compel an insurer to defend only when the evidence pertains to claims actually asserted by the third party. *See, e.g., Horace Mann*, 4 Cal.4th at 1081, 17 Cal.Rptr.2d 210, 846 P.2d 792 (stating that extrinsic facts "give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy" (emphasis added)); *Gray*, 65 Cal.2d at 276-77, 54 Cal.Rptr. 104, 419 P.2d 168 (stating that an insurer's duty to defend is "fixed by the facts which the insurer learns from the complaint, the insured, or other sources," and holding that the insurer had a duty to defend because the facts pled in the complaint would have supported alternate, covered claims, notwithstanding "the theory of recovery" actually advanced by the third party); *El-Com Hardware*, 92 Cal.App.4th at 217, 111 Cal.Rptr.2d 670 (stating that "extrinsic facts known to the insurer can generate a duty to defend" when "they reveal a possibility the policy may cover the claim" ).

*Id.* at 811.

*Gunderson v. Fire Ins. Exchange*, 37 Cal. App. 4th 1106 (1995) is no more helpful to Travelers' position. The plaintiff there purposely did not allege any potentially covered damages because such allegations would have eliminated her claim to title of the property at issue. In *Gunderson*, as in *Storek*, the insured attempted to provide extrinsic evidence that was unrelated to the claims being made by the plaintiff. Moreover, the insured in *Gunderson* tried to rely on extrinsic facts that had not been provided to the insurer during the pendency of the action. Here, Angles presented Travelers with discovery responses provided by Hair Art that set forth the basis for and facts supporting Hair Art's claims against Angles. Angles has not made any attempt to provide evidence that is unrelated to Hair Art's claim, as occurred in the cases upon which Travelers relies.

Travelers relies on two additional cases in which the insured attempted to trigger the defense duty where the entire action was conducted without any fact that evidenced potentially covered liability. In *Low v. Golden Eagle Ins. Co.*, 99 Cal App. 4th 109, 112 (2002), the plaintiff expressly disavowed seeking damages for potentially covered bodily injury, while the insured tried to argue to the contrary. In *Sony Computer Entertainment America, Inc. v. American Home Assurance Co.*, __ F.3d __, 2008 WL 2736012, *11 (9th Cir. 2008), the insured asserted that it provided the insurer with customer complaints regarding property damage but those complaints were never part of the action and the only time any indication that property damage was at issue came in the settlement agreement where the parties inserted "loss of use" as part of the recovery. Like *Gunderson*, this evidence was provided too late to trigger the insurer's defense duty.

Finally, Travelers relies on *Butler v. Clarendon America Ins. Co.*, 494 F. Supp. 2d 1112, 1131 (N.D. Cal. 2007) to support its denial. The underlying plaintiff in *Butler* claimed that the

insured had committed fraud on the small claims court in discovery responses. The insured attempted to convert that fact assertion into a claim for malicious prosecution. The court correctly found that this was insufficient to implicate a claim for malicious prosecution but did not follow binding California law regarding how an insurer's defense duty is triggered by extrinsic evidence. In *Scottsdale, supra*, the California Supreme Court explained that the defense duty is triggered where the complaint allegations, reasonable inferences or facts known show that the complaint **could be amended** to state a potentially covered liability. The *Butler* court found that nothing in the complaint related to a claim for malicious prosecution but wrongfully failed to analyze whether the complaint could be amended to assert the claim. The court erroneously required an actual amendment to the complaint which is contrary to binding California law and Travelers' reliance on this misapplication of California law is misplaced.

While Angles does not believe this finding comports with California law, it is not an issue here. Hair Art asserted an express cause of action under Section 43(a) of the Lanham Act, 15, U.S.C. § 1125(a), which reasonably can include claims for slander or disparagement.

> To state a claim under Section 43(a), a plaintiff must allege (1) that the defendant has made false or misleading statements; (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the advertised goods traveled in interstate commerce; and (5) that there is a likelihood of injury to the plaintiff. *Ditri v. Coldwell Banker*, 954 F.2d 869, 872 (3d Cir.1992) (citing *U.S. Healthcare v. Blue Cross of Gr. Philadelphia*, 898 F.2d 914, 922-23 (3d Cir.1990)).

*Caldon, Inc. v. Advanced Measurement & Analysis Group, Inc.*, 515 F.Supp.2d 565, 578 (W.D.Pa. 2007).

Given that a Lanham Act claim, in order to withstand a Rule 12(b)(6) challenge, must allege elements that include those necessary for claims of disparagement and slander, it is reasonable that a claimant asserting such a claim might identify defamatory or disparaging statements during the discovery process. The discovery process is, after all, the point in litigation when the parties support their asserted claims and defenses with actual evidence. Here, Hair Art claimed, in the litigation, that Angles and some of its representatives made false statements about Hair Art and its products to third parties which resulted in damage to Hair Art's business and reputation. This evidence supports Hair Art's Lanham Act claim, although the facts can also be separately pled as causes of action for slander or disparagement.

The Ninth Circuit supports finding an insurer's defense duty triggered where these kinds of facts are actually asserted by the claimant. In *Microtec Research, Inc. v. Nationwide Mut. Ins. Co.*, 40 F.3d 968, 971 (9th Cir. (Cal.) 1994), the court determined the insurer did not owe a defense because the claimant was not pursuing the disparagement claim available due to advertisements the insured had published.

> Microtec did produce advertisements which arguably disparaged Green Hills' by claiming that Microtec's code was faster than Green Hills' code. Green Hills knew

about the advertisements before it filed suit, perhaps could have sued for disparaging the speed of its compiler, but did not. The complaint conspicuously and carefully omits to allege any wrongdoing with respect to these advertisements. If Microtec had been able to establish that it faced potential liability for those advertisements, it might have arguably had a claim against its insurers under *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 54 Cal.Rptr. 104, 112, 419 P.2d 168, 176 (1966) ("courts do not examine only the pleaded word but the potential liability created by the suit."). Unlike the situation to which the "potential liability" language of *Gray* applies, here there was no potential liability based on the possible disparagement in these advertisements, because Green Hills elected not to make that claim.

Like the cases relied on by Travelers, *Microtec* involved an insured providing evidence that was not part of the underlying plaintiff's claim. Here, Angles did exactly what the Ninth Circuit requires. Angles conducted discovery to ascertain the basis for and evidence supporting Hair Art's claims, and in the course of conducting that discovery, Angles was advised that Hair Art was pursuing claims for slander and disparagement related to its Lanham Act claim. This evidence was immediately provided to Travelers to show that its defense duty was triggered. Instead of recognizing the reasonable likelihood of slander and disparagement being included in a Lanham Act claim, Travelers misrepresents California coverage law by claiming Angles is speculating and that the evidence is unrelated to the counterclaim. Travelers is wrong and owes Angles a defense.

Travelers' improper interpretation leads to the inescapable conclusion that Travelers is intentionally placing its financial interests above Angles' financial interests, and that Travelers' denial is unreasonable.

Very truly yours,

Eric R. Little

ERL/MCR/bh

Cc:    Vince Marci (via facsimile (877.808.5693) and email (vmarci@travelers.com))

# LITTLE REID & KARZAI
——LLP——
## ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

---

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Sharon L. Rice; Vince Marci | Eric R. Little, Esq. |

| COMPANY: | DATE: |
|---|---|
| Travelers Indemnity Co | 8/7/2008 |

| FAX NUMBER: | TOTAL NO. OF PAGES, INCLUDING COVER: |
|---|---|
| 877.816.4731; 877.808.5693 | 6 |

SENDER'S REFERENCE:

Angles Beauty Care Group, Inc.

RE:

Insurance Claim

---

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

---

NOTES/COMMENTS:

**CONFIDENTIALITY NOTICE:** THIS FAX IS PRIVILEGED AND CONFIDENTIAL AND IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED. THE TERM "PRIVILEGED" AND "CONFIDENTIAL" INCLUDES ATTORNEY-CLIENT COMMUNICATIONS, ATTORNEY WORK PRODUCT, TRADE SECRETS AND OTHER PROPRIETARY INFORMATION. NOTHING HEREIN IS INTENDED TO CONSTITUTE A WAIVER OF THE CONFIDENTIALITY OF THIS FAX; IF YOU ARE NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING IS PROHIBITED. IF YOU HAVE RECEIVED THIS FAX IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND DESTROY THE ORIGINAL FAX. THANK YOU.

Exhibit "19"
292

P. 01

# TRANSACTION REPORT

AUG-07-2008 THU 04:08 PM

## BROADCAST

| # | DATE | START TM | RECEIVER | COM TIME | PGS | TYPE/NOTE | | DEPT | FILE |
|---|------|----------|----------|----------|-----|-----------|---|------|------|
| 1 | AUG-07 | 04:03 PM | 18778164731 | 0:02:23 | 6 | SG3 | OK | | 151 |
| 2 | | 04:06 PM | 18778085693 | 0:02:31 | 6 | SG3 | OK | | 151 |
| | | | TOTAL | 0:04:54 | 12 | | | | |

**EXHIBIT 20**



**TRAVELERS**

215 Shuman Blvd., Suite 106
Naperville, IL 60563
Tel: (630) 961-8673
Fax: (877) 816-4731

**Sharon L. Rice, Counsel**
**Central Coverage Advice Group**
Direct Line: (630) 961-8673
e-mail: slrice@travelers.com

August 7, 2008

*__Via E-Mail and United States Mail__*

Eric R. Little, Esq.
Little Reid & Karzai, LLP
3333 Michelson Drive
Suite 310
Irvine, CA 92612

Re:     *Angles Beauty Care Group, Inc. v. Hair Art International, Inc.*
        Case No. 05 CV 0166
        Insured:      Angles Beauty Group, Inc.
        Claimant:     Hair Art International, Inc.
        Claim No.:    ABM4957

Dear Mr. Little:

I have reviewed your correspondence from this morning, including the August 1, 2008 demand letter from Hair Art. I must advise that neither Vince Marci nor I received a copy of this demand letter until this morning. Your letter indicates that you had sent the demand to Travelers earlier. Could you please advise me who you sent the letter to, what date the letter was sent, and by what method the letter was sent so that I can confirm the date of receipt?

I disagree with your statement that Angles has asserted "a separate cause of action for common law 'slander' and 'defamation.'" The phrase "cause of action" refers to allegations in a pleading, and the first amended counterclaim contains no factual allegations of defamation or disparagement in any count, including the Lanham Act count. The earlier interrogatory responses may have suggested that Hair Art *could have* included a cause of action for defamation, but chose not to do so, or could at some point in the future amend the counterclaim to include such a cause of action. As discussed at length in my earlier letter, however, nothing in the interrogatory answers established that the First Amended Counterclaim had alleged any potentially covered claim.

In the August 1, 2008 demand letter, however, Hair Art is certainly asserting a claim, albeit a still unpled claim, for defamation. Travelers, therefore, will investigate this claim and will have a representative attend the August 13, 2008 mediation pursuant to a full reservation of rights. In

Eric Little
August 8, 2008
Page 2 of 4

order for Travelers to prepare for the mediation, would you please provide Vince Marci with all documents Angles Beauty has regarding the source and amount of Hair Art's purported damages, including any documents produced in discovery and any reports prepared by Angles Beauty's or Hair Art's experts.

The demand letter, however, does not trigger coverage for the claims actually pled in the First Amended Counterclaim. Because Travelers' duty to defend is limited to suits rather than claims, and the only potential coverage is for the unpled defamation and/or disparagement claim, Travelers' duty to defend the existing suit is not triggered. In the August 1, 2008 letter, Hair Art's attorney insists that he can prove the elements of a product disparagement claim under the Lanham Act. He omits any mention of one crucial element of such a claim: the disparaging statements must be made "in commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). The representations must: (1) be commercial speech; (2) by a defendant who is in commercial competition with the plaintiff; and, (3) for the purpose of influencing consumers to buy defendant's goods or services; while the representations need not be made in a classic advertising campaign, the statements must be disseminated sufficiently to the relevant public to constitute "advertising" or "promotion." *Coastal Abstract Service, Inc. v. First American Title Insurance Company*, 173 F.3d 725, 734-735 (9th Cir. 1999). The complaint does not allege that Angles Beauty, its officers or its employees made *any* representations, false or otherwise, to anyone. In the interrogatory answers, Hair Art contended that Angles Beauty's officer made one disparaging statement to Hair Art' own sales representative at a trade show and stated that Hair Art *believed* Angles Beauty had made similar statements to other unspecified, unidentified persons. The demand letter states that Angles Beauty's employees have told "members of the trade and potential customers" that Hair Art is pretending to be HAI. None of the documents provided to Travelers, however, indicate that Hair Art has ever contended that Angles Beauty made these statements in commercial advertising or promotion and the extrinsic "facts" contained in the demand letter are not sufficient to show that Count I in the first amended counterclaim is potentially covered. *Cargill, Inc. v. Progressive Dairy Solutions, Inc.*, 2008 WL 2235354 (E.D. Cal. 2008) (Statements made to two of Progressive's customers were not sufficient to prove commercial advertising or promotion); and *Fashion Boutique of Short Hills v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2nd Cir. 2002) (Business harmed by isolated disparaging statements do not have redress under the Lanham Act).

The August 1, 2008 demand letter also states that Hair Art can prove the elements of common law disparagement. Regardless of the accuracy of that statement, however, the First Amended Counterclaim does not allege any facts or legal theories that would establish a cause of action for common law product disparagement. As noted above, the complaint does not allege that Angles Beauty's officers and employees made any statements, false or otherwise, to anyone. The second claim for relief is for common law trademark infringement and that count would not encompass common law product disparagement. The third claim for relief alleges violation of the California Unfair Trade Practices Act. Hair Art, however, does not seek any damages under that count, but instead requests only injunctive relief. Because the claim is not for damages, no coverage would be available for Count III under the Travelers' policy. The fourth claim for relief alleges only the common law tort of "palming off" and that tort is not the equivalent of "product disparagement." The fifth claim for relief again seeks only injunctive relief—

Eric Little
August 8, 2008
Page 3 of 4

cancellation of Angle Beauty's HAI trademark and would not be covered under the Travelers' policy. The sixth claim for relief also seeks only declaratory or injunctive relief and would not be covered. Thus, none of the extrinsic "facts" set forth in the demand letter could be construed to create coverage for the causes of action actually alleged in the First Amended Counterclaim.

In short, neither the factual allegations, the extrinsic "facts" nor the legal theories set forth in the pleadings suggest that the First Amended Counterclaim contains any cause of action potentially covered under the Travelers policy. Travelers, therefore, will not provide a defense to Angles Beauty in this litigation. Because the demand letter, however, could be construed to allege potentially covered, but unpled, claims for defamation and/or common law product disparagement, Travelers will investigate these unpled claims and send a representative to the mediation under a full reservation of rights.

Please refer to the Web Xtend Liability endorsement contained in the policy. The endorsement states, in relevant part:

2.    **Exclusions**

This insurance does not apply to:

a.    **Knowing Violation of Rights of Another**

"Personal injury," "advertising injury" or "web site injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal injury," "advertising injury" or "web site injury."

b.    **Material Published With Knowledge of Falsity**

"Personal injury," "advertising injury" or "web site injury" arising out of oral, written or electronic publication of material, if done by or at the direction of the insured with knowledge of its falsity.

If the insured made the allegedly false statements about Hair Art with knowledge that the statements were false and/or with knowledge that its conduct would violate Hair Art's rights and would inflict "personal injury" or "advertising injury," no coverage would be available for these unpled claims under the Travelers policy.

By investigating these unpled claims under a reservation of rights, and/or participating in any mediation or settlement negotiations, Travelers does not waive any of its rights under the policy, including its right to deny coverage if its investigation establishes that no coverage is available. Travelers' position regarding its obligations under the policy is based on presently known facts and is, by necessity, subject to change as additional allegations and facts are developed. This letter cannot, does not, and is not intended to address each and every provision of the policy. This letter is only intended to address those terms and provisions that appear pertinent at this

Eric Little
August 8, 2008
Page 4 of 4

time in light of the facts currently known to Travelers.  The enumeration of specific rights and coverage defenses herein should not be interpreted as a waiver of any other rights or policy defenses Travelers may have or which may later become apparent.

Very truly yours,


Sharon L. Rice

Cc:    Vince Marci

BLUEBIRD OFFICE SUPPLIES (888) 477-0700 www.bluebirdonline.com

**EXHIBIT 21**

# LITTLE REID & KARZAI
——LLP——
## ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

Eric R. Little, Esq.
erl@lrkllp.com

August 8, 2008

**VIA E-MAIL & FACSIMILE**

Sharon L. Rice, Counsel
Travelers Indemnity Company of Connecticut
Central Coverage Advice Group
215 Shuman Blvd., Suite 106
Naperville, IL 60563
Email: slrice@travelers.com
Fax: 877.816.4731

> **Re:**   ***Angles Beauty Care Group, Inc. v. Hair Art International, Inc.***
> **United States District Court, Southern District of California, Case No. 05 CV 0166 JAH ("*Hair Art*" Action)**

> **Your Insured:**     Angles Beauty Care Group, Inc. ("Angles")
> **Your Policy:**      967X8612 [10/31/2004-10/31/2005]
> **Your Claim Nos.:**  MR121101; ABM4957

Dear Ms. Rice:

    We received your August 7, 2008 letter advising that Travelers would send a representative to the August 13, 2008 mediation. We expect Travelers to participate fully and protect the interests of its insured, Angles. Travelers requested information and advised it would be investigating Hair Art's claims. Unfortunately, Travelers response contained numerous misstatements regarding its duties owed Angles.

<u>Travelers' Defense Duty</u>

    Travelers acknowledges, in your letter, that the discovery responses that Travelers has had knowledge of for more than two years assert a potentially covered claim. Travelers then asserts that it will now, two years after being provided the information, investigate Hair Art's claims of slander and disparagement. Travelers' duty to investigate was triggered when it

received the discovery responses and it cannot now delay performing its contractual duties through a significantly delayed investigation.

Even though Travelers now acknowledges that Hair Art has asserted a potentially covered claim in its discovery responses, Travelers refuses to defend Angles. Travelers takes the unsupported position that the claim must be pled in the amended counterclaim for Travelers defense duty to be triggered. As more fully discussed in our August 7, 2008 letter, Travelers misinterprets California law on the duty to defend. California, unlike Illinois, has long held that an insurer's defense duty is triggered by the complaint allegations and facts extrinsic to the complaint that are known by the insurer, where those facts show that a claim may be potentially covered by the policy. *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 276-77 (1966).

The *Gray* Court and other California Supreme Court decisions have explained that the extrinsic facts that could result in the complaint being amended are sufficient to trigger an insurer's defense duty. See e.g., *Montrose Chem. Co. v. Superior Ct.*, 6 Cal. 4th 287 (1993) and *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal.4th 643, 654 (2005). Travelers' assertion that it has no defense duty because Hair Art's claims for slander and disparagement are unpled in the amended counterclaim is invalid under California law and renders Travelers in admitted breach of its contract with Angles.[1] Travelers can avoid substantial damages by paying Angles' defense expenses from July 24, 2006 through conclusion of the lawsuit.

Travelers also takes the position that because it defends suits and not claims that it can avoid its defense duty. Travelers actually agreed to defend suits seeking damages because of "personal injury" or "advertising injury." The idea that discovery responses, elicited in the course of litigation that set forth facts to support the allegations in the counterclaim, are outside of Travelers' defense duty is ludicrous. Again, Travelers admits that Hair Art is seeking damages because of slander and disparagement – both covered offenses. Hair Art could introduce evidence of these offenses at trial, amend its counterclaim to comply with this proof and obtain a finding of liability against Angles for damages. This is the very reason a defense duty is owed.

If Travelers' assertion were correct, an insurer would never have a duty to defend based upon extrinsic facts even where the insured is ultimately found liable for covered damages. Travelers' position ignores the distinction between its defense duty and its duty to indemnify. Under the facts here, Travelers could owe a duty to indemnify upon a finding of liability against Angles for covered offenses but would not owe a defense until Hair Art actually requested permission to amend its complaint according to the proof it presented at trial. This is unsupported by California law, which finds that the defense duty is broader than the duty to pay and requires an insurer defend its insured when facts, extrinsic to the complaint, show that the insured might be liable for damages covered by the policy.

---

[1] This is further demonstrated by Travelers' discussion at page 2 of its letter in which it admits the Lanham Act claim includes disparagement, but asserts that Hair Art cannot show commercial advertising. Not only is this factually inaccurate but it is not relevant to Travelers' defense duty which is triggered by potential liability not actual liability.

"[A]n insurer has a duty to defend an insured **if it becomes aware of, or if the third party lawsuit pleads,** facts giving rise to the potential for coverage under the insuring agreement. [Citations.] This duty, which applies even to claims that are 'groundless, false, or fraudulent,' is separate from and broader than the insurer's duty to indemnify. [Citation.]" (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19 [44 Cal.Rptr.2d 370, 900 P.2d 619].) The scope of the duty does not depend on the labels given to the causes of action in the third party complaint; instead it rests on whether the alleged facts or known extrinsic facts reveal a possibility that the claim may be covered by the policy. (See *Hurley Construction Co. v. State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 538 [12 Cal.Rptr.2d 629].)

*Atlantic Mutual Ins. Co. v. J. Lamb, Inc.*, 100 Cal.App.4th 1017, 1033-1034 (2002)(emphasis added).

Travelers' discussion of the ability of Hair Art to prove its case is not only contrary to the facts presented in the case but irrelevant to its defense duty. The question of whether Hair Art can prove its claim demonstrates that Angles' liability is possible but not established. Again, the reason Travelers must defend. Moreover, Travelers' reliance solely on Hair Art's settlement demand letter to claim that one element of its Lanham Act claim for disparagement is omitted ignores the previously provided interrogatory responses in which Hair Art claimed slander and disparagement due to Angles' advertising and promotion of itself and its products.

Hair Art claims that Angles' advertising and promotion has led members of the public to believe that Hair Art is an infringer, which Hair Art claims is untrue and that Hair Art has been damaged by this. This is sufficient to trigger Travelers' defense duty under the disparagement offense and is virtually identical to the claim asserted against the insured in *J. Lamb* in which the court found:

Such allegations, in our view, clearly allege a disparagement of both Continental as well as its products. The term "disparagement" has been held to include statements about a competitor's goods that are untrue or misleading and are made to influence potential purchasers not to buy. (See *Sentex Systems, Inc. v. Hartford Acc. & Indem. Co.* (C.D.Cal. 1995) 882 F.Supp. 930, 944.) Whether characterized as a trade libel or product disparagement, an injurious falsehood directed at the organization or products, goods, or services of another falls within the coverage of the Atlantic Mutual policy. The plain language of the Atlantic Mutual policy includes in the definition of "personal injury" the publication of any oral or written statement that not only slanders or libels but also one that disparages an organization or its goods, products, or services. This amounts to coverage for product disparagement and trade libel as well as defamation. (See e.g., *Amerisure Ins. Co. v. Laserage Technology Corp.* (W:D.N.Y. 1998) 2 F.Supp.2d 296, 304 [where the court construed nearly identical policy language and reached the same conclusion].)

*Id.* at 1034. Based on well settled California law, Travelers has a defense duty and, by refusing to defend Angles and continuing in that refusal, has breached its contract with Angles and committed bad faith.

Travelers Settlement Duty

Travelers owes a duty to settle Hair Art's claim because Travelers **must accept any reasonable offer (within policy limits) to settle a potentially covered suit against Angles, irrespective of whether there is actual coverage,** or assume the risk of an excess judgment and all other damages resulting from its failure to settle. *Blue Ridge Ins. Co. v. Jacobsen,* 25 Cal. 4th 489, 498, 22 P.3d 313 (2001). It is critical to note that **the duty to settle cannot be equated with an insurer's obligation to indemnify the insured for a judgment.** Whereas questions of indemnity turn exclusively on what is (or is not) *actually* covered, **these considerations play no part in evaluating an insurer's settlement obligation.** *Johansen v. California State Auto. Ass'n,* 15 Cal. 3d 9, 16, 123 Cal. Rptr. 288, 292 (1975) (insurer cannot consider coverage issues in evaluating the reasonableness of a settlement opportunity); *Blue Ridge,* 25 Cal. 4th at 498 *citing Johansen.*

Here, Hair Art has made a settlement demand within the policy limits of Travelers' policy. Travelers must accept the settlement or risk potential additional damages in an excess judgment. Travelers has been provided information regarding the damages sought by Hair Art for corrective advertising – a damage directly related to the slander and disparagement claims, attorneys' fees which are part of the supplementary payments coverage and proxy damages that are not uninsurable restitution or disgorgement. Travelers will be provided the documents it requested, for the first time, in your August 7, 2008 letter once Travelers executes the attached agreement to be bound by the protective order in place in the lawsuit.

Travelers should remember that coverage issues such as allocation between covered and uncovered claims cannot be properly considered when evaluating and effectuating settlement of a suit against the insured. If the proposed settlement is reasonable, Travelers must agree to fund the entire amount. It cannot seek to allocate amongst the claims[2] and it cannot force the insured to contribute to the settlement. *Hamilton v. Maryland Cas. Co.,* 27 Cal. 4th 718, 731, 117 Cal. Rptr. 2d 318, 328 (2002) Further, there is also no authority allowing one insurer to refuse to settle unless a second insurer agrees to contribute toward the settlement. Travelers must meet its independent settlement obligations to Angles.

---

[2]*Johansen,* 15 Cal. 3d at 10, 16, 19, 123 Cal. Rptr. at 289, 292 (an insurer must accept a reasonable settlement offer within policy limits regardless of doubts as to policy coverage; it is free to seek reimbursement from its insured of a settlement payment if it subsequently establishes noncoverage under its policy). Attempting to allocate between covered and uncovered claims and thereby refusing to pay the entire reasonable settlement amount would be a breach of this duty. *See also United States Fire Ins. Co. v. Green Bay Packaging, Inc.,* 66 F. Supp. 2d 987, 999 (E.D. Wis. 1999), a disparagement case holding that "where there is some evidence that some covered conduct was the basis for the damage award" the entire damage award is covered by the policy. If non-covered conduct and covered conduct together contribute to damages, all of the damages are covered unless it can be proven that the uncovered conduct "was the sole cause of the damages." *Id.*

With these provisions of California law regarding Travelers' settlement duty, Angles provides information regarding the damages claimed by Hair Art. Hair Art intends to present evidence of its damages at trial that Angles infringed and that Hair Art is entitled to damages of a portion of Angles' profit as a proxy for its damages or under the theory of unjust enrichment. Essentially, by claiming Angles' profit as a proxy for its damages, Hair Art is not seeking disgorgement of profit but is asserting that the best way to calculate Hair Art's damages is by reference to Angles' profits. Under the theory of "proxy for the plaintiff's own damages" theory, Hair Art claims that it is required only to prove that it suffered actual harm to its business through lost sales or injury to its reputation and that Hair Art and Angles are competitors. Thus, this damage theory does not require disgorgement or restitution, nor does it require that Hair Art prove its actual lost sales. These are not damages that are uninsurable or that are excluded under the Travelers policy.

Additionally, Hair Art seeks damages to enable it to perform corrective advertising in order to offset the alleged harm caused by Angles' allegedly wrongful conduct. This damage claim alone amounts to $          Finally, Hair Art claims it is entitled to attorneys' fees. An award of attorneys' fees is considered a cost award and not damages under California law. As such, it falls within the supplementary payments provision of the policy. One California appellate court explained that "[e]ven more to the point is *Insurance Co. of North America v. National American Ins. Co., supra*, 37 Cal.App.4th 195, 206-207, which held that costs awarded against the insured because of prevailing party attorney fee clauses applicable in the underlying litigation were part of the supplementary payments section of the policy." *Prichard v. Liberty Mut. Ins. Co.*, 84 Cal. App. 4th 890, 911-912 (2000).

This information, along with Hair Art's settlement demand, evidence that Angles faces potential liability exposure that might be covered under the Travelers policy. This not only implicates Travelers' duty to defend but its duty to settle. We look forward to Travelers working to protect its insured at the mediation and paying its defense expenses from July 24, 2006 to conclusion of the lawsuit.

Very truly yours,

M. Catherine Reid

MCR/bh

(Enclosure)

Cc:    Vince Marci (with enclosure, via facsimile (877.808.5693) and email (vmarci@travelers.com))

Exhibit "21"
302

# LITTLE REID & KARZAI
—— LLP ——
## ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

Eric R. Little, Esq.
erl@lrkllp.com

August 7, 2008

**Via Fax and Email**

Lance A. Labelle
Berger Kahn
2 Park Plaza, Suite 650
Irvine, CA 92614-8516
Fax: 949.474.7265
Email: llabelle@bergerkahn.com

> *Re:*  *Angles Beauty Care Group, Inc. v. Hair Art International, Inc.*
> **United States District Court, Southern District of California, Case No. 05 CV
> 0166 JAH (“*Hair Art*” Action)**
>
> **Hartford's Insured:    Angles Beauty Care Group, Inc. (“Angles”)**
> **Hartford's Policies:    72 SBA LH0763 and others**
> **Your Claim No.: GL0009777890**

Dear Mr. LaBelle:

Jason Beach of The Hartford advised me by email that Hartford has retained you regarding this claim. My understanding is that Hartford is now represented by counsel in this matter, and that I should communicate with you rather than directly with Mr. Beach. Please advise me immediately if my understanding is in error.

I enclose a copy of Angles' August 6, 2008 settlement conference brief, and look forward to your attendance on Hartford's behalf at the August 13, 2008 settlement conference.

Since July 3, I have repeatedly requested that Hartford provide copies of its general liability policies, both primary and excess, effective from the 1998 calendar year through the

termination of coverage. While Mr. Beach has provided excerpts of some policies, Hartford has yet to provide a complete copy of any policy year.

I also note that Mr. Beach has represented that Hartford's general liability coverage continued through October 31, 2002. As a result, Hartford has a duty to defend and settle based on Hartford's "slander" and "disparagement" coverage during the 2001 through 2002 calendar years as well as Hartford's "advertising injury" coverage for the 1998, 1999 and 2000 calendar years.

The Hair Art discovery responses state in pertinent part:

Interrogatory No. 11:

Explain in detail all facts upon which You base Your contention that Richard Ouellette slandered You personally. . . .

Supplemental Response to Interrogatory No. 11:

Richard Ouellette attended a trade show a couple of years ago in his capacity as Angles CEO for the purpose of attracting new customers and increasing the sales of Angles' products and services. Tom Donahue, an independent sales representative from Donahue & Associates in Texas, attended the same show. Mr. Ouellette engaged in conversation with Mr. Donahue. When Mr. Ouellette learned, among other things, that Mr. Donahue represented [Hair Art] and Jackie, Mr. Ouellette stated words to the effect that he was having trouble with [Hair Art] and/or Yu because they were using Angles' name. Mr. Ouellette's statement was false and Mr. Donahue understood it as an accusation that [Hair Art] and Yu were trademark infringers and, thus, engaged in unethical business practices.

[Hair Art] believes that Mr. Ouellette's comment was not an isolated occurrence and that he and other Angles employees, such as Camillo Schuchardt, made similar comments to other persons on other occasions.

Interrogatory No. 20:

Explain in detail all facts upon which You base the allegations in paragraph twenty (20) of the First Amended counterclaim that "[Hair Art] has suffered damage to its business, reputation and goodwill and the loss of profits and sales it would have made but for counterdefendants' conduct." . . .

Supplemental Response to Interrogatory No. 20:

The use by Angles of the name "Hair Art and Information" and its use of the Composite Mark is causing confusion in the marketplace, which Angles has admitted. As a consequence of this confusion, some prospective customers have

labeled [Hair Art] an "infringer" because they wrongly believe that [Hair Art] is a junior user that is infringing the alleged rights of Angles in and to the term "Hair Art and Information" and the Composite Mark. In fact, [Hair Art] is the senior user of the marks that are at issue in the case and being wrongly labeled as an "infringer" is damaging to [Hair Art's] business and reputation.

In addition, as a consequence of Angles use of the "Hair Art and Information" name and the Composite Mark, one of [Hair Art's] long-standing customers, i.e., Sally Beauty, the largest retail seller of beauty products in the United States, cut back its purchases of products from [Hair Art] because its buyers believed that [Hair Art], which sells at the wholesale level, was competing with Sally Beauty at the retail level. This belief was caused by the fact Angles was selling products at the retail level under the "Hair Art and Information" name and the Composite Mark which confused Sally Beauty's buyers into thinking that the products in question originated with [Hair Art].

Moreover, as Camillo Schuchardt testified, at some point between 2001 and 2003, Angles imported and distributed a hair pressing iron that had a very high failure rate. The Composite Mark was affixed to both the iron and the box in which this particular iron was packaged. However, neither the iron nor the box contained Angles' corporate name or its address. Since Angles' failed to affix its name and/or address to the box or the irons in question, a substantial number of persons thought that the irons originated with, or were associated with, [Hair Art] and when the irons failed, it caused these persons to think that [Hair Art] made poor quality products. This injured [Hair Art's] business reputation.

Finally, as a consequence of the confusion Angles is intentionally causing in the marketplace, some prospective customers have dealt with, and purchased from, Angles believing they were dealing with, and purchasing from, [Hair Art].

Interrogatory No. 21:

Explain in detail all facts upon which You base the allegation in paragraph twenty-one (21) of the First Amended Counterclaim that "Counterdefendants' acts of copying and using the HAI Marks in connection with hair-related products and services have caused and will continue to cause irreparable and immediate injury to [Hair Art] for which [Hair Art] has no adequate remedy at law." . . .

Supplemental Response to Interrogatory No. 21:

The use by Angles of the name "Hair Art and Information" and its use of the Composite Mark is causing, and has caused, confusion in the marketplace. Angles has admitted that there is confusion in the marketplace that is being caused by [Hair Art's] use of the "HAIRART" mark and by Angles' concurrent use of the term "Hair Art and Information" and the Composite Mark. Angles has also admitted that some members of the public have labeled [Hair Art] an

"infringer" because they believe, wrongly, that [Hair Art] is a junior user that is infringing the alleged rights of Angles in and to the term "Hair Art and Information" and the Composite Mark.

Angles' employees have reinforced this erroneous belief by telling people in the trade that [Hair Art] and Yu are using Angles' marks, which is tantamount to calling them infringers. In fact, [Hair Art] is the senior user of the marks that are at issue in the case and it is Angles that is using [Hair Art] trademarks. . . .

Hair Art clearly claims damages resulting from statements made by Angles that allegedly disparaged and slandered Hair Art by accusing it of being a trademark infringer. Hair Art also claims that Angles' statements disparaged Hair Art's products by associating them with infringing conduct and defective products. And Hair Art contends that this purportedly wrongful conduct occurred during 2001-03, which includes Hartford's policy periods. I enclose a copy of the discovery responses for your review.

One California appellate court, in addressing a case where the insured accused a competitor of being an infringer, explained the insurer's obligation to defend where facts extrinsic to the complaint show a possibility of coverage under the policy. Here, Hartford's defense duty under its "disparagement" and "slander" coverage is triggered by the extrinsic facts provided in Hair Art's discovery responses.

"[A]n insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement. [Citations.] This duty, which applies even to claims that are 'groundless, false, or fraudulent,' is separate from and broader than the insurer's duty to indemnify. [Citation.]" (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19 [44 Cal.Rptr.2d 370, 900 P.2d 619].) The scope of the duty does not depend on the labels given to the causes of action in the third party complaint; instead it rests on whether the alleged facts or known extrinsic facts reveal a possibility that the claim may be covered by the policy. (See *Hurley Construction Co. v. State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 538 [12 Cal.Rptr.2d 629].)

*Atlantic Mutual Ins. Co. v. J. Lamb, Inc.*, 100 Cal.App.4th 1017, 1033-1034 (2002). The court also explained that the allegations that the insured made statements that its competitor was an infringer to potential customers demonstrated a potential for coverage for the personal injury offense of disparagement.

The term "disparagement" has been held to include statements about a competitor's goods that are untrue or misleading and are made to influence potential purchasers not to buy. (See *Sentex Systems, Inc. v. Hartford Acc. & Indem. Co.* (C.D.Cal. 1995) 882 F.Supp. 930, 944.) Whether characterized as a trade libel or product disparagement, an injurious falsehood directed at the organization or products, goods, or services of another falls within the coverage of the Atlantic Mutual policy. The plain language of the Atlantic Mutual policy

includes in the definition of "personal injury" the publication of any oral or written statement that not only slanders or libels but also one that disparages an organization or its goods, products, or services. This amounts to coverage for product disparagement and trade libel as well as defamation. (See e.g., *Amerisure Ins. Co. v. Laserage Technology Corp.* (W.D.N.Y. 1998) 2 F.Supp.2d 296, 304 [where the court construed nearly identical policy language and reached the same conclusion].)

*Id.* at 1035. Similarly here, Hair Art claims that statements made by Angles about Hair Art and its products were untrue and made for the purpose of influencing customers not to buy Hair Art's products. In fact, Hair Art specifically identifies customers who were influenced by Angles' allegedly disparaging or defamatory statements and claims damages resulting from Angles' allegedly wrongful conduct.

Were there any question that Hair Art is seeking damages for potentially covered "disparagement" and "slander", Hair Art's August 1, 2008 settlement demand letter conclusively establishes such potentially covered damages are sought. I enclose a copy of that settlement demand letter and have marked pertinent passages.

In conclusion, Hartford has an obligation to accept and fully fund any reasonable settlement of the *Hair Art* Action within policy limits since there is a potential for coverage. Accordingly, Angles requests Hartford immediately: (1) acknowledge its defense and settlement obligation; (2) attend the August 13, 2008 settlement conference as ordered; and (3) provide a copy of the applicable policies by email as promised.

Angles looks forward to Hartford's positive response.

Very truly yours,

Eric R. Little

ERL/bh

(Enclosures: Hair Art's August 1, 2008 Settlement Demand Letter; Hair Art's discovery responses; and Angles' August 7, 2008 settlement conference brief.)

Cc:    Richard Ouellette (via e-mail)
       Andrew Skale, Esq. (via e-mail)
       Ben Wagner, Esq. (via e-mail)

# LITTLE REID & KARZAI
—LLP—
## ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Lance A. LaBelle, Esq. | Eric R. Little, Esq. |

| COMPANY: | DATE: |
|---|---|
| Berger Kahn | 8/7/2008 |

| FAX NUMBER: | TOTAL NO. OF PAGES, INCLUDING COVER: |
|---|---|
| 949.474.7265 | 35  (Part 1 of 2) |

SENDER'S REFERENCE:

Angles Beauty Care Group, Inc.

RE:

Insurance Claim

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

**CONFIDENTIALITY NOTICE:** THIS FAX IS PRIVILEGED AND CONFIDENTIAL AND IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED. THE TERM "PRIVILEGED" AND "CONFIDENTIAL" INCLUDES ATTORNEY-CLIENT COMMUNICATIONS, ATTORNEY WORK PRODUCT, TRADE SECRETS AND OTHER PROPRIETARY INFORMATION. NOTHING HEREIN IS INTENDED TO CONSTITUTE A WAIVER OF THE CONFIDENTIALITY OF THIS FAX; IF YOU ARE NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING IS PROHIBITED. IF YOU HAVE RECEIVED THIS FAX IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND DESTROY THE ORIGINAL FAX. THANK YOU.

P. 01

## TRANSACTION REPORT

AUG−07−2008 THU 10:56 AM

TX (MEMORY)

| # | DATE | START TM | RECEIVER | COM TIME | PGS | TYPE/NOTE | | DEPT | FILE |
|---|------|----------|----------|----------|-----|-----------|---|------|------|
| 1 | AUG−07 | 10:49 AM | 4747265 | 0:11:38 | 35 | ECM | OK | | 147 |
| | | | TOTAL | 0:11:38 | 35 | | | | |

P. 01

## TRANSACTION REPORT

AUG-07-2008 THU 11:06 AM

TX (MEMORY)

| # | DATE | START TM | RECEIVER | COM TIME | PGS | TYPE/NOTE | | DEPT | FILE |
|---|------|----------|----------|----------|-----|-----------|---|------|------|
| 1 | AUG-07 | 10:57 AM | 4747266 | 0:09:01 | 35 | SG3 | OK | | 148 |
| | | | TOTAL | 0:09:01 | 35 | | | | |

Exhibit "2"
310

**EXHIBIT 23**

# LITTLE REID & KARZAI
—LLP—
## ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

Eric R. Little, Esq.
erl@lrkllp.com

August 15, 2008

**VIA E-MAIL & FACSIMILE**

Craig D. Aronson
Berger Kahn
2 Parker Plaza, 6th Floor
Irvine, CA 92614-8516
Email: caronson@bergerkahn.com
Fax: (949) 474-7265

    **Re:**   *Angles Beauty Care Group, Inc. v. Hair Art International, Inc.*
          **United States District Court, Southern District of California, Case No. 05 CV
          0166 JAH (*"Hair Art"* Action)**

    **Your Insured:**    **Angles Beauty Care Group, Inc. ("Angles")**
    **Your Policy:**     **72 SBA LH0763 and others**
    **Your Claim Nos.:**  **GL0009777890**

Dear Mr. Aronson:

    As you know, at the settlement conference, held on August 13, 2008, Hair Art made a reasonable settlement demand of _ _ _,_ _, which is well within Hartford's policy limits. Much to our surprise and as a detriment to your insured, Hartford refused to contribute more than ̄ ̄ ̄ towards a settlement demand of $ ̄ ̄ ̄ ̄ ̄ ̄ As a result of Hartford failure to protect the interests of its insured, Angles has lost the opportunity to settle this matter, as the Magistrate ruled in its August 14, 2008 Minute Order that no further settlement conferences will be held.[1] Hartford's actions have prejudiced Angles because it lost an opportunity to accept a reasonable settlement and now must prepare for a costly trial and a possibly higher judgment.

---

[1] A copy of the Court's Minute Order is enclosed for your reference.

**Exhibit "23"**
**311**

As a consequence of Hartford's failure to accept a reasonable settlement demand within policy limits, Hartford is now liable for all damages, including a settlement or judgment in excess of policy limits.

As justification for Hartford's failure to fund the settlement demand, Hartford relied on its erroneous argument that it had no settlement obligation because of a purported statute of limitations defense to Hair Art's allegations.

### An Insurer May Not Rely on the Statute of Limitations To Avoid Coverage

California courts have held that an insurer may not rely on the statute of limitations as a means of avoiding defense, settlement, or coverage obligations. A statute of limitations argument may be advanced in the underlying action, but not by an insurer as a means of avoiding coverage.

In *Garriott Crop Dusting Co. v. Superior Court*, 221 Cal.App.3d 78 (1990), the appellate court observed:

> If the applicable statutes of limitations do ultimately preclude the [underlying plaintiff] from recovering for damage suffered during the [insurer's] policy periods, [the insurer] may be able to withdraw from the defense of the [underlying plaintiff's] action and avoid any obligation to indemnify against an ultimate jury verdict. Effectiveness of a statute of limitations is not a certainty, however; equity may prohibit [the policyholder] from effectively raising the statute of limitations defense. [Citation.] Thus this defense is not a certainty but a mere potentiality, and the duty to initially defend [the policyholder] exists regardless of potentially meritorious defenses to the [underlying plaintiff's] claims. Only after the trial court in the [underlying plaintiff's] action resolves such defenses in [the policyholder's] favor can [the insurer] step away from its contractually imposed obligation 'to defend any suit against the Insured seeking damages on account of such ... property damage, even if any of the allegations of the suit are groundless....' [Citations.]" *Id.* at pp. 796-797.

The appellate court concluded

> The court in the [underlying plaintiff's] action has not ruled on the statute of limitations. Applicability of the defense remains an unknown. [The insurer] may thus not yet rely on the statute as a means of avoiding its coverage duties. Instead, [the insurer] should raise the limitations defense in the substantive action for [the policyholder's] benefit, rather than in the instant action to [the policyholder's] detriment." *Id.* at p. 797.

In *U.K. Abba Products, Inc. v. Employers Ins. of Wausau*, 2002 WL 1998265, *9 (Cal.App. August 29, 2002), the court stated:

Just because an insured has a surefire defense does not mean there is no insurance coverage on the theory that there is no potential covered liability. The point is perhaps best illustrated by *Garriott Crop Dusting Co. v. Superior Court* (1990) 221 Cal.App.3d 783, 796-797, 270 Cal.Rptr. 678, where any liability was clearly barred by applicable statutes of limitations. Even so, there was a duty to defend. After all, courts have been known to misinterpret the statutes of limitations and the possibility of liability still remained. Arguments that go to the merits of a dispute do not demonstrate the absence of potential recovery under the policy.

As the cases above illustrate, a statute of limitation defense does not absolve an insurer from its coverage obligations. In the *Hair Art* Action, the court's ruling of Jan. 11, 2007 on the parties motions for summary judgment, concluded:

> Because of genuine issues of disputed facts of several factors, however, this Court cannot determine as a matter of law whether Defendants were unreasonable in delaying suit for the HAIRART and HAI mark. . . . Accordingly, the Court hereby DENIES summary judgment to Angles based on a laches affirmative defense.

Since a possibility of liability still remains, Hartford owed its insured an obligation to fund the reasonable settlement demand within policy limits. By failing fund the settlement demand because of the statute of limitations argument, Hartford failed to protect its insured and is now liable for all subsequent damages suffered by Angles, regardless of policy limits.

## Statute of Limitations Defense is Not Applicable

Hartford argues that its coverage obligation is barred by the statute of limitations. What Hartford fails to acknowledge is that the claim asserted in the *Hair Art* Action is a Lanham Act claim. The Lanham Act does not contain a statute of limitations. When a federal statute lacks a specific statute of limitations, courts apply the limitations period from the most closely analogous action under state law. In this case, the most analogous state law claims to 43(a) claims, are state trademark infringement and state unfair competition claims. Both claims carry a four year statute of limitations in California. Thus, Hartford statute of limitations defense to coverage is erroneous and inapplicable to this case.

In *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 942 fn. 11 (9th Cir. (Cal.) 2006), the court found:

> The California statute of limitations for . . . state trademark infringement and/or dilution claims, and state unfair competition claims is four years. *See Cal.Code Civ. Proc.* §§ 337, 343. The Lanham Act does not contain a statute of limitations, and therefore Lanham Act claims are governed by the analogous state statute of limitations, which in this case are state trademark infringement and dilution claims under *Cal. Bus. & Prof.Code* §§ 14330 and 14335. *See Jarrow Formulas*, 304 F.3d at 836-37. Therefore, the statute of limitations for all of Plaintiffs' eleven causes of action is four years.

**Hartford's Settlement Duty**

Hartford owes a duty to settle Hair Art's claim because Hartford **must accept any reasonable offer (within policy limits) to settle a potentially covered suit against Angles, irrespective of whether there is actual coverage,** or assume the risk of an excess judgment and all other damages resulting from its failure to settle. *Blue Ridge Ins. Co. v. Jacobsen*, 25 Cal. 4th 489, 498, 22 P.3d 313 (2001). It is critical to note that **the duty to settle cannot be equated with an insurer's obligation to indemnify the insured for a judgment.** Whereas questions of indemnity turn exclusively on what is (or is not) *actually* covered, **these considerations play no part in evaluating an insurer's settlement obligation.** *Johansen v. California State Auto. Ass'n*, 15 Cal. 3d 9, 16, 123 Cal. Rptr. 288, 292 (1975) (insurer cannot consider coverage issues in evaluating the reasonableness of a settlement opportunity); *Blue Ridge*, 25 Cal. 4th at 498 *citing Johansen.*

Hartford is obligated to accept a reasonable settlement offer within policy limits. As the California Supreme Court explained in *Commercial Union Assur. v. Safeway Stores, Inc.*, 26 Cal. 3d 912, 918, 164 Cal. Rptr. 709, 712 (1980):

> One of the most important benefits of a maximum limit insurance policy is the assurance that the company will provide the insured with defense and indemnification for the purpose of protecting him from liability. Accordingly, **the insured has the legitimate right to expect that the method of settlement within policy limits will be employed in order to give him such protection.**

(Emphasis added.)

Where there is an opportunity to settle a suit seeking potentially covered damages within policy limits and the insured would likely face adverse consequences (excess judgment or otherwise) from its continuation, a good faith balancing of the insurer's and insured's interests requires the insurer to accept and fully fund the settlement. *Cathay Mortuary Inc. v. United Pacific Ins. Co.*, 582 F. Supp. 650, 658 (N.D. Cal. 1984).

It is critical to note that **the duty to settle cannot be equated with an insurer's obligation to indemnify the insured for a judgment.** Whereas questions of indemnity turn exclusively on what is (or is not) *actually* covered, **these considerations play no part in evaluating an insurer's settlement obligation.** *Johansen v. California State Auto. Ass'n*, 15 Cal. 3d 9, 16, 123 Cal. Rptr. 288, 292 (1975) (insurer cannot consider coverage issues in evaluating the reasonableness of a settlement opportunity); *Blue Ridge*, 25 Cal. 4th at 498 *citing Johansen.*

Additionally, coverage issues such as allocation between covered and uncovered claims cannot be properly considered when evaluating and effectuating settlement of a suit against the insured. If the proposed settlement is reasonable, Hartford must agree to fund the entire amount. It cannot seek to allocate amongst the claims[2] and it cannot force the insured to contribute to the

---

[2]*Johansen*, 15 Cal. 3d at 10, 16, 19, 123 Cal. Rptr. at 289, 292 (an insurer must accept a reasonable settlement offer within policy limits regardless of doubts as to policy coverage; it is free to seek reimbursement from

settlement. *Hamilton v. Maryland Cas. Co.*, 27 Cal. 4th 718, 731, 117 Cal. Rptr. 2d 318, 328 (2002) Further, there is also no authority allowing one insurer to refuse to settle unless a second insurer agrees to contribute toward the settlement. Hartford must meet its independent settlement obligation to Angles.

Here, Hair Art made a settlement demand within the policy limits of Hartford's policy. Hartford failed to accept the settlement demand and now becomes liable for the full judgment, including any amounts in excess of its policy limits. In *Comunale v. Traders & General Ins. Co.*, 50 Cal.2d 654, 660-61 (1958), the court stated:

> We do not agree with the cases that hold there is no liability in excess of the policy limits where the insurer, believing there is no coverage, wrongfully refuses to defend and without justification refuses to settle the claim. . . . An insurer who denies coverage does so at its own risk, and, although its position may not have been entirely groundless, if the denial is found to be wrongful it is liable for the full amount which will compensate the insured for all the detriment caused by the insurer's breach of the express and implied obligations of the contract. Certainly an insurer who not only rejected a reasonable offer of settlement but also wrongfully refused to defend should be in no better position than if it had assumed the defense and then declined to settle. The insurer should not be permitted to profit by its own wrong.

> A breach which prevents the making of an advantageous settlement when there is a great risk of liability in excess of the policy limits will, in the ordinary course of things, result in a judgment against the insured in excess of those limits.

By refusing a reasonable settlement demand within policy limits, Hartford has prejudiced its insured, has failed to protect the interests of its insured and is now liable for any liability in excess of policy limits.

With respect to Angles' defense costs, we previously forwarded copies of defense invoices from August 30, 2006 through July 16, 2008. We are enclosing herein, additional invoices from January 31, 2006 through July 17, 2006. This makes the total defense fees outstanding $461,594.43 and prejudgment interest through August 31, 2008, $80,072.69, for a grand total of $541,667.12. We request that Hartford immediately honor its defense obligation and reimburse Angles for the defense fees incurred to date.

---

its insured of a settlement payment if it subsequently establishes noncoverage under its policy). Attempting to allocate between covered and uncovered claims and thereby refusing to pay the entire reasonable settlement amount would be a breach of this duty. *See also United States Fire Ins. Co. v. Green Bay Packaging, Inc.*, 66 F. Supp. 2d 987, 999 (E.D. Wis. 1999), a disparagement case holding that "where there is some evidence that some covered conduct was the basis for the damage award" the entire damage award is covered by the policy. If non-covered conduct and covered conduct together contribute to damages, all of the damages are covered unless it can be proven that the uncovered conduct "was the sole cause of the damages." *Id.*

**Exhibit "23"**
**315**

Should you have any questions, please do not hesitate to contact me.

Very truly yours,

Eric R. Little, Esq.

ERL/ntk

(Enclosure:  Minute Order)

## Eric R. Little

| | |
|---|---|
| **From:** | Skale, Andrew [ADSkale@mintz.com] |
| **Sent:** | Thursday, August 14, 2008 10:37 AM |
| **To:** | Eric R. Little |
| **Subject:** | FW: Angles/Hair Art: 2008-08-13 Email from Court re Minute Entry for Today's Mandatory Settlement Conference |

**From:** efile_Information@casd.uscourts.gov [mailto:efile_Information@casd.uscourts.gov]
**Sent:** Wednesday, August 13, 2008 2:56 PM
**To:** efile_Information@casd.uscourts.gov
**Subject:** Activity In Case 3:05-cv-00166-JAH-CAB Angles Beauty Care v. Hair Art Inc, et al Mandatory Settlement Conference

This is an automatic e-mail message generated by the CM/ECF system. Please **DO NOT RESPOND** to this e-mail because the mail box is unattended.

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. **PACER** access fees apply to all other users. To avoid later charges, download a copy each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### Southern District of California

**Notice of Electronic Filing**

The following transaction was entered on 8/13/2008 at 2:56 PM PDT and filed on 8/13/2008
**Case Name:**     Angles Beauty Care v. Hair Art Inc, et al
**Case Number:**     <u>3:05-cv-166</u>
**Filer:**
**Document Number:** 116(No document attached)

**Docket Text:**
**Minute Entry for proceedings held before Magistrate Judge Cathy Ann Bencivengo: Mandatory Settlement Conference held on 8/13/2008. The case did not settle. No further settlement conferences will be held, and parties indicate they are ready to proceed to trial. (ma)**

**3:05-cv-166 Notice has been electronically mailed to:**

Douglas H Morseburg  doug@usip.com, cassandra@usip.com

Andrew D Skale  askale@mintz.com, Docketing@mintz.com, kearle@mintz.com

**Exhibit "23"**
**317**

Benjamin L Wagner bwagner@mintz.com, Docketing@mintz.com, kearle@mintz.com

**3:05-cv-166 Notice has been delivered by other means to:**

--------------------------------------------------------------

IRS CIRCULAR 230 NOTICE

In compliance with IRS requirements, we inform you that any U.S. tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of avoiding tax penalties or in connection with marketing or promotional materials.

--------------------------------------------------------------

STATEMENT OF CONFIDENTIALITY:
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited. Please notify Mintz, Levin, Cohn, Ferris, Glovsky and Popeo immediately at either (617) 542-6000 or at ISDirector@Mintz.com, and destroy all copies of this message and any attachments. You will be reimbursed for reasonable costs incurred in notifying us.

**Exhibit "23"**
**318**

8/15/2008

P. 01

# TRANSACTION REPORT

AUG-15-2008 FRI 04:12 PM

TX (MEMORY)

| # | DATE | START TM | RECEIVER | COM TIME | PGS | TYPE/NOTE | DEPT | FILE |
|---|------|----------|----------|----------|-----|-----------|------|------|
| 1 | AUG-15 | 04:09 PM | 4747265 | 0:02:12 | 9 | SG3    OK | | 160 |
| | | | TOTAL | 0:02:12 | 9 | | | |

Exhibit "23"
319

# LITTLE REID & KARZAI
——LLP——
## ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: | FROM: |
| Craig D. Aronson | Eric R. Little, Esq. |
| COMPANY: | DATE: |
| Berger Kahn | 8/15/2008 |
| FAX NUMBER: | TOTAL NO. OF PAGES, INCLUDING COVER: |
| 949.474.7265 | 8 9 |
| SENDER'S REFERENCE: | |
| Angles Beauty Care Group, Inc., | |
| RE: | |
| Insurance Claim | |

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

**CONFIDENTIALITY NOTICE:** THIS FAX IS PRIVILEGED AND CONFIDENTIAL AND IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED. THE TERM "PRIVILEGED" AND "CONFIDENTIAL" INCLUDES ATTORNEY-CLIENT COMMUNICATIONS, ATTORNEY WORK PRODUCT, TRADE SECRETS AND OTHER PROPRIETARY INFORMATION. NOTHING HEREIN IS INTENDED TO CONSTITUTE A WAIVER OF THE CONFIDENTIALITY OF THIS FAX; IF YOU ARE NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING IS PROHIBITED. IF YOU HAVE RECEIVED THIS FAX IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND DESTROY THE ORIGINAL FAX. THANK YOU.

**Exhibit "23"**
**320**

# LITTLE REID & KARZAI

——LLP——

## ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

Eric R. Little, Esq.
erl@lrkllp.com

August 15, 2008

**VIA E-MAIL & FACSIMILE**

Jeffrey M. Anielski
Osman & Associates
9325 Sky Park Court, #230
San Diego, CA 92123
Email: janielsk@travelers.com
Fax: 858-616-6170

    **Re:**    *Angles Beauty Care Group, Inc. v. Hair Art International, Inc.*
              **United States District Court, Southern District of California, Case No. 05 CV**
              **0166 JAH (*"Hair Art"* Action)**

    **Your Insured:**    Angles Beauty Care Group, Inc. ("Angles")
    **Your Policy:**     967X8612 [10/31/2004-10/31/2005]
    **Your Claim Nos.:**  MR121101; ABM4957

Dear Mr. Anielski:

      As you know, at the settlement conference, held on August 13, 2008, Hair Art made a reasonable settlement demand of        , which is well within Travelers' policy limits.  Much to our surprise and as a detriment to your insured, Travelers refused to contribute more than       towards a settlement demand of      .  As a result of Travelers failure to protect the interests of its insured, Angles has lost the opportunity to settle this matter, as the Magistrate ruled in its August 14, 2008 Minute Order that no further settlement conferences will be held.[1]  Travelers' actions have prejudiced Angles because it lost an opportunity to accept a reasonable settlement and now must prepare for a costly trial and a possibly higher judgment.

---

[1] A copy of the Court's Minute Order is enclosed for your reference.

**Exhibit "24"**
**321**

As a consequence of Travelers' failure to accept a reasonable settlement demand within policy limits, Travelers is now liable for all damages, including a settlement or judgment in excess of policy limits.

As justification for Travelers' failure to fund the settlement demand, Travelers relied on its erroneous argument that it had no settlement obligation because of a purported statute of limitations defense to Hair Art's allegations.

## An Insurer May Not Rely on the Statute of Limitations To Avoid Coverage

California courts have held that an insurer may not rely on the statute of limitations as a means of avoiding defense, settlement, or coverage obligations. A statute of limitations argument may be advanced in the underlying action, but not by an insurer as a means of avoiding coverage.

In *Garriott Crop Dusting Co. v. Superior Court*, 221 Cal.App.3d 78 (1990), the appellate court observed:

> If the applicable statutes of limitations do ultimately preclude the [underlying plaintiff] from recovering for damage suffered during the [insurer's] policy periods, [the insurer] may be able to withdraw from the defense of the [underlying plaintiff's] action and avoid any obligation to indemnify against an ultimate jury verdict. Effectiveness of a statute of limitations is not a certainty, however; equity may prohibit [the policyholder] from effectively raising the statute of limitations defense. [Citation.] Thus this defense is not a certainty but a mere potentiality, and the duty to initially defend [the policyholder] exists regardless of potentially meritorious defenses to the [underlying plaintiff's] claims. Only after the trial court in the [underlying plaintiff's] action resolves such defenses in [the policyholder's] favor can [the insurer] step away from its contractually imposed obligation 'to defend any suit against the Insured seeking damages on account of such ... property damage, even if any of the allegations of the suit are groundless....' [Citations.]" *Id.* at pp. 796-797.

The appellate court concluded

> The court in the [underlying plaintiff's] action has not ruled on the statute of limitations. Applicability of the defense remains an unknown. [The insurer] may thus not yet rely on the statute as a means of avoiding its coverage duties. Instead, [the insurer] should raise the limitations defense in the substantive action for [the policyholder's] benefit, rather than in the instant action to [the policyholder's] detriment." *Id.* at p. 797.

In *U.K. Abba Products, Inc. v. Employers Ins. of Wausau*, 2002 WL 1998265, *9 (Cal.App. August 29, 2002), the court stated:

Just because an insured has a surefire defense does not mean there is no insurance coverage on the theory that there is no potential covered liability. The point is perhaps best illustrated by *Garriott Crop Dusting Co. v. Superior Court* (1990) 221 Cal.App.3d 783, 796-797, 270 Cal.Rptr. 678, where any liability was clearly barred by applicable statutes of limitations. Even so, there was a duty to defend. After all, courts have been known to misinterpret the statutes of limitations and the possibility of liability still remained. Arguments that go to the merits of a dispute do not demonstrate the absence of potential recovery under the policy.

As the cases above illustrate, a statute of limitation defense does not absolve an insurer from its coverage obligations.  In the *Hair Art* Action, the court's ruling of Jan. 11, 2007 on the parties motions for summary judgment, concluded:

> Because of genuine issues of disputed facts of several factors, however, this Court cannot determine as a matter of law whether Defendants were unreasonable in delaying suit for the HAIRART and HAI mark.  . . . Accordingly, the Court hereby DENIES summary judgment to Angles based on a laches affirmative defense.

Since a possibility of liability still remains, Travelers owed its insured an obligation to fund the reasonable settlement demand within policy limits.  By failing fund the settlement demand because of the statute of limitations argument, Travelers failed to protect its insured and is now liable for all subsequent damages suffered by Angles, regardless of policy limits.

## Statute of Limitations Defense is Not Applicable

Travelers argues that its coverage obligation is barred by the statute of limitations.  What Travelers fails to acknowledge is that the claim asserted in the *Hair Art* Action is a Lanham Act claim.  The Lanham Act does not contain a statute of limitations.  When a federal statute lacks a specific statute of limitations, courts apply the limitations period from the most closely analogous action under state law.  In this case, the most analogous state law claims to 43(a) claims, are state trademark infringement and state unfair competition claims.  Both claims carry a four year statute of limitations in California.    Thus, Travelers statute of limitations defense to coverage is erroneous and inapplicable to this case.

In *Miller v. Glenn Miller Productions, Inc.,* 454 F.3d 975, 942 fn. 11 (9th Cir. (Cal.) 2006), the court found:

> The California statute of limitations for . . . state trademark infringement and/or dilution claims, and state unfair competition claims is four years. *See Cal.Code Civ. Proc.* §§ 337, 343. The Lanham Act does not contain a statute of limitations, and therefore Lanham Act claims are governed by the analogous state statute of limitations, which in this case are state trademark infringement and dilution claims under *Cal. Bus. & Prof.Code* §§ 14330 and 14335. *See Jarrow Formulas*, 304 F.3d at 836-37. Therefore, the statute of limitations for all of Plaintiffs' eleven causes of action is four years.

**Travelers Settlement Duty**

Travelers owes a duty to settle Hair Art's claim because Travelers **must accept any reasonable offer (within policy limits) to settle a potentially covered suit against Angles, irrespective of whether there is actual coverage,** or assume the risk of an excess judgment and all other damages resulting from its failure to settle. *Blue Ridge Ins. Co. v. Jacobsen*, 25 Cal. 4th 489, 498, 22 P.3d 313 (2001). It is critical to note that **the duty to settle cannot be equated with an insurer's obligation to indemnify the insured for a judgment.** Whereas questions of indemnity turn exclusively on what is (or is not) *actually* covered, **these considerations play no part in evaluating an insurer's settlement obligation.** *Johansen v. California State Auto. Ass'n*, 15 Cal. 3d 9, 16, 123 Cal. Rptr. 288, 292 (1975) (insurer cannot consider coverage issues in evaluating the reasonableness of a settlement opportunity); *Blue Ridge*, 25 Cal. 4th at 498 *citing Johansen.*

Travelers is obligated to accept a reasonable settlement offer within policy limits. As the California Supreme Court explained in *Commercial Union Assur. v. Safeway Stores, Inc.*, 26 Cal. 3d 912, 918, 164 Cal. Rptr. 709, 712 (1980):

> One of the most important benefits of a maximum limit insurance policy is the assurance that the company will provide the insured with defense and indemnification for the purpose of protecting him from liability. Accordingly, **the insured has the legitimate right to expect that the method of settlement within policy limits will be employed in order to give him such protection.**

(Emphasis added.)

Where there is an opportunity to settle a suit seeking potentially covered damages within policy limits and the insured would likely face adverse consequences (excess judgment or otherwise) from its continuation, a good faith balancing of the insurer's and insured's interests requires the insurer to accept and fully fund the settlement. *Cathay Mortuary Inc. v. United Pacific Ins. Co.*, 582 F. Supp. 650, 658 (N.D. Cal. 1984).

It is critical to note that **the duty to settle cannot be equated with an insurer's obligation to indemnify the insured for a judgment.** Whereas questions of indemnity turn exclusively on what is (or is not) *actually* covered, **these considerations play no part in evaluating an insurer's settlement obligation.** *Johansen v. California State Auto. Ass'n*, 15 Cal. 3d 9, 16, 123 Cal. Rptr. 288, 292 (1975) (insurer cannot consider coverage issues in evaluating the reasonableness of a settlement opportunity); *Blue Ridge*, 25 Cal. 4th at 498 *citing Johansen.*

Additionally, coverage issues such as allocation between covered and uncovered claims cannot be properly considered when evaluating and effectuating settlement of a suit against the insured. If the proposed settlement is reasonable, Travelers must agree to fund the entire amount. It cannot seek to allocate amongst the claims[2] and it cannot force the insured to

---

[2]*Johansen*, 15 Cal. 3d at 10, 16, 19, 123 Cal. Rptr. at 289, 292 (an insurer must accept a reasonable settlement offer within policy limits regardless of doubts as to policy coverage; it is free to seek reimbursement from

contribute to the settlement. *Hamilton v. Maryland Cas. Co.*, 27 Cal. 4th 718, 731, 117 Cal. Rptr. 2d 318, 328 (2002) Further, there is also no authority allowing one insurer to refuse to settle unless a second insurer agrees to contribute toward the settlement. Travelers must meet its independent settlement obligation to Angles.

Here, Hair Art made a settlement demand within the policy limits of Travelers' policy. Travelers failed to accept the settlement demand and now becomes liable for the full judgment, including any amounts in excess of its policy limits. In *Comunale v. Traders & General Ins. Co.*, 50 Cal.2d 654, 660-61 (1958), the court stated:

> We do not agree with the cases that hold there is no liability in excess of the policy limits where the insurer, believing there is no coverage, wrongfully refuses to defend and without justification refuses to settle the claim. . . . An insurer who denies coverage does so at its own risk, and, although its position may not have been entirely groundless, if the denial is found to be wrongful it is liable for the full amount which will compensate the insured for all the detriment caused by the insurer's breach of the express and implied obligations of the contract. Certainly an insurer who not only rejected a reasonable offer of settlement but also wrongfully refused to defend should be in no better position than if it had assumed the defense and then declined to settle. The insurer should not be permitted to profit by its own wrong.

> A breach which prevents the making of an advantageous settlement when there is a great risk of liability in excess of the policy limits will, in the ordinary course of things, result in a judgment against the insured in excess of those limits.

By refusing a reasonable settlement demand within policy limits, Travelers has prejudiced its insured, has failed to protect the interests of its insured and is now liable for any liability in excess of policy limits.

With respect to Angles' defense costs, we previously forwarded copies of defense invoices from August 30, 2006 through July 16, 2008. We are enclosing herein, additional invoices from January 31, 2006 through July 17, 2006. This makes the total defense fees outstanding $461,594.43 and prejudgment interest through August 31, 2008, $80,072.69, for a grand total of $541,667.12. We request that Travelers immediately honor its defense obligation and reimburse Angles for the defense fees incurred to date.

---

its insured of a settlement payment if it subsequently establishes noncoverage under its policy). Attempting to allocate between covered and uncovered claims and thereby refusing to pay the entire reasonable settlement amount would be a breach of this duty. *See also United States Fire Ins. Co. v. Green Bay Packaging, Inc.*, 66 F. Supp. 2d 987, 999 (E.D. Wis. 1999), a disparagement case holding that "where there is some evidence that some covered conduct was the basis for the damage award" the entire damage award is covered by the policy. If non-covered conduct and covered conduct together contribute to damages, all of the damages are covered unless it can be proven that the uncovered conduct "was the sole cause of the damages." *Id.*

Should you have any questions, please do not hesitate to contact me.

Very truly yours,

Eric R. Little, Esq.

ERL/ntk

(Enclosure: Minute Order; Invoices, Invoice Chart)

Cc:      Rosie Partida (with enclosures, via facsimile (866-577-8331) and email (rpartida@travelers.com))

## Eric R. Little

| | |
|---|---|
| **From:** | Skale, Andrew [ADSkale@mintz.com] |
| **Sent:** | Thursday, August 14, 2008 10:37 AM |
| **To:** | Eric R. Little |
| **Subject:** | FW: Angles/Hair Art: 2008-08-13 Email from Court re Minute Entry for Today's Mandatory Settlement Conference |

---

**From:** efile_information@casd.uscourts.gov [mailto:efile_information@casd.uscourts.gov]
**Sent:** Wednesday, August 13, 2008 2:56 PM
**To:** efile_information@casd.uscourts.gov
**Subject:** Activity in Case 3:05-cv-00166-JAH-CAB Angles Beauty Care v. Hair Art Inc, et al Mandatory Settlement Conference

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### Southern District of California

### Notice of Electronic Filing

The following transaction was entered on 8/13/2008 at 2:56 PM PDT and filed on 8/13/2008
**Case Name:**       Angles Beauty Care v. Hair Art Inc, et al
**Case Number:**     3:05-cv-166
**Filer:**
**Document Number:** 116(No document attached)

**Docket Text:**
**Minute Entry for proceedings held before Magistrate Judge Cathy Ann Bencivengo: Mandatory Settlement Conference held on 8/13/2008. The case did not settle. No further settlement conferences will be held, and parties indicate they are ready to proceed to trial. (ma)**

**3:05-cv-166 Notice has been electronically mailed to:**

Douglas H Morseburg  doug@usip.com, cassandra@usip.com

Andrew D Skale  askale@mintz.com, Docketing@mintz.com, kearle@mintz.com

**Exhibit "24"**
**327**

Benjamin L Wagner bwagner@mintz.com, Docketing@mintz.com, kearle@mintz.com

**3:05-cv-166 Notice has been delivered by other means to:**

------------------------------------------------------------

IRS CIRCULAR 230 NOTICE

In compliance with IRS requirements, we inform you that any U.S. tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of avoiding tax penalties or in connection with marketing or promotional materials.

------------------------------------------------------------

STATEMENT OF CONFIDENTIALITY:
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited. Please notify Mintz, Levin, Cohn, Ferris, Glovsky and Popeo immediately at either (617) 542-6000 or at ISDirector@Mintz.com, and destroy all copies of this message and any attachments. You will be reimbursed for reasonable costs incurred in notifying us.

Attorney Work-Product

## Angles Beauty Group Inc.
## Defense Fees by Firm

| Entity | Invoice Date | Invoice No. | Fees | Costs | Total Fees and Costs | No. of Days Accruing Interest Through 8/31/08 | 10% Interest Statement Date 8/31/08 | Total Fees & Costs Plus Interest Through 8/31/08 |
|---|---|---|---|---|---|---|---|---|
| Buchanan Ingersoll | 1/31/2006 | 9881950 | $ 1,624.00 | $ 325.00 | $ 1,949.00 | 943 | $ 503.54 | $ 2,452.54 |
| Buchanan Ingersoll | 2/13/2006 | 9885780 | $ 11,380.00 | $ - | $ 11,380.00 | 930 | $ 2,899.56 | $ 14,279.56 |
| Buchanan Ingersoll | 2/13/2006 | 9885779 | $ 102.50 | $ - | $ 102.50 | 930 | $ 26.12 | $ 128.62 |
| Buchanan Ingersoll | 2/13/2006 | 9885778 | $ 732.50 | $ - | $ 732.50 | 930 | $ 186.64 | $ 919.14 |
| Buchanan Ingersoll | 3/9/2006 | 9892235 | $ 3,046.00 | $ 1,075.00 | $ 4,121.00 | 906 | $ 1,022.91 | $ 5,143.91 |
| Buchanan Ingersoll | 3/31/2006 | 541922 | $ 11,337.00 | $ 238.08 | $ 11,575.08 | 884 | $ 2,803.39 | $ 14,378.47 |
| Buchanan Ingersoll | 4/13/2006 | 9900228 | $ 33,123.00 | $ 743.00 | $ 33,866.00 | 871 | $ 8,081.45 | $ 41,947.45 |
| Buchanan Ingersoll | 5/23/2006 | 9909346 | $ 54,776.00 | $1,606.07 | $ 56,382.07 | 831 | $ 12,836.58 | $ 69,218.65 |
| Buchanan Ingersoll | 6/13/2006 | 9914208 | $26,941.00 | $510.37 | $27,451.37 | 810 | $ 6,091.95 | $ 33,543.32 |
| Buchanan Ingersoll | 7/17/2006 | 9921149 | $ 78,252.50 | $ 1,839.75 | $ 80,092.25 | 776 | $ 17,027.83 | $ 97,120.08 |
| Buchanan Ingersoll | 8/30/2006 | 9932750 | $ 78,827.50 | $617.46 | $ 79,444.96 | 732 | $ 15,932.52 | $ 95,377.48 |
| Buchanan Ingersoll | 10/11/2006 | 9945277 | $ 655.00 | $ 835.28 | $ 1,500.28 | 690 | $ 283.61 | $ 1,783.89 |
| Buchanan Ingersoll | 11/30/2006 | 9960449 | $ 72.50 | $ - | $ 72.50 | 640 | $ 12.71 | $ 85.21 |
| Buchanan Ingersoll | 2/21/2007 | 9984495 | $ 534.50 | $ 5.00 | $ 539.50 | 557 | $ 82.33 | $ 621.83 |
| Buchanan Ingersoll | 2/21/2007 | 9984493 | $ 100.00 | $ - | $ 100.00 | 557 | $ 15.26 | $ 115.26 |
| Buchanan Ingersoll | 2/21/2007 | 9984498 | $ 154.00 | $ - | $ 154.00 | 557 | $ 23.50 | $ 177.50 |
| Buchanan Ingersoll | 3/23/2007 | 9993987 | $ 6,094.50 | $ - | $ 6,094.50 | 527 | $ 879.95 | $ 6,974.45 |
| Buchanan Ingersoll | 3/23/2007 | 9993986 | $ 82.50 | $ - | $ 82.50 | 527 | $ 11.91 | $ 94.41 |
| Buchanan Ingersoll | 3/23/2007 | 9993985 | $ 82.50 | $ 300.00 | $ 382.50 | 527 | $ 55.23 | $ 437.73 |
| Buchanan Ingersoll | 4/12/2007 | 9999213 | $ 87.00 | $ 150.00 | $ 237.00 | 507 | $ 32.92 | $ 269.92 |
| Buchanan Ingersoll | 5/31/2007 | 10011900 | $ 82.50 | $ - | $ 82.50 | 458 | $ 10.35 | $ 92.85 |
| Buchanan Ingersoll | 5/31/2007 | 10011901 | $ 49.50 | $ - | $ 49.50 | 458 | $ 6.21 | $ 55.71 |
| Buchanan Ingersoll | 5/31/2007 | 10011902 | $ 18,460.50 | $ 424.01 | $ 18,904.51 | 458 | $ 2,372.13 | $ 21,276.64 |

1

**Exhibit "24"**
**329**

Attorney Work-Product

## Angles Beauty Group Inc.
## Defense Fees by Firm

| Entity | Invoice Date | Invoice No. | Fees | Costs | Total Fees and Costs | No. of Days Accruing Interest Through 8/31/08 | 10% Interest Statement Date Through 8/31/08 | Total Fees/Costs Plus Interest Through 8/31/08 |
|---|---|---|---|---|---|---|---|---|
| Mintz, Levin, Cohn | 6/10/2007 | 8420950 | $ 18,344.50 | $ 349.03 | $ 18,693.53 | 448 | $ 2,294.44 | $ 20,987.97 |
| Mintz, Levin, Cohn | 7/10/2007 | 8424234 | $ 123.00 | $ - | $ 123.00 | 418 | $ 14.09 | $ 137.09 |
| Mintz, Levin, Cohn | 8/10/2007 | 8428442 | $ 157.00 | $ 7.50 | $ 164.50 | 387 | $ 17.44 | $ 181.94 |
| Mintz, Levin, Cohn | 9/10/2007 | 8431107 | $ 9,174.00 | $ 151.25 | $ 9,325.25 | 356 | $ 909.53 | $ 10,234.78 |
| Mintz, Levin, Cohn | 12/10/2007 | 8441485 | $ 8,943.00 | $ 690.73 | $ 9,633.73 | 285 | $ 699.44 | $ 10,333.17 |
| Mintz, Levin, Cohn | 1/10/2008 | 8444880 | $ 17,507.00 | $ 571.62 | $ 18,078.62 | 234 | $ 1,159.01 | $ 19,237.63 |
| Mintz, Levin, Cohn | 9/17/2007 | 8447021 | $ 17,330.00 | $ 479.71 | $ 17,809.71 | 355 | $ 1,732.18 | $ 19,541.89 |
| Mintz, Levin, Cohn | 2/7/2008 | 8445595 | $ 7,446.15 | $ 158.13 | $ 7,604.28 | 206 | $ 429.17 | $ 8,033.45 |
| Mintz, Levin, Cohn | 3/7/2008 | 8453084 | $ 1,762.32 | $ 1,608.65 | $ 3,370.97 | 177 | $ 163.47 | $ 3,534.44 |
| Mintz, Levin, Cohn | 4/8/2008 | 8455442 | $ 30,974.40 | $ 1,062.70 | $ 32,037.10 | 145 | $ 1,272.71 | $ 33,309.81 |
| Mintz, Levin, Cohn | 5/14/2008 | 8458087 | $ 2,518.65 | $ 273.70 | $ 2,792.35 | 109 | $ 83.39 | $ 2,875.74 |
| Mintz, Levin, Cohn | 6/18/2008 | 8464213 | $ 1,364.00 | $ 622.07 | $ 1,986.07 | 74 | $ 40.27 | $ 2,026.34 |
| Mintz, Levin, Cohn | 7/16/2008 | 8467168 | $ 4,679.00 | $ 0.30 | $ 4,679.30 | 46 | $ 58.97 | $ 4,738.27 |
| **GRAND TOTAL** | | | **$446,950.02** | **$14,644.41** | **$461,594.43** | | **$80,072.69** | **$541,667.12** |

2

**Exhibit "24"**
330

P. 01

TRANSACTION REPORT

AUG-15-2008 FRI 03:48 PM

BROADCAST

| # | DATE | START TM | RECEIVER | COM TIME | PGS | TYPE/NOTE | | DEPT | FILE |
|---|------|----------|----------|----------|-----|-----------|---|------|------|
| 1 | AUG-15 | 03:29 PM | 18586166170 | 0:00:56 | 53 | SG3 | OK | | 157 |
| 2 | | 03:36 PM | 18665778331 | 0:11:18 | 53 | SG3 | OK | | 157 |
| | | | TOTAL | 0:18:14 | 106 | | | | |

**Exhibit "24"**
**331**

# LITTLE REID & KARZAI
—————LLP—————
## ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

---

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Jeffrey M. Anielski; Rosie Partida | Eric R. Little, Esq. |

| COMPANY: | DATE: |
|---|---|
| Travelers Indemnity Co | 8/15/2008 |

| FAX NUMBER: | TOTAL NO. OF PAGES, INCLUDING COVER: |
|---|---|
| 858.616.6170; 866.577.8331 | 52 53 |

SENDER'S REFERENCE:

Angles Beauty Care Group, Inc.,

claim nos. MR121101; ABM4957

RE:

Insurance Claim: Part 1 of 2

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

NOTES/COMMENTS:

**CONFIDENTIALITY NOTICE:** THIS FAX IS PRIVILEGED AND CONFIDENTIAL AND IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED. THE TERM "PRIVILEGED" AND "CONFIDENTIAL" INCLUDES ATTORNEY-CLIENT COMMUNICATIONS, ATTORNEY WORK PRODUCT, TRADE SECRETS AND OTHER PROPRIETARY INFORMATION. NOTHING HEREIN IS INTENDED TO CONSTITUTE A WAIVER OF THE CONFIDENTIALITY OF THIS FAX; IF YOU ARE NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING IS PROHIBITED. IF YOU HAVE RECEIVED THIS FAX IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND DESTROY THE ORIGINAL FAX. THANK YOU.

**EXHIBIT 25**

# LITTLE REID & KARZAI
——LLP——
## ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

Najwa T. Karzai Esq.
ntk@lrkllp.com

August 15, 2008

**VIA E-MAIL & FACSIMILE**

Craig D. Aronson
Berger Kahn
2 Parker Plaza, 6th Floor
Irvine, CA 92614-8516
Email: caronson@bergerkahn.com
Fax: (949) 474-7265

> **Re:** *Angles Beauty Care Group, Inc. v. Hair Art International, Inc.*
> **United States District Court, Southern District of California, Case No. 05 CV 0166 JAH ("*Hair Art*" Action)**

> **Your Insured:**     Angles Beauty Care Group, Inc. ("Angles")
> **Your Policy:**      72 SBA LH0763 and others
> **Your Claim Nos.:**  GL0009777890

Dear Mr. Aronson:

Enclosed please find the Court's August 13, 2008 order setting the *Hair Art* Action's trial for September 30, 2008. Because of Hartford's failure to accept the reasonable settlement demand at the August 13, 2008 settlement conference, Angles has lost the opportunity to settle this action and must now incur substantial fees getting ready for trial and is exposed to an excessive judgment.

Hartford's actions have seriously jeopardized Angles' position in this litigation and with a September 30, 2008 trial date, there is insufficient time to resolve the matter without going to trial. Should Hartford finally decide to honor its obligations and put its insured's interests above its own, please let us know so that we can attempt to salvage the settlement.

Should you have any questions, please do not hesitate to contact me or Eric R. Little..

Very truly yours,

Najwa T. Karzai, Esq.

NTK

cc:    Richard Ouellette (via e-mail)
       Andrew Skale, Esq. (via e-mail)

EXHIBIT 26

# LITTLE REID & KARZAI
——LLP——
## ATTORNEYS AT LAW

3333 Michelson Drive, Suite 310
Irvine, CA 92612
T: (949) 333-1699 • F: (949) 333-1697
www.lrkllp.com

Najwa T. Karzai Esq.
ntk@lrkllp.com

August 15, 2008

**VIA E-MAIL & FACSIMILE**

Jeffrey M. Anielski
Osman & Associates
9325 Sky Park Court, #230
San Diego, CA 92123
Email: janielsk@travelers.com
Fax: 858-616-6170

> **Re:** *Angles Beauty Care Group, Inc. v. Hair Art International, Inc.*
> United States District Court, Southern District of California, Case No. 05 CV
> 0166 JAH ("*Hair Art*" Action)

> **Your Insured:**    Angles Beauty Care Group, Inc. ("Angles")
> **Your Policy:**    967X8612 [10/31/2004-10/31/2005]
> **Your Claim Nos.:**   MR121101; ABM4957

Dear Mr. Anielski:

     Enclosed please find the Court's August 13, 2008 order setting the *Hair Art* Action's trial for September 30, 2008.   Because of Travelers' failure to accept the reasonable settlement demand at the August 13, 2008 settlement conference, Angles has lost the opportunity to settle this action and must now incur substantial fees getting ready for trial and is exposed to an excessive judgment.

     Travelers' actions have seriously jeopardized Angles' position in this litigation and with a September 30, 2008 trial date, there is insufficient time to resolve the matter without going to trial.   Should Travelers finally decide to honor its obligations and put its insured's interests above its own, please let us know so that we can attempt to salvage the settlement.

---

**Exhibit "26"**
**335**

Should you have any questions, please do not hesitate to contact me or Eric R. Little..

Very truly yours,

Najwa T. Karzai, Esq.

NTK

cc:    Richard Ouellette (via e-mail)
       Andrew Skale, Esq. (via e-mail)

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

FILED

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

2008 AUG 20  PM 4:05

## I. (a) PLAINTIFFS
ANGLES BEAUTY CARE GROUP, a California Corporation;
RICHARD OUELLETTE, an Individual

**(b)** County of Residence of First Listed Plaintiff   San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Eric R. Little, Little Reid & Karzai, LLP
3333 Michelson Drive, Suite 310

## DEFENDANTS
FIDELITY & GUARANTY INSURANCE COMPANY, a Minnesota
Corporation

County of Residence of First Listed Defendant    Ramsey
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)

'08 CV 1541 JLS AJB

SOUTHERN DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY _____ DEPU

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)
☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):  28 USC 1338
Brief description of cause:
Insurers breached their duty to defend and settle a lawsuit against their insureds.

## VII. REQUESTED IN
COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S)
IF ANY
(See instructions):   JUDGE  Hon. John A. Houston    DOCKET NUMBER  05cv0166-JAH

DATE
8/19/08

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #  15413    AMOUNT  $350.00    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

MB  08/20/08

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 154313    — MB
* * C O P Y * *
August 20, 2008
16:06:28**

**Civ Fil Non-Pris**
USAO #.: 08CV1541 CIVIL FILING
Judge..: JANIS L. SAMMARTINO
Amount.:                    $350.00 CK
Check#.: BC9092

**Total—>    $350.00**

FROM: ANGLES BEAUTY CARE GROUP,
      ET AL VS FIDELITY & GUARANTY
      INSURANCE CO